BLANK ROME LLP
Attorneys for Defendants
The Chrysler Building
405 Lexington Avenue
New York, New York  10174-0208
(212) 885-5000
Richard V. Singleton (RS-9489)
Alan M. Weigel (AW-0800)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X          ECF CASE

MICHAEL STEPSKI, KIRSTEN STEPSKI, Wife,      :
GEAL RODERICK and BENJAMIN SCHOBER,          :          06 CV 01694 (CM)
                                                       :
                    Plaintiffs,                        :
                                                       :
            -against-                                  :
                                                       :
The M/V NORASIA ALYA, her owners,            :     **LOCAL RULE 56.1**
operators, etc., and MS "ALENA"              :     **STATEMENT IN**
SCHIFFAHRTSGESELLSCHAFT mbH & CO. KG,        :     **SUPPORT OF**
PETER DOEHLE SCHIFFAHARTS-KG,                :     **DEFENDANTS'**
                                                       :     **MOTION FOR**
                    Defendants.                        :     **PARTIAL SUMMARY**
-------------------------------------------------------------------X     **JUDGMENT**


        Defendants MS "ALENA" Schiffahrts GmbH & Co. KG and Peter Doehle

Schiffaharts-KG, owner and manager of M/V NORASIA ALYA ("NORASIA ALYA"),

by their attorneys, Blank Rome LLP, in support of their motion for partial summary

judgment , as and for their short and concise statement of material facts as to which there

exists no genuine issue to be tried, pursuant to Rule 56.1 (a) of the Local Rules of this

Court, state as follows:

**A.    AVA CLAIRE**

**1.    The Vessel and Crew**

1.    AVA CLAIRE was an 18 ton, 42 foot long, wood and fiberglass hulled fishing vessel.  (Affidavit of Richard V. Singleton, Esq. sworn to December 9, 2008 ("Singleton Aff."), Ex. "C" Stepski Tr. 40.)

2.    AVA CLAIRE was outfitted to handle gill nets and was equipped with a hydraulic net hauler operated from a control station aft of the wheel house.  (Ex. "C" Stepski Tr. 42, 131-32, 146.)

3.    On May 22, 2004 the three persons in AVA CLAIRE's crew were Michael Stepski (Stepski"), who was serving as master; and Geal Roderick ("Roderick") and Benjamin Schober ("Schober"), who were serving as deck hands.  (Compl. ¶¶ 11, 13, 14.)

**2.    The Accident on May 22, 2004**

4.    On May 22, 2004, AVA CLAIRE was hauling its gill nets at a location about 30 miles south of Montauk Point, Long Island in the vicinity of the westbound lane of the Ambrose-Nantucket Safety Fairway used by large commercial vessels approaching the Port of New York.  (Singleton Aff. ¶ 8, Ex. "C" Stepski Tr. 226 - 28.)

5.    AVA CLAIRE was fishing in heavy fog when it allegedly collided with a large commercial vessel at about 1233.  (Ex. "C" Stepski Tr. 191, 289; Ex. "D" Roderick Tr. 171; Ex. "E" Schober Tr. 60.)

6.    Stepski testified:

> Q.    What were the visibility conditions as you were leaving the dock heading out to the ocean that day?

     A.     It was calm and foggy.

     Q.     What was the visibility when you started out?

     A.     Started out, it was still dark and it was thick fog, very, very limited.

     Q.     As the sun came up and you could sort of assess the visibility, what was the visibility say at 7:00 or 8:00 in the morning?

     A.     We could probably see a hundred feet off the boat to one yard off the boat maybe, if that much.

     Q.     Did that visibility change up to the time of the collision?

     A.     It stayed pretty steady, thick like that.

     Q.     At the time of the collision, what was the visibility?

     A.     I would have to say less than a quarter mile.

(Stepski Tr. 190 - 91.)

     7.     Roderick testified:

     Q.     What was the fog at that time?  How much visibility do you think you had?

     A.     At what point?

     Q.     When the collision occurred?

     A.     Maybe a hundred feet.

(Ex. "D" Roderick Tr. 171.  <u>See also</u> Ex. "E" Schober Tr. 60 ("probably zero visibility").)

     8.     AVA CLAIRE sank. (Ex. "C" Stepski Tr. 238.)  Stepski, Roderick and Schober entered the water and subsequently entered the boat's liferaft and donned survival suits.  (Id. 238 - 40.)

9.      AVA CLAIRE's Emergency Position Indicating Radio Beacon ("EPIRB") was eventually activated.  (Id. 240 - 41.)

10.     By 1520 local time, AVA CLAIRE's crew was rescued by United States Coast Guard ("USCG") helicopter.  (Singleton Aff., Exs. "F" and "G.")

**B.      NORASIA ALYA**

**1.      <u>The Vessel and Crew</u>**

11.     The Master of NORASIA ALYA on May 22, 2004 was Captain Maciej Kowalewski.  (Declaration of Captain Maciej Kowalewski sworn to December 3, 2008. ("Kowalewski Decl.") ¶1.)

12.     At the time of the alleged collision, Captain Kowalewski had 23 years experience at sea, 10 years as master of 11 different vessels.  (Kowalewski Decl. ¶¶ 2 - 3.)

13.     The NORASIA ALYA is on long term time charter to CSAV Norasia, who controls all of the vessel's movements.  (Kowalewski Decl. ¶5, Ex. "2.")

14.     The NORASIA ALYA is equipped with an S-band and an X-band radar, both fitted with Automatic Radar Plotting Aids ("ARPA") and an Automatic Identification System ("AIS").

15.     Both of the ARPAs and the AIS are connected to an electronic charting display system ("ECDIS") which automatically records and plots the NORASIA ALYA's position and course as well as all targets acquired by the ARPAs or the AIS. (Kowalewski Decl. ¶¶6 - 8.)

16.     ARPA targets will be acquired automatically if they meet the criteria set as collision threats.  They also can be manually acquired by the operator.  The operator can stop the ECDIS from continuing to record a target, but cannot erase a voyage path or a target that has been acquired and recorded.  (Id. ¶9.)

17.     The NORASIA ALYA is also equipped with a "talk-back" system which consists of a microphone on the forecastle and a speaker on the bridge.  The microphone on the forecastle can be left on continuously, allowing the bridge watchstanders to hear any sounds coming from the forecastle or ahead of the vessel.  (Id. ¶10.)

## 2.     NORASIA ALYA's Voyage to the United States

18.     NORASIA ALYA departed Hamburg on May 15, 2004.  After departure, the vessel transmitted it sailing plan to the USCG's Automated Merchant Vessel Rescue System ("AMVER") and made daily noon position reports thereafter.  (Kowalewski Decl., Ex. "4.")

19.     During the transit, the vessel encountered icebergs and an adverse current which delayed its expected arrival by about eight hours.  (Id. ¶13.)

20.     As a result of the delay, the charterer's agent requested that the vessel proceed to Ambrose at full speed in order to arrive in time to make a previously scheduled USCG inspection on May 22, 2004.  (Kowalewski Decl., Ex. "5.")

21.     Although he complied with the charterer's agent's request, he was not under any obligation to do so and could and would have slowed down at any time if necessary for the vessel's safety and to comply with the COLREGS.  (Kowalewski Decl. ¶¶13 - 14.)

3.      **The Transit of the Safety Fairway on May 22, 2004**

22.     As the vessel approached the East Coast of the United States during the early morning hours of May 22, 2004 it began to encounter heavy fog.

23.     Pursuant to the Captain's Standing Orders (Kowalewski Decl., Ex. "6"), the Chief Officer, who stood watch from 0400 to 0800, summoned the Master to the Bridge at 0438 when visibility had reached less than four miles.

24.     Captain Kowalewski remained continuously on the bridge until the vessel arrived at Ambrose, except for a short break for a quick meal and to use the toilet.  (Id. ¶17.)

25.     When he was off the bridge during this period, the bridge was still manned by the officer on watch, who maintained a continuous lookout using the radar until Captain Kowalewski returned.  At no time was the bridge unmanned.  (Id.)

26.     Captain Kowalewski did not leave the bridge at any time between 1100 to 1300.  (Id.)

27.     By 0700, when NORASIA ALYA had reached the extreme end of the Great South Channel off the Nantucket Shoals, visibility had become restricted to the length of the vessel.  (Id. ¶18.)

28.     By 0700, Captain Kowalewski and the officer on watch were relying on radar for navigation.  The vessel began sounding fog signals.  (Id.)

29.     As the vessel approached the eastern end of the westbound Safety Fairway, visibility continued to deteriorate until only the aftermost of the vessel's three cranes

could be seen from the bridge.  Winds and seas were calm with swells less than a foot. (Id. ¶¶18 - 20.)

30.   By 1000, NORASIA ALYA had entered the Safety Fairway on a course of 264° and a speed of 21.9 knots.  (Id. ¶21.)

31.   By 1000, visibility remained restricted and Captain Kowalewski was navigating by continuously monitoring both radars.  (Id.)

32.   Automatic target acquisition for the radars was set for any target approaching less than 6 nm.  An ARPA alarm was set for any target with a closest point of approach ("CPA") of less than 0.5 nm.  The radars were set on a six mile range scale, but Captain Kowalewski periodically adjusted the range scale to three miles to search for close targets.  (Id. ¶¶21 - 22.)

33.   To supplement his lookout capabilities, Captain Kowalewski energized the talk-back system to listen for fog signals ahead of the vessel.  (Id. ¶23.)

34.   The lookout was supplemented by the watch officer, who also monitored the radar and periodically went out on the bridge wing to do a visual search and to listen for fog signals.  (Id.)

35.   By 1000, Two vessels were detected on radar and by AIS ahead of NORASIA ALYA that were also westbound in the Safety Fairway.  (Id. ¶24.)

36.   By 11:00 a.m., NORASIA ALYA had overtaken and passed one of these vessels.  (Kowalewski Decl., Ex. "7.")

37.     Radar contact was also gained on an unidentified non-AIS craft about six miles south of NORASIA ALYA.  This craft was traveling north at about 10 knots and passed about seven miles astern of NORASIA ALYA.  (Id., Ex. "8.")

38.     At approximately 1227, Captain Kowalewski altered NORASIA ALYA's course 10° to starboard to pass the second westbound vessel, later identified as the M/V PODRAVINA, at a distance of 2 nm to port, taking NORASIA ALYA slightly outside the northern boundary of the Northern Safety Fairway.  (Id. ¶27.)

39.     There were no radar or AIS targets detected outside of the Safety Fairway ahead of the vessel.  No fog signals were heard from the talk-back system.  (Kowalewski Decl. ¶27, Ex. "9.")

40.     The fog conditions did not change from 1100-1300.  At the time AVA CLAIRE alleges the collision occurred the visibility was less than 0.1 miles.  (Id. ¶22, Kowalewski Tr. 161, 197, 227.)

**4.     The Voice and Text Messages From the USCG**

41.     At about 1400, Captain Kowalewski heard a voice broadcast on VHF Channel 16 from the USCG about a report of a emergency signal from an Emergency Position Indicating Radio Beacon ("EPIRB") from the fishing vessel AVA CLAIRE. (Kowalewski Decl., Ex. "10.")

42.     He noted the position from the message and determined that he was approximately thirty-two miles past the reported area.  (Id. ¶29.)

43.     Since he had already transmitted his daily AMVER noon position report to the USCG, he expected the USCG Rescue Coordination Center would contact NORASIA ALYA if its assistance was needed.  No such call was received.  (Kowalewski Decl. ¶29.)

44.     At 2247, NORASIA ALYA received a text message from the USGG containing the details of the reported collision between an unidentified commercial vessel and AVA CLAIRE.  (Kowalewski Decl., Ex. "11.")

45.     Upon receipt of this message from the USCG, Captain Kowalewski reviewed the chart and the ECDIS and determined that the position of NORASIA ALYA between 1100 and 1300 was no closer than two miles north of the position reported in the USCG message.  (Id. ¶ 30.)

## C.     POST-ACCIDENT INJURY/TREATMENT

46.     The alleged accident occurred on May 22, 2004, but Stepski did not seek treatment of any kind until July 8, 2004 when, at the suggestion of his attorney, he visited with Dr. Gloria Small, a psychologist.  (Affidavit of Michael E. Unger, Esq., sworn to December 9, 2008 ("Unger Aff."), Ex. "L" Small Tr. 16.)

47.     Roderick waited until July 19, 2004 to seek the assistance of a mental health professional when he also saw Dr. Small, again at the suggestion of his attorney. (Unger Aff., Ex. "L" Small Tr. 102, 116.)

48.     Kirsten Stepski and Schober were never seen by Dr. Small and never sought treatment for their alleged injuries from any other mental health care provider. (Unger Aff., Ex. "L" Small Tr. 15-16.)

49.   Stepski only treated with Dr. Small for a few months and has not seen her since February 2005. (Unger Aff., Ex. "L" Small Tr. 33-37.)

50.   Roderick only met with Dr. Small on three occasions in 2004 and on two occasions in 2006, after providing his deposition. (Unger Aff., Ex. "L" Small Tr. 102, 122.)

51.   Stepski, Roderick and Schober were examined by plaintiffs' expert psychiatrist Dr. Arnold Merriam in May of 2007.  (Unger Aff.  Ex "K.")

52.   Mrs. Stepski was not examined by Dr. Merriam.  (Id.)

53.   After examining the plaintiffs, Dr. Merriam concluded that Stepski, Roderick and Schober would have benefited from treatment and should have received medication to treat their alleged injuries.   (Unger Aff., Ex "K" Merriam Tr. 137-139.)

54.   Dr. Merriam testified that with proper treatment the plaintiffs' prognosis was good.  (Unger Aff., Ex. "K" Merriam Tr. 131).

55.   Dr. Merriam was questioned specifically about whether the plaintiffs would benefit from treatment and medication and testified as follows:

> Q.   What is your prognosis for these three if they do have treatment?
>
> A.   Better than if they are not treated.  The disorder is one that tends to be indelible.  People generally do not return to their former selves ever.   And there is typically a pattern of recurrence during life stress.  But I think each of them deserves a trial of therapy and medication treatment.
>
> Q.   And if they get medication and therapy, how do you expect Mr. Stepski will respond?

A.    I think he probably would respond pretty well.

Q.    What about Mr. Roderick?

A.    Mr. Roderick, I think, is less symptomatic than Mr. Stepski, but still should be treated.  For Mr. Schober, the alcohol substance abuse was exacerbation is central and he needs not only psychiatric treatment for the P.T.S.D., but he also needs to be in alcohol substance abuse counseling or he is going to be in long-term trouble.

                              *   *   *

Q.    You believe it would be beneficial for these three men to be on some kind of medication; is that correct?

A.    Yes, yes.

Q.    Something like Paxil, for instance?

A.    Yes.

Q.    And  the  purpose  being  to  ameliorate  the symptomatology?

A.    Yes.

Q.    And once you ameliorate, it's easier to hopefully get over the hump in terms of these issues that cause anxiety and any other problems; is that right?

A.    Yes.

Q.    You haven't done any investigation in terms of whether these men could get the proper medication prescribed to them?

A.    No.

Q.    Is that something that they should be investigating either themselves or –

A.    They should be in treatment and they should be on medication.

> Q.    Okay.  If they had the resources and the ability to get medication and have treatment, but they haven't undertaken to do so, would that be a failure on their part to assist in their own healing process?
>
> A.    If they had the ability to avail themselves of treatment, they should do so.

(Unger Aff., Ex. "K" Merriam Tr. 131, 137-139.)

56.    Dr. Small testified that she wanted Stepski to continue treating with her but he unilaterally elected to "solve his problems on his own".  (Unger Aff., Ex. "L" Small Tr. 97-99.)

57.    Dr. Small further testified that the alleged injuries could have been successfully treated had Stepski and Roderick continued treating.  (Unger Aff., Ex. "L" Small Tr. 68-69.)

58.    Dr. Small testified optimistically about the expected results of treatment, regarding Stepski as follows:

> Q.    Had Mr. Stepski seen you regularly from July 8th for whatever period you think would have been appropriate, do you anticipate that he would have had a favorable outcome in terms of his treatment?
>
> A.    Probably.  I've worked with many people who suffer from trauma and they have been successfully treated.

(Unger Aff., Ex. "L" Small Tr. 68-69.)

59.    Stepski employed Roderick and Schober but failed to provide medical insurance nor did he offer to pay for any needed psychological treatment for their complaints of post-accident psychological symptoms.  (Singleton Aff., Ex. "D" Roderick Tr. 186-188.)

60.     Despite this, Dr. Small testified that she would have continued treating Roderick on a weekly basis without pay.  (Unger Aff., Ex. "L" Small Tr. 116.)

61.     While Roderick testified that the limited treatment he received was helpful, he nevertheless unilaterally discontinued treating with Dr. Small.  (Singleton Aff., Ex. "D" Roderick Tr. 248.)

62.     Roderick testified that the limited treatment he received helped him:

        Q.     Did the visits with Dr. Small help you?

        A.     A little bit, yes.

        Q.     How did it help?

        A.     Figure out exactly why it's bother—I'm trying to figure out why it's bothering me.

(Singleton Aff., Ex. "D" Roderick Tr. 248.)

63.     For unknown reasons, Roderick missed an appointment with Dr. Small scheduled for August 2, 2004 and did not see her again until November of 2006. (Unger Aff., Ex. "L" Small Tr. 121.)

64.     After seeing Dr. Small twice in 2006, Roderick simply stopped coming. (Unger Aff., Ex. "L" Small Tr. 125.)

65.     Roderick was questioned specifically about the lack of cure, for his alleged injury:

        Q.     Did you have any insurance that paid for these visits?

        A.     At that time, no.

        Q.     Did you pay the doctor?

        A.     Have I? Not yet.

Q.      So I take it then you owe the doctor a fee?

A.      Yes.

Q.      Approximately how much is that?

A.      I think it was $100 a visit.  I don't know.

Q.      So somewhere between $600 and $1,200, you figure?

A.      Roughly, yes.

Q.      Did you see any other medical or mental health professionals for any complaints that you have or symptoms that you have that you relate to the accident?

A.      Not at this time.

Q.      When you say "not at this time," does that indicate that you have a plan to go see mental health professionals or medical professionals in connection with some complaints or symptoms?

A.      If I could afford to, yes.

Q.      Who would you see if you could afford to?

A.      Probably go back to the existing doctor.

Q.      Dr. Small?

A.      Yes.

(See Singleton Aff., Ex. "D" Roderick Tr. 186-188)

Dated:       New York, New York
              December 23, 2008

BLANK ROME LLP

//s//Richard V. Singleton
Richard V. Singleton (RS-9489)
Attorneys For Defendants
The Chrysler Building
405 Lexington Avenue
New York, New York  10174-0208

&

FREEHILL HOGAN & MAHAR LLP
Attorneys for Defendants
80 Pine Street
New York, New York 10005
Telephone: 212-425-1900
Facsimile: 212-425-1901
E-Mail: munger@freehill.com

601230.00001/6689741v.1