`

# EXHIBIT C (PART 1)

Page 1

[1]

[2] UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK

[3]
    MICHAEL STEPSKI, KIRSTEN STEPSKI, Wife,   :
[4] GEAL RODERICK and BENJAMIN SCHOBER,
[5]     Plaintiffs,                    :
[6]
        -against-      Index No.
[7]                              :06 CV 01694
    The M/V NORASIA ALYA, her owners,    (CM)
[8] operators, etc., and MS "ALENA"      :
    SCHIFFAHRTSGESELLSCHAFT mbH & CO.
[9] KG, PETER DOEHLE SCHIFFAHARTS-KG, :
[10]    Defendants.
[11]
[12]
[13]    DEPOSITION of MICHAEL A. STEPSKI, taken by
[14] Defendants at the offices of Messrs. Blank Rome, LLP,
[15] The Chrysler Building, 405 Lexington Avenue, New York,
[16] New York 10174-0208, on Thursday, November 9, 2006,
[17] commencing at 10:25 o'clock a.m., before Annette
[18] Forbes, a Certified Shorthand (Stenotype) Reporter and
[19] Notary Public within and for the State of New York.
[20]
[21]
[22]
[23]
[24]
[25]

Page 2

[1]

[2] APPEARANCES:

[3]
        THOMAS H HEALEY, ESQ.
[4]         Attorney for Plaintiffs
            17 Battery Place, Suite 605
[5]         New York, New York 10004
[6]
[7]     Messrs. STEVENS, HARRIS, GUERNSEY
        & QUILLIAM, P.C.
[8]         Attorneys for Plaintiffs
            351 Main Street
[9]         Niantic, Connecticut 06357
[10] BY:  RONALD F. STEVENS, Esq., of Counsel
[11]
[12]    Messrs. BLANK ROME, LLP
        Attorneys for Defendants
[13]        The Chrysler Building
            405 Lexington Avenue
[14]        New York, New York 10174-0208
[15] BY:  RICHARD V. SINGLETON, Esq., of Counsel
        ALAN M. WEIGEL, Esq., of Counsel
[16]
[17]    Messrs. FREEHILL, HOGAN & MAHAR, LLP
        Attorneys for Defendants
[18]        80 Pine Street
            New York, New York 10005
[19]
        BY·  MICHAEL E. UNGER, Esq., of Counsel
[20]
[21] ALSO PRESENT.
[22]    Kirsten Stepski
[23]    Geal Roderick
[24]
[25]

Page 3

[1]                          *Stepski*
[2] M I C H A E L A. S T E P S K I, called as
[3] a witness, having been first duly sworn by
[4] Annette Forbes, a Notary Public within and
[5] for the State of New York, was examined and
[6] testified as follows:
[7]                   **DIRECT EXAMINATION**
[8]                   **BY MR. SINGLETON:**
[9]    **Q:** Would you state your full name for
[10] the record, please?
[11]    **A:** Michael Alexander Stepski.
[12]    **Q:** What is your residence address,
[13] Mr. Stepski?
[14]    **A:** 140 Four Mile River Road, Old Lyme,
[15] Connecticut 06371.
[16]    **Q:** How long have you lived there?
[17]    **A:** About two years.
[18]    **Q:** Where did you live before that?
[19]    **A:** Ledyard, condominium in Ledyard, 1J
[20] Lakeside Drive.
[21]    MR. HEALEY: Off the record.
[22]    (Discussion off the record.)
[23]    MR. SINGLETON: Back on the
[24] record.
[25]    **Q:** How long did you live at that prior

Page 4

[1]                          *Stepski*
[2] address?
[3]    **A:** About two years.
[4]    **Q:** Are you a resident of Connecticut?
[5]    **A:** Yes.
[6]    **Q:** And how long have you been in
[7] Connecticut?
[8]    **A:** My entire life.
[9]    **Q:** Are you married?
[10]    **A:** Yes.
[11]    **Q:** How long have you been married?
[12]    **A:** Two years.
[13]    **Q:** When is the exact date that you got
[14] married?
[15]    **A:** I can't remember off the top of my
[16] head.
[17]    MR. SINGLETON: Off the
[18] record.
[19]    (Discussion off the record.)
[20]    MR. SINGLETON: Back on the
[21] record.
[22]    **A:** September, I don't remember.
[23]    MR. HEALEY: We will get it.
[24]    **Q:** Were you married when this incident
[25] that's brought us all together here occurred?

Page 5

[1]                          *Stepski*
[2]    **A:** Yes.
[3]    **Q:** What is your wife's full name?
[4]    **A:** Kirsten Stepski. Kirsten Ann
[5] Stepski.
[6]    **Q:** How old are you?
[7]    **A:** Thirty-one.
[8]    **Q:** How old?
[9]    **A:** Thirty-one.
[10]    **Q:** You have to keep your voice up
[11] because we have a big room here and a lot of
[12] people.
[13]    I'm going to save the question of
[14] how old your wife is for her.
[15]    What is your present employment?
[16]    **A:** Commercial fisherman.
[17]    **Q:** Let me just explain a little bit,
[18] now that I have some of your facts down, what's
[19] going to happen.
[20]    I'm sure your lawyer has advised
[21] you, so much of what I say, I hope, is going to be
[22] pretty clear.
[23]    Before I do that, I am actually the
[24] lawyer, along with Alan Weigel and Mike Unger,
[25] representing the NORASIA ALYA, her owners in this

Page 6

[1]                          *Stepski*
[2] matter.
[3]    You have brought a lawsuit against
[4] NORASIA ALYA alleging that that ship struck and
[5] sunk your fishing vessel in May of 2000.
[6]    I'm going to be asking you a series
[7] of questions, it's probably going to take most of
[8] the day, if not all day, about your business, your
[9] boat, your history, what you have done and the
[10] events of that day.
[11]    What I want you to do and what you
[12] are under oath to do here is to answer those
[13] questions honestly, completely.
[14]    If you don't understand my question,
[15] tell me. I'm happy to rephrase it for you.
[16]    My goal is not to confuse or trick
[17] you. My goal is to just get out the facts as you
[18] remember them or know them.
[19]    If you feel like your mind is
[20] getting fuzzy or cluttered and you want to take a
[21] break, tell me. So long as we are not in the
[22] middle of something crucial, I am happy to
[23] accommodate you.
[24]    Do you have any questions of what I
[25] have just told you?

Page 7

**Stepski**

[1]
[2] A: No.
[3] MR. HEALEY: You have stated
[4] exactly what we have stated. We are
[5] in agreement with what you are going
[6] to do and his role.
[7] Q: If I ask you a question, regardless
[8] of whether your counsel objects or not, you are
[9] under an obligation to answer that question, you
[10] must answer it.
[11] It's only if your counsel instructs
[12] you not to answer the question that you can refuse
[13] then to answer a question on advice of your
[14] counsel.
[15] Do you understand that?
[16] A: Yes.
[17] Q: Have you ever been deposed before?
[18] A: No.
[19] Q: Have you ever testified at trial
[20] before?
[21] A: No.
[22] Q: Have you ever sat in on a live trial
[23] before?
[24] A: Just small charges in court, a
[25] friend's case.

Page 8

**Stepski**

[1]
[2] Q: Was this court in Connecticut?
[3] A: Yes.
[4] Q: Were you there to be a witness or
[5] were you just there to listen?
[6] A: Just to listen.
[7] Q: Have you ever been charged with a
[8] crime before?
[9] A: I had a DWI some years ago. It's
[10] about eight years ago.
[11] Q: What was the disposition of that
[12] matter?
[13] A: I had to go through an alcohol
[14] course. I didn't lose my license.
[15] I think it was about — there was
[16] also a couple of other charges with that one. I'm
[17] trying to think. Attempted assault on an officer.
[18] I think that was it.
[19] Q: Were you convicted of the attempted
[20] assault on the officer?
[21] A: I don't believe so. I can't say for
[22] sure. I don't remember.
[23] MR. HEALEY: Keep your voice
[24] up.
[25] Q: Did you have a lawyer represent you

Page 9

**Stepski**

[1]
[2] in connection with that?
[3] A: Yes.
[4] Q: Who was that lawyer?
[5] A: Ron Stevens.
[6] Q: What year did this occur? What year
[7] were you charged with this crime?
[8] A: I think it was about eight years
[9] ago, but I can't say for sure.
[10] Q: Have you been charged with any
[11] crimes since then?
[12] A: No.
[13] Q: Arrested for any reason?
[14] A: No — wait, I did have another.
[15] I got arrested for driving without a
[16] license, insurance rather, I think that was before
[17] that. I'm pretty sure those were the only two I
[18] got charged.
[19] Q: What court did you appear in? Was
[20] this in Connecticut?
[21] A: Yes.
[22] Q: What court did you appear in?
[23] A: In New London. Not the superior
[24] court, it's the other one, the smaller one.
[25] Q: Do you remember?

Page 10

**Stepski**

[1]
[2] A: I don't know what they call it.
[3] Q: We can find that out. Maybe your
[4] lawyer can let us know.
[5] Now, are you taking any medications
[6] right now?
[7] A: No.
[8] Q: In the past 24 hours have you taken
[9] any kind of medication that may affect your
[10] ability to understand my questions and respond
[11] truthfully to them?
[12] A: No.
[13] Q: Do you have any medical conditions
[14] for which you are not taking medication that may
[15] affect your ability to understand my questions and
[16] respond to them?
[17] A: No.
[18] Q: What is your eyesight?
[19] A: What is it?
[20] Q: 20/20, 20/40?
[21] A: I don't know. It's fair though.
[22] Q: Do you wear glasses or contact
[23] lenses?
[24] A: No.
[25] Q: When was the last time you had your

Page 11

[1]                    *Stepski*
[2] eyesight checked by anybody essentially?
[3]    A: That would be my last physical, I
[4] believe. That was maybe three years ago.
[5]    Q: Who was the doctor that administered
[6] that physical?
[7]    A: I don't remember his name. I can
[8] probably get it to you.
[9]    MR. SINGLETON: Do we have it
[10] already?
[11]   MR. HEALEY: I don't think so.
[12] We will get it for you.
[13]   You can make a note. If we
[14] can find it, I will supply it to you.
[15]                 BY MR. SINGLETON:
[16]   Q: The doctor that actually performed
[17] the physical, actually gave you a physical
[18] examination to test your vision?
[19]   A: I can't say for sure.
[20] I'm assuming that's when my last
[21] eyesight was. I did get one when I went to renew
[22] my license or went to get a motorcycle license. I
[23] passed that fine.
[24]   Q: When did you obtain that motorcycle
[25] license?

Page 12

[1]                    *Stepski*
[2]    A: I don't know. It was probably
[3] around 2000.
[4]    Q: Is that the same year you had the
[5] eye exam by the Motor Vehicles Administration?
[6]    A: Yes, if that happened. I can't say
[7] that's the year for sure. I don't remember.
[8]    Q: So at least between that time and
[9] the present, you haven't had any vision
[10] examination except perhaps this physical that was
[11] three years ago?
[12]   A: Right.
[13]   Q: Did you review any documents to
[14] prepare yourself to come testify here today?
[15]   A: Yes.
[16]   Q: Tell me what it is that you
[17] reviewed.
[18]   A: I went over my claim, basically the
[19] whole accident, everything that happened and
[20] everything that's been continuing to affect me.
[21]   Q: My question though is really not
[22] whether you did anything to prepare yourself, my
[23] question is did you look at any documents?
[24]   A: I looked at my claim documents.
[25]   Q: When you say your claim, do you mean

Page 13

[1]                    *Stepski*
[2] the sheet you prepared with various figures on it
[3] evidencing what your catches had been and what
[4] your losses are?
[5]    A: Basically, yes.
[6]    Q: Anything else?
[7]    A: I don't remember.
[8]    Q: Did you look at a chart before to
[9] prepare yourself to come here to testify today?
[10]   A: Yes.
[11]   Q: Do you remember which chart you
[12] looked at?
[13]   A: Basically a chart of this area.
[14]   Q: I am going to show you a chart, it's
[15] the chart labeled Approaches to New York, chart
[16] No. 12300, Loran-C, and it's the fourth edition,
[17] March '05.
[18]   Is this the chart that you looked
[19] at?
[20]   A: (Perusing document.) Yes. This one
[21] I had on my boat. I actually had a couple of
[22] different charts, one of this and one of the
[23] smaller area, looking at those.
[24]   Q: By smaller area, you just outlined
[25] with your hands an area on this chart.

Page 14

[1]                    *Stepski*
[2]    Would you do that again and try to
[3] identify more precisely what you are talking
[4] about?
[5]    A: Basically the area (indicating). I
[6] can't exactly say. Just one I had on my boat I
[7] looked at.
[8]    Q: That's a chart you have on your boat
[9] now?
[10]   A: Yes.
[11]   Q: Do you know what the chart number of
[12] that chart was?
[13]   A: No.
[14]   Q: When you say it's a chart that
[15] covers a smaller area than the chart covered by
[16] the chart in front of you now, SR 12300; is that
[17] correct?
[18]   A: I believe so.
[19]   Q: A smaller geographic area?
[20]   A: The one I have on the boat is a
[21] waterproof one and I don't believe it goes all the
[22] way down this far, but I can't say.
[23]   Q: Does it show New York on it?
[24]   A: It shows Long Island. I don't
[25] remember if it shows New York. I know I have this

Page 15

**Stepski**

[1]
[2] one and I definitely looked at this one.
[3]     And there was a chart that we had
[4] gone over in our — I believe it's the same one
[5] here.
[6]     **Q:** This chart, the chart of a smaller
[7] geographic area.
[8]     Did you say there was a third chart
[9] you looked at?
[10]    **A:** That was the chart that we had in
[11] our office, lawyer's office, that we looked at. I
[12] tried to describe the area where I got hit.
[13]    **Q:** It was not this chart or the smaller
[14] chart that you described previously?
[15]    **A:** I think it was this one, but I don't
[16] know.
[17]    **Q:** Did the charts you reviewed have any
[18] marks on them, any pencil marks that weren't on
[19] the printed chart?
[20]    **A:** Yes. We had marks of, outlining
[21] some of the — wait, there was also a smaller
[22] chart, a paper chart that we had, as well, that
[23] had, we had drawn some lines on it because you
[24] couldn't see the lines pretty well, the Loran
[25] lines. That's why I go by the Loran lines.

Page 16

**Stepski**

[1]
[2]     **Q:** Who drew the lines on the paper
[3] chart?
[4]     **A:** That was Terry that works with Tom
[5] Healey.
[6]     **Q:** Did you draw any of the lines
[7] yourself?
[8]     **A:** No.
[9]     **Q:** You said there were also lines on
[10] the printed chart, the nautical chart.
[11]    Did you draw any marks or lines on
[12] that chart yourself?
[13]    **A:** No.
[14] I don't believe I said there was
[15] marks on the big chart.
[16]    **Q:** I'm sorry.
[17] So your testimony is that the only
[18] chart you remember marks on was this smaller paper
[19] drawing that had been prepared; is this correct?
[20]    **A:** Yes.
[21]    **Q:** By Terry, is Terry's last name
[22] Gargan?
[23]    **A:** Yes.
[24]    **Q:** Apart from the chart —
[25]    MR. HEALEY: You should

Page 17

**Stepski**

[1]
[2] distinguish. We have three charts.
[3]     **Q:** Apart from the charts that you
[4] reviewed, did you review any other documents in
[5] order to prepare yourself to testify?
[6]     **A:** Could you give an example?
[7]     **Q:** Documents, any piece of paper, any
[8] piece of paper that was shown to you or that you
[9] had in your own file and pulled out and looked at?
[10]    **A:** No. The Coast Guard report, of
[11] course.
[12]    **Q:** Coast Guard report, the charts.
[13] How about any documents about your
[14] ownership of the vessel?
[15]    **A:** Of my ownership of my vessel?
[16]    **Q:** Yes.
[17]    **A:** Oh, yes. We had all sorts of
[18] receipts, logbooks that I have written, basically
[19] all the paperwork on the boat, the documentation,
[20] permits, all that kind of stuff.
[21]    **Q:** And you reviewed all that before
[22] coming here to testify?
[23]    **A:** Yes. I didn't go through
[24] everything. I just basically reviewed the Coast
[25] Guard report and the charts.

Page 18

**Stepski**

[1]
[2]     **Q:** For what purpose did you review the
[3] Coast Guard reports?
[4]     **A:** I just wanted to have a good idea of
[5] everything that happened the way the Coast Guard
[6] saw it and that's basically it.
[7]     **Q:** Did you read the entire Coast Guard
[8] report, including something called a statement of
[9] facts?
[10]    **A:** Yes.
[11]    **Q:** Were you surprised at anything
[12] contained in that report?
[13]    **A:** Surprised?
[14]    **Q:** Yes.
[15]    **A:** No. I don't believe so.
[16]    **Q:** Do you believe you saw anything in
[17] that report that was incorrect?
[18]    **A:** They said that one of my crew
[19] members had been drinking before the accident,
[20] which wasn't true, to the best of my knowledge.
[21]    **Q:** Was that Mr. Schober?
[22]    **A:** Yes.
[23]    **Q:** Well, do you have any idea what the
[24] basis of the Coast Guard statement was that
[25] Mr. Schober had been drinking before the accident?

Page 19

Stepski

[1]
[2] A: Basis?
[3] Q: Yes.
[4] A: I think — I think they said that he
[5] had told them he was drinking, but when I asked
[6] him, he said he hadn't been. I believe it was
[7] after the accident.
[8] Q: Assuming for a second the Coast
[9] Guard just didn't make this up, is it your
[10] testimony that you believe the basis of the entry
[11] in the Coast Guard report was that Mr. Schober had
[12] told the investigating officer or someone in the
[13] Coast Guard that he had been drinking before the
[14] accident?
[15] Is that what your belief is?
[16] A: Do I believe that he told them?
[17] Q: Yes. Do you believe that's the
[18] reason the Coast Guard put it in the report, what
[19] I just stated?
[20] A: No. They must have made a mistake.
[21] Q: You think the Coast Guard made a
[22] mistake?
[23] A: Yes.
[24] Q: If I understood you right though,
[25] Mr. Schober, you asked him about this, this

Page 20

Stepski

[1]
[2] specific entry in the Coast Guard report and he
[3] denied that he ever said that; is that correct?
[4] A: Yes.
[5] Q: When did you ask him that?
[6] A: This is quite a while back. It was
[7] shortly after we got the report.
[8] Q: Did you look at any photographs to
[9] prepare yourself to come here and testify today?
[10] A: No. Just the ones in the report and
[11] my boat.
[12] Q: Did you look at any photographs?
[13] A: All the pictures in the Coast Guard
[14] report. The pictures of my boat and the ship, the
[15] bow of the ship that hit us.
[16] Q: So outside of the pictures that were
[17] in the Coast Guard report and the pictures of your
[18] boat, did you look at any other photographs before
[19] coming here today?
[20] A: No.
[21] Q: Have you looked or have you
[22] discussed with anybody the appearance or the way
[23] the NORASIA ALYA looks?
[24] A: No. Just the pictures that I saw in
[25] the report.

Page 21

Stepski

[1]
[2] Q: Has anyone told you that your
[3] counsel actually inspected the NORASIA ALYA about
[4] a week ago or so?
[5] A: Yes.
[6] Q: This past Sunday.
[7] Has anyone, either your counsel or
[8] anyone else, described to you the appearance of
[9] any part of the NORASIA ALYA?
[10] MR. HEALEY: I don't think you
[11] can ask him what we were talking
[12] about. Anyone else.
[13] I'm objecting just to the
[14] form. I'm not stopping him from
[15] answering, I'm putting it in form.
[16] If you think it's good in
[17] form, go ahead.
[18] Q: Did your counsel or anyone else that
[19] you are aware of that participated in that
[20] inspection provide any information to you about
[21] the way the NORASIA ALYA looked?
[22] A: No.
[23] Q: From the time this incident occurred
[24] until the time you obtained the Coast Guard
[25] report, had you seen any photographs of the

Page 22

Stepski

[1]
[2] NORASIA ALYA?
[3] A: I believe that the Coast Guard
[4] showed me a picture of a big container ship, but
[5] it had a different name on it. It's been a
[6] change.
[7] Q: Do you know where the Coast Guard
[8] obtained that particular photograph of the big
[9] container ship?
[10] A: No.
[11] Q: Was it a color photograph?
[12] A: Yes.
[13] Q: Was it on a page such as you might
[14] print out from the Internet as opposed to —
[15] A: Yes, I believe it was an Internet
[16] picture.
[17] Q: — as opposed to an eight and a half
[18] inch one?
[19] A: I think the Internet.
[20] Q: An Internet printout?
[21] A: Yes.
[22] Q: I take it you met with your counsel
[23] to prepare yourself to come here today?
[24] A: Yes.
[25] Q: May I ask who it was that you met

Page 23

**Stepski**

[1] with?

[2] A: Ron and Tom Healey.

[3] Q: Was Terry Gargan present?

[4] A: No, not at the last meeting. But he

[5] was at the one before that.

[6] Q: When did the last meeting with

[7] counsel occur?

[8] A: Just yesterday, I believe. Sorry,

[9] either yesterday or the day before yesterday.

[10] Q: Outside of meetings with counsel,

[11] and I don't want to, I'm not interested in

[12] anything that counsel might have told you or you

[13] might have told counsel, but outside of your

[14] meetings with counsel, did you speak to anyone

[15] else about coming here to testify?

[16] A: I told my father we were coming

[17] down. That's it.

[18] Q: Did you speak with your wife?

[19] A: Yes, of course.

[20] Q: Did you speak with Geal Roderick?

[21] A: Yes.

[22] Q: Did you speak with Mr. Schober?

[23] A: No, I haven't.

[24] Q: So it was your wife, Mr. Roderick,

Page 24

**Stepski**

[1] your father. Anybody else?

[2] A: Other than my lawyers.

[3] (Discussion off the record.)

[4] Q: Just keep your voice up. You are a

[5] soft-spoken guy, but if you just try to shout at

[6] me.

[7] A: I think that was it. I told a

[8] friend of mine that we were coming down here

[9] today.

[10] Q: Of any of those people that you told

[11] or talked to, did you discuss with them the

[12] circumstances of this incident?

[13] A: I have been talking about it with my

[14] wife and with Geal and a little bit with my father

[15] and, of course, my lawyers.

[16] Q: There again, let's put the lawyers

[17] in a separate category. I'm interested in just

[18] ordinary people.

[19] So anybody else?

[20] A: No.

[21] Q: I take it since the incident

[22] occurred you have had discussions with Geal

[23] Roderick about the incident.

[24] How many times would you say you and

Page 25

**Stepski**

[1] Geal have discussed the incident or some part of

[2] it?

[3] A: Probably a couple dozen times.

[4] Q: By the way, do you still work with

[5] Geal?

[6] A: Not at the moment.

[7] Q: But since the incident, did you work

[8] with Geal?

[9] A: Yes.

[10] Q: For how many seasons or how long or

[11] however you want to define it, trips or whatever

[12] you want to say?

[13] A: He did some trips with me. I can't

[14] say off the bat. He has probably done at least

[15] ten trips, maybe more, since then.

[16] Q: How did you come to hook up with

[17] Geal in the first place?

[18] A: I have known him from our small

[19] fishing community for years. I have seen him

[20] since I was a kid.

[21] He had fished with friends of mine

[22] in the past and I just asked him to come along one

[23] day.

[24] Q: Would you consider Geal a personal

Page 26

**Stepski**

[1] friend?

[2] A: Yes.

[3] Q: Do you socialize with Geal outside

[4] of your fishing boat?

[5] A: Not so much. Occasionally. Or if I

[6] see him on the docks. Every now and then we will

[7] get together with him and his wife for dinner, ·

[8] birthday parties, stuff like that.

[9] Q: How about Schober, how did you get

[10] to know Mr. Schober?

[11] A: I met him at my cousin's house. He

[12] is my cousin's husband's brother. And I was short

[13] one crew for a trip the next day and he said he

[14] was looking for work, so I asked him to come

[15] along.

[16] He said he had some experience

[17] fishing. So I think his family has a boat.

[18] He seemed like a nice guy.

[19] Q: So did the incident occur on

[20] Schober's first trip with you?

[21] A: That was his second.

[22] Q: So you met him and the next day you

[23] went fishing with him?

[24] A: I think it was actually the night of

Page 27

*Stepski*

[1]
[2] the next day, I think sometime the next morning.
[3]  Q: That was one trip.
[4] And then when was that, a day, two
[5] days before the trip where the incident occurred
[6] on?
[7]  A: I think it was four days.
[8]  Q: Was that the trip where you set the
[9] nets?
[10]  A: Trip where I set the nets?
[11]  Q: That you were checking on the day of
[12] the incident or that you were hauling on the day
[13] of the incident?
[14]  A: No. They had been set there longer
[15] than that.
[16]  Q: So you went out to harvest the catch
[17] from the nets?
[18]  A: Right.
[19]  Q: The first time you took Mr. Schober
[20] and then four days later you went out again, is
[21] that about right?
[22]  A: Yes.
[23]  Q: What was the occasion that you met
[24] him at your husband's — was it your cousin's
[25] brother's house?

Page 28

*Stepski*

[1]
[2]  A: My cousin's husband's house.
[3]  Q: Okay.
[4]  A: The occasion, I think I was over
[5] there collecting firewood from the tree they had
[6] just cut down. I believe that was the case.
[7]  Q: What was Mr. Schober doing there?
[8]  A: He actually helped us load firewood.
[9]  Q: What is your cousin's husband's
[10] name?
[11]  A: Rob Schober.
[12]  Q: Where does he reside?
[13]  A: In Uncasville, Connecticut — it
[14] might be right over the border of Montville.
[15]  One of the two. Power House Road.
[16]  Q: Power House?
[17]  A: Yes.
[18]  Q: The name of the town?
[19]  A: Right, the border of Uncasville,
[20] Montville. I'm sure it's there in Uncasville
[21] though.
[22]  Q: Did you attend high school?
[23]  A: Yes. Waterford High.
[24]  Q: Did you graduate?
[25]  A: Yes.

Page 29

*Stepski*

[1]
[2]  Q: Did you serve in the military?
[3]  A: No.
[4]  Q: How long would you say you have been
[5] a commercial fisherman?
[6]  A: I worked on a lot of commercial — I
[7] worked on charter boats in high school and then
[8] right after high school I basically worked for
[9] myself, but I also did some commercial fishing all
[10] through high school on my own.
[11]  Q: Did you get any education above high
[12] school?
[13]  A: No. I have taken, I took a college
[14] class a few years ago, just a writing class, but
[15] nothing for degrees.
[16]  Q: Did you ever take any mariners
[17] courses?
[18]  A: Other than the boating license, I
[19] don't believe so, no.
[20]  Q: Did you ever take a course, for
[21] example, in how to read radar?
[22]  A: No.
[23]  Q: Did you ever take a course in the
[24] international rules of the road?
[25]  A: No. But they do discuss that when

Page 30

*Stepski*

[1]
[2] you get your boater's license.
[3]  I actually started to take an
[4] advanced coastal navigation course, but I only sat
[5] in for one class. I didn't like the instructor.
[6]  Q: Was the boater's license that you
[7] obtained issued by the State of Connecticut?
[8]  A: Yes.
[9]  Q: Do you have a copy of that license?
[10]  A: It actually went down with the ship.
[11] My wallet, I never got a new one. I was about 12
[12] years old when I got that.
[13]  Actually, I think I do have a copy
[14] at my house. I could get it.
[15]  MR. SINGLETON: I would like a
[16] copy of it if it could be obtained.
[17]  MR. HEALEY: That is what?
[18]  MR. SINGLETON: The State of
[19] Connecticut license.
[20]  MR. HEALEY: Okay.
[21]  Q: Did you ever take a power squadron
[22] course or anything like that?
[23]  A: No.
[24]  MR. HEALEY: Back up a minute.
[25] Connecticut?

Page 31

**Stepski**

[1]
[2] THE WITNESS: Safe boating
[3] certificate.
[4]   Q: Excluding high school when you
[5] worked on the charter boats, after you graduated
[6] from high school, was fishing then your career?
[7]   A: Yes.
[8] I also got into the apprenticeship
[9] for boilermaking for a short time, maybe as much
[10] as six months, but I always fished as I was doing
[11] that training. Then I just stopped doing that.
[12]   Q: Did you ever obtain a Coast Guard
[13] mariner's document?
[14]   A: No, other than safety inspections.
[15] You are not talking about that?
[16]   Q: No. I'm talking about a mariner sea
[17] card issued by the United States Coast Guard?
[18]   A: No.
[19]   Q: Do you have a Connecticut driver's
[20] license?
[21]   A: Yes.
[22]   Q: And that's still current?
[23]   A: Yes.
[24]   Q: In Connecticut, are you required to
[25] obtain an operator's permit for a vessel if you

Page 32

**Stepski**

[1]
[2] are under a certain year of age?
[3]   A: I believe everyone needs to have
[4] one.
[5]   The safe boating certificate?
[6]   Q: Right. That's what you obtained
[7] when you were 12 that we have been talking about
[8] here?
[9]   A: Yes.
[10]   Q: When did you first acquire —
[11]   A: There's also an operator's license,
[12] but you don't have to go through a course for
[13] that. It's a federal operator's license to run a
[14] federally permitted fishing boat.
[15]   Q: Did you obtain that license?
[16]   A: Yes.
[17]   Q: That's a matter of filling out an
[18] application and sending in a check?
[19]   A: Right. Which I don't get paid for.
[20]   Q: You weren't given any sort of test
[21] or examination to obtain that license?
[22]   A: No.
[23]   Q: I believe you said you took no
[24] course to obtain that license; is that right?
[25]   A: Yes.

Page 33

**Stepski**

[1]
[2]   Q: When did you first own your own boat
[3] or acquire your own boat?
[4]   A: When I was 14, I bought a boat. It
[5] was the first one.
[6]   Q: Let me rephrase my question.
[7] When did you first obtain a
[8] commercial fishing boat? Maybe that was 14.
[9]   A: Well, I didn't get it in the water
[10] for a couple of years. When I was 16, I was
[11] pretty much fishing.
[12]   Q: You bought the boat when you were
[13] 14.
[14]   What type of boat was it?
[15]   A: It was a Palmer Scott, the name of
[16] the hull, and it was a lobster dragger
[17] combination.
[18]   Q: What was the vessel's name?
[19]   A: AGGIE ROSE.
[20]   Q: Did you actually fish with the AGGIE
[21] ROSE?
[22]   A: Yes.
[23]   Q: When did you start fishing with her?
[24]   A: When I was 16.
[25]   Q: How long did you fish with the AGGIE

Page 34

**Stepski**

[1]
[2] ROSE?
[3]   A: I think it was when I was 19, I
[4] bought the next boat.
[5]   Q: What was the name of that boat?
[6]   A: PHYLLIS ANN.
[7]   MR. HEALEY: What was the
[8] name?
[9]   THE WITNESS: PHYLLIS ANN.
[10]   Q: What type of boat was the PHYLLIS
[11] ANN?
[12]   A: Same thing, little bigger.
[13]   Q: What was the length of the AGGIE
[14] ROSE?
[15]   A: 26 feet.
[16]   Q: What was the length of the PHYLLIS
[17] ANN?
[18]   A: 26 feet.
[19]   Q: Were they the same breadth?
[20]   A: No. The PHYLLIS ANN was quite a bit
[21] wider.
[22]   Q: How wide was the PHYLLIS ANN?
[23]   A: 10 feet.
[24]   Q: How wide was the AGGIE ROSE?
[25]   A: Eight.

Page 35

Stepski

[1]
[2]    Q: How long did you fish with the
[3] PHYLLIS ANN?
[4]    A: I still own that today. I still
[5] fish it.
[6]    Q: When you owned the AGGIE ROSE, were
[7] you her master, captain of the AGGIE ROSE?
[8]    A: Yes.
[9]    Q: Same way with the PHYLLIS ANN, were
[10] you the captain with the PHYLLIS ANN?
[11]    A: Yes.
[12]    Q: Have you owned any other boats
[13] beside the two we have just described?
[14]    A: Yes. I also own another 26 footer,
[15] it's a tuna boat, that I rebuilt probably about
[16] five years ago.
[17]    Q: What is her name?
[18]    A: RICHARD ERIC.
[19]    Q: What is the RICHARD ERIC's size?
[20]    A: 26 by 10.
[21]    Q: Do you own any other boats?
[22]    A: I have a little 14-foot skiff and a
[23] couple of canoes. And that's it.
[24]    Q: Now, did you own the RICHARD ERIC at
[25] the same time that you owned the PHYLLIS ANN?

Page 36

Stepski

[1]
[2]    A: Oh, I also bought a new boat since
[3] the accident. I have that.
[4]    Q: If I have my history right, it was
[5] the AGGIE ROSE, and you acquired the PHYLLIS ANN,
[6] then you acquired the RICHARD ERIC?
[7]    A: I still own that.
[8]    Q: Then you acquired the AVA CLAIRE?
[9] Was it the AVA CLAIRE?
[10]    A: Yes.
[11]    Q: And you have another boat now.
[12] What is the name of the boat you
[13] have now?
[14]    A: MADELINE RUTH.
[15]    MR. HEALEY: What was that?
[16]    THE WITNESS: MADELINE RUTH.
[17]    Q: What size vessel was the MADELINE
[18] RUTH?
[19]    A: That's a 38-foot by 14-foot Novy.
[20]    Q: What is she outfitted for?
[21]    A: Gill netting and tuna fishing.
[22]    Q: Are you the captain of the MADELINE
[23] RUTH?
[24]    A: Yes.
[25]    Q: When did you acquire the MADELINE

Page 37

Stepski

[1]
[2] RUTH?
[3]    A: I think it was about six months
[4] after the accident.
[5]    Q: When you acquired her, was she ready
[6] to go?
[7]    A: Yes.
[8]    Q: And you were able to transfer your
[9] fishing permits from the AVA CLAIRE to the
[10] MADELINE RUTH?
[11]    A: Yes.
[12]    Q: So if you acquired her about six
[13] months after the accident. When did you start
[14] fishing with her?
[15]    A: It was about four days after I
[16] bought her I started to do fishing.
[17]    Q: For tuna fishing, where do you
[18] usually, since you bought her, engage in tuna
[19] fishing?
[20]    A: Out of Gloucester, Massachusetts.
[21] In that particular case, Ipswitch Bay. That's it.
[22]    Q: Is that area on the chart in front
[23] of you here?
[24]    A: No.
[25]    Q: So about six months after the

Page 38

Stepski

[1]
[2] incident would have made it roughly December?
[3]    A: It was in October that I bought it.
[4] And that would be two Octobers ago.
[5]    Q: October 2004?
[6]    A: Not this past one, not the one
[7] before that, but the one before that.
[8]    Q: The past one, 2006, the one before
[9] 2005, the one before that is 2004.
[10]    How many trips could you take on
[11] her — do you get closed in by the winter or do
[12] you continue all winter long?
[13]    A: We fish pretty much through the
[14] winter.
[15]    Q: How many trips would you say you
[16] took on her between when you acquired her in
[17] December 2003 to 2004, the end of that year?
[18]    A: I tuna fished for three weeks pretty
[19] much every day, three and a half weeks and then
[20] brought it back into Connecticut and I went
[21] fishing and we fished right up until December
[22] 31st, maybe four days or so once a week.
[23]    Q: That was gill netting for monkfish?
[24]    A: Yes.
[25]    Q: When you were fishing for tuna, how

Page 39

Stepski

[1]
[2] far offshore were you going, approximately?
[3]    A: We were only going about 8 miles.
[4]    Q: What size tuna could you catch in
[5] that area?
[6]    A: Anywhere from 200 pounds to, I think
[7] our biggest one was 700 pounds.
[8]    MR. HEALEY: Are you
[9] comfortable?
[10]    Do you want to get up and
[11] stretch?
[12]    THE WITNESS: I'm all right.
[13]    Q: Whatever happened with the PHYLLIS
[14] ANN? Did you sell her?
[15]    A: No, I still own her.
[16]    Q: You still own the RICHARD ERIC?
[17]    A: Yes.
[18]    Q: How about the AGGIE ROSE, did you
[19] sell her?
[20]    A: I sold that.
[21]    Q: Well, right now, for example, you
[22] own three boats, if I calculated this right.
[23]    A: Yes.
[24]    Q: What do you do to utilize those
[25] three boats, if anything?

Page 40

Stepski

[1]
[2]    A: Well, the PHYLLIS ANN I fish in
[3] between monk trips, during the spring and into the
[4] summer.
[5]    And the RICHARD ERIC I use, I only
[6] did one tuna trip on that this year because tuna
[7] fishing wasn't very good.
[8]    And my brother also ran the PHYLLIS
[9] ANN a little bit this summer.  .
[10]    Q: With respect to the AVA CLAIRE, when
[11] did you acquire her?
[12]    A: I believe it was 2001. I don't
[13] remember. Just two years before the accident.
[14]    Q: What were the dimensions of the AVA
[15] CLAIRE?
[16]    A: 42 feet by 12.
[17]    Q: What type of vessel was she?
[18]    A: It was a Bruno Stillman.
[19]    Q: So you said your last part —
[20]    A: I set it up for gill netting, is
[21] what I thought I said, right?
[22]    Q: Yes.
[23]    A: Yes.
[24]    Q: When you acquired her, what was she
[25] set up to do?

Page 41

Stepski

[1]
[2]    A: Lobster.
[3]    Q: What is the difference between the
[4] lobster setup and the gill netting setup?
[5]    A: Just a different type of hauler on
[6] the side of the boat.
[7]    Q: Can you describe to me what that —
[8] I don't commercial fishing, so can you tell me
[9] what that is, the difference in the hauler between
[10] gill netting and a lobster setup?
[11]    A: A lobster hauler is a narrow free
[12] shive that butts straight up to the forward
[13] bulkhead on the side of the boat, has a davit
[14] going over the side with a pulley with a line
[15] through the pulley around the shives and that
[16] pulls the line in for you, pulls the traps up to   .
[17] the side.
[18]    With gill netting we have a circular
[19] hauler that rotates this way. It's bolted up in
[20] the same area, but to the deck, and it's a roller
[21] over the side of the boats. Nets come up over the
[22] roller around this hauler to a table into the pit
[23] in the back of the boat.
[24]    Q: Which piece of equipment is heavier,
[25] the lobster hauler or the gill net hauler?

Page 42

Stepski

[1]
[2]    A: Gill net hauler.
[3]    Q: By a magnitude of what?
[4]    A: The gill net hauler, I would say, is
[5] probably a few hundred pounds where the lobster
[6] hauler is maybe 50 pounds.           .   .
[7]    Q: When did you actually do the
[8] conversion of the AVA CLAIRE to the gill netting
[9] hauler?
[10]    A: Right when I bought it.
[11]    Q: With respect to the Palmer Scott
[12] lobster dragger, the AGGIE ROSE, what sort of
[13] electronic gear did you have on board?
[14]    A: I had a Loran, I had a depth
[15] sounder, fish finder, they call it. I had a radar
[16] and compass, of course. I believe that was it.
[17]    Q: What type of radar did you have?
[18]    A: That was, I believe it was a Furuno.
[19]    Q: What types of display modes was it
[20] capable of presenting?
[21]    A: Up to, I think it went up to
[22] 24 miles.
[23]    Q: Could you get a display mode on that
[24] with the ship's head as opposed to true north?
[25]    A: It was always ship's head.

Page 43

*Stepski*

[1]
[2] Q: Could you change that?
[3] A: No.
[4] Q: What type of electronics did you
[5] have on the PHYLLIS ANN?
[6] A: I have a radar, a Furuno radar, I
[7] have a GPS, a chart plotter and a fish finder.
[8] Q: You haven't mentioned VHF, but I
[9] assume you have those?
[10] A: Oh, of course, yes.
[11] Q: It was a Furuno radar, did you say?
[12] A: Yes.
[13] Q: On the PHYLLIS ANN?
[14] A: Yes.
[15] Q: What type of display could you
[16] obtain or present on that radar?
[17] A: That goes up to 16 miles.
[18] Q: What would the increments be?
[19] In other words, what could you
[20] display?
[21] A: Goes from a quarter mile to a half a
[22] mile to 1 mile to 2 miles. It just doubles as you
[23] go up.
[24] Q: What was the display you could
[25] obtain on that by way of ship's head, just ship's

Page 44

*Stepski*

[1]
[2] head up?
[3] A: Yes.
[4] Q: Now, your tuna boat, the RICHARD
[5] ERIC, what type of electronics do you have on her?
[6] A: We have a Loran, we have a GPS chart
[7] plotter. We have a marine radar, as well as a
[8] combination chart plotter — that's the chart
[9] plotter, that combination.
[10] Q: The marine radar is connected to
[11] your chart plotter?
[12] A: Yes. It's both.
[13] And I said Loran, fish finder and
[14] gauge.
[15] Q: Before you acquired the AVA CLAIRE,
[16] and if you say it's two years before the accident
[17] that you acquired the AVA CLAIRE, the accident was
[18] May of 2004, so that would be sometime in 2002
[19] that you acquired her.
[20] Prior to the acquisition of the AVA
[21] CLAIRE, did the RICHARD ERIC have the same
[22] electronics on it that you have described or have
[23] you upgraded?
[24] A: We have upgraded.
[25] Q: Go back to the period before you

Page 45

*Stepski*

[1]
[2] acquired the AVA CLAIRE. Tell me what electronics
[3] you had on the RICHARD ERIC.
[4] A: I had an older Furuno radar and fish
[5] finder, VHF, and a chart plotter.
[6] Q: That chart plotter was not
[7] interfaced with your radar at that time?
[8] A: No.
[9] Q: When did you make that upgrade to
[10] the interface of the chart plotter with the radar?
[11] A: Just this summer.
[12] Q: By the way, the AGGIE ROSE, how many
[13] crew did you usually have on the AGGIE ROSE?
[14] A: Just myself or one to two other
[15] people.
[16] Q: How about with the PHYLLIS ANN?
[17] A: Same thing, usually just me or one
[18] other person.
[19] Q: And the RICHARD ERIC?
[20] A: Me and one other person.
[21] Q: How about now, when you operate the
[22] MADELINE RUTH?
[23] A: Just me and two other people.
[24] Q: With the AVA CLAIRE, what was your
[25] usual crew size on the AVA CLAIRE?

Page 46

*Stepski*

[1]
[2] A: Two other people.
[3] Q: Why is it that you needed two guys
[4] on the AVA CLAIRE or you wanted two guys?
[5] A: It was a little more work involved.
[6] I couldn't afford to keep three of us busy with
[7] the gill netting versus the dragging lobstering.
[8] Q: Would it have been possible for you
[9] to have done your gill netting with you and one
[10] other crew member?
[11] A: Yes.
[12] Q: But it makes it a little easier if
[13] you take a third guy?
[14] A: Yes, quite a bit easier.
[15] Q: Did you ever consider taking four,
[16] in other words, you plus three others?
[17] A: No.
[18] Q: Why not?
[19] A: Just kind of get in the way, a
[20] fourth person. I have taken other guys, but not
[21] as paying crew. It's not necessary.
[22] Q: But if you had to, you and one other
[23] guy could have worked the gill nets on the AVA
[24] CLAIRE?
[25] A: Yes. And I think I have done trips

Page 47

**Stepski**

[1]
[2] with just me and one other person.
[3]    Q: Tell me then about the, when you
[4] bought the AVA CLAIRE sometime in 2002 or
[5] thereabouts, was she ready to at least go
[6] lobstering at that time?
[7]    A: Yes.
[8]    Q: Did you use her for lobstering at
[9] that time?
[10]    A: No.
[11]    Q: Did you take some time before using
[12] her and making any conversions or modifications to
[13] her?
[14]    A: Yes.
[15]    Q: Tell me what you did.
[16]    A: I hauled it right away, inspected
[17] the hull, had a survey done. I changed the skeg,
[18] I put a new skeg in.
[19]    I raised the inside gunnels up a
[20] bit, put the hauler on, put new pen boards inside,
[21] a king table, a new cabin, wheelhouse, engine
[22] cover, engine box rather, couple of bunks and
[23] pretty much a full set of electronics and a life
[24] raft.
[25]    Q: Did you upgrade her electronic

Page 48

**Stepski**

[1]
[2] package?
[3]    A: Yes.
[4]    Q: What did you do in that regard?
[5]    A: Well, I put the chart plotter on,
[6] radar and fish finder and new VHF.
[7]    We did a lot of new wiring, of
[8] course, through the hull, new wheelhouse.
[9]    Q: Who did this work?
[10]    A: Me, my father, my brother and one
[11] other guy. Some friends helped.
[12]    Q: You, your father and your brother.
[13] What is your brother's name?
[14]    A: Nicholas Stepski.
[15]    Q: And your father's name?
[16]    A: Victor.
[17]    MR. HEALEY: What is your
[18] father's name?
[19]    THE WITNESS: Victor.
[20]    Q: You say you had a friend that helped
[21] you?
[22]    A: I had a few friends that would come
[23] down from time to time and help.
[24]    Q: Did you employ any true marine
[25] contractor to come in and assist with anything you

Page 49

**Stepski**

[1]
[2] were doing?
[3]    A: Just the survey.
[4]    Q: Apart from the survey?
[5]    A: No, everything else was stuff that I
[6] had done before.
[7]    Q: Prior to making these modifications
[8] that you have described, did you employ a marine
[9] engineer or architect, marine architect, to take a
[10] look at this and approve them in advance, take a
[11] look at your plans or whatever and approve them in
[12] advance?
[13]    A: No.
[14]    Q: After you made the modifications,
[15] did you hire a marine engineer or marine architect
[16] to come look at it and give their approval to it?
[17]    A: The survey was done while we were in
[18] the middle of work.
[19]    Other than that, no.
[20]    Q: When you say the survey, which
[21] survey are you talking about now?
[22]    A: Johnson Marine.
[23] He came back afterwards, and I'm
[24] pretty sure he came back afterwards and did
[25] another upgrade of the boat. I can't remember.

Page 50

**Stepski**

[1]
[2]    Q: As you were doing these
[3] modifications, did the Johnson Marine surveyor
[4] attend?
[5]    A: As I was?
[6]    Q: Making the modifications, during the
[7] modifications?
[8]    A: He came when I had it hauled out, I
[9] was in the middle of working on the hull, putting
[10] the skeg and that type of stuff. I'm sure he came
[11] back afterwards.
[12]    It was after we got it in the water
[13] he came back and took a ride with me to see how
[14] the thing ran.
[15]    Q: Did he attend while you were doing
[16] the modifications at your request?
[17]    A: No. He just came to inspect the
[18] boats. I just needed a survey done for the hull
[19] itself.
[20]    Q: Why did you have a survey done?
[21] What was the reason you needed a survey?
[22]    A: To get my loan, to get insurance,
[23] make sure the boat was in good shape, the hull.
[24]    Q: Would it be fair to say that as far
[25] as you knew, he was there to make sure you were

Page 51

Stepski

[1]
[2] actually making improvements to the boat, and to
[3] verify that for the purposes of, either for
[4] financial purposes or insurance purposes or
[5] something like that?
[6]    A: Afterwards, yes. The second time.
[7] He came down in the beginning, it was a hull
[8] survey.
[9]    And he did the in-the-water survey.
[10] By then most of the improvements had been done.
[11]    Q: I think you said that this survey
[12] where he came, when you were performing the
[13] modifications, you did not ask him to come; is
[14] that correct?
[15]    A: Yes. I asked him.
[16]    Q: Oh, you did ask him to come?
[17]    A: Yes.
[18]    Q: I'm sorry, I misunderstood you then.
[19] And what was the purpose of you
[20] asking him to come while the modifications were
[21] being made?
[22]    A: Well, I needed him to come as soon
[23] as possible. I hadn't even bought the boat.
[24]    Right after we hauled it out of the
[25] water he came, surveyed it. He basically, to get

Page 52

Stepski

[1]
[2] my loan, check the hull, make sure it was a good,
[3] sound boat.
[4]    Q: Right after you hauled it out of the
[5] water, but before you started working on it, he
[6] came down and took a look at it?
[7]    A: I had already started work on it.
[8] Before I even bought it, I started working on it.
[9] I hauled it, started sanding, painting. I had a
[10] lot of work. I wanted to get started.
[11]    Q: How many days after you hauled it
[12] out did this Johnson surveyor attend?
[13]    A: I don't remember. It may have been
[14] four days up to a week.
[15]    Q: For example, did he attend before
[16] you started putting the new skeg in?
[17]    A: No. He probably got there before I
[18] did that.
[19]    Q: Did he attend before you put the new
[20] house on?
[21]    A: Yes.
[22]    Q: Did you change the fuel tank in that
[23] boat?
[24]    A: I did that a year later.
[25]    Q: From a 250 to a 350-gallon tank?

Page 53

Stepski

[1]
[2]    A: Yes, I believe that's what it was.
[3]    Q: That was a year later, after you had
[4] already been using the boat?
[5]    A: Yes.
[6]    Q: When you left on your trip the early
[7] morning hours the day when this accident occurred,
[8] did you have a full tank of fuel?
[9]    A: I don't remember.
[10] I believe it was. Off the top of my
[11] head, I don't remember.
[12]    Q: Where did you generally fuel up?
[13]    A: From Bernie's Oil Company.
[14]    Q: Would they bring a truck up to the
[15] docks and put something out on the boat?
[16]    A: Yes.
[17]    Q: Bernie's Oil Company, New London?
[18]    A: There is also another place across
[19] the river, Groton Oil, that we would occasionally
[20] get it. I think I might have went to Stonington
[21] also. Stonington Docks.
[22]    Q: Just before you left to go out on
[23] this trip?
[24]    MR. HEALEY: Are we talking
[25] May 22nd?

Page 54

Stepski

[1]
[2]    Q: The May 22th trip, early morning,
[3] just before you left, you said you believe you did
[4] fill it up. Where did you fill it up?
[5]    If you did, where did you do that?
[6] It sounds odd.
[7]    A: I don't remember right off the top
[8] of my head, but I would say probably Bernie's. I
[9] would have to look it up.
[10]    Q: Back now to the surveyor, Johnson
[11] surveyor, attending —
[12]    MR. STEVENS: Before you do
[13] that, do you want to take a break for
[14] a minute?
[15]    THE WITNESS: I'm all right.
[16]    MR. HEALEY: Keep going. You
[17] tell us.
[18]    MR. SINGLETON: As I said in
[19] the instructions, when you want to
[20] take a break, you let us know.
[21]    MR. HEALEY: If you want any
[22] soda or anything, you can get it while
[23] you are testifying.
[24]                Q
[25]    MR. SINGLETON: Sure.

Page 55

**Stepski**

[3] **Q:** To change the keel, what was
[4] required?
[5]   **A:** I just had to cut off the wooden
[6] part, the skeg, and I made a new one out of steel
[7] bolted up to the keel.
[8]   **Q:** And I think you said you raised the
[9] gunnels. How did you do that?
[10]   **A:** On the inside, I put fiberglass over
[11] plywood and raised it, put braces.
[12]   **Q:** Why did you want to raise the
[13] gunnels?
[14]   **A:** To make pens to hold the fish in
[15] nets that were high enough to have the capacity
[16] that I needed.
[17]   **Q:** So the keel, when you changed the
[18] keel, you put a steel keel in?
[19]   **A:** Yes.
[20]   **Q:** Was that heavier than the prior keel
[21] that had been in the boat?
[22]   **A:** Maybe a little bit. That was pretty
[23] heavy, too. Probably close to the same.
[24]   **Q:** Was it about the same size as the
[25] oak keel that you removed?

Page 56

**Stepski**

[2]   **A:** Yes. Same thing.
[3]   **Q:** With the gunnels, what would you say
[4] the dimension of raising the gunnels, how much did
[5] you raise it?
[6]   **A:** Twelve inches, I believe it was.
[7]   **Q:** Twelve inches over what period of
[8] linear foot length?
[9]   **A:** From the back of the cabin right and
[10] the back.
[11]   **Q:** What would you estimate that to be
[12] by way of total linear foot length?
[13]   **A:** Probably 50 feet around.
[14]   **Q:** And that was, you say plyboard
[15] laminated with fiberglass?
[16]   **A:** Yes.
[17]   **Q:** What inch plywood did you use?
[18]   **A:** Three-quarter.
[19]   **Q:** How many coats of fiberglass did you
[20] put on?
[21]   **A:** Two.
[22]   **Q:** And the fiberglass that you did, did
[23] that involve taping?
[24]   **A:** Taping as well as —
[25]   **Q:** Taping, gel coat?

Page 57

**Stepski**

[2]   **A:** Matting over everything. And gel
[3] coat.
[4]   **Q:** The pen board, you said you added
[5] pen boards?
[6]   **A:** We made pens on the deck.
[7]   **Q:** Pens?
[8]   **A:** On the transom, it was pens, pen
[9] board rather.
[10]   **Q:** How did you make the pens?
[11]   **A:** We would take aluminum channel and
[12] put it where we wanted the pen boards to ride.
[13] And we did it all basically like that, with the
[14] aluminum channel.
[15]   **Q:** The aluminum channel was vertical.
[16] What did you use as a footer to
[17] support the bottom of the deck?
[18]   **A:** They are all kind of locked
[19] together.
[20]   **Q:** What did you actually use for the
[21] sides of the pens?
[22]   **A:** Two by 12's, I believe.
[23]   **Q:** Two by 12's?
[24]   **A:** Douglas firs.
[25]   **Q:** Two by 12 Douglas firs stacked how

Page 58

**Stepski**

[2] high to make the pen, do you know?
[3]   **A:** They were three high.
[4]   **Q:** How many pens did you have and what
[5] were the dimensions of the pens, approximately?
[6]   **A:** There was four. Dimensions were
[7] probably roughly about, there was two there that
[8] were about four feet by seven feet.
[9]      Then there was one bigger one,
[10] probably five by seven. And then another one
[11] probably about four by four.
[12]   **Q:** The four —
[13]   **A:** Actually, we had one more on that
[14] boat that was about two by six. Maybe two by
[15] seven.
[16]   **Q:** From the aft of the wheelhouse to
[17] the transom, what was your distance on that boat?
[18]   **A:** The wheelhouse came further back
[19] than the back cabin wall.
[20]      Do you mean —
[21]   **Q:** The back cabin wall.
[22]   **A:** I would have to say about 20 feet at
[23] least, maybe a little more.
[24]   **Q:** You had enough room to put all those
[25] pens you described?

Page 59

**Stepski**

[1]
[2]     A: They went across the deck, the first
[3]  three I described went across the deck. And one
[4]  floored on each side of those.
[5]     Q: The pens were for fish?
[6]     A: Yes.
[7]     Q: And the dimensions you gave me, for
[8]  example, four by seven, five by seven, that's
[9]  length times width that you were giving me?
[10]    A: Uh-huh.
[11]    Q: Each one of those I think you said
[12]  was three 2 by 12's high?
[13]    A: Yes.
[14]    Q: The engine box, what do you mean by
[15]  engine box?
[16]    A: Well, the engine sits a little
[17]  higher than the deck, so we put framing. On that
[18]  boat we just had a side coming up about probably
[19]  eight inches, then we had a top for that. That's
[20]  what I considered a box.
[21]    Q: Did it have an engine box on it when
[22]  you acquired the vessel?
[23]    A: Yes.
[24]    Q: Why did you replace it?
[25]    A: It just needed to be replaced,

Page 60

**Stepski**

[1]
[2]  ratty, not completely set up.
[3]     Q: Did you replace it in kind, use
[4]  roughly the same kind of material?
[5]     A: Yes. Fiberglass over wood. The top
[6]  was just wood.
[7]     Q: Did the old one have fiberglass over
[8]  wood or just wood?
[9]     A: That was fiberglass over wood.
[10]     MR. SINGLETON: Would you mark
[11]  this, please.
[12]     I suggest for all the
[13]  depositions we start with one number
[14]  and continue on, whether it's
[15]  Defendant's, Plaintiff's or whatever.
[16]     Mark this, please, as Exhibit
[17]  1.
[18]     (Photographs were marked as
[19]  Exhibit No. 1 for identification, as
[20]  of this date.)
[21]     MR. SINGLETON: For the
[22]  record, I have labeled on my copy just
[23]  in alphabetical order each of the
[24]  separate photographs that are in the
[25]  exhibit what we have marked now as

Page 61

**Stepski**

[1]
[2]  Exhibit 1.
[3]             BY MR. SINGLETON:
[4]     Q: Let me show you a new bundle of
[5]  documents stapled together that are photographs.
[6]     Just generally, are these
[7]  photographs of the AVA CLAIRE?
[8]     A: (Perusing document.) Yes.
[9]     Q: Looking at the first page photograph
[10]  that we have hand labeled A, it looks like a box
[11]  with some nets in it.
[12]     Is that one of the pens that you
[13]  have referred to?
[14]     A: Yes. Looks like my dimensions might
[15]  have been a little off.
[16]     Q: In what way?
[17]     A: That middle pen board is three wide,
[18]  it's narrower than what I told you. I think I
[19]  told you four feet, looks like three or less.
[20]     Q: But they span the breadth of the
[21]  boat, it looks like; is that right?
[22]     A: Yes.
[23]     Q: Apart from the width, the length
[24]  going forward or aft on your boat, are you still
[25]  pretty confident of the dimensions you gave me?

Page 62

**Stepski**

[1]
[2]     A: Yes.
[3]     Q: I would like you to turn to the next
[4]  page that has photos C, D and E.
[5]     Do any of these photos indicate your
[6]  radar that you had on board the AVA CLAIRE?
[7]     A: Yes, the bottom one, A.
[8]     Q: D you mean?
[9]     A: Sorry, D.
[10]     Q: Would you circle with the pen the
[11]  radar?
[12]     That circle is not showing, I will
[13]  just do an arrow.
[14]     What kind of radar was this?
[15]     A: Furuno.
[16]     Q: What sort of display would it
[17]  present?
[18]     A: A heads up. I think that was a
[19]  16 miles.
[20]     Q: Did it give the ship's head up, but
[21]  it also gave you a true north display?
[22]     A: No.
[23]     Q: Do you remember what the model of
[24]  this radar was?
[25]     A: I believe we have it written down,

Page 63

**Stepski**

[1] but not off the top of my head.

[2] **Q:** Written down in what, one of the

[3] documents that you have prepared for your damages

[4] claim?

[5] **A:** Yes.

[6] **Q:** Where did you get that model number

[7] from?

[8] **A:** Oh, no, I got it off my other boat

[9] because I think it's the same radar I had in my

[10] other boat, the radar number.

[11] **Q:** Do you still have the radar manual

[12] for the radar on your other boat?

[13] **A:** I might. I'm not sure.

[14] **Q:** I would like you to check if there

[15] is.

[16] Are you certain the two radars were

[17] the same?

[18] **A:** I'm pretty certain, but I couldn't

[19] say exactly.

[20] **Q:** But you believe them to be the same?

[21] **A:** Yes.

[22] **MR. SINGLETON:** I would like

[23] the production of the manual, the

[24] operations manual for the radar on the

Page 64

**Stepski**

[1] other boat.

[2] **MR. HEALEY:** I understand.

[3] **MR. SINGLETON:** Why don't I

[4] ask him.

[5] **MR. HEALEY:** You should clear

[6] that up.

[7] **BY MR. SINGLETON:**

[8] **Q:** Where did you keep the manuals with

[9] respect to your radar and the GPS and whatever

[10] else you had, on board or at home?

[11] **A:** On board.

[12] **Q:** Was the radar manual lost when the

[13] AVA CLAIRE sank?

[14] **A:** Yes.

[15] **MR. SINGLETON:** Then I would

[16] like the other one produced.

[17] **MR. HEALEY:** I shall get it.

[18] We will not know at this time

[19] whether or not they are similar. They

[20] are not exact, they are similar,

[21] right, the two radars?

[22] The manual from the second

[23] boat, we still do not know whether it

[24] is going to be sufficiently related to

Page 65

**Stepski**

[1] the AVA CLAIRE. We will determine

[2] that; you and I together.

[3] **MR. SINGLETON:** I don't know

[4] how you and I could. I think the

[5] witness is the only one who could.

[6] **MR. HEALEY:** Let's put it this

[7] way. It will be determined in that

[8] fashion when we get that whether or

[9] not it does give us information on the

[10] AVA CLAIRE's radar.

[11] All I am saying to you,

[12] Richard, I just said I don't know how

[13] from what he said that's relevant.

[14] I'm not hedging at all. I said we

[15] have to establish that.

[16] **MR. SINGLETON:** The witness

[17] just said he believes they are the

[18] same. Whatever he says has got to

[19] trump what you or I said.

[20] **MR. HEALEY:** That's what I

[21] said. I'm getting it.

[22] **BY MR. SINGLETON:**

[23] **Q:** I think you said the AVA CLAIRE at

[24] the time of the incident also had a chart plotter

Page 66

**Stepski**

[1] on board?

[2] **A:** Yes. That's down on the north end.

[3] **Q:** That's in photographs A and D as

[4] well?

[5] **A:** D.

[6] **Q:** Would you look through these and see

[7] if you find, in any of these photographs, find a

[8] better picture of the chart plotter?

[9] **A:** There's another one there on F, but

[10] I don't know if I would call it better.

[11] Here is a good one, on K.

[12] **Q:** K is a picture of just the chart

[13] plotter, is that right?

[14] **A:** Right, and the auto pilot.

[15] **Q:** The chart plotter is the larger

[16] screen on the right?

[17] **A:** Yes.

[18] **Q:** Let's go back to where it's situated

[19] in the wheelhouse. Let's go back to photograph D.

[20] I believe you said it's at the

[21] bottom. If you could put a circle around the

[22] chart plotter.

[23] So the record is clear, when you

[24] orient the photograph top to bottom, the top arrow

Page 67

[1] **Stepski**
[2] that I have drawn to the circle is the radar and
[3] the bottom arrow that I have drawn to the circle
[4] is the chart plotter, agreed?
[5] A: Yes.
[6] Q: I believe you said that the AVA
[7] CLAIRE's chart plotter was not integrated with the
[8] radar, is that correct?
[9] A: Correct.
[10] Q: Is there a reason why you didn't do
[11] that package?
[12] A: No. They came separately. They are
[13] separate units. You can integrate them, but —
[14] Q: If you integrate your radar, if you
[15] have an integrated package so that your chart
[16] plotters are integrated with your radar, you also
[17] see targets that are approaching you superimposed
[18] on the chart; is that correct?
[19] A: Yes.
[20] Q: When you upgraded, when you made
[21] your modifications to the AVA CLAIRE after you
[22] acquired her, did you upgrade the radar or change
[23] the radar in any way?
[24] A: No.
[25] Q: From the time you acquired her to

Page 68

[1] **Stepski**
[2] the time of the accident, did you make any changes
[3] to the radar?
[4] A: No. Other than when I mounted it.
[5] But, no, no changes.
[6] Q: So you didn't change the display?
[7] A: Oh, wait. I believe I swapped
[8] this — yes, that's why it was the same as the
[9] other boat.
[10] I had changed radars with my other
[11] boat because the one on the other boat had a
[12] feature that I liked better. I can't remember
[13] what it was. For some reason I swapped them.
[14] There was something I liked better
[15] about the one on the RICHARD ERIC than the one on
[16] the PHYLLIS ANN.
[17] Yes, I believe I switched it with
[18] the one on the PHYLLIS ANN. So they must be the
[19] same model number.
[20] Q: You switched the display with the
[21] PHYLLIS ANN?
[22] A: Yes.
[23] Q: What about the array, the antenna?
[24] A: No.
[25] Q: Were they both, were the displays

Page 69

[1] **Stepski**
[2] both Furuno?
[3] A: Yes.
[4] Q: And the antennas were both Furuno?
[5] A: Yes.
[6] Q: But when you bought the radar, the
[7] radar that had been on the AVA CLAIRE, that was a
[8] different radar than the one that you moved over
[9] from the PHYLLIS ANN?
[10] A: Yes. But the same radar, just a
[11] different one.
[12] Q: It's a Furuno radar, but a different
[13] model?
[14] A: I believe they are the same model.
[15] If this is the exact same radar, do they keep the
[16] same model numbers — no.
[17] It would be the same model number,
[18] the same radar. So the same model, same radar.
[19] Q: Why did you switch the PHYLLIS ANN
[20] radar with the AVA CLAIRE?
[21] A: There was a feature that I liked
[22] better on this. I think it had an alarm.
[23] Q: The PHYLLIS ANN's had an alarm?
[24] A: Yes. I believe that's why I
[25] switched, because it had an alarm. I liked that

Page 70

[1] **Stepski**
[2] feature.
[3] Q: But it was still the same model,
[4] just with a different feature?
[5] A: I believe so. Maybe it was just a
[6] newer one. I don't know.
[7] I think it was like an added piece
[8] or something. I really can't remember off the top
[9] of my head.
[10] Q: I just want to make sure though what
[11] you did, and correct me if I am wrong, I'm not
[12] trying to put words in your mouth, I'm trying to
[13] characterize it so that I understand it, we get it
[14] in one sentence on the record.
[15] You liked the display on the PHYLLIS
[16] ANN better because it had an alarm feature?
[17] A: Yes.
[18] Q: Therefore you took the one off of
[19] the AVA CLAIRE and you took the one from the
[20] PHYLLIS ANN and mounted it on the AVA CLAIRE?
[21] A: Yes.
[22] Q: Did you use the AVA CLAIRE's then on
[23] the PHYLLIS ANN or did you buy a new display?
[24] A: I used it.
[25] Q: But you are certain at least in one

Page 71

*Stepski*

[1] sense those two displays were different because

[2] the PHYLLIS ANN had this feature that you did not

[3] have on the AVA CLAIRE's?

[5] A: Right.

[6] Q: After you switched the radars, did

[7] you have a technician come in and make sure that

[8] the radar display was integrating properly with

[9] the radar antenna?

[10] A: No. But it had been working fine.

[11] Q: How long before the accident did you

[12] do this exchange of radar displays?

[13] A: It was quite a while. I don't know

[14] when.

[15] I think it was shortly after I began

[16] using the boat, because I liked the other one

[17] better.

[18] Q: From the time you acquired the AVA

[19] CLAIRE, did you ever have a technician come out

[20] and calibrate the radar?

[21] A: No.

[22] Q: Did you ever have a technician come

[23] out and service the radar?

[24] A: No. Wait a minute. I don't believe

[25] so.

Page 72

*Stepski*

[2] Q: Did you ever take the radar off the

[3] AVA CLAIRE, either the antennas or displays, and

[4] take it to a shop and have it checked or serviced

[5] or repaired?

[6] A: I don't believe so.

[7] Q: This alarm feature that was on the

[8] PHYLLIS ANN, was it a collision alarm?

[9] A: Like an anchor watch alarm.

[10] Q: On the radar?

[11] A: If someone comes into the ring that

[12] you set the alarm at, if they come into the ring,

[13] then the alarm goes off.

[14] If that was the feature. I'm pretty

[15] sure that's the way it was, the reason why I

[16] swapped them because it had that — it's so long

[17] ago, I don't remember.

[18] Q: But if that was the feature, what

[19] that feature would do is, for example, if you set

[20] it for six miles, if something comes inside

[21] six miles or a target moves within a six-mile

[22] range, some alarm goes off; is that right?

[23] A: Yes.

[24] Q: Did you have that feature activated

[25] on the day of the accident?

Page 73

*Stepski*

[1]

[2] A: No.

[3] Q: Is there a reason why not?

[4] A: I only use that feature for

[5] anchoring at night, to get some rest. Otherwise

[6] you are watching the whole time.

[7] Q: You are certain you did not have

[8] that feature activated on the day of the accident;

[9] is that correct?

[10] A: Right.

[11] Q: The AVA CLAIRE, did it have a GPS?

[12] A: That chart plotter was a GPS.

[13] I believe that chart plotter hooked

[14] up to a small unit that was a GPS — no, this one,

[15] what happens, the GPS had an antenna.

[16] Q: The chart plotter was a GPS?

[17] A: Yes.

[18] Q: Had a separate GPS antenna?

[19] A: Yes.

[20] Q: Where was the antenna mounted?

[21] A: Up on the top.

[22] Q: Top of the wheelhouse?

[23] A: Yes. I think it was on the

[24] starboard side.

[25] Q: Do you know when you were fishing —

Page 74

*Stepski*

[1]

[2] you are looking at the photographs. Go ahead.

[3] A: Yes, I think it was on the starboard

[4] side.

[5] Q: On the day you were fishing, on the

[6] day of the accident, do you know how many

[7] satellites your GPS was acquiring?

[8] A: No.

[9] Q: Did you try to read any positions

[10] from your GPS that day?

[11] A: The position of my nets.

[12] Q: Did you have a Loran on board, a

[13] Loran-C?

[14] A: Yes, I had one on that boat.

[15] Q: What were you using to navigate that

[16] day, your Loran-C or your GPS or both?

[17] A: Both.

[18] Q: What were you using for the

[19] positions of your nets?

[20] A: That would be the Loran, as well as

[21] pictures on the charts of both. I would mark the

[22] nets on the chart plotter, but I would use the

[23] Loran numbers to get there, basically, as well as

[24] the picture, using them together.

[25] Q: Did your chart plotter, as most of

Page 75

*Stepski*

[1]
[2] them do, also have the time of day indicated on
[3] it?
[4]    A: I believe so.
[5]    Q: Would it have a box on the bottom
[6] that gave the GPS coordinates displayed?
[7]    A: Yes. It was in the top left corner,
[8] if I remember.
[9]    Q: The top left corner?
[10]   A: Yes.
[11]   Q: Where was your Loran-C in the
[12] wheelhouse?
[13]   A: I believe it was — I might have
[14] mounted it after these pictures, got that later
[15] on. I think I had it right up where that radio is
[16] in F. Can you see it in this picture over here?
[17]     I moved the radio here, I have the
[18] Loran, I have it right up in that corner.
[19]   Q: So the Loran was basically right
[20] between the radio and the radar?
[21]   A: Yes.
[22]   Q: When were these photographs taken
[23] that we have marked as Exhibit 1?
[24]   A: I don't know.
[25] This one, G here was before we had

Page 76

*Stepski*

[1]
[2] done any of the work, obviously. And most of
[3] these were all at the beginning, especially I,
[4] while we were building the wheelhouse.
[5]     H, I had been fishing it for a
[6] while. And that was at the dock.
[7]   Q: This H is completely modified?
[8]   A: Yes. Pretty much.
[9] I mean, I always have been doing
[10] stuff to the boat.
[11]   Q: H has a new wheelhouse?
[12]   A: Yes.
[13]   Q: And it had the new skeg or keel?
[14]   A: Yes.
[15]   Q: Does it have the pens?
[16]   A: No. They were taken out because I
[17] had been tuna fishing at that time.
[18]   Q: How about J, is that after
[19] modifications?
[20]   A: I don't know. I don't even see the
[21] name on there. So that probably was right before
[22] we finished.
[23]   Q: How about L?
[24]   A: Yes. That looks like the major
[25] modifications had been done.

Page 77

*Stepski*

[1]
[2]   Q: How about M?
[3]   A: Yes. That was right before our
[4] first trip.
[5]   Q: And would you tell me who the people
[6] are in the picture from left to right?
[7]   A: My father, my daughter Ava Claire,
[8] my dog Joey, me and my brother Nick.
[9]   Q: Is your daughter Ava Claire, is she
[10] a result from the union of you and Kirsten?
[11]   A: Yes.
[12]   Q: And on the end, who is that fellow?
[13]   A: That's my brother.
[14]   Q: If you would, look at F, photograph
[15] F. Is that before or after your modifications?
[16]   A: That was after.
[17]   Q: Would you please look at photograph
[18] C we have already talked about.
[19]     Was that after modifications?
[20]   A: Yes.
[21]   Q: How about photograph D, I think
[22] there were modifications, with the exception of
[23] Loran-C?
[24]   A: Yes. Well, as I explained, I moved
[25] the radar to that position in picture D because I

Page 78

*Stepski*

[1]
[2] mounted the Loran-C. That's it right there on
[3] that wooden frame. I remember that is where the
[4] Loran was.
[5]     Right after the radar, you can see
[6] the wooden frame. That housing is the Loran.
[7]   Q: When you are on the aft deck of this
[8] boat, after it was modified by you, could you look
[9] into the wheelhouse and see any of your electronic
[10] gear?
[11]   A: On the aft?
[12]   Q: If you were working on deck?
[13]   A: Where I work, yes, I can see all of
[14] them.
[15]   Q: Through what, through a window,
[16] through a door?
[17]   A: Through the window. You can see in
[18] D there, that glass window.
[19]   Q: That window D that we see in
[20] photograph D, I believe you said photograph G,
[21] that also shows a window, but I think you said
[22] that was before modification, right?
[23]   A: Yes.
[24]   Q: After?
[25]   A: Yes.

Page 79

Stepski

[1]
[2] **Q:** After modification was that window
[3] in about the same place?
[4] **A:** No. You can see in F where they
[5] were.
[6]    Basically, if I could explain, the
[7] edge of this cabin where you put a wall going
[8] forward and another wall coming over, which is
[9] this wall here where the windows are, and I would
[10] always stand up in that corner.
[11] **Q:** When you were standing hauling —
[12] the record is not going to pick that all up, I'm
[13] not sure it's necessary.
[14]    When you were hauling nets, how far
[15] were you from a window?
[16] **A:** Just on the backside of the gill net
[17] hauler. So probably three feet maybe.
[18] **Q:** Three feet from the window?
[19] **A:** Yes.
[20] **Q:** To get from where you ordinarily
[21] stood when you were hauling nets, to get into the
[22] wheelhouse, put your face close to the radar so
[23] that you could get a better picture of what you
[24] were looking at, how long would it take you to do
[25] that?

Page 80

Stepski

[1]
[2] **A:** I could do it pretty quick. I would
[3] just jump right over the table and walk in the
[4] door.
[5] **Q:** Jump over the table? What table did
[6] you have to jump over?
[7] **A:** You see in A here, the table that is
[8] coming right back to where those nets are.
[9] **Q:** That's the table that's sort of in
[10] the bottom of the picture?
[11] **A:** Yes.
[12] **Q:** Let's just label that table.
[13] On that table, if I understand, what
[14] happens is the nets come in and the hauler, they
[15] come up — what did you call it?
[16] **A:** A roller.
[17] **Q:** Around the hauler and they slide
[18] down that table?
[19] **A:** Yes.
[20] **Q:** Is that what happened?
[21] **A:** Yes.
[22] **Q:** And they go into a box to hold them?
[23] **A:** Yes.
[24] **Q:** You have to climb over that table we
[25] have just been talking about?

Page 81

Stepski

[1]
[2] **A:** Yes.
[3] **Q:** And go into the wheelhouse?
[4] **A:** Yes.
[5] **Q:** From where you would stand
[6] three feet from that window to the wheelhouse,
[7] could you actually see what was being displayed on
[8] your radar?
[9] **A:** Yes. You could see it right in
[10] front of the window.
[11] **Q:** How big was the display on that
[12] radar?
[13] **A:** Probably eight to ten inches.
[14] **Q:** You indicated a rectangle with your
[15] hands.
[16] About eight to ten inches?
[17] **A:** Yes. It was a little more taller
[18] than it was wide, so maybe eight inches wide by
[19] ten inches tall.
[20] **MR. SINGLETON:** By the way, I
[21] asked for the radar manual on the
[22] other boat, for the manual. I believe
[23] it is the one that the witness
[24] believes is the one that went onto the
[25] AVA CLAIRE, not just the operations

Page 82

Stepski

[1]
[2] manual, but they should have a
[3] technical manual in there with it?
[4] **MR. HEALEY:** Off the record.
[5] (Discussion off the record.)
[6] **MR. SINGLETON:** Would you mark
[7] that as No. 2, please.
[8] (Johnson Marine Service 3/2/03
[9] survey was marked as Exhibit No. 2 for
[10] identification, as of this date.)
[11]          **BY MR. SINGLETON:**
[12] **Q:** Let me show you what has been marked
[13] as Exhibit 2.
[14] Would you take a quick minute and
[15] leaf through that, if you would?
[16] **A:** (Perusing document.)
[17] **Q:** You mentioned earlier that
[18] Mr. Johnson came to do a survey to your boat?
[19] **MR. HEALEY:** Are you finished
[20] reading that?
[21] Listen to the question.
[22] **Q:** Are you done?
[23] **A:** Yes.
[24] **Q:** The Johnson survey, Johnson Marine
[25] Service came and did a survey on your boat and

Page 83

*Stepski*

[1]
[2] basically by this document you testified he did
[3] visit the boat about when you were starting or
[4] during your repairs that you made.
[5]    Is this a survey that's the result
[6] of that?
[7]    A: Yes.
[8]    Q: The survey itself says he conducted
[9] the survey on March 25th, after then, 3/31/2003.
[10]    I believe you said you started these
[11] repairs very shortly after you acquired the boat,
[12] four days or so?
[13]    A: Yes.
[14]    Q: So does that mean it's fair to say
[15] you acquired the AVA CLAIRE sometime in March of
[16] 2003?
[17]    A: I believe so.
[18]    Q: Is it also fair to say that you
[19] hadn't done any fishing with the AVA CLAIRE yet
[20] when this inspection occurred?
[21]    A: Right.
[22]    Q: If we look at the photograph that's
[23] on the very front, is that the AVA CLAIRE before
[24] modifications, at least to her wheelhouse or after
[25] modifications to her wheelhouse?

Page 84

*Stepski*

[1]
[2]    A: Before.
[3]    Q: Do you recall whether there were any
[4] other photographs attached to this survey when you
[5] received it?
[6]    A: I don't believe so.
[7]    Q: Would you turn to Page 3 of 8,
[8] please — sorry, it's actually Page 4 of 8.
[9]    You will see under the column Loran,
[10] it says no.
[11]    Do you understand that to mean that
[12] you had no Loran fitted on this boat at this time?
[13]    A: Right.
[14]    Q: When did you actually install the
[15] Loran?
[16]    A: I don't remember.
[17]    Q: About how long before the accident?
[18] Let's work backwards.
[19]    A: I really can't remember.
[20]    Q: Was the EPIRB that was on this
[21] vessel on it when you acquired it?
[22]    A: No.
[23]    Q: So did you purchase a new EPIRB?
[24]    A: No. I took that one off my little
[25] boat, the RICHARD ERIC—

Page 85

*Stepski*

[1]
[2]    Q: The RICHARD ERIC?
[3]    A: Yes.
[4]    Q: Are the manuals for that EPIRB still
[5] on the RICHARD ERIC?
[6]    A: No. I believe it went down with the
[7] boat.
[8]    Q: You moved the manuals over as well
[9] to the AVA CLAIRE?
[10]    A: I don't remember if there were
[11] manuals — yes. Everything I had with that I
[12] moved onto the AVA CLAIRE.
[13]    Q: Tell me about the EPIRB, what type
[14] of EPIRB was it?
[15]    A: 406 is the number I remember.
[16]    Q: Was it an EPIRB that was, as far as
[17] you remember, that was designed to be
[18] hydrostatically activated or did it have to be
[19] manually activated?
[20]    A: Manual, it was a float free. Floats
[21] activates it.
[22]    Q: It doesn't have to be submerged to a
[23] certain depth in order to be activated?
[24]    A: I'm not sure about that. I believe
[25] just getting wet.

Page 86

*Stepski*

[1]
[2]    Q: Water activated?
[3]    A: Yes.
[4]    Q: But?
[5]    A: Yes.
[6]    Q: But it has to be free of its mount
[7] in order to be activated?
[8]    A: No. It slides out if the mount goes
[9] under water.
[10]    Q: Do you have any information at all
[11] left at home or on other boats regarding this
[12] EPIRB?
[13]    A: I don't think so, no.
[14] I think we asked the Coast Guard if
[15] they had the model number, but I don't know if we
[16] obtained that.
[17]    Q: If you turn to Page 6 of this
[18] report, under hull deck and hardware at the
[19] bottom.
[20]    The very first entry talks about
[21] higher than normal moisture. And it recommends a
[22] repair of the affected cord material.
[23]    Was that repair ever made?
[24]    A: Yes. It was going to be the next
[25] time I hauled out.

Page 87

Stepski

[1]
[2]   Q: No. 2, it was recommended to install
[3] a rudder step and it continues.
[4]    Was that repair or modification ever
[5] made?
[6]   A: Yes.
[7]   Q: If you would go to the next page,
[8] recommendation No. 2 regarding the electrical
[9] wiring.
[10]    Was that done?
[11]   MR. HEALEY: Read it.
[12]   A: No. 2?
[13]   MR. HEALEY: Yes.
[14]   A: (Perusing document.) Yes.
[15]   Q: If you go down under the conclusion,
[16] about halfway down the paragraph, it says, "It is
[17] the surveyor's opinion that this vessel is
[18] considered to be a good insurance risk with the
[19] above one priorities corrected."
[20]    Was the primary reason for this
[21] inspection insurance purposes?
[22]   A: It was a combination of insurance,
[23] the loan and to make sure that the hull was a
[24] good, sound hull. I wanted to know for myself.
[25]   Q: It says here she has been used as a

Page 88

Stepski

[1]
[2] working vessel.
[3]    Do you know, by that do you know
[4] what she had been used for before you acquired
[5] her?
[6]   A: Lobstering.
[7]   Q: That was a lobster — I know you
[8] said that earlier. I was wondering if by working
[9] vessel, she was used for some other purpose?
[10]   A: Not that I know of.
[11]   Q: It continues on, "has been
[12] maintained in below average condition."
[13]    Was that your assessment of her, as
[14] well?
[15]   A: Yes.
[16]   Q: Did Mr. Johnson, I assume he sent
[17] you a bill for his services?
[18]   A: Yes.
[19]   Q: I assume you paid the bill?
[20]   A: Yes.
[21]   Q: Do you have a copy of that bill?
[22]   A: I should.
[23]   MR. SINGLETON: I would ask
[24] that a copy of that bill be produced.
[25]   MR. HEALEY: If we have it,

Page 89

Stepski

[1]
[2] you have it.
[3]    It's Johnson's survey bill,
[4] correct?
[5]   MR. SINGLETON: Correct.
[6]    (Whereupon, at 12:20 o'clock
[7] p.m., a recess was taken.)
[8]    (Whereupon, at 12:30 o'clock
[9] p.m., the deposition resumed with all
[10] parties present.)
[11] MICHAEL A. STEPSKI,
[12] resumed and testified further as follows:
[13]   MR. SINGLETON: Would you mark
[14] that as 3, please.
[15]    (Athearn Marine Agency survey
[16] was marked as Exhibit No. 3 for
[17] identification, as of this date.)
[18]                BY MR. SINGLETON:
[19]   Q: Let me show you what has been marked
[20] as Exhibit 3.
[21]    Can you tell me what that is?
[22]   A: (Perusing document.)
[23]   Q: I can read that it's an Athearn
[24] Marine Agency report. But for what reason was
[25] this report done or inspection done?

Page 90

Stepski

[1]
[2]   A: This is just a boat that's for sale,
[3] a similar one to mine.
[4]   Q: So this is not your boat?
[5]   A: No.
[6]   Q: It doesn't have anything to do with
[7] your boat?
[8]   A: No.
[9]   Q: I know it's hard to see. There is a
[10] picture on Page 3 of a boat.
[11]    Is that your boat?
[12]   A: No.
[13]   Q: So this document has nothing to do
[14] with any of the statistics or gear or anything
[15] with the AVA CLAIRE, is that a correct statement?
[16]   A: Yes, that's correct. Just a similar
[17] boat, about the same size, same engine.
[18]   Q: Did you obtain a copy of this
[19] yourself or did somebody else obtain a copy?
[20]   A: I think I obtained this.
[21]   Q: Why did you obtain it?
[22]   A: To show my lawyers a similar boat
[23] and value.
[24]   Q: The Loran that you put on the AVA
[25] CLAIRE, did you purchase that new?

Page 91

*Stepski*

[1]
[2] A: No, used.
[3] Q: But you purchased it?
[4] A: Yes.
[5] Q: Do you have a bill of sale or
[6] anything for that or receipt for payment?
[7] A: I don't know if I would. I can't
[8] remember where I bought it.
[9] Q: Do you have receipts for any of the
[10] electronic gear that you installed, that you
[11] purchased and installed on the AVA CLAIRE?
[12] A: I am sure I have one for the auto
[13] pilot and the maybe the fish finder. I would have
[14] to look that up.
[15]     My wife looked for most of that
[16] stuff. So she would know better.
[17] Q: Did you bring any documents with you
[18] today?
[19] A: No.
[20] MR. HEALEY: Before you leave
[21] then, I think Kirsten was indicating
[22] they probably have some.
[23]     So make a note, I will get any
[24] document if that exists.
[25] MR. SINGLETON: May we mark

Page 92

*Stepski*

[1]
[2] this as Exhibit 4, please.
[3]     (Johnson Marine Services
[4] 8/4/04 survey was marked as Exhibit
[5] No. 4 for identification, as of this
[6] date.)
[7] BY MR. SINGLETON:
[8] Q: I show you what we have marked as
[9] Exhibit 4, Johnson Marine Services called survey,
[10] it says at the request of Mr. Stepski.
[11]     Do you see that?
[12] A: (Perusing document.) Yes.
[13] Q: Why did you make this request to
[14] Captain Ken Johnson?
[15] A: I wanted to get a value of the boat
[16] after I had done all the work that I had done to
[17] it.
[18] Q: How did Mr. Johnson know what
[19] equipment to value?
[20] A: Because I told him what I had done
[21] to the boat.
[22] Q: So you told him?
[23] In other words, you told him, "I put
[24] an auto pilot on, depth sounder, Furuno radar," so
[25] on and so forth?

Page 93

*Stepski*

[1]
[2] A: Yes.
[3] Q: Because he didn't see it before the
[4] accident, did he?
[5] A: No, not just before. He had seen it
[6] at some point along the line.
[7] Q: Did he do a survey of it since his
[8] initial survey?
[9] A: No.
[10] Q: Did anybody do a survey of your
[11] vessel between the Johnson survey and when the
[12] accident occurred?
[13] A: No.
[14] Q: Did you provide Mr. Johnson with any
[15] documentation to support the various items that
[16] you wanted valued by him?
[17] A: I don't remember.
[18] I don't remember if I just told him
[19] or if I showed him.
[20] Q: If you would turn to the second page
[21] of the document, there are some hours next to the
[22] various items labeled A, B, C, D and E.
[23]     Whose hours does that represent?
[24] A: That's mine.
[25] Q: In other words, you spent 120 hours

Page 94

*Stepski*

[1]
[2] of your time rebuilding the wheelhouse?
[3] A: Well, I had a helper that I was
[4] paying.
[5] Q: Well, is the 120 hours just for your
[6] time or is it for your time and your helper's
[7] time?
[8] A: I don't remember how we came up with
[9] that number. I could probably find out.
[10] MR. HEALEY: If you don't
[11] remember, you don't remember.
[12] Q: It says at the bottom total hours,
[13] 460 hours times $60 per hour, I suppose, equals a
[14] figure.
[15]     And $60 per hour, how did you arrive
[16] at that figure?
[17] A: Well, I believe we went by what that
[18] kind of work would cost if you had somebody else
[19] do it, what they would charge.
[20] Q: Where did you get that figure from?
[21] In other words, where did you get your idea of
[22] what someone else would charge?
[23] A: Just from knowing what those kind of
[24] things go for.
[25] Q: You said in response to my question

Page 95

**Stepski**

[1]
[2] about A, the 120 hours, or that 120 hours, whether
[3] that 120 hours included any hours for your help,
[4] you said you don't know, can't remember.
[5]     Is that going to be your same answer
[6] for B, C, D and E, as well?
[7]     A: Yes.
[8]     Q: Is there anything you can look at
[9] that would help refresh your memory as to whether
[10] those are just your hours or whether they include
[11] a helper's hours in there?
[12]     A: Is there any what?
[13]     Q: Any document you can look at to help
[14] refresh your memory as to whose time is included
[15] in those hours?
[16]     A: Well, this is Johnson figuring.
[17] I can probably discuss it with my
[18] wife and maybe even Mr. Johnson how we figured
[19] those hours and let you know.
[20]     Q: That raises a question.
[21] Did you give Mr. Johnson the number
[22] of hours that you thought was required to do it or
[23] did he look at the job and estimate the number of
[24] hours he thought would be required to do it?
[25]     A: I probably told him.

Page 96

**Stepski**

[1]
[2]     Q: I think you said the people that
[3] helped you were your father, your brother, and
[4] some friends?
[5]     A: Yes.
[6] There was one guy that was working
[7] with me pretty steady every day.
[8]     Q: Did you pay anybody for their help?
[9]     A: Yes.
[10]     Q: Who did you pay?
[11]     A: This one guy. His name was Eugene,
[12] I don't remember the last name. I can find out
[13] though.
[14]     Q: Do you remember where Eugene lives?
[15]     A: I believe somewhere in Connecticut,
[16] Plainfield or something like that.
[17]     Q: Do you have his address or can you
[18] get his address?
[19]     A: Yes, I could probably get it.
[20]     MR. SINGLETON: I would like
[21] your counsel to provide us with his
[22] full name and present address or last
[23] known address that you had for him.
[24]     A: Sure.
[25]     Q: How much did you pay Eugene?

Page 97

**Stepski**

[1]
[2]     A: There was no set pay.
[3] I didn't really do like an hourly
[4] thing. I think I paid him probably, it was always
[5] different, depending on the job. You know what I
[6] mean?
[7]     Q: What did you pay him total for the
[8] work that's listed here under A, B, C, D and E on
[9] Page 2 of Exhibit 4?
[10]     A: He basically did my — like I said,
[11] it would depend on each job and how long he worked
[12] throughout the day.
[13] He did a lot of the sanding. He
[14] helped me with pretty much everything on the boat
[15] when he was there. I would just kind of figure a
[16] fair pay for the day and give him.
[17]     Q: Okay.
[18] Well, in total, what did you
[19] consider fair and what did you pay him?
[20]     A: In total for the whole job?
[21]     Q: Yes.
[22]     A: I don't know, because it was just
[23] cash on a daily basis.
[24]     Q: Do you have any records of that?
[25]     A: No.

Page 98

**Stepski**

[1]
[2]     Q: You didn't withhold any tax for this
[3] guy or anything like that?
[4]     A: No.
[5]     Q: Is there anything you can think of
[6] that you can look at that would help you remember
[7] over the total course of the job what you paid to
[8] Eugene?
[9]     A: I could probably get a rough figure,
[10] but I don't know exactly.
[11]     Q: What would you look at to get your
[12] rough figure?
[13]     A: If I could figure about how long we
[14] worked on the boat, how many weeks.
[15] I know I paid him at least $50 a
[16] day. Probably get a rough idea.
[17]     Q: How many days did he work?
[18]     A: I don't know.
[19]     Q: Is there anything you can look at to
[20] help refresh your memory as to how many days
[21] Eugene worked?
[22]     A: Not in front of me here.
[23]     Q: Not just here.
[24]     A: Like I said, if I could figure out
[25] how long we worked on the boat, I don't know if I

Page 99

[1] *Stepski*
[2] have something that would show me that.
[3]    I can probably figure by the time we
[4] started fishing versus the time we bought it and
[5] figure out how long he worked on the boat.
[6]    I think he was with me right through
[7] the whole restoration, probably get an idea.
[8]    **Q:** How long did the restoration take?
[9]    **A:** That's what I don't know right now.
[10]   **Q:** What records would you go look at
[11] for you to determine how long the restoration
[12] took?
[13]   **A:** Well, from the time I bought the
[14] boat versus the time I started fishing?
[15]   **Q:** What would we look at to determine
[16] when you started fishing?
[17]   **A:** Probably when my first catch was.
[18]   **Q:** Did you work on the boat every
[19] single day from the time you bought it until the
[20] time you went out for your fishing for the first
[21] time?
[22]   **A:** Yes.
[23]   **Q:** Was Eugene with you every single day
[24] that you worked on the boat?
[25]   **A:** Not every single day, but most days.

Page 100

[1] *Stepski*
[2]   **Q:** When I say every single day, I mean
[3] seven days a week, because that's when you were
[4] there.
[5]    And how many days on average would
[6] you say Eugene was there?
[7]   **A:** I think back, I think he was with me
[8] almost every day, too.
[9]   **Q:** Are we talking about like a
[10] three-week period or a month period, do you
[11] remember?
[12]   **A:** I think I started fishing in April.
[13] This report was done in March. So maybe a month.
[14]    I don't think he finished this
[15] report for a while. So I would say at least a
[16] month we worked on it. I think it was more than
[17] that though.
[18]    Like I said, from the time I bought
[19] it to the first catch.
[20]   **Q:** Would it be fair to say Eugene
[21] probably worked about 30 days during that period
[22] of time or not fair to say?
[23]   **A:** Yes, that would be fair to say.
[24]   **MR. SINGLETON:** Mark that as
[25] the next exhibit, please.

Page 101

[1] *Stepski*
[2]    (Certificate of documentation
[3] was marked as Exhibit No. 5 for
[4] identification, as of this date.)
[5]    **BY MR. SINGLETON:**
[6]    **Q:** Who did you purchase the AVA CLAIRE
[7] from?
[8]    **A:** I got it through Athearn Marine
[9] Agency.
[10]   The AVA CLAIRE you are asking?
[11]   **Q:** Yes.
[12]   **A:** I bought that from Skip Myers.
[13]   **Q:** What was the prior name of the AVA
[14] CLAIRE when Mr. Myers operated it?
[15]   **A:** That was THE VIKING.
[16]   **Q:** And Skip Myers, where does he live?
[17]   **A:** Waterford, Connecticut.
[18]   **Q:** Is it M-e-y-e-r-s?
[19]   **A:** It's M-y-e-r-s.
[20]   **Q:** Was the AVA CLAIRE ever known as the
[21] fishing vessel WINTERS?
[22]   **A:** No.
[23]   **Q:** There have been some documents that
[24] have been produced to us and I have stapled them
[25] together and marked them as Exhibit 5.

Page 102

[1] *Stepski*
[2]    Let me show them to you.
[3] The first page indicates a
[4] certificate of documentation for the AVA CLAIRE.
[5] It's dated April 18, 2003.
[6]    And the second page has to do with
[7] this vessel, F/V WINTERS.
[8]    What relationship do these documents
[9] have to the AVA CLAIRE?
[10]   **A:** (Perusing document.) The federal
[11] fishing permits were taken off this boat and
[12] transferred to the AVA CLAIRE.
[13]   **Q:** Fishing permits were taken off the
[14] F/V WINTERS and transferred to the AVA CLAIRE?
[15]   **A:** Yes.
[16]   **Q:** But did you buy the F/V WINTERS from
[17] Mr. Frye?
[18]   **A:** I bought it and sold it right back
[19] to him. To transfer the permits, that's how it's
[20] done.
[21]   **Q:** Explain to me exactly what you did.
[22]   **A:** The way you buy the boat, transfer
[23] the permits and then sell the boat back to the
[24] person.
[25]   **Q:** Couldn't Mr. Frye have transferred

Page 103

### Stepski

[1]
[2] the fishing permits directly to you?
[3]    **A:** I don't believe so.
[4]    **Q:** Because in order to transfer a
[5] permit, it has to be between boats under the same
[6] ownership?
[7]    **A:** Yes, I think so. That's why we did
[8] it that way.
[9]    **Q:** I notice that both of these
[10] documents, Pages 2 and 3 of Exhibit 5, have the
[11] date April, then a blank, 2003.
[12]    Was that blank ever filled in?
[13]    **A:** What blank?
[14]    **Q:** Do you see at the top, see the date
[15] April blank, 2003?
[16]    **MR. HEALEY:** There is a blank
[17] April 2003?
[18]    **Q:** Do you see the place?
[19]    **MR. HEALEY:** I agree there is
[20] no number for a day. Whether or not
[21] that was intended, I don't know.
[22]    I agree it doesn't have a day
[23] number.
[24]    Do you see what he is talking
[25] about?

Page 104

### Stepski

[1]
[2]    **THE WITNESS:** Yes.
[3]    **Q:** Let me start again.
[4] Were these documents sent to the
[5] National Marine Fisheries Service?
[6]    **A:** I would have to say so.
[7]    **Q:** Was a day filled in for the date
[8] before they were sent?
[9]    **A:** I don't know.
[10]    **Q:** You say they were sent because you
[11] were permitted to transfer the fishing permits for
[12] the F/V WINTERS to the AVA CLAIRE; is that
[13] correct?
[14]    **A:** Yes.
[15]    **Q:** But, in fact, you never physically
[16] took ownership of this F/V WINTERS vessel, did
[17] you?
[18]    **A:** Physically?
[19]    **Q:** Yes?
[20]    **A:** No, I guess not.
[21]    **Q:** Was the sale to your company and
[22] then the resale back to Mr. Frye simultaneous, was
[23] that the intention?
[24]    **A:** I'm not sure how long that took.
[25]    **Q:** Let me state it a different way.

Page 105

### Stepski

[1]
[2]    Did you ever intend to purchase and
[3] own the F/V WINTERS?
[4]    **A:** For a long enough time to transfer
[5] the permit.
[6]    **Q:** But you never operated her?
[7]    **A:** Right.
[8]    **Q:** After the permits were transferred,
[9] you sold her back to Mr. Frye?
[10]    **A:** Right.
[11]    **Q:** How much money changed hands?
[12]    **A:** I don't remember.
[13]    **Q:** Did you pay Mr. Frye any money at
[14] all?
[15]    **A:** For the permits, the whole thing,
[16] yes.
[17]    It's really Athearn.
[18]    **Q:** But you paid Mr. Frye for the
[19] permits, that is did you pay him for the boat?
[20]    **A:** I believe so.
[21]    **Q:** Do you have checks for this or
[22] evidence of this?
[23]    **A:** I should. I don't know.
[24]    **MR. SINGLETON:** I would like
[25] evidence of the actual payment.

Page 106

### Stepski

[1]
[2]    **MR. HEALEY:** Is there any
[3] relevance to any of this?
[4]    Will you tell me why you are
[5] doing it?
[6]    **MR. SINGLETON:** Yes, but I'm
[7] not going to tell you in front of the
[8] witness. I will tell you later.
[9]    **Q:** This whole transfer with Mr. Frye
[10] was arranged through his broker, Athearn?
[11]    **A:** Yes.
[12]    **Q:** Let's go to the very last page where
[13] it says indemnity.
[14]    Do you know whose signature appears
[15] here over the box witness?
[16]    **A:** No.
[17]    **Q:** This indemnity, do you know was this
[18] also given to the National Marine Fisheries?
[19]    **A:** I don't know.
[20]    **Q:** If you would turn to the fourth page
[21] of the document, it's the U.S. Department of
[22] Commerce Marine Fisheries Service vessel
[23] application.
[24]    That's your signature that appears
[25] at the bottom there?

Page 107

Stepski

[1]
[2] A: Yes.
[3] Q: If you go to the next two pages
[4] after that, it says general information.
[5] Is this your signature that appears
[6] there, as well?
[7] A: Yes.
[8] Q: If you would go a little further
[9] over into the document, there is a law firm's
[10] letterhead here, I don't think I will be able to
[11] pronounce it, Cianciulli, C-i-a-n-c-i-u-l-l-i and
[12] Ouellette?
[13] A: Ouellette.
[14] Q: Are they your lawyers?
[15] A: Yes. They worked with me through
[16] this.
[17] Q: If you turn one more page, there is
[18] next to initial cash exchange or replacement of
[19] documentation, redocumentation.
[20] Is that your signature on the second
[21] page of that application?
[22] A: Yes.
[23] Q: What is the name of your company
[24] that owned the AVA CLAIRE?
[25] A: Niantic Fish, LLC.

Page 108

Stepski

[1]
[2] Q: It's an LLC.
[3] Who are the shareholders in the LLC?
[4] A: Shareholders? I think I'm the sole
[5] member.
[6] Q: Do you have officers or directors?
[7] A: No.
[8] Q: Outside of the AVA CLAIRE, did
[9] Niantic Fish own any other assets or have any
[10] other assets?
[11] A: I don't believe so.
[12] Q: With the loss of the AVA CLAIRE,
[13] were you able to transfer the fishing permits to
[14] one of the other vessels?
[15] A: Yes.
[16] Q: Did you do that?
[17] A: Yes.
[18] Q: Which vessel now has those permits?
[19] A: MADELINE RUTH.
[20] Q: Niantic Fish were the registered
[21] owners of the AVA CLAIRE?
[22] A: Documented owners, yes.
[23] Q: I have one more question on this.
[24] I think we will break for lunch.
[25] MR. SINGLETON: Would you mark

Page 109

Stepski

[1]
[2] this, please.
[3] (Insurance binder was marked
[4] as Exhibit No. 6 for identification,
[5] as of this date.)
[6] BY MR. SINGLETON:
[7] Q: Let me show you what we have marked
[8] as Exhibit 6. That's titled insurance binder.
[9] Is this actually a copy of the
[10] policy of insurance that you had for the AVA
[11] CLAIRE?
[12] A: I believe so.
[13] Q: You do or you don't?
[14] A: I do believe so.
[15] Q: Looks like for hull and machinery
[16] you had an insured value of $35,000; is that
[17] correct?
[18] A: Yes.
[19] Q: After you made your modifications to
[20] the vessel, did you attempt to increase the amount
[21] of insurance?
[22] A: No.
[23] Q: Why not?
[24] A: Well, I wasn't done with all the
[25] work I wanted to do to it.

Page 110

Stepski

[1]
[2] Q: You mean even after you made the
[3] modifications, you weren't done with everything
[4] you wanted to do with it?
[5] A: Yes. There were still further
[6] improvements I wanted to do with the boat.
[7] I was going to wait until I finished
[8] off the fish hold and put a generator in and just
[9] redo the insurance then, have another survey done.
[10] Q: Finish off down below?
[11] A: I wanted to build cabinets and all
[12] that.
[13] Q: That may be so, but your insurance
[14] was up for renewal every year, wasn't it?
[15] A: Yes.
[16] Q: Why didn't you, at the renewal time
[17] at least increase it enough to cover the work that
[18] you had already done?
[19] A: Because I would have to pay for
[20] another survey.
[21] Q: Yes. You probably would have to pay
[22] a higher premium, too?
[23] A: Yes.
[24] Q: So you made a conscious decision not
[25] to increase the insurance?

Min-U-Script®

FINK & CARNEY (800) NYC-FINK

Page 111

Stepski

[1] A: Well, my decision was to increase
[2] insurance once I finished all the work I wanted to
[3] do.
[4] Q: My question is, you made a conscious
[5] decision not to increase the insurance before you
[6] completed all the work that you wanted to do?
[7] MR. HEALEY: Do you understand
[8] him?
[9] THE WITNESS: Yes, I do.
[10] A: Yes, I guess so.
[11] Q: If you would look at this policy, it
[12] also indicates you got a million dollars
[13] protection indemnity insurance.
[14] Do you understand what that is,
[15] protection indemnity?
[16] A: If I am sued.
[17] Q: If you are sued.
[18] Look at the effective date of the
[19] insurance and the expiration date. According to
[20] the policy here, it's effective April 4, 2003, and
[21] it expires April 4, 2004, which was about four or
[22] six weeks or so before the accident.
[23] That's all that has been produced.
[24] Was the policy renewed?

Page 112

Stepski

[1] A: Yes.
[2] Q: Do you have a copy of the binder for
[3] the renewal?
[4] A: I should.
[5] MR. SINGLETON: I would like a
[6] copy of that renewal produced.
[7] Q: Do you know when you renewed it if
[8] you increased the hull insurance from $35,000 to
[9] some greater amount?
[10] A: I don't believe.
[11] Q: Because of your decision not to
[12] increase the insurance before you finished all the
[13] work you wanted to do; is that right?
[14] A: Yes.
[15] Q: It says here on the insurance,
[16] operation of property description. It says
[17] inshore and then C/F/V.
[18] What does the C stand for,
[19] commercial?
[20] A: I don't know.
[21] MR. HEALEY: Where are you
[22] looking?
[23] MR. SINGLETON: Under
[24] operation of property description.

Page 113

Stepski

[1] Q: What do you understand inshore to
[2] be?
[3] A: Inshore, meaning not to — I don't
[4] know what they consider inshore, but distance.
[5] Q: You don't know what that distance is
[6] off land, where the shore stops and the offshore
[7] begins?
[8] A: No.
[9] Q: When you took out the insurance,
[10] where did you tell the insurance company you were
[11] going to be fishing?
[12] A: I believe I told them all the way
[13] from New Jersey to Massachusetts.
[14] Q: How far did you tell them you
[15] intended to go off the coast?
[16] A: I don't remember.
[17] Q: Did the insurance company, have you
[18] been paid yet on the hull and machinery policy?
[19] A: Yes.
[20] Q: So you have received how much from
[21] the insurance company?
[22] A: It was just 35,000.
[23] Q: They didn't withhold the deductible?
[24] A: Deductible.

Page 114

Stepski

[1] Q: You have a $2,500 deductible on your
[2] insurance policy?
[3] A: I don't remember.
[4] Q: Well, how did you get paid, in the
[5] form of a check?
[6] A: Yes.
[7] Q: Do you have a copy of that check?
[8] A: I don't know if we saved a copy. I
[9] probably have it.
[10] Q: When you received the check, did you
[11] make a deposit of that check into a bank account?
[12] A: Actually, no.
[13] We gave it to Sector that financed,
[14] meaning the company that financed me. And he held
[15] it until he got the boat.
[16] Q: You endorsed it over to him?
[17] A: Yes.
[18] Q: Was the check made payable to you or
[19] made payable to Sector?
[20] A: I don't remember.
[21] Q: But your recollection was it was a
[22] $35,000 check?
[23] A: Yes.
[24] Q: As part of payment of that check,

Page 115

**Stepski**

[1]
[2] did you have to sign anything such as a
[3] subrogation receipt or any other kind of document
[4] from the insurance company presented to you?
[5] A: I don't remember.
[6] MR. SINGLETON: Why don't we
[7] take your lunch break.
[8] (Whereupon, at 1:10 o'clock
[9] p.m., a luncheon recess was taken.)
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 116

**Stepski**
**AFTERNOON SESSION**

[1]
[2]
[3] November 9, 2006
[4] 2:05 o'clock p.m.
[5] MICHAEL A. STEPSKI, having
[6] been previously duly sworn, was examined
[7] and testified further as follows:
[8] BY MR. SINGLETON:
[9] Q: Who is the policyholder?
[10] A: Niantic Fish.
[11] Q: Your insurance, right, apart from
[12] what inshore and offshore means, were you aware
[13] whether there was a limit as to how far you could
[14] go away from land under that policy?
[15] A: I don't know. I don't remember
[16] there being a limit.
[17] Q: Did you read the policy to see if
[18] there was a limit or did your broker explain that
[19] to you?
[20] A: I believe he went through the whole
[21] thing.
[22] Q: If you would turn to Page 4 of the
[23] exhibit, Exhibit 6?
[24] MR. HEALEY: I don't think you
[25] are on the right page.

Page 117

**Stepski**

[1]
[2] Q: Schedule, it says for AVA CLAIRE at
[3] the very bottom, basically navigation at the end
[4] of that paragraph, not to exceed 20 miles
[5] offshore?
[6] MR. HEALEY: It does say that,
[7] we agree.
[8] Did you put a question to him?
[9] Q: I thought I did. Let me refer you
[10] to that.
[11] My question is, were you aware of
[12] this restriction in the policy?
[13] A: No.
[14] Q: The place where the incident
[15] occurred, were you more than 20 miles offshore?
[16] A: Yes.
[17] Q: You mentioned the keel, that you had
[18] replaced the keel on the AVA CLAIRE?
[19] A: Yes. Skeg.
[20] Q: Just the skeg?
[21] A: Yes.
[22] Q: If you would, would you sort of draw
[23] for me, I'm going to give you a piece of paper,
[24] the bottom of the vessel.
[25] On the side view, just show me what

Page 118

**Stepski**

[1]
[2] it is that you actually replaced.
[3] A: Indicating it's about here. At the
[4] end of the keel, the prop here and just this bit
[5] here I replaced (indicating).
[6] MR. SINGLETON: The witness
[7] has made a drawing on a piece of lined
[8] paper.
[9] Q: You want to just label that skeg?
[10] A: Okay.
[11] Q: How long of a piece was this in real
[12] life?
[13] A: It was probably, I would say, about
[14] close to two to three feet.
[15] Q: What was the depth of it?
[16] A: The width of it?
[17] Q: Yes, the vessel is sitting from the
[18] water, from top to bottom.
[19] MR. HEALEY: I don't follow
[20] you.
[21] Q: The vessel sitting in the water,
[22] from the part that is closest to the propeller to
[23] the part that's closest to the bottom of the boat?
[24] A: It was only about 23 inches, a piece
[25] of the channel.

Page 119

**Stepski**

[1]

[2] Q: How did you affix a new skeg to the

[3] structure of the vessel?

[4]    A: There is a channel and welded

[5] plates. There was four of them to the side of it

[6] going up, and bolt it right through the keel.

[7]    Q: Can you just put little lines where

[8] you bolted it?

[9]    A: The plate ran all the way up here.

[10] This is where it went past, where the old skeg was

[11] cut off.

[12]    Q: Did the new skeg extend farther than

[13] the old skeg did?

[14]    A: No, the same.

[15]    Q: The same? And what size bolts did

[16] you use, what diameter bolts?

[17]    A: They were probably

[18] three-quarter-inch stainless bolts.

[19]    Q: Did you thread the holes so that

[20] they would bolt into something on the vessel or

[21] did you put nuts on them?

[22]    A: We put nuts and bolted it to the

[23] other side of the plates on the other side, so

[24] there were plates on either side of that coming up

[25] the side of the keel.

Page 120

**Stepski**

[1]

[2]    Then we bolted right through the

[3] keel into the next plate.

[4]    Q: So you sort of straddled the keel

[5] with this thing?

[6]    A: Yes.

[7]    Q: And the bolt went right through one

[8] plate through the keel, but the other plate, then

[9] a bolt, then a nut to tighten it down?

[10]    A: Yes.

[11]    Q: How many bolts were there?

[12]    A: One in each one.

[13]    Q: One of those plates?

[14]    A: Yes.

[15]    Q: Then the way you have drawn the

[16] plates, that's the orientation top to bottom the

[17] way they would fit in?

[18]    A: Yes.

[19]    Q: Why is it that you replaced the old

[20] one? What was wrong with the old one?

[21]    A: There was some delamination on the

[22] end of it and I didn't like it the way it was.

[23] And rather than refiberglass, I thought that it

[24] would be better to just put a nice solid steel

[25] piece in its place. It seemed a little safer to

Page 121

**Stepski**

[1]

[2] me.

[3]    Q: You drilled holes, I guess?

[4]    A: Yes.

[5]    Q: How far were those bolt holes apart,

[6] how much distance between the bolts?

[7]    A: Each plate was six inches wide. And

[8] I think there was six inches between each plate,

[9] so the bolts would be a foot.

[10]    Q: A foot apart?

[11]    A: About a foot apart, yes.

[12]    MR. SINGLETON: Ms. Reporter,

[13] please mark that as an exhibit,

[14] please.

[15]    (Diagram of repair was marked

[16] as Exhibit No. 7 for identification,

[17] as of this date.)

[18]    BY MR. SINGLETON:

[19]    Q: Since your artwork looks worthy of

[20] replication, what I would like you to do now is we

[21] had the photographs of your vessel, of the AVA

[22] CLAIRE, but they really don't give you a good

[23] plain view down top of it, like a bird's eye view

[24] looking down, of how it was laid out, where you

[25] had your fish pens and tables.

Page 122

**Stepski**

[1]

[2]    Could you draw that diagram?

[3] Doesn't have to be to scale, just as close as you

[4] can, an accurate depiction what it looked like?

[5]    A: Transom here would be the first set

[6] of pen boards coming across.

[7]    The second set of pen boards, of

[8] course, we have the pens set up so there's three,

[9] three pens here. Cabin wall, split. The hull

[10] right up in the corner, hauler right up in the

[11] corner here. Another set of pen boards running

[12] right here and here.

[13]    I would stand right here.

[14]    MR. HEALEY: Just lay the ship

[15] out for him and get a question.

[16]    A: This being a fish pen, you would

[17] have one here, the doorway right here.

[18]    Is that enough?

[19]    Q: Where is the table you have talked

[20] about?

[21]    A: The table would run basically from

[22] here.

[23]    Q: Looks like you have six fish pens?

[24]    A: This was just a standing area. This

[25] was another pen.

---

Page 123

*Stepski*

[1]
[2] Q: So you have five pens.
[3] Can you label your hauler as a
[4] hauler, draw an arrow to it or write in there
[5] either way?
[6]    A: (Witness complies.)
[7]    MR. HEALEY: Just stick to
[8] what you are being asked.
[9]    Q: Can you label the two rollers as
[10] just rollers?
[11]    A: There was actually just one roller.
[12]    Q: Now, I would like you to draw what
[13] you haven't drawn on here yet is a, just indicate
[14] where the window was. Maybe we will do that in
[15] color.
[16]    Can you use the blue pen and sort of
[17] superimpose with a small line where the window
[18] was?
[19]    A: Here (indicating.)
[20]    Q: And now the door?
[21]    A: There is another window right in
[22] this area.
[23]    MR. SINGLETON: I am going to
[24] label so we don't forget what these
[25] are. Agreed?

---

Page 124

*Stepski*

[1]
[2]    MR. HEALEY: Yes. That's what
[3] you drew, right?
[4]    THE WITNESS: Yes.
[5]    MR. HEALEY: Agreed.
[6]    MR. SINGLETON: I have labeled
[7] door. And I'm going to put just a P
[8] in each one of the fish pens, just to
[9] signify pen.
[10]    Q: This area is open. Is that a
[11] working area?
[12]    A: Yes.
[13] ·   Q: That's the area between the pens and
[14] the transom, there are just decks?
[15]    A: There is a setting bar.
[16]    Q: What is a setting bar?
[17]    A: In one of the pictures you could see
[18] part of it.
[19]    Q: You want to draw it with your
[20] pencil?
[21]    Let's go to the photographs, Exhibit
[22] 1.
[23]    A: Pipes coming up, one across this
[24] piece here, and there also is a lower part that is
[25] crossing. It bolts right to the transom.

---

Page 125

*Stepski*

[1]
[2]    MR. HEALEY: What did you call
[3] that?
[4]    THE WITNESS: Setting bar.
[5]    Q: What you have drawn here, it's kind
[6] of hard to get it that way, so with your
[7] permission, I will shade it across pencil marks
[8] and I will write on it table.
[9]    Is that accurate as drawn?
[10]    MR. HEALEY: As we said, it's
[11] not to scale or anything like that.
[12]    Just to be fair, because we
[13] will try to get something else at some
[14] point to be really accurate.
[15]    ·He is drawing to give us the
[16] location of things in his best
[17] recollection; is that correct?
[18]    THE WITNESS: Yes.
[19]    Q: I appreciate it's not to scale, but
[20] have you tried to roughly proportion things at
[21] least in relative proportion to others?
[22]    A: Yes.
[23] It's a little bit wider than it
[24] should be.
[25]    Q: But the pens, for example, are

---

Page 126

*Stepski*

[1]
[2] roughly proportional, the middle one being larger,
[3] the two side ones being a little narrower?
[4]    A: Yes.
[5]    Q: The rough approximate position of
[6] the table is about right in relation to where the
[7] wheelhouse is and the doors and the windows; isn't
[8] that correct?
[9]    A: Yes.
[10]    Q: And you before indicated where you
[11] would stand.
[12]    What I would like you to do, if you
[13] would label that, just draw an arrow to it, put
[14] me.
[15]    A: (Witness complies.)
[16]    Q: When you are hauling, that's where
[17] you indicated the position "me," that's your usual
[18] position, correct?
[19]    A: I guess, yes.
[20]    Q: Where do the other two guys, when
[21] you are hauling, usually stand?
[22]    A: Usually right here or sometimes one
[23] will stand in one of these pens.
[24]    Q: But usually they stand where you put
[25] the first two circles.

---

**Min-U-Script®**

Page 127

Stepski

[1]
[2] Can you just label that crew?
[3] A: (Witness complies.)
[4] Q: We understand that by crew that's
[5] their usual position, but sometimes they may go
[6] down into one of the pens, the middle pen.
[7] And why do they do that?
[8] MR. HEALEY: Go into the pen?
[9] A: To straighten the nets out as they
[10] come off the table.
[11] Q: From the place you stand, I believe,
[12] I think you have already told us that the distance
[13] from where you usually stand to the window in the
[14] wheelhouse is about three feet?
[15] A: Yes.
[16] Q: What is the distance from the window
[17] to the radar unit?
[18] A: That's probably another three feet.
[19] Q: Can you just indicate something? I
[20] don't know how you want to do it.
[21] A: With a dash.
[22] Q: Show us on the dash with a box where
[23] the radar is located.
[24] A: About here (indicating).
[25] Q: I will label this line called the

Page 128

Stepski

[1]
[2] dashboard?
[3] A: Well, it's the forward bulkhead and
[4] the dash would be on top of that line.
[5] Q: That's forward bulkhead, FWD
[6] bulkhead. I will label that as the forward
[7] bulkhead.
[8] And this is the radar?
[9] A: Yes.
[10] Q: And the distance from the face of
[11] the radar to the window is about three feet, you
[12] would say?
[13] A: I guess.
[14] MR. SINGLETON: Would you mark
[15] that as the next exhibit, please.
[16] (Diagram of ship's layout was
[17] marked as Exhibit No. 8 for
[18] identification, as of this date.)
[19] BY MR. SINGLETON:
[20] Q: So when you are hauling nets, is
[21] there generally a net on the table?
[22] A: Well, a part of a net will be on the
[23] table. They are constantly being slid off the
[24] table in that pen or one of the other two,
[25] normally this one.

Page 129

Stepski

[1]
[2] Q: Pointing to the center, the large
[3] pen?
[4] A: Yes. As they are pulled, the fish
[5] are being picked out at the table and the net is
[6] being pushed into the pen.
[7] Q: So on the table there is part of a
[8] net, usually when the nets are being pulled they
[9] are full of fish?
[10] A: Yes.
[11] Q: Crew members taking the fish out of
[12] the net?
[13] A: Yes.
[14] Q: When the crew members are stationed
[15] in their position, can they see the radar?
[16] A: Yes, they can, right through this.
[17] Q: Let's call it through what is called
[18] the window at the centermost of the vessel?
[19] A: Yes.
[20] Q: Did you radar have a hood on it? Do
[21] you know what I mean by a hood?
[22] A: Yes.
[23] Q: And it did?
[24] A: Yes.
[25] Q: That's to cut down sun glare?

Page 130

Stepski

[1]
[2] A: Yes.
[3] Q: How far up did the sides of that
[4] hood stick past the face?
[5] A: I would say three, four inches.
[6] Q: When you are working nets, is it
[7] generally you leave your engines on?
[8] A: Yes.
[9] Q: How many engines did the AVA CLAIRE
[10] have?
[11] A: One.
[12] Q: You leave your engine on, but you
[13] have the engine in neutral?
[14] A: Yes. And while we are heading out,
[15] the gear is constantly running up on the nets.
[16] The net is close to a mile long and
[17] we are just working our way to the other end very
[18] slowly in and out of gear.
[19] Q: So your vessel is traveling in the
[20] direction that the net is laid out?
[21] A: Yes. But it's almost a stop-go, it
[22] stays a while.
[23] MR. HEALEY: Just the
[24] direction he is asking.
[25] Is it correct that you are

Page 131

*Stepski*

[1]
[2] traveling in that direction?
[3] THE WITNESS: Yes. That's the
[4] direction.
[5] Q: That's correct? What I said is
[6] correct?
[7] A: Yes.
[8] Q: And as you move down the net with
[9] your vessel, if I understand you, you are
[10] engaging, disengaging the engine?
[11] A: Uh-huh.
[12] Q: Physically how does that work? I
[13] see that when you are hauling nets you are
[14] stationed out here where you indicated the "me"
[15] position on Exhibit 8.
[16] You also have to go in, I guess, in
[17] order to work the throttle.
[18] A: No. There is a whole set of
[19] controls in front of me here.
[20] Q: You can operate from right there?
[21] A: Yes, all the controls.
[22] Q: All the controls are there in front
[23] of you?
[24] A: The shifter, the transmission, the
[25] throttle and the valve for the hydraulic to run

Page 132

*Stepski*

[1]
[2] the hauler and the steering wheel.
[3] Q: If you are there, you wanted to go
[4] full ahead, you could do it right from that
[5] position?
[6] A: Yes.
[7] Q: Could you go full astern that
[8] position?
[9] A: Yes.
[10] Q: So anything you would do inside the
[11] wheelhouse as far as the engine and steering the
[12] vessel, you can do from this, let's call it
[13] auxiliary position, control position?
[14] A: Yes.
[15] Q: Can you now draw in on our diagram
[16] where that auxiliary control position is?
[17] A: (Witness complies.)
[18] Q: If the auxiliary —
[19] MR. HEALEY: We can use that
[20] term.
[21] I think we all understand what
[22] you mean.
[23] A: There was a box basically built
[24] right between the hauler and the roller with the
[25] controls on it.

Page 133

*Stepski*

[1]
[2] Q: Drawing the box in on the diagram.
[3] Let me draw you a line to that aux for auxilliary,
[4] and label that control.
[5] MR. SINGLETON: What I am
[6] going to start now is I'm going to
[7] start getting into actually what
[8] happened.
[9] I assume Mr. Geal could
[10] excuse himself.
[11] MR. STEVENS: Do you have a
[12] place he could go?
[13] Off the record.
[14] (Discussion off the record.)
[15] (Whereupon, Mr. Roderick
[16] leaves the room.)
[17] BY MR. SINGLETON:
[18] Q: What time did you leave on the
[19] morning of May 22nd to go out to start fishing?
[20] A: I believe it was 4:30, maybe 4:38,
[21] if I remember correctly.
[22] Q: You were going to a location that
[23] you already knew that you were going to proceed
[24] to, is that correct, because you knew your nets
[25] were there?

Page 134

*Stepski*

[1]
[2] A: Yes.
[3] Q: How were you navigating to that
[4] position?
[5] A: On that boat I would go by the chart
[6] plotter and I would put the cursor on the first
[7] flag and run a course from where we were to the
[8] nets, go to cursor.
[9] Q: By on the first flag, you mean the
[10] first flag on the highfliers?
[11] A: Yes.
[12] Q: The highfliers are the poles that
[13] mark the position of your nets?
[14] A: Yes.
[15] Q: Is that the position you generally
[16] start on, you pick it up at the highflier and then
[17] start moving along the net from there?
[18] A: Yes.
[19] Q: You said you left at 4:38 a.m.?
[20] A: I believe that's what it was.
[21] Q: That's a pretty precise time?
[22] A: Well, we have to call in to the
[23] Fisheries. We have the exact.
[24] Q: That's the time you left the dock,
[25] all lines off, in other words?

Min-U-Script®       FINK & CARNEY (800) NYC-FINK

Page 135

[1]                    *Stepski*
[2]    A: Yes.
[3]    Q: Is that what you told the Coast
[4] Guard?
[5]    A: Yes. If that's the right time. I
[6] looked it up in the log to make sure.
[7]    MR. HEALEY: That is what you
[8] told the Coast Guard?
[9]    Just listen to Richard's
[10] question.
[11]    A: Yes, I believe that's what I told
[12] him.
[13]    Q: You said you looked it up in the
[14] log. What log are you talking about?
[15]    A: We didn't have a log for that trip.
[16] I went by the time I called in, which they have
[17] recorded.
[18]    Q: Which the National Fisheries Service
[19] has recorded?
[20]    A: Yes.
[21]    Q: How long did it take you to get from
[22] when you left the dock to where you were at the
[23] first highflier?
[24]    A: It was roughly six hours.
[25]    Q: What did you do when you got to the

Page 136

[1]                    *Stepski*
[2] first highflier?
[3]    A: We started hauling.
[4]    Q: By hauling, you mean hauling in your
[5] nets?
[6]    A: Yes.
[7]    Q: Now tell me about the nets.
[8] How long were each of these nets
[9] that you had out?
[10]    A: We had two 300-foot nets tied
[11] together. They were long.
[12]    Q: You mean you had nets tied together
[13] that totaled 2,300 feet?
[14]    A: Yes — wait. No. 300-nets, 20 of
[15] them in a row, so 300-foot nets.
[16]    MR. HEALEY: Times 20?
[17]    A: 6,000.
[18]    Q: 6,000 feet. That's just one string?
[19]    A: Yes.
[20]    Q: How many strings did you have?
[21]    A: We had seven at the time.
[22]    Q: And each string is marked with a
[23] highflier?
[24]    A: Yes.
[25]    Q: We will get to this in a minute.

Page 137

[1]                    *Stepski*
[2] These nets, were they pretty much
[3] positioned in a row?
[4]    A: I had them staggered a little.
[5] The first, one string would be in a
[6] row, the next string would be staggered. I had
[7] them all staggered.
[8]    Q: How did you work these? Did you
[9] work them from south to north, west to east?
[10]    A: West to east.
[11]    Q: How long did it take you to haul in
[12] the first string?
[13]    A: I think it took us around two hours.
[14]    Q: After you have hauled in the first
[15] string, then I take it, what's at the tail end of
[16] these, this highflier at one end, what's on the
[17] other?
[18]    A: An anchor and highflier.
[19]    Q: You then turn around, do you start
[20] going from east to west or do you go back and
[21] start west to east again?
[22]    A: No. We set it back from east to
[23] west.
[24]    Q: When you started going from east to
[25] west, that was on the second string?

Page 138

[1]                    *Stepski*
[2]    A: Say that again.
[3]    Q: When you finished with the first
[4] string, did you just then work the next string in
[5] the row or next closest?
[6]    A: We set the first one back and then
[7] went to the next one.
[8]    Q: When you set the first one back, do
[9] you then just work in reverse where you ended up
[10] pulling the net until you lay it down and go back,
[11] in this case you had gone from west to east, do
[12] you then lay the net back going from east to west?
[13]    A: Yes.
[14]    Q: Then you move to the next net?
[15]    A: Right.
[16]    Q: When you say the two hours then to
[17] haul in the first net, does that include hauling
[18] it in, getting the fish out of it, and then
[19] putting it back down on the bottom?
[20]    A: That's kind of a guess. It is
[21] usually one to two hours, then setting it back is
[22] another 15 to 20 minutes, maybe as much as a half
[23] hour.
[24]    Q: How long did it take on that day, on
[25] May 22nd?

Page 139

Stepski

[1]
[2] A: I would have to say almost two hours
[3] to haul it and maybe 20 minutes to set it back.
[4] Q: After you set it back, then you
[5] started on the next string in line?
[6] A: Yes.
[7] Q: How much of a time passed, if any
[8] appreciable time, from when you finished setting
[9] No. 1 back and before you started hauling No. 2?
[10] A: Very short. As long as it took to
[11] get there, which was on the east end of the first
[12] string.
[13] Q: Five minutes?
[14] A: Probably about five to ten minutes.
[15] Ten minutes.
[16] Q: If I understood the sequence of
[17] events, about how long after you started hauling
[18] the second string did this accident occur?
[19] A: It was in the beginning of it, maybe
[20] the first third of the string, I would say.
[21] Q: Well, it might be the first third of
[22] the string, but how much time did you spend
[23] between when you started heaving, hauling the
[24] second string and when the accident occurred?
[25] A: Maybe 20 minutes, a half hour,

Page 140

Stepski

[1]
[2] something like that. That's almost more of a
[3] guess. I don't really know exactly.
[4] Q: Did the Coast Guard ask you
[5] questions like this at the time?
[6] A: Yes.
[7] Q: Was your recollection clearer when
[8] the Coast Guard asked you these questions?
[9] A: Probably. Because it was soon
[10] after.
[11] Q: The answers that you gave to the
[12] Coast Guard, you believed them to be true when you
[13] gave them?
[14] A: Yes.
[15] Q: I believe you said that with the
[16] exception of the issue with Mr. Schober and
[17] drinking beer, that you didn't see anything else
[18] in the Coast Guard report and the statement of
[19] facts that you thought was incorrect, is that also
[20] true?
[21] A: Yes. That's true.
[22] Q: So I just want to recap the times
[23] and correct me if there is something wrong.
[24] You believe you left at 4:38 a.m.
[25] from the dock?

Page 141

Stepski

[1]
[2] A: Uh-huh.
[3] Q: And that you were under power for
[4] six hours to arrive at the first string?
[5] A: Uh-huh.
[6] Q: You started, immediately started to
[7] haul in the first string and that took about two
[8] hours?
[9] A: Yes. Give or take.
[10] Q: Then what do you call them, you lay
[11] it back down?
[12] A: Reset.
[13] Q: Reset the string. And that took, I
[14] think you said, 15 to 20 call it, you said 20
[15] minutes; is that right?
[16] A: Yes. That's probably about right.
[17] You have to keep it 15 to 20, depends on each one.
[18] Q: Would you say 15 to 30 would be --
[19] A: Yes, that could be true. As much as
[20] 30. Because the crew has to retie the net back on
[21] and then position myself.
[22] Q: Is it unlikely it was more than 30
[23] minutes to reset the string?
[24] A: Yes.
[25] Q: Then it's about 20 minutes to get to

Page 142

Stepski

[1]
[2] your next string, correct, right? Then you said
[3] you were about 20 minutes to a half hour into
[4] hauling the second string when the collision
[5] occurred?
[6] A: I think so, but I don't remember
[7] exactly how long it took. I can't keep track of
[8] them.
[9] Q: On this particular day in question,
[10] you, when the nets are being hauled, were you in
[11] the same position you have indicated here on
[12] Exhibit 8, that is your usual position?
[13] MR. HEALEY: Are we talking —
[14] generally?
[15] Q: When you were hauling the nets on
[16] that day, the second string up until the
[17] collision, were you in about the position that you
[18] have indicated on Exhibit 8?
[19] A: I also came around and into the
[20] wheelhouse a few times.
[21] Q: We will get to that. I just want to
[22] verify that you didn't do anything out of the
[23] ordinary, let's put it that way, on that day?
[24] A: No. Out of the ordinary.
[25] Q: Up to, of course, when events

Page 143

**Stepski**

[1]
[2] started to occur.
[3]    I know that you saw the radar
[4] target, at least that's what you told the Coast
[5] Guard.
[6]    Up until that started to happen, was
[7] this an ordinary day for you?
[8]    A: Yes.
[9]    Q: How about the crew members? Were
[10] your crew members in the position, generally
[11] speaking, that you have indicated on Exhibit 8?
[12]    A: Yes.
[13]    Q: Is it your practice, as you are
[14] hauling this, to periodically go into the
[15] wheelhouse to check things?
[16]    A: Usually about, not every string, but
[17] once per string I will go out to it.
[18]    Q: Did you follow that procedure up
[19] until you saw the radar target, did you follow
[20] that procedure on May 22nd?
[21]    A: You asked me if I went into the
[22] wheelhouse before I saw the target on the radar?
[23]    Q: Let's start again.
[24] You were in the wheelhouse, I take
[25] it, as you navigated up to the first highflier to

Page 144

**Stepski**

[1]
[2] pick up the first string?
[3]    A: Yes.
[4]    Q: You left the wheelhouse and took up
[5] your position labeled as me?
[6]    A: Yes.
[7]    Q: I guess you assisted in getting up
[8] the hauler?
[9]    A: I run the hauler.
[10]    Q: You operate the hauler?
[11]    A: Yes.
[12]    Q: As you are moving down the nets, you
[13] are steering, you are using your engine and you
[14] are running the hauler?
[15]    A: Yes.
[16]    Q: To run the hauler, what is it, a
[17] lever, like a tension kind of lever?
[18]    A: Not so much tension, it's just a
[19] lever that you turn to make it go, it goes faster
[20] the more you turn. Stage of the lever.
[21]    MR. STEVENS: Keep your voice
[22] up. I can't hear you.
[23]    Q: The hauler, as you described
[24] earlier, it's like a disk, if you will, the net
[25] comes up the roller, and does it go completely,

Page 145

**Stepski**

[1]
[2] once completely around the hauler or semi —
[3]    A: Yes.
[4]    Q: But the lever you used, can that
[5] control how much pull you put on the nets that you
[6] are bringing in, that you are hauling in?
[7]    A: To control the speed, but not
[8] tension, is that what you are asking me?
[9]    Q: Speed might be the same.
[10] Let me state it a different way.
[11] Is the hauler such that you can
[12] actually haul the net in faster than the boat is
[13] moving forward and somehow put a strain on things?
[14]    A: Well, as the slack in the net
[15] decreases — as you lose slack in the net, it gets
[16] tight, that's when I kick it a gear, kick the boat
[17] in gear so the hauler can keep hauling the net.
[18]    If it got too tight, the hauler
[19] wouldn't be able to haul it. The boat has to be
[20] moving along the net in order for the hauler to be-
[21] able to pull it in.
[22]    Q: Optimally then you as captain of the
[23] boat, your job, one of the things you have to
[24] coordinate is you coordinate the speed of your
[25] boat with the speed of the hauler?

Page 146

**Stepski**

[1]
[2]    A: Yes.
[3]    Q: So you don't get too much slack in
[4] the net or you don't get too much tension in the
[5] net?
[6]    A: Right.
[7]    Q: You control the speed of the boat by
[8] the throttle of the boat or taking it out of gear;
[9] is that correct?
[10]    A: Yes.
[11]    Q: You control the speed of the hauler
[12] by the lever?
[13]    A: Yes.
[14]    Q: Of the motor?
[15]    A: Yes, hydraulic motor.
[16]    Q: That's an electric hydraulic motor
[17] powered off the generator?
[18]    A: It was a, it was a belt off the
[19] front of the engine that ran the hydraulic pump up
[20] so the haul goes up to the hauler.
[21]    Q: If you moved too fast with both the
[22] hauler and the forward speed of your vessel, does
[23] this create any kind of problems with what your
[24] crew is doing, trying to retrieve the net, get the
[25] fish out?

Page 147

**Stepski**

[1]
[2]   A: If I move too fast with the hauler?
[3]   Q: Yes.
[4]   A: Yes. We would get backed up. You
[5] would have more nets on the table waiting to be
[6] picked.
[7]   I try to keep it so that there is
[8] very minimal net on the table and there is a
[9] constant flow. We are constantly pushing it
[10] picking the fish.
[11]   Q: Do you watch your crew to see how
[12] fast they are actually cleaning the fish out of
[13] the net?
[14]   A: Basically. They are right in front
[15] of me.
[16]   Q: I am trying to get a sense of what
[17] you have to be doing, your responsibility.
[18]   So you are making sure you are
[19] maintaining the right speed for your boat, you are
[20] maintaining the right speed for the hauler, you
[21] are watching your guys to make sure they are
[22] getting the fish out.
[23]   Even though you could go a little
[24] faster, if they are not getting fish out fast
[25] enough, you have to keep the speed of the boat

Page 148

**Stepski**

[1]
[2] back and the hauler back, right?
[3]   A: Yes.
[4]   Q: On your first run that day, the
[5] string, how did you do, did you have a lot of
[6] fish?
[7]   A: Yes. We did very well.
[8]   Q: Could you give me a rough estimation
[9] of how many pounds of fish you estimate you would
[10] have gotten on that first run?
[11]   A: I think it was over 2,000 pounds
[12] that first run.
[13]   Q: On the second string before the
[14] accident, how were you doing on the second string?
[15]   A: Pretty good. About the same.
[16]   Q: If you did about a third of it, then
[17] you had about 700 pounds, 600 pounds or so of fish
[18] from that string?
[19]   A: Yes.
[20]   Q: You would call that a pretty good
[21] day?
[22]   A: Yes.
[23]   Q: Would you call it an exceptionally
[24] good day?
[25]   A: I wouldn't say exceptionally good,

Page 149

**Stepski**

[1]
[2] but good fishing, good fishing day.
[3]   Q: From the time you arrived and took
[4] your position at what we call the auxiliary
[5] controls at the first string or maybe the second
[6] until you finished the string, did you go to the
[7] wheelhouse?
[8]   A: On the first one?
[9]   Q: Yes.
[10]   A: I don't remember if I did that
[11] particular time.
[12]   Q: What is your best recollection of
[13] whether you did or not?
[14]   A: I really don't know.
[15]   Q: I believe you said it's your
[16] practice, custom usually that you will go into the
[17] wheelhouse right after you finish your string or
[18] before you start the next string; is that right?
[19]   A: Yes. Right after I set grab, we set
[20] the string, I will set it from the wheelhouse,
[21] when we get to the next one, I will come back out
[22] to the hauler, the auxilliary station.
[23]   Q: So you set it from the wheelhouse?
[24]   A: Yes.
[25]   Q: While you are actually hauling, is

Page 150

**Stepski**

[1]
[2] it your practice to remain at the auxilliary
[3] station until that net is hauled and you are ready
[4] to reset?
[5]   A: Usually, but occasionally I will go
[6] up in the wheelhouse to check things.
[7]   Q: But if you don't sense anything
[8] unusual, you don't see a radar target looking
[9] through the window, assuming you can see your
[10] radar, you didn't hear a funny noise or anything
[11] that you think requires your attention, in the
[12] ordinary course you remain at your auxilliary
[13] station during the hauling of the nets, at least
[14] one string of nets, isn't that true?
[15]   A: Usually.
[16]   Q: Do you remember when you hauled the
[17] first string of nets here if there was anything
[18] unusual that occurred that you thought required
[19] your attention in the wheelhouse?
[20]   A: I don't remember, no. I don't
[21] recall that happened.
[22]   Q: Then when you first were hauling the
[23] first string, went to reset it, you then went into
[24] the wheelhouse, then you set that net and after
[25] you reset it, you proceeded still in the

Page 151

**Stepski**

[1]
[2] wheelhouse over at the second; am I correct so far
[3] what happened?
[4] A: Yes.
[5] Q: You are clear on this part?
[6] A: Yes.
[7] Q: When you were in the wheelhouse
[8] during the resetting and navigating to the second
[9] string, what did you have your vessel's radar set
[10] on, what range?
[11] A: I believe it was six miles.
[12] Q: Did you see any targets on the radar
[13] at that time?
[14] A: At that time, I don't believe so.
[15] Q: Go ahead.
[16] A: I don't remember seeing any target.
[17] Q: You think you would have remembered
[18] if you had seen that?
[19] A: I don't think I would have. I mean,
[20] we see targets all the time. Back two years I
[21] don't remember.
[22] Q: Do you remember then while you were
[23] in the wheelhouse if you don't remember seeing a
[24] target, do you remember making any assessment
[25] while you were in the wheelhouse whether any

Page 152

**Stepski**

[1]
[2] targets presented a threat to your vessel?
[3] A: I don't remember at that time, at
[4] the time going to the next string?
[5] Q: Either from the time you went in the
[6] wheelhouse to reset string No. 1 until the time
[7] you arrived at string No. 2's highflier to lift
[8] that up, do you remember seeing any targets?
[9] That's my first question.
[10] A: That might have been when I first
[11] saw the target, the ship, right around then. I
[12] don't remember if it was before I started hauling
[13] that string or —
[14] Q: Before you started hauling string
[15] No. 2, you mean?
[16] A: Yes.
[17] Q: Or after you started hauling string
[18] No. 2?
[19] A: Right.
[20] Q: Again, so it's clear, so the record
[21] is clear, you don't remember whether you saw that
[22] target that eventually you believe was the target
[23] that actually was in collision with you while you
[24] were in the wheelhouse before you started to haul
[25] string No. 2 or you saw it after you started to

Page 153

**Stepski**

[1]
[2] haul string No. 2; is that correct?
[3] A: Right.
[4] Q: If it's true you think that might be
[5] the case, what is your best recollection of what
[6] was the case?
[7] A: I'm thinking that that ship showed
[8] up on the radar before I started hauling the
[9] second string.
[10] Q: While you were in the wheelhouse,
[11] proceeding to the second string?
[12] A: Or maybe right at the beginning of
[13] the second one that I saw it.
[14] Q: It would have been two different
[15] things, wouldn't it, Mr. Stepski?
[16] If you would have seen it in the
[17] wheelhouse, had it been before you started hauling
[18] the second string, but once you started hauling
[19] the second string, you would have seen it if you
[20] saw it through the window?
[21] A: Yes.
[22] Q: Into the wheelhouse; is that
[23] correct?
[24] A: Yes.
[25] Q: And you can't remember which one it

Page 154

**Stepski**

[1]
[2] is?
[3] A: I don't remember when I first saw
[4] it, whether it was while I was proceeding to the
[5] next string or a while later. I believe it was
[6] while we were hauling the next string, that's when
[7] we saw it and that's —
[8] Q: You are using the word "we." Who
[9] saw it first?
[10] A: Me.
[11] Q: By using the word "we;" did you use
[12] the word loosely or did anybody else see it as
[13] well?
[14] A: I think the guys were aware that I
[15] was watching this particular target.
[16] Q: When you saw that target for the
[17] first time, how long was it before the collision
[18] occurred?
[19] A: I would have to say a period of — I
[20] can't really say because it's not something, at
[21] the time something I was really considering, I was
[22] just watching it. Probably roughly 20 minutes,
[23] half an hour, I don't know.
[24] Q: Did you tell the Coast Guard the
[25] time —

Page 155

**Stepski**

[1]
[2] A: I don't remember if I told them. I
[3] don't remember.
[4] Q: Your recollection right now is 20
[5] minutes to a half an hour?
[6] A: It probably wasn't that long.
[7] Q: What is your best recollection of
[8] how much time passed between when you first saw
[9] that radar target and the collision?
[10] A: I really don't know.
[11] Q: By don't know, you mean you can't
[12] remember now?
[13] A: I can't give you a good honest
[14] answer to that because I really, I wasn't timing
[15] it.
[16] Q: Of course. You didn't know that,.
[17] but I take it from your answer then when you saw
[18] the radar target, you didn't look at your watch,
[19] look at the clock on the chart plotter or anything
[20] else to determine what time you observed that?
[21] A: No.
[22] Q: What I'm really trying to get at is
[23] even though you didn't look at your watch or try
[24] to figure out the time, do you have a rough
[25] approximation, even if it's rough, of how much

Page 156

**Stepski**

[1]
[2] time actually passed?
[3] MR. HEALEY: We have
[4] established — I am going to put the
[5] objection on the record.
[6] You have asked him about three
[7] times. He has not been able to
[8] answer.
[9] A: I hate to say an answer to that
[10] because I really don't know.
[11] Q: Was it closer to 15 minutes than it
[12] was to half an hour?
[13] A: Yes, I think so.
[14] Q: You still have to keep your voice
[15] up.
[16] When you saw the target, since you
[17] don't remember whether you were in the wheelhouse
[18] when you saw it, whether you looked through the
[19] window and saw it, what did you do about it, if
[20] anything?
[21] A: Well, I watched it to make sure we
[22] weren't on a collision course, to see what
[23] direction it was going.
[24] Q: You said though that while you
[25] weren't sure, you believed you saw it while you

Page 157

**Stepski**

[1]
[2] were hauling the second string.
[3] If that's the case, you were
[4] watching it through the wheelhouse window?
[5] A: No, I jumped. I went right in there
[6] at least three or four times to watch it.
[7] Q: When you saw it, you left your
[8] station and you said jumped, jumped over the table
[9] that had nets on it now and your guys getting fish
[10] out of the nets and you went into the wheelhouse
[11] and you took a look at it up close and personal on
[12] the radar.
[13] Why did you do that?
[14] A: I just wanted to try to figure out
[15] exactly which way he was going, if there was any
[16] threat to us.
[17] Q: Couldn't you see that through the
[18] window?
[19] A: Yes.
[20] Q: Why did you go in the wheelhouse?
[21] A: Just to be able to take my time and
[22] really remove myself from everything else and
[23] concentrate on what this target is doing.
[24] Q: You went in the wheelhouse and you
[25] looked at it.

Page 158

**Stepski**

[1]
[2] How long would you say you stayed in
[3] the wheelhouse this first time?
[4] A: I guess five minutes.
[5] Q: What was happening with the
[6] retrieval of, the hauling in the nets while you
[7] were in the wheelhouse?
[8] A: I believe Geal jumped right into my
[9] space. If I have to go inside, he watches the
[10] hauling for me.
[11] Q: When you were in the wheelhouse for
[12] five minutes, you were looking at your radar
[13] screen, was the radar still set on the six-mile
[14] range?
[15] A: Yes.
[16] Q: When you were in the wheelhouse this
[17] first time, what was the distance from the target
[18] to your vessel?
[19] A: It had just come inside of — it was
[20] probably still six miles away at that time,
[21] because the radar will show a little bit more at
[22] the top than the six miles. So just inside of six
[23] miles. About six miles.
[24] Q: About six miles ahead, inside
[25] six miles?

Page 159

```
                    Stepski
[1]
[2]   A: Yes.
[3]   Q: So you studied it for five minutes.
[4] When you left the wheelhouse, where
[5] was the target?
[6]   A: It was still due east of us.
[7]   Q: What was its distance from your
[8] vessel?
[9]   A: When I went back outside, what was
[10] the distance?
[11]   Q: Yes.
[12]   A: I don't know exactly.
[13]   Q: But you are in there for five
[14] minutes?
[15]   A: I don't know if it's exactly five
[16] minutes. I went in there another at least three
[17] times.
[18]   Q: Hold on. We are talking about the
[19] first time you were in there, the very first time
[20] you saw the target, you went in the wheelhouse,
[21] you studied it, you said, for about five minutes,
[22] and I'm not saying it was exactly five minutes,
[23] but about five minutes before you went back
[24] outside?
[25]   A: Uh-huh.
```

Page 160

```
                    Stepski
[1]
[2]   Q: What I am asking you is while you
[3] were in there, did that target advance closer to
[4] your vessel?
[5]   A: Yes.
[6]   Q: About how much?
[7]   A: I don't know exactly.
[8]   Q: Did you make any calculation in this
[9] regard while you were there?
[10]   A: No. I was trying to get the
[11] direction.
[12]   Q: Trying to get? What did you do to
[13] try to get the direction?
[14]   A: I watched as he came down my heading
[15] line, which direction he was going.
[16]   Q: What did that indicate to you?
[17]   A: That he was going to — well, at
[18] that point I really wasn't sure. I was still
[19] watching it very carefully.
[20]   Q: Let me ask it a different way.
[21] When you were in there and saw it
[22] the first time, did the range of that target
[23] decrease?
[24]   A: Yes.
[25]   Q: Did the bearing of that target
```

Page 161

```
                    Stepski
[1]
[2] change relative to your vessel?
[3]   A: Bearing of it, how far away.
[4]   Q: No, the directionality of it. If it
[5] was like 80 degrees off your beam, a hundred
[6] degrees, did it change?
[7]   A: No. Because we had the boat
[8] stopped. So I didn't get a direction of my boat.
[9]   Q: When you looked at your radar
[10] screen, was the target that you observed, where
[11] was the target you observed on the radar screen?
[12]   A: It was — when I observed it, while
[13] I was in there?
[14]   Q: Yes. The first five-minute
[15] observation period.
[16]   A: It was basically just due east of
[17] us. I don't remember if it was a little off to
[18] the right of center. I don't remember exactly.
[19]   Q: Was it in the top half of the screen
[20] or the bottom half of the screen?
[21]   A: Top half.
[22]   Q: And a little right to the center of
[23] the top half?
[24]   A: That's correct.
[25]   Q: Your radar was set in heads up
```

Page 162

```
                    Stepski
[1]
[2] ship's head?
[3]   A: Uh-huh.
[4]   Q: While you were in the wheelhouse,
[5] outside of watching the target, did you take any
[6] other action, such as — well, let me put it this
[7] way.
[8]     Were you concerned when you were in
[9] the wheelhouse at that time about the risk of
[10] collision with your vessel?
[11]   A: Any time I see a target on the
[12] radar, I'm concerned about that. But he was still
[13] five miles away.
[14]   Q: Five miles away?
[15]   A: East.
[16]   Q: That's what I am trying to get at.
[17] When you left the wheelhouse, how
[18] much had that distance or range decreased?
[19]   A: I don't remember.
[20]   Q: Was it a mile, more than a mile,
[21] less than a mile?
[22]   A: I don't know.
[23]   Q: Because you said just a second ago
[24] he was about five miles away, I'm wondering where
[25] you got that from?
```

Page 163

**Stepski**

[1]
[2]  A: Well, five to six miles. By the
[3] time I'm in there for a while, I know he was
[4] getting closer. It's kind of a guess, I guess.
[5]  Q: Did the thought occur to you at that
[6] time to try to raise the ship or make a call on
[7] the VHF radio?
[8]  A: At that time, the thought occurred
[9] to me, yes.
[10]  Q: Well, why didn't you?
[11]  A: Because he was still far enough away
[12] that I wasn't that concerned at that point that I
[13] had to call him. I wanted to keep watching first.
[14]  Q: What did you do? You then left the
[15] wheelhouse after about five minutes, you left the
[16] wheelhouse.
[17]    What did you do?
[18]  A: I think I went right back to the
[19] hauler, kept hauling.
[20]  Q: Did there come a time you went back
[21] into the wheelhouse again to take another up close
[22] and personal look at this situation?
[23]  A: Yes.
[24]  Q: About how long after the first time
[25] in the wheelhouse did you come back to the

Page 164

**Stepski**

[1]
[2] wheelhouse?
[3]  A: I don't remember that. I don't
[4] remember exactly the period of time.
[5]  Q: When you left the wheelhouse, did
[6] you leave your radar set on six miles?
[7]  A: I left it on six miles until he got
[8] within three miles. Then I decreased the range.
[9]  Q: For lack of a better word, I'm going
[10] to call that first time time one in the
[11] wheelhouse.
[12]    MR. HEALEY: For lack of a
[13] better word, because there is nothing
[14] exact.
[15]    MR. SINGLETON: I accept it.
[16]  Q: Time one in the wheelhouse, then you
[17] went back out to work your position at the hauler.
[18]    Can you make an estimate of the
[19] amount of time you were at the hauler before you
[20] went back into the wheelhouse for time two?
[21]  A: Maybe another few minutes. Another
[22] five minutes, I don't know. I hate to say time.
[23] It would have been up to ten minutes.
[24]    I don't remember.
[25]    MR. HEALEY: Just tell the

Page 165

**Stepski**

[1]
[2] lawyer.
[3]  A: I don't remember.
[4]  Q: But you then went back into the
[5] wheelhouse. Why did you do that?
[6]  A: Because he was getting closer. I
[7] wanted to take a really good look, make sure. We
[8] weren't on a collision course.
[9]  Q: How did you know he was getting
[10] closer?
[11]  A: He was getting closer on the range
[12] of the radar.
[13]  Q: How do you know that, you were
[14] looking through the window and saw it?
[15]  A: Well, the range.
[16]  Q: You were out at the steering
[17] station, you said you went back into the
[18] wheelhouse because he was getting closer?
[19]  A: Yes.
[20]  Q: How did you know he was getting
[21] closer?
[22]  A: I could see he was six miles away
[23] down to five, then four.
[24]  Q: Let me try this.
[25] Were you watching through the window

Page 166

**Stepski**

[1]
[2] of the wheelhouse periodically at the radar or
[3] not?
[4]  A: Constantly.
[5]  Q: So you saw through the window of the
[6] wheelhouse that the range was decreasing further
[7] to your vessel?
[8]  A: Yes.
[9]  Q: And because of that, at some period
[10] of time after you had gone back out to the hauler,
[11] after time one you went back in a second time to
[12] the wheelhouse to take a look at things; is that
[13] right?
[14]  A: Yes.
[15]  Q: What did you do when you were in the
[16] wheelhouse the second time?
[17]  A: I studied his direction and I
[18] considered making a call.
[19]  Q: Anything else?
[20]  A: No. I was watching him.
[21]  Q: How long were you in the wheelhouse
[22] the second time did you say?
[23]  A: I don't know.
[24] I stayed there for a while until I
[25] was a little more comfortable and went back

Page 167

Stepski

[1]
[2] outside.
[3]   Q: When you went into the wheelhouse
[4] for the second time, about how long after that did
[5] the collision occur?
[6]   A: I'm pretty sure I had gone in a
[7] third time, so I don't really know how long after
[8] that second time.
[9]   Q: You can't say?
[10]   A: No.
[11]   Q: When you went in for the third time,
[12] is that the time when the collision occurred,
[13] right after that?
[14]   A: No. The third time I was pretty
[15] sure, I was actually positive that he was going to
[16] pass us, that we weren't on a course, collision
[17] course rather.
[18]   Q: Did you go into the wheelhouse for a
[19] fourth time?
[20]   A: Well, when I saw that he had changed
[21] course, I went back in and I could see that he was
[22] getting really close really fast so — the
[23] question was?
[24]   Q: Did you go back in the wheelhouse
[25] for a fourth time?

Page 168

Stepski

[1]
[2]   A: Yes.
[3]   Q: Did the collision occur right after
[4] that?
[5]   A: Very shortly after that.
[6] It could have been the fifth time
[7] because I was in and out of that wheelhouse at
[8] least three or four times. That's why I say I
[9] don't know exactly how many times I went in there.
[10]   Q: Each time when you went out of the
[11] wheelhouse, you would go back to your station at
[12] the hauler?
[13]   A: I think so.
[14] I might have just gone out on the
[15] table and watched them from the table that one
[16] time rather than going back over to the hauler.
[17]   Q: It could have been a fifth time in
[18] the wheelhouse.
[19]   When you were in the wheelhouse for
[20] the third time, let's just go to the second time
[21] when you went in the wheelhouse, what was the
[22] distance of the target from your vessel?
[23]   A: The second time?
[24]   Q: Yes.
[25]   A: The second time was probably — I

Page 169

Stepski

[1]
[2] don't know. I really don't know the exact
[3] distances each time I went in there.
[4]   I was trying to get —
[5]   MR. HEALEY: You have answered
[6] his question.
[7]   Wait for another one, we might
[8] move along.
[9]   Q: You said you didn't get the
[10] distances because you were trying to get
[11] something.
[12]   What was it that you were trying to
[13] get when you were going in the wheelhouse to look
[14] at the radar?
[15]   A: His course. He was headed for us.
[16]   Q: When you went in the second time,
[17] did it appear he was headed for you?
[18]   A: No.
[19]   Q: Had the target's bearing to your
[20] vessel changed from the first time to the second
[21] time?
[22]   A: No.
[23]   Q: When you went in the third time, did
[24] you notice what the distance of the target —
[25]   A: Wait. Target's bearing, direction?

Page 170

Stepski

[1]
[2]   Q: Yes.
[3]   A: What is the question?
[4]   Q: The answer you gave was correct to
[5] my question?
[6]   A: Yes, he still seemed to be coming
[7] right along the same path.
[8]   Q: The third time when you went in the
[9] wheelhouse, what was the distance then from the
[10] target to your vessel?
[11]   A: I would have to guess about three
[12] miles.
[13]   Q: Had the bearing changed?
[14]   A: No.
[15]   Q: When you saw the third time in the
[16] wheelhouse that the distance was about three
[17] miles, is that when you switched your radar
[18] display to three miles?
[19]   A: I believe so.
[20]   Q: When you went in the wheelhouse the
[21] fourth time, what was the distance of the target
[22] to your vessel?
[23]   A: Probably -- I don't know.
[24]   Q: By "I don't know," do you mean at
[25] the time you didn't really try to determine

Page 171

Stepski

[1]
[2] that —
[3]    A: At the time I was paying attention.
[4] But you are talking about on a scale one to six.
[5] I don't know which, each time I went in there
[6] which one he was. I can't remember back that far
[7] and the detail.
[8]    Q: That's my point.
[9] Did you know then but just can't
[10] remember now is what I am getting at?
[11]    A: Yes. I paid attention to how far he
[12] was each time, absolutely.
[13]    Q: At that fourth time or the third
[14] time when you were in the wheelhouse, were you
[15] concerned about the risk of a collision?
[16]    A: The fourth time.
[17]    Q: The third time when he was three
[18] miles?
[19]    A: No. He was definitely on a passing
[20] course.
[21]    Q: He was?
[22]    A: It was after that that they were on
[23] a collision course.
[24]    Q: The target's bearing to your vessel
[25] had not changed; is that right?

Page 172

Stepski

[1]
[2]    A: Target's bearing?
[3]    Q: Yes.
[4]    A: My heading is here, he is coming
[5] down like this. He is at three miles. And it
[6] hadn't changed, he was still on the same course. ·
[7]    Q: So you believed that the ship was
[8] on — did you make any calculation or use anything
[9] to try to determine what the closest point of
[10] approach between the target you had and your
[11] vessel might be in?
[12]    MR. HEALEY: I am going to
[13] object at this point, just to form.
[14]    You said did you make any
[15] calculations or do anything. They are
[16] two things, should be broken up into
[17] two.
[18]    MR. SINGLETON: I accept that.
[19]    Q: Did you do anything to calculate the
[20] closest point of approach of that vessel or that
[21] target when you were in the wheelhouse the third
[22] time?
[23]    A: What do you mean the closer point of
[24] approach?
[25]    Q: Well, how close he was going to pass

Page 173

Stepski

[1]
[2] to your vessel?
[3]    A: Yes.
[4]    Q: What did you do?
[5]    A: I don't remember what I did to
[6] figure out how far he was going to pass. I
[7] remember knowing that he was going to pass us.
[8] That's what I remember.
[9]    Q: How do you make such a calculation?
[10]    A: Holding my heading steady and
[11] watching his heading in relation to my heading
[12] line.
[13]    Q: Anything else?
[14]    A: In many situations I will use the
[15] variable range mark.
[16]    MR. HEALEY: I think you are
[17] talking about now?
[18]    MR. SINGLETON: He said he
[19] doesn't recollect what he did.
[20]    MR. HEALEY: Go ahead. I .
[21] thought maybe he was straying from
[22] your question.
[23]    MR. SINGLETON: I am asking
[24] now how he calculates in a situation
[25] like that, how he calculates the

Page 174

Stepski

[1]
[2] closer points to the radar target.
[3]    MR. HEALEY: Again, I'm
[4] confused.
[5]    Are you asking him generally
[6] or what he was doing that day?
[7]    MR. SINGLETON: He said he
[8] doesn't recollect what he did that
[9] day.
[10]    I am asking what he does.
[11]    MR. HEALEY: Generally is what
[12] you are talking about?
[13]    MR. SINGLETON: In general,
[14] that's correct.
[15]    A: In general I put a variable range
[16] mark on the target and see if he is heading right
[17] down the mark to us or going to pass us, which
[18] side he is going to pass us.
[19]    Q: And you don't remember whether you
[20] did that or not on the AVA CLAIRE on May 22nd?
[21]    A: All I know is I determined that he
[22] was going to pass us.
[23]    I don't remember exactly if it was a
[24] range mark or if I just used my heading in
[25] relation to how he was traveling down the head.

Page 175

Stepski

[1]
[2] Q: At the time, the second, third or
[3] fourth time, the second or third time you went
[4] into the wheelhouse on May 22, 2004, what was the
[5] bearing of the target to your vessel?
[6] A: What was the bearing?
[7] He was — I can't give you an exact
[8] bearing. I don't remember exactly what his
[9] bearing was, but he was coming in from the east.
[10] Q: On your radar screen he was coming
[11] from the top left as you looked at the radar
[12] screen?
[13] A: No, top right.
[14] Q: The top right.
[15] Was his course such that if you
[16] maintained your course and speed and he maintained
[17] his, would he pass off your bow or off your stern?
[18] A: He would have passed our starboard
[19] side. He was almost —
[20] MR. HEALEY: You said it.
[21] Q: He was on what we would call
[22] something close to a reciprocal course.
[23] In other words, as you calculated,
[24] you would pass side to side, make no contact, he
[25] would pass your starboard side, you would be on

Page 176

Stepski

[1] his starboard side; is that right?
[2]
[3] A: Yes.
[4] Q: That's the way you read your radar
[5] on May 22, 2004?
[6] A: Yes.
[7] Q: How close do you believe he would
[8] have passed, based on your observations?
[9] MR. HEALEY: This is prior to
[10] what he mentioned, he thought there
[11] was a turn? This is prior to that?
[12] MR. SINGLETON: Well, we will
[13] talk about the turn in a minute.
[14] MR. HEALEY: I understand
[15] that.
[16] Then you would get two sets of
[17] figures before he believed there was a
[18] turn.
[19] MR. SINGLETON: Yes, it is.
[20] A: I already answered that I don't
[21] remember exactly how far. I hate to guess.
[22] Q: Now, at some point did you believe
[23] the other vessel had turned or altered its course?
[24] A: Yes.
[25] Q: In which one of your trips to the

Page 177

Stepski

[1]
[2] wheelhouse did you realize this or did you believe
[3] this had occurred?
[4] A: I don't remember which trip to the
[5] wheelhouse.
[6] As I was watching, I could see that
[7] he was heading right for us.
[8] Q: So the turn that the vessel made,
[9] that you believe the vessel made, was a turn that
[10] then put the vessel on a collision course with
[11] you; is that right?
[12] A: Yes.
[13] Q: About how long before the collision
[14] did you perceive or believe this turn was made?
[15] A: I don't remember the time.
[16] Q: Was it ten minutes before the
[17] collision?
[18] A: I don't think it was that long.
[19] Q: Was it five minutes before the
[20] collision?
[21] A: I don't know. Very short.
[22] Q: Was it one minute before the
[23] collision?
[24] A: No. It was pretty quick. We were
[25] on a passing course and he turned and headed right

Page 178

Stepski

[1]
[2] for us. That's the way I read it.
[3] Q: What is the maximum amount of time
[4] before the collision you believe this turn
[5] occurred?
[6] MR. HEALEY: Go ahead, but,
[7] Richard, he keeps telling us he cannot
[8] tell the time under these
[9] circumstances.
[10] So I'll object based upon his
[11] prior answers to the form. I won't
[12] stop you.
[13] Your question, I interrupted
[14] you?
[15] A: What was it?
[16] Q: The question was give me a time that
[17] you think would be the greatest distance or time
[18] between which you saw the turn or observed or
[19] believed the vessel had turned and the collision
[20] occurred?
[21] A: It would be a matter of minutes.
[22] Q: So less than five minutes, would you
[23] say?
[24] MR. HEALEY: I object.
[25] I think you are arguing and

Page 179

Stepski

[1]
[2] that is bad form.
[3]       The man has told you he cannot
[4] give you a better estimate than he
[5] has.
[6]       You have to answer the
[7] question nonetheless.
[8]    A: I don't know. I would say less than
[9] five minutes.
[10]   Q: So it may have been more than five
[11] minutes?
[12]   A: I don't know.
[13]   Q: Were you in the wheelhouse when you
[14] saw the vessel, saw what you thought was the
[15] vessel make a turn, the target make a turn?
[16]   A: No. At that point I was out, when I
[17] realized — I was at the hauler.
[18]   Q: You were at the hauler when you
[19] believe the other vessel, the target made a turn;
[20] is that right?
[21]   A: Yes.
[22]   Q: Did you see that turn indicated on
[23] the radar through the window?
[24]   A: No. I could just tell he was
[25] bearing right down on us.

Page 180

Stepski

[1]
[2]   Q: When you were at the hauler and saw
[3] the vessel, "bearing right down on us," what did
[4] you do?
[5]   A: I yelled to my mate to untie the
[6] nets and let them go.
[7]   Q: Did he do that?
[8]   A: He was in the process until I yelled
[9] at him to cut the nets and let them go, because it
[10] was really bearing down on us fast.
[11]   Q: And did he do that?
[12]   A: He didn't even have time because I
[13] just gave a full throttle as soon as I saw that
[14] thing coming out of the fog.
[15]   Q: You gave full throttle.
[16] What was your heading at the time
[17] you gave full throttle?
[18]   A: I have no idea. I was trying to get
[19] the heck out of there.
[20]   Q: What was your rutter, were you going
[21] straight when you gave it full throttle?
[22]   A: Yes. I think it was pretty
[23] straight. But by the time my boat started moving,
[24] he was coming on the side.
[25]   Q: Did you still have the nets attached

Page 181

Stepski

[1]
[2] to your boat or had they been cut?
[3]   A: I don't know if they had been cut by
[4] then.
[5]   Q: Well, when you saw, when you first
[6] observed that this vessel had changed course, did
[7] you sound any danger signals?
[8]   A: There wasn't time.
[9] I was more concerned with just
[10] getting out of there because I could see that he
[11] wasn't obviously watching the radar.
[12]   Q: At your auxiliary control position,
[13] does your vessel have a horn or whistle?
[14]   A: Yes.
[15]   Q: Can you sound that from the
[16] auxiliary control position?
[17]   A: Yes.
[18]   Q: Did you sound it?
[19]   A: No.
[20]   Q: What sound would you have sounded
[21] had you sounded?
[22]   A: One long and two shorts is the
[23] fishing signal.
[24]   MR. HEALEY: Answer the
[25] question.

Page 182

Stepski

[1]
[2]   Q: So one long and two shorts?
[3]   A: Yes.
[4]   Q: And just to recap, you can't tell me
[5] in any way, shape or form by references to
[6] anything how long it was between when you believed
[7] you saw this vessel change course and when the
[8] collision occurred?
[9]   MR. HEALEY: As of now?
[10] Because there's going to be a lot more
[11] information developed.
[12]       All I'm saying is, Richard,
[13] don't try and say that if something
[14] comes up later from the situations for
[15] other people, he might not be able to
[16] amplify.
[17]       The question is, again, I
[18] think it has to be done.
[19]       I'm sorry, you have to answer
[20] the question.
[21]   A: I have.
[22]   MR. SINGLETON: From now on, I
[23] would appreciate it, the rules in this
[24] district —
[25]   MR. HEALEY: Don't tell me

Page 183

**Stepski**

[1]

[2] rules.

[3]     If you want me not to do

[4] anything except object, I will do

[5] that.

[6]     MR. SINGLETON: Any time you

[7] want to talk to me about reasons, I'm

[8] happy to step outside.

[9]     MR. HEALEY: Good enough.

[10] That's the way we will do it.

[11]     **Q:** My question to you is, is there

[12] anything or any way that you can tell, anything

[13] you can look at or if we sat here for a hundred

[14] years, would you be able to think of how much time

[15] passed between when you first believed you saw the

[16] target change course and when the collision

[17] occurred?

[18]     MR. HEALEY: Note my

[19] objection.

[20]     **A:** I think it was a matter of minutes,

[21] like I said before. It was very short. Because

[22] then he was looming, I was just so concerned about

[23] getting out of the way that I don't know exactly

[24] how many minutes took place.

[25]     **Q:** How about when you saw the vessel,

Page 184

**Stepski**

[1]

[2] you physically saw it at one point, didn't you?

[3]     **A:** Yes.

[4]     **Q:** Before it struck your vessel?

[5]     **A:** Uh-huh.

[6]     **Q:** About how much time passed between

[7] when you first saw the vessel initially and when

[8] the collision occurred?

[9]     **A:** That would have to be seconds.

[10] I don't even know if it would make a

[11] full minute because it was so close and moving so

[12] fast.

[13]     Like I said, by the time I gave full

[14] throttle, my boat, I don't think it was barely

[15] moving by the time he came to the side.

[16]     How long that would have taken —

[17]     **Q:** But sort of to recap, even though

[18] you had an operating VHF, did you do any radio

[19] checks to try to make sure it was working?

[20]     **A:** We called the bridge first thing in

[21] the morning and I had heard other transmissions

[22] but, yes, bridge first thing.

[23]     **Q:** The bridge responded to you when you

[24] called.

[25]     So assuming your VHF was working,

Page 185

**Stepski**

[1]

[2] you knew it was working, you decided not to make

[3] any calls at all or try to hail this vessel even

[4] though you knew you were in fog and it was going

[5] to at least pass in some proximity to your vessel;

[6] is that correct?

[7]     **A:** Yes. Because I had determined that

[8] we weren't in danger of hitting in the beginning.

[9] By the time we were, I didn't have time to do

[10] anything but get the heck out of there. He was

[11] moving so fast.

[12]     **Q:** Just to recap, from the time you

[13] first saw this target to the time the collision

[14] occurred, you did not remain in the wheelhouse?

[15]     MR. HEALEY: Objection.

[16]     **A:** Can you ask that questoin again?

[17]     **Q:** From the time you first saw the

[18] target to the time the collision occurred or

[19] immediately before the collision, you did not

[20] remain in the wheelhouse the entire time; is that

[21] true?

[22]     **A:** Yes.

[23]     **Q:** That's because you were out

[24] attending to other things on the deck, such as

[25] continuing to haul your nets; is that true?

Page 186

**Stepski**

[1]

[2]     **A:** Yes.

[3]     **Q:** And when you went out on the deck,

[4] did you leave anybody in charge, either Geal or

[5] Schober, with a specific instruction to do nothing

[6] but watch the radar?

[7]     **A:** No. We were all pretty much looking

[8] at it. There was no specific instructions because

[9] I kept a steady eye on it myself.

[10]     **Q:** Here is the other question I have,

[11] it's not really a question, I want to make sure I

[12] understand what you have said.

[13]     Did you see the actual course change

[14] on the radar screen or did you look at the radar

[15] and see that the course had changed and was now

[16] bearing down upon you?

[17]     **A:** I saw that it had changed.

[18]     **Q:** You did not see him when he changed,

[19] at the time the change occurred?

[20]     **A:** That's a tough question to answer.

[21] You see him make a turn on the

[22] radar. I don't understand the question.

[23]     **Q:** The question is did you watch the

[24] radar and see blip here, blip here, then see the

[25] blip start to turn as the radar antenna went

Page 187

**Stepski**

[1]

[2] around?

[3]    Is that what you saw?

[4]    A: Yes.

[5]    Q: Why didn't, as soon as you saw that

[6] turn start to occur, why didn't you take emergency

[7] action?

[8]    MR. HEALEY: Objection to the

[9] form.

[10]    A: I did. I told Geal to untie the

[11] nets so we could get out of there.

[12]    Q: And there was — we are talking

[13] about now that order to Geal.

[14]    How long was that before the

[15] collision occurred?

[16]    A: It was, like I say, a matter of

[17] minutes, because he had more than doubled his

[18] closeness to us by the time I told him to cut the

[19] nets. Then he was coming through the fog by the

[20] time I gave it throttle.

[21]    Q: When you saw the turn occur, how far

[22] away was the target?

[23]    A: I don't remember exactly.

[24] I would have to say it was less than

[25] three miles, may have been close to two or less,

Page 188

**Stepski**

[1]

[2] but I don't remember.

[3]    I was so concerned at the time just

[4] to get out of there that I could tell when I

[5] realized he was heading right for us, I wanted to

[6] get out of there, I wanted to get the nets off the

[7] boat and get out of there.

[8]    Q: When you looked at that radar and

[9] you saw the blips of the target starting to change

[10] direction from the course that it had been on, did

[11] you know at that time whether that course that he

[12] eventually wound up on was going to be straight

[13] for your boat?

[14]    A: I didn't have time to actually sit

[15] and calculate it. I wanted to just be free of our

[16] nets and get away from him.

[17]    Q: So when you, as soon as you saw it

[18] start to turn, that's when you gave the order to

[19] Geal to let go of the nets or release the nets or

[20] untie the nets?

[21]    A: Uh-huh.

[22]    Q: But you can't say at that time how

[23] far away that target was from your vessel; is that

[24] true?

[25]    MR. HEALEY: Objection.

Page 189

**Stepski**

[1]

[2]    Q: Is that true?

[3]    A: Right.

[4]    Q: Can you say was it more than a mile?

[5]    MR. HEALEY: Objection.

[6] Now I will talk to you for a

[7] minute.

[8]    MR. SINGLETON: Fine. Let's

[9] take a short break.

[10]    (Whereupon, at 3:40 o'clock

[11] p.m., a recess was taken.)

[12]    (Whereupon, at 3:45 o'clock

[13] p.m., the deposition resumed with all

[14] parties present.)

[15] MICHAEL A. STEPSKI,

[16] resumed and testified further as follows:

[17]    MR. SINGLETON: Back on the

[18] record.

[19]            BY MR. SINGLETON:

[20]    Q: Let me try to get at this a

[21] different way, one other way, and you either

[22] remember or you don't remember.

[23]    And you either don't remember

[24] exactly what it was or you may remember a range or

[25] you don't remember a range.

Page 190

**Stepski**

[1]

[2]    But my question is in any way, by

[3] range, exact time or otherwise, can you give me

[4] some conception of how much time passed between

[5] when you saw the vessel, your target, make the

[6] turn and the collision occurred?

[7]    A: It would have to be less than a few

[8] minutes.

[9]    MR. HEALEY: Listen, I didn't

[10] get that.

[11]    THE WITNESS: Less than a few

[12] minutes, I think. I don't know.

[13]    Q: Same question with respect to

[14] distance.

[15]    You threw out a couple of figures

[16] before when you saw that course change being made

[17] on the radar screen by the target by way of a

[18] range of over, under, whatever you can do, what

[19] was the distance from that target to your vessel?

[20]    A: Probably less than two miles.

[21]    Q: Less than two, but greater than

[22] what?

[23]    A: I'm guessing probably in between one

[24] and two possibly, somewhere around there.

[25]    Q: What were the visibility conditions

Page 191

**Stepski**

[1]
[2] as you were leaving the dock heading out to the
[3] ocean that day?
[4]    **A:** It was calm and foggy.
[5]    **Q:** What was the visibility when you
[6] started out?
[7]    **A:** Started out, it was still dark and
[8] it was thick fog, very, very limited.
[9]    **Q:** As the sun came up and you could
[10] sort of assess the visibility, what was the
[11] visibility say at 7:00 or 8:00 in the morning?
[12]    **A:** We could probably see a hundred feet
[13] off the boat to one yard off the boat maybe, if
[14] that much.
[15]    **Q:** Did that visibility change up to the
[16] time of the collision?
[17]    **A:** It stayed pretty steady, thick like
[18] that.
[19]    **Q:** At the time of the collision, what
[20] was the visibility?
[21]    **A:** I would have to say less than a
[22] quarter mile.
[23]    **Q:** Were you sounding any kind of a fog
[24] signal?
[25]    **A:** No.

Page 192

**Stepski**

[1]
[2]    **Q:** Why not?
[3]    **A:** Because there was no one, I sound a
[4] fog signal when there's someone around that will
[5] either hear or be in danger of collision.
[6]    **Q:** When you saw this other target on
[7] the screen, as a precaution you didn't think it
[8] was necessary to sound a fog signal?
[9]    **MR. HEALEY:** At which point?
[10]    **MR. SINGLETON:** At any point
[11] from the time he observed it until the
[12] collision.
[13]    **A:** Those are horns that only go so far,
[14] they are rated at half a mile. By the time he was
[15] that close, I was a little more busy with trying
[16] to get out of there than sounding a fog horn.
[17]    **Q:** With your boat, the AVA CLAIRE, from
[18] a dead start with the engine idle, if you gave it
[19] full throttle, how long would it take to get it
[20] moving?
[21]    **MR. HEALEY:** With the attached
[22] nets?
[23]    **Q:** Not attached to the nets, without
[24] any nets attached.
[25]    **A:** It's a little slow. If you give it

Page 193

**Stepski**

[1]
[2] full throttle right off the bat, it would just —
[3] are you asking me a time?
[4]    **Q:** How long would it take it to go 50
[5] feet?
[6]    **A:** I don't know how long it would take.
[7] It would get going pretty quick, but
[8] I don't know how long. It's not going to be an
[9] instant, but it's not going to be slow either.
[10]    **Q:** If you think you gave it a full
[11] throttle without nets attached, you think in about
[12] thirty seconds she would go 50 feet?
[13]    **A:** Thirty seconds?
[14]    **Q:** In other words, an AVA CLAIRE boat
[15] length or two?
[16]    **A:** In thirty seconds?
[17]    **Q:** Yes.
[18]    **A:** Would it go the length of the boat?
[19] Yes. Probably about that.
[20]    **Q:** I think you said, do you know or do
[21] you not know whether they actually had cut the
[22] nets loose by the time of the collision?
[23]    **MR. HEALEY:** He answered that
[24] he didn't know.
[25]    **A:** I don't know.

Page 194

**Stepski**

[1]
[2]    **Q:** With the nets attached, how fast
[3] could the AVA CLAIRE go?
[4]    **A:** I don't even know if those nets
[5] would have any change on how fast the boat would
[6] go really. They would eventually break off. It
[7] might slow it down a little bit, but I don't think
[8] by that much.
[9]    But you could get in the wheel,
[10] that's the biggest.
[11]    **Q:** What I am asking is if you had to,
[12] in an emergent situation, put the boat full
[13] throttle ahead, would the nets really slow the
[14] boat down?
[15]    **A:** Probably would once they came tight
[16] a little bit until they probably break, they would
[17] break off.
[18]    **Q:** But you would have some give. You
[19] would be able to go forward if the net became
[20] tight; is that correct?
[21]    **A:** Yes.
[22]    **Q:** How many feet of net did you have
[23] out?
[24]    **A:** 6,000.
[25]    **Q:** How many feet do you think you have

Page 195

*Stepski*

[1]
[2] to play before that net would get tight?
[3] A: It gets tight pretty quick, just
[4] because of the water resistance. So you probably
[5] would have tension if you moved more than ten feet
[6] ahead.
[7] Q: But how much before you would start
[8] feeling the net slow you down?
[9] A: I don't know if you would actually
[10] feel it slowing you down or if it would just break
[11] off by then. I don't know. I never tried that.
[12] Q: I think you said you had a chance to
[13] review the Coast Guard report of this incident; is
[14] that correct?
[15] A: Yes.
[16] Q: Did you review the complete report?
[17] A: Yes, I believe so.
[18] Q: Did you review any of the
[19] attachments to the report that showed basically a
[20] track of the NORASIA ALYA?
[21] A: Yes.
[22] Q: Did that indicate that the NORASIA
[23] ALYA made a turn?
[24] A: Yes.
[25] Q: Did you in your interviews to the

Page 196

*Stepski*

[1]
[2] Coast Guard say, ever say anything about that
[3] turn?
[4] A: Yes.
[5] Q: You did?
[6] A: Yes.
[7] MR. SINGLETON: Let's mark
[8] this, please, as the next exhibit.
[9] (Conversation record was
[10] marked as Exhibit No. 9 for
[11] identification, as of this date.)
[12] BY MR. SINGLETON:
[13] Q: Let me show you what we have marked
[14] as Exhibit 9. It's a conversation record.
[15] Do you remember being interviewed
[16] after the incident by the Coast Guard at Cape Cod?
[17] A: Yes.
[18] Q: Who was it that interviewed you
[19] there?
[20] A: I don't remember.
[21] Q: Was it Lieutenant Commander Bloom?
[22] A: I don't think so.
[23] Q: Do you remember the rank of the
[24] Coast Guard officer that interviewed you?
[25] A: No.

Page 197

*Stepski*

[1]
[2] Q: Was it a Coast Guard officer that
[3] interviewed you?
[4] A: I may have been wrong. Yes, it was
[5] a Coast Guard officer.
[6] Q: Have you seen this document before,
[7] Exhibit 9?
[8] A: (Perusing document.) No. I don't
[9] think so.
[10] Q: It was part of the Coast Guard file.
[11] A: Yes, I must have seen it. Yes, I
[12] remember seeing this.
[13] Q: I would like to go to the first
[14] line, it says contact, stated contact is you, by
[15] the way, you are the contact, stated that the
[16] vessel had been gill netting for monkfish in Long
[17] Island Sound in approximate lower end sea
[18] position. Then it gives a Loran-C coordinate.
[19] Did you report to the Coast Guard
[20] your position of fishing in Loran coordinates?
[21] A: They had a chart on the wall and I
[22] just basically pointed to where we were. I
[23] thought I gave them the latitude and longitude,
[24] but I don't remember.
[25] Q: It says underneath that chart not

Page 198

*Stepski*

[1]
[2] available at time of interview for verification of
[3] position.
[4] A: There was one right on the wall in
[5] their building. Geal even looked at it.
[6] Q: You don't know whether you gave the
[7] latitude and longitude or you gave a Loran-C or
[8] you believe you gave them latitude and longitude?
[9] A: From the letter I wrote, remember, I
[10] wrote down the Loran numbers. It was probably
[11] Loran numbers.
[12] Q: Further down on this you say gill
[13] net gear.
[14] The document says gill net gear was
[15] set on Loran line 14760.
[16] As we sit here today, do you believe
[17] that's where you had set your nets?
[18] A: I gave them a rough area of where —
[19] they weren't all on the same line anyway, so I
[20] can't really say that they were on that number.
[21] Q: This particular Loran line 14760
[22] runs approximately north and south, doesn't it?
[23] A: Yes.
[24] Q: So when it says, when you set your
[25] nets, you would set them, if you will, each one a

Min-U-Script®

Page 199

**Stepski**

[1]
[2] little bit more north than the other?
[3]     A: Yes.
[4]     Q: So while the east-west Loran line
[5] may change and probably would because you will be
[6] changing the -- the east-west line will change
[7] because you are going to be changing that
[8] position, the north-south Loran line would remain
[9] the same, wouldn't it, because you are going to
[10] set your nets?
[11]     A: No.
[12]     Q: No?
[13]     MR. HEALEY: The answer is no.
[14]     A: No. The north-south, what do you
[15] mean by the north-south line?
[16]     Q: We are going to get specific in a
[17] moment. Let me go through that, I will come back
[18] to that question.
[19]     The next statement says at
[20] approximately 1100 the vessel had completed
[21] retrieving the first net at the westward end of
[22] the gear and was beginning to pick up the second
[23] net.
[24]     By this I take it that they mean
[25] second string?

Page 200

**Stepski**

[1]
[2]     A: Yes.
[3]     Q: Is that correct?
[4]     A: Is what correct?
[5]     Q: Did this happen at approximately
[6] 1100?
[7]     A: You see, I had the same hard time
[8] with times when I was explaining to them. I think
[9] I explained it basically the same as I did to you,
[10] just going by the amount of time it took to get
[11] there versus all the first string and then start
[12] the second one.
[13]     Q: At the end of whatever exercise you
[14] went through with the Coast Guard, did you
[15] represent to them you believed it was about 1100
[16] that had you completed retrieving the first net
[17] and were beginning to pick up the second?
[18]     A: Yes, I must have said that. It's
[19] right.
[20]     Q: What I am asking you for, is that
[21] what you remember saying to them?
[22]     A: I remember having a tough time with
[23] the times, just as we did, and trying to explain
[24] to them that I really don't know the time that
[25] anything happened. It's a very rough guess.

Page 201

**Stepski**

[1]
[2]     Q: Is the 11:00 o'clock figure the
[3] figure you essentially settled on with them as
[4] being the approximate time?
[5]     A: Yes.
[6]     Q: Is that correct?
[7] If you would back up a bit, it says
[8] "vessel was monitoring only one radar, only one
[9] contact on radar that appeared to be maintaining a
[10] distance of approximately three miles."
[11]     Now, was that your phrase, that it
[12] appeared to be maintaining a distance of
[13] approximately three miles; is that what you told
[14] the Coast Guard?
[15]     A: No.
[16]     Q: Did you tell the Coast Guard that
[17] when you observed it, it was approximately three
[18] miles?
[19]     A: No. I told them I saw it over six
[20] miles away.
[21]     Q: It says here, "radar contact was
[22] believed to be another fishing vessel."
[23]     Did you believe it to be another
[24] fishing vessel when you observed it?
[25]     A: I didn't really know what it was.

Page 202

**Stepski**

[1]
[2]     Q: Did you tell the Coast Guard you
[3] believed it to be another fishing vessel?
[4]     A: I don't think so.
[5] I don't think I ever said what it
[6] was, because I didn't know what it was. Just the
[7] target.
[8]     Q: Further down it says previously
[9] noted radar contact was, "suddenly observed in
[10] close proximity."
[11]     I will read that again. "Previously
[12] noted radar contact was suddenly observed at close
[13] proximity on radar."
[14]     Did you tell the Coast Guard that?
[15]     A: Yes.
[16]     Q: It says next, "contact ran into
[17] pilot house to the control station and put vessel
[18] in gear."
[19]     Did you tell the Coast Guard that?
[20]     A: Yes.
[21]     Q: So you put the vessel in gear from
[22] the pilot house, not from the auxilliary control
[23] station?
[24]     A: Right.
[25]     Q: It goes on to say, "observed

Page 203

*Stepski*

[1]
[2] visually for the first time a large ship bearing
[3] down on their position," in other words, your
[4] position.
[5]    Is that what you told the Coast
[6] Guard?
[7]    A: Yes.
[8]    Q: "Vessel's throttles were put full
[9] ahead and crew on deck attempted to disconnect
[10] from gill net gear."
[11]    Did you tell the Coast Guard that?
[12]    A: Well, they tried to disconnect
[13] before I put the throttles in.
[14]    Q: With that qualification, is this
[15] sentence, did you tell the Coast Guard this?
[16]    A: That particular sentence, no.
[17]    Q: Did you tell them those facts?
[18]    A: Well —
[19]    Q: How about if we change it to say
[20] crew attempted disconnection from gill net gear
[21] and vessel's throttles were put full ahead, is
[22] that what you told the Coast Guard?
[23]    A: They tried to disconnect before,
[24] when I saw them getting very close, when I saw the
[25] ship, that's when I gave full throttle.

Page 204

*Stepski*

[1]
[2]    Q: Did you actually have your boat in
[3] full throttle mode before the collision occurred?
[4]    A: Yes. That's how it was when we got
[5] hit.
[6]    Q: Back to the timing questions again.
[7] Do you know how long you were going
[8] full throttle before the collision occurred?
[9]    A: Just seconds.
[10] It all —
[11]    MR. HEALEY: Wait until you
[12] get asked a question.
[13]    Q: It says here, "operator escaped from
[14] pilot house just before vessel was struck
[15] broadside," I guess, "view of."
[16]    I guess they meant in way of the
[17] pilot house; is that true?
[18]    A: Say that again.
[19]    Q: Do you see?
[20]    A: "Operator escaped from pilot house
[21] just before vessel was struck." Yes.
[22]    Q: Go down a little further, just below
[23] the little line, the line that was skipped.
[24]    "Contact stated that radar unit was
[25] Furuno brand and that he just changed out another

Page 205

*Stepski*

[1]
[2] radar display unit (first trip with new unit)
[3] leaving the old display in place en masse."
[4]    Did you tell the Coast Guard that?
[5]    A: I don't know if I told them I had
[6] changed it. It wasn't the first trip.
[7]    Q: Did you tell them you had just
[8] changed it?
[9]    A: No. I told them I had changed it
[10] when they asked about the radar.
[11]    Q: You didn't tell them it was the
[12] first trip with the new unit?
[13]    A: No, I don't believe so.
[14]    Q: Where in here does it say that you
[15] saw the target vessel — where in here does it say
[16] you thought you saw the target vessel make a
[17] change of course?
[18]    A: It says close to that, here, between
[19] seeing it at three miles and then noticing it was
[20] suddenly in close proximity. That's about as
[21] close as they get to it there.
[22]    Q: But I have read through this and I
[23] don't remember seeing anywhere —
[24]    MR. HEALEY: I don't remember
[25] seeing.

Page 206

*Stepski*

[1]
[2]    Q: Contact reported —
[3]    MR. HEALEY: This Coast Guard
[4] report, what we are looking at, right,
[5] that's what you are limiting it to.
[6]    To save you the trouble, I
[7] will stipulate because the Coast Guard
[8] did not make such a notation in that
[9] report.
[10]    Q: But you contend though, Mr. Stepski,
[11] that you told the Coast Guard that you saw the
[12] contact vessel make a course change?
[13]    A: Excuse me?
[14]    Q: You continue to maintain that you
[15] told the Coast Guard at the time of your
[16] interviews that you saw the radar contact in your
[17] radar make a course change?
[18]    You told them that?
[19]    A: Yes.
[20]    Q: By the way, how many times were you
[21] interviewed by the Coast Guard?
[22]    A: Two for sure and maybe one more
[23] time. I think it was just the once in Cape Cod
[24] and one in New London.
[25]    Q: Did you tell them at the Cape Cod

Page 207

Stepski

[1]
[2] base that you saw this target make a turn?
[3]    A: I don't know if I told them that. I
[4] didn't really get that into detail at that base so
[5] much as we did at the next meeting.
[6]    Q: Did you tell them in New London that
[7] you saw the target vessel making a course change?
[8]    A: Yes.
[9]    MR. SINGLETON: Would you mark
[10] that, please, as the next exhibit?
[11]    (Handwritten document dated
[12] 5/22/04 was marked as Exhibit No. 10
[13] for identification, as of this date.)
[14]              BY MR. SINGLETON:
[15]    Q: Now, the Coast Guard conversation
[16] record that we marked as Exhibit 9 that you have
[17] in front of you has a time recorded on it for the
[18] interview of 1900 hours, May 22, 2004.
[19]    I now put before you handwritten
[20] notes marked as Exhibit 10.
[21]    My first question is do you
[22] recognize the handwriting?
[23]    A: (Perusing document.) Yes.
[24]    Q: Is this yours?
[25]    A: Yes.

Page 208

Stepski

[1]
[2]    Q: When did you prepare this document?
[3]    A: This was at the Coast Guard station.
[4]    Q: There seems to be a fax or some time
[5] stamp on the top May 22, 041119P.
[6]    Do you know how that stamp got on
[7] the document?
[8]    A: No.
[9]    Q: Did you sit down and write it out at
[10] the Coast Guard station?
[11]    A: Yes.
[12]    Q: This was the Coast Guard station
[13] Cape Cod?
[14]    A: Yes.
[15]    Q: You sat down and wrote this document
[16] out yourself?
[17]    A: Yes.
[18]    Q: Did you do this at someone's
[19] request?
[20]    A: Yes.
[21]    Q: Whose request?
[22]    A: One of the Coast Guard guys.
[23]    Q: Did you write this document before
[24] or after you were interviewed by the Coast Guard
[25] guys in Cape Cod?

Page 209

Stepski

[1]
[2]    A: I think it was before.
[3]    Q: Let's go to the first sentence.
[4]    "As owner and captain of the AVA
[5] CLAIRE, I was engaged in hauling gill nets at
[6] position 147000 43600."
[7]    Is that the end of your first
[8] sentence there?
[9]    A: It's not capital, the next word, so
[10] I'm guessing it's a comma.
[11]    Q: You say at around 11:00 o'clock a.m,
[12] this is your writing, this is the time you came up
[13] with; is that right?
[14]    A: Yes.
[15]    Q: Next sentence, "I was watching a
[16] target on the radar."
[17]    Is that the end of that sentence or
[18] does it continue as it got closer?
[19]    A: Looks like the end of the sentence.
[20]    Q: Is that a capital A for the next?
[21]    A: Yes.
[22]    Q: So does this mean at around 11:00
[23] o'clock while you were hauling your gill nets you
[24] were watching a target on the radar?
[25]    A: If that's the right time.

Page 210

Stepski

[1]
[2]    Q: But that was your intention when you
[3] wrote this, to convey the thought I just
[4] expressed; is that right?
[5]    A: I guess that's about it.
[6]    Q: What you meant to say, at 11:00
[7] o'clock, while hauling my gill nets, I saw a
[8] target on the radar; that's the thought you
[9] intended to express, right?
[10]    A: At around 11:00 o'clock.
[11]    Q: At around 11:00 o'clock, but that's
[12] the thought you intended to express; is that
[13] right?
[14]    A: Yes.
[15]    Q: Your next sentence says, "As it got
[16] closer," I take it you mean the target, correct,
[17] "it seemed to slow down."
[18]    You didn't tell me anything about
[19] this earlier today.
[20]    Did you observe the target slowing
[21] down?
[22]    A: I don't think I did.
[23]    You have got to understand I had
[24] just got pulled over there with a helicopter and
[25] dropped off. I was still shaking at the time I

Page 211

Stepski

[1]
[2] was writing this.
[3]     I think the slow down part is
[4] probably the turning point, when I said it was
[5] turning. That's why I'm assuming when I wrote
[6] this —
[7]     Q: You wrote the words slow down. Now
[8] you are telling me what you meant to say was turn?
[9]     MR. HEALEY: I object to the
[10] form.
[11]     Put it in context, he was just
[12] pulled out three hours —
[13]     MR. SINGLETON: You said you
[14] wouldn't make a speech.
[15]     MR. HEALEY: The question
[16] wasn't clear.
[17]     MR. SINGLETON: I would like
[18] the record to reflect that I have
[19] asked Mr. Healey to not raise talking
[20] objections and I have invited him any
[21] time he has a problem with my
[22] questions, I would be happy to go
[23] outside.
[24]     I would appreciate you not
[25] making talking objections.

Page 212

Stepski

[1]
[2]     MR. HEALEY: You got my remark
[3] about being spurred by an unfair
[4] negative, didn't you?
[5]         BY MR. SINGLETON:
[6]     Q: Whether you were upset or not, my
[7] only question is you wrote slow down. But what
[8] you are telling us now, what really happened was
[9] the vessel turned; is that right?
[10]     A: Yes.
[11]     Q: Next sentence, I think I'm reading
[12] this right. "We readied a knife"; is that right?
[13]     A: Yes.
[14]     Q: "And untied," is that it?
[15]     A: Yes.
[16]     Q: "Our gill net bridle in case we had
[17] to flee."
[18]     So now you wrote this, I'm going to
[19] ask you again.
[20]     Does this help refresh your memory
[21] about whether the bridles were untied or not at
[22] the time the collision occurred?
[23]     A: I don't believe the guys ever got
[24] them untied. I think they were looking for them
[25] to untie them, but I think, before they even found

Page 213

Stepski

[1]
[2] the bridles I yelled at them to cut them. And
[3] then it was over.
[4]     Q: Your statement is a little bit
[5] incorrect or inaccurate.
[6]     A: You have to ask the guys, because I
[7] wasn't there watching. I know I yelled at them to
[8] untie them and then I yelled at them to cut them.
[9]     I would have to say they didn't have
[10] enough time. It takes a while to find them, you
[11] have a 300-foot net, you have to find the end of
[12] them.
[13]     Q: You next say "about that time."
[14] Now, by that time, I'm not sure what you mean by
[15] "about that time."
[16]     Can you tell me what you are
[17] referring to by "about that time"?
[18]     A: Basically when I yelled at them to
[19] cut them, right after that the thing come through
[20] the fog. So at that time.
[21]     Q: Then it says you "saw through the
[22] thick fog a container ship bearing down on us very
[23] fast. I ran into the wheelhouse."
[24]     Was your recollection at the time
[25] that you saw the container ship from on deck at

Page 214

Stepski

[1]
[2] your station by the hauler and then after you saw
[3] it, you ran into the wheelhouse very fast?
[4]     A: No. I had come out of the
[5] wheelhouse to tell them to cut the nets. That's
[6] when I saw it. I ran back in to give it throttle.
[7]     Q: You came out of the wheelhouse to
[8] tell them to cut the nets?
[9]     A: Yes.
[10]     Q: Could they hear you if you just
[11] yelled out the door?
[12]     A: Probably.
[13]     Q: Why did you come out of the
[14] wheelhouse if you see a ship on your radar target
[15] apparently, according to your testimony, you are
[16] very concerned now you are going to be run down,
[17] yet you went out of the wheelhouse to tell them to
[18] cut the nets?
[19]     A: Yes. Wait, wait. Let me think
[20] about that for a second.
[21]     I went in, then I saw it coming
[22] through the fog while I was out on deck, so I ran
[23] back in to give it throttle.
[24]     MR. SINGLETON: Would you mark
[25] this as the next exhibit.

Page 215

**Stepski**

[1]
[2]   (Summary was marked as Exhibit
[3] No. 11 for identification, as of this
[4] date.)
[5]                    **BY MR. SINGLETON:**
[6]   **Q:** Let me show you what we have now
[7] marked as Exhibit 11 as part of the Coast Guard
[8] report. Just leaf through it, generally tell me
[9] if you have seen it before?
[10]  **A:** (Perusing document.) Yes.
[11]  **Q:** Now, this document here, under
[12] findings of fact, purports to be what the United
[13] States Coast Guard conclude were its findings of
[14] fact based upon its collection of evidence, its
[15] interview with, it lists you, Ben Schober, Geal
[16] Roderick and other information and evidence it
[17] collected.
[18]     I don't see anything in here that
[19] could even remotely be construed to be a finding
[20] of fact that the NORASIA, that your people on your
[21] vessel observed the NORASIA or observed the target
[22] turn shortly before the collision occurred.
[23]     Now, are you absolutely certain you
[24] told that to the Coast Guard?
[25]   **MR. HEALEY:** So far as you

Page 216

**Stepski**

[1]
[2] recall, reading this document.
[3]     Objection to the entire line
[4] of questioning.
[5]   **MR. SINGLETON:** What is the
[6] objection?
[7]   **MR. SINGLETON:** I say insofar as
[8] you are incorporating, referring to
[9] this document, what is the number, I
[10] don't know.
[11]  **MR. WEIGEL:** Exhibit 11.
[12]  **MR. HEALEY:** I have an
[13] objection to the entire line of
[14] questioning.
[15]  **MR. SINGLETON:** I don't think
[16] you would —
[17]  **MR. HEALEY:** Well, maybe you
[18] and I know different things about the
[19] law.
[20]  **MR. SINGLETON:** But it doesn't
[21] contain anything.
[22]                    **BY MR. SINGLETON:**
[23]  **Q:** But it doesn't contain anything in
[24] here at all about your term, does it?
[25]  **A:** I don't know if it does, but I know

Page 217

**Stepski**

[1]
[2] I told Bloom.
[3]   **MR. HEALEY:** You don't know if
[4] it does.
[5]     We will take the next
[6] question.
[7]   **MR. SINGLETON:** We are going
[8] to take a quick break.
[9]     (Discussion off the record.)
[10]  **MR. SINGLETON:** Back on the
[11] record.
[12]  **Q:** Exhibit 9 says the Coast Guard
[13] reports that you said that you had been gill
[14] netting in approximately Loran-C position 43605
[15] 14760?
[16]  **MR. HEALEY:** I have the same
[17] objection for use of the Coast Guard
[18] document.
[19]     I object to the questions,
[20] unless you want me to say it each
[21] time, I have an objection to the
[22] entire line when referring to this
[23] document.
[24]  **MR. SINGLETON:** You are
[25] objecting?

Page 218

**Stepski**

[1]
[2]   **MR. HEALEY:** Yes.
[3]                    **BY MR. SINGLETON:**
[4]   **Q:** Did you find that on the chart?
[5]   **A:** The 14760? Where is the other one?
[6]   **Q:** 43605?
[7]   **A:** No. That's my documentation number.
[8]   **Q:** These two?
[9]   **A:** 14760.
[10] 43605.
[11]  **Q:** Draw a line or some kind of circle
[12] we will be able to see in the future.
[13]  **A:** (Witness complies.)
[14]  **Q:** I'm just going to make it a little
[15] bigger.
[16]     I am going to label that one we just
[17] discussed as — why don't you label it A, position
[18]  **A:** I would be writing upside down.
[19]  **A:** Okay.
[20]  **Q:** In your statement, Exhibit 10, you
[21] state that you were hauling gill nets at position
[22] 14700, 43600.
[23]     Can you plot that for us?
[24]  **A:** (Witness complies.)
[25]  **Q:** I will put a circle around that.

Page 219

Stepski

[1]
[2] Which one of these is the correct
[3] position?
[4]    A: Neither actually.
[5]    Q: Neither?
[6]    MR. HEALEY: Neither. That's
[7] the answer.
[8]    Q: What was the correct position?
[9] Where were you hauling your gill nets?
[10]    A: We were setting right up in this
[11] trench here. I believe I started setting around,
[12] right around this area, 615, 43615, probably about
[13] right here. 14650.
[14]    MR. STEVENS: Make a mark.
[15]    MR. HEALEY: Do you want him
[16] to make a mark?
[17]    MR. SINGLETON: Yes.
[18]    A: I would say right in this area.
[19]    MR. SINGLETON: I will circle
[20] that one here.
[21]    Q: Would you put a B next to the second
[22] one you did and C next to the third one?
[23]            BY MR. SINGLETON:
[24]    Q: Just so the record is straight, is
[25] is the position taken from your handwritten

Page 220

Stepski

[1]
[2] statement marked Exhibit 10.
[3]    A is from the Coast Guard
[4] conversation report marked Exhibit 9. And C is
[5] now what you say is the correct position?
[6]    A: Yes.
[7]    Q: How do you know that's the correct
[8] position?
[9]    A: Because I remember where I set them.
[10]    Q: Did you remember where you set them
[11] when you talked to the Coast Guard?
[12]    A: Yes, but not the exact numbers. I
[13] just remembered basic area on the chart.
[14]    Q: Did you remember when you were being
[15] interviewed by the Coast Guard at Cape Cod? I
[16] thought you said there was a chart right there?
[17]    A: Yes.
[18]    Q: But it appears you still gave the
[19] Coast Guard on Exhibit 9 the Loran-C coordinates
[20] which were put on Exhibit A?
[21]    A: We previously —
[22]    MR. HEALEY: He didn't ask a
[23] question, he made a statement.
[24] Listen.
[25]    Q: Do you believe then that you gave

Page 221

Stepski

[1]
[2] the Coast Guard a position other than is reported
[3] here in Exhibit 9?
[4]    A: I have a hard time believing I gave
[5] them that position.
[6]    Q: Look at the exhibit, this is your
[7] own handwriting.
[8]    Are you saying the position you put
[9] down in your own handwriting right after the time
[10] is incorrect?
[11]    A: That in my head, I remember it
[12] around 760. I don't remember the exact numbers
[13] after the 760. I remember 760.
[14]    Off the top of my head, I couldn't
[15] remember exactly where we were. I had it all
[16] written down on charts, the logs in the boat. I
[17] go to the chart —
[18]    MR. HEALEY: You gave an
[19] answer. Don't try to sell him. Give
[20] the answer.
[21]    Q: Which way were your nets running
[22] here on position C?
[23]    A: That was the far west. They went
[24] east from there.
[25]    Q: They went east from there?

Page 222

Stepski

[1]
[2]    A: Yes.
[3]    Q: They ran for how many feet?
[4]    MR. HEALEY: Three times,
[5] times to —
[6]    Q: So 1.5 miles, something like that?
[7]    MR. HEALEY: Yes.
[8]    Q: So this was the westerly end, did
[9] you say, or the easterly end?
[10]    A: That would be the westerly end,
[11] across this area.
[12]    Q: Go ahead, draw this line.
[13] You said we were fishing in this
[14] gully here, just draw a line.
[15]    A: As I said, they were a little
[16] staggered, but roughly, the nets were running
[17] across like that.
[18]    Q: Let me make a stronger line.
[19]    A: That's all seven strings.
[20]    Q: Tell me when to stop. I'm going to
[21] overlap your line.
[22]    Stop here?
[23]    MR. HEALEY: That's the
[24] direction.
[25]    Q: That's the direction. We can

Page 223

Stepski

[1]
[2] calculate from this point how far 1.6 miles is.
[3] In fact, we have gone way beyond that already
[4] 1.5 miles?
[5]     A: I was up a little more on this bank.
[6]     Q: So that's 1.5 miles right there?
[7]     MR. HEALEY: Okay. It's about
[8] half the line. We don't have to make
[9] it exact. There is the line, it's
[10] more than a mile.
[11]     Q: So whatever 1.5 miles is from this
[12] dot marked as C?
[13]     MR. HEALEY: You can figure
[14] out exactly at some point if you want.
[15] You have 600 feet. You could figure
[16] that out.
[17]     You spent four years at
[18] Annapolis to learn to do that stuff.
[19] I thought you would be able to snap
[20] that out right here.
[21]     MR. WEIGEL: I'm not
[22] testifying, unlike you.
[23]     Q: I want you to assume that the Coast
[24] Guard indicated in another document that the nets
[25] were placed along three Loran lines, 43610, 43608,

Page 224

Stepski

[1]
[2] 42606.
[3]     Let's mark that first.
[4]     MR. HEALEY: Are you referring
[5] to a document?
[6]     MR. SINGLETON: This is my
[7] notes.
[8]     MR. HEALEY: Are you referring
[9] to a document?
[10]     MR. SINGLETON: I am asking
[11] him to assume something right now.
[12]     MR. HEALEY: I am asking you,
[13] you said assume the Coast Guard
[14] document. I asked refer me to the
[15] document.
[16]     MR. SINGLETON: I actually am
[17] trying to ask the following question.
[18]     Q: Assume that the Coast Guard has
[19] reported that your nets were placed along three
[20] lines, one of which is 43610.
[21]     Can you find that for me?
[22]     MR. HEALEY: Objection.
[23]     Q: Just a little bit to the south of
[24] where your C line is?
[25]     A: Yes.

Page 225

Stepski

[1]
[2]     Q: Do you think that position is more
[3] accurate than the C position?
[4]     A: I don't think so.
[5]     MR. HEALEY: Sit down and
[6] don't make a speech.
[7]     Q: How long had you been fishing in
[8] that area, the area around position C on the
[9] chart?
[10]     MR. HEALEY: Clarify. This
[11] day or in his life?
[12]     MR. SINGLETON: In his life is
[13] a better way of putting it.
[14]     A: That was my second spring with the
[15] boat, so it would have to be my second year.
[16]     Q: Where did you fish prior to that?
[17] Did you have an area that you preferred?
[18]     A: Prior to that, what do you mean?
[19] You fish all over the place.
[20]     Q: Well, your fishing trip reports
[21] indicate another location, at least some of them,
[22] the official fishing trip reports from 2003.
[23]     So where did you fish for monkfish
[24] in 2003?
[25]     A: The year before? This spring I know

Page 226

Stepski

[1]
[2] we ended up in this area.
[3]     Q: In the Block Channel area?
[4]     A: Yes.
[5] And I don't remember if I came
[6] further than that that year.
[7]     Q: Why did you switch? Why did you
[8] change?
[9]     A: Because earlier in the season
[10] fishing is better the further you go out.
[11]     Q: Did it concern you at all that you
[12] were fishing in heavy fog in the area of
[13] commercial vessel traffic?
[14]     A: Concern me?
[15]     Q: Yes.
[16]     A: Of course. I'm always concerned
[17] when I'm out there, whether it's foggy or not.
[18] But it as far as foggy, I guess, you don't go back
[19] because of fog.
[20]     Q: Right. That may or may not be true.
[21]     A: It's absolutely true.
[22]     Q: Certainly fishing in the area of a
[23] vessel traffic separation scheme in one of the
[24] major approaches to New York Harbor, you would be
[25] worried about the possibility of encountering a

Page 227

Stepski

[1]
[2] large, fast-moving vessel?
[3] A: Not when I purposely set them north
[4] of the lane. I usually stay in the lane most of
[5] these trips when I go out.
[6] Q: Your answer is no?
[7] MR. HEALEY: That's not his
[8] answer. You have his answer.
[9] I object to the form of the
[10] question. Ask a question, don't
[11] rephrase what he said.
[12] Q: Were you concerned that you were in
[13] close proximity to a commercial shipping lane in
[14] the fog?
[15] A: Was I concerned?
[16] Q: Yes.
[17] A: Concerned?
[18] Q: Did you believe it was more
[19] dangerous to fish there than someplace further
[20] away from a commercial traffic lane?
[21] It's a different question, but I
[22] will stick to that one.
[23] A: I was thoroughly aware of the ship
[24] traffic, because I always see it. So, concerned?
[25] Does that answer the question?

Page 228

Stepski

[1]
[2] Q: You said you were thoroughly aware
[3] of it.
[4] But my question is do you believe as
[5] a commercial fisherman understanding vessels that
[6] it's riskier to fish in close proximity to a
[7] traffic separation scheme than it is to fish away
[8] from it?
[9] MR. HEALEY: Objection.
[10] A: Well, I would say it's probably
[11] riskier the closer you get, especially if you get
[12] into it.
[13] Q: Did you take any special precautions
[14] on May 22nd before engaging in fishing in the area
[15] that you did in the fog that you encountered?
[16] A: Yes, yes. I made sure the boat is
[17] fully equipped with all the safety equipment,
[18] everything is working, in good order. I
[19] constantly check the engine room, make sure
[20] everything is operating properly. Survival suits,
[21] life jackets, all that.
[22] Q: But outside of that, did you do
[23] anything differently than you ordinarily do things
[24] because you were fishing in fog close to a
[25] commercial vessel traffic separation scheme?

Page 229

Stepski

[1]
[2] A: Yes. Keep a close, steady watch on
[3] the radar. Listen to, make sure the radio is boat
[4] channel 16 and 13. Spend more time watching the
[5] radar and doing that kind of stuff than I do
[6] actually working.
[7] Q: If that's the case, what I am
[8] curious about is even though you thought that the
[9] target you were observing might pass, according to
[10] your testimony, and it would pass, and you would
[11] not be in collision with it, why is it that you
[12] didn't stay for that 15 or 20 minutes, whatever it
[13] might be, just carefully observe it to make sure
[14] that you weren't going to be put in danger?
[15] MR. HEALEY: Objection.
[16] A: I did. I watched that sucker steady
[17] as soon as I first saw it on the screen.
[18] Q: Amongst doing other things, is that
[19] fair?
[20] A: Still running a boat. I have to
[21] continue running the boat.
[22] I'm not going to freeze every time I
[23] see something on the radar, although since then I
[24] kind of do. I have to keep, I always see the
[25] target on the radar, you have to watch, make sure

Page 230

Stepski

[1]
[2] you are not on a collision course. There's a lot
[3] of traffic out there.
[4] Q: Did Roderick and Schober have
[5] assigned duties?
[6] A: Assigned duties.
[7] I explained. Geal had been fishing
[8] with me for quite a while by then. He knew all
[9] the jobs that came up. I explained what needed to
[10] be done, I went over it with him before we even
[11] went fishing.
[12] Q: Would you trust Schober with
[13] navigating your boat?
[14] A: Navigating, yes. It's — well, yes,
[15] I would give him a wheel watch. You just got to
[16] tell certain people as soon as you see a target,
[17] to wake me up, or if you hear something on the
[18] radio, wake me up.
[19] But I think I could trust him.
[20] Q: How about Geal?
[21] A: Absolutely. He has been fishing his
[22] whole life.
[23] Q: Could he read a radar?
[24] A: Yes.
[25] Q: He understands what he is looking at

Min-U-Script®        FINK & CARNEY (800) NYC-FINK

Page 231

Stepski

[1]
[2] when he looks at the radar?
[3]     A: Yes.
[4]     Q: Let me ask you this.
[5] Did you give any thought to having
[6] Geal stand in the wheelhouse and observe this
[7] situation to make sure it didn't develop into a
[8] dangerous situation while you continued to work
[9] the fishing part of the boat?
[10]    A: No. I prefer to watch myself.
[11]    Q: Why didn't you do that then, you
[12] just watch that, don't do anything else, you watch
[13] the radar?
[14]    A: Well, I did do that. I also did a
[15] little work, too.
[16]    Q: My question is why didn't you just
[17] do that and let the other guys do the work?
[18]    MR. HEALEY: Wait a minute.
[19] I object to the form.
[20]    Q: The lines or — I will state it
[21] again.
[22]    Why didn't you assign Roderick and
[23] Schober the job of dealing with the hauler,
[24] dealing with the fish, and you stay in the
[25] wheelhouse to monitor this target and assess the

Page 232

Stepski

[1]
[2] risk of collision continually, do nothing else but
[3] do that?
[4]     A: Because I had determined that we
[5] weren't on a collision course. I was sure of it.
[6]     Q: But stuff happens, vessels turn?
[7]     MR. HEALEY: That's a comment
[8] which he should not make.
[9]     You answered, so we stop
[10] there.
[11]    Q: You are aware, are you not, that
[12] sometimes vessels do erratic things?
[13]    A: Yes.
[14]    Q: And would you agree with me that at
[15] least in hindsight it would have been prudent to
[16] have somebody stay right in that wheelhouse
[17] watching that radar screen, do nothing but watch
[18] that?
[19]    A: I was watching that radar screen
[20] steadily, even though I may have went on the
[21] hauler a couple of times, I never took my eyes off
[22] it.
[23]    Q: What you are suggesting to me is
[24] that you watched it carefully enough that you saw
[25] that ship, which you have described as a big ship,

Page 233

Stepski

[1]
[2] start to turn; is that right?
[3]     A: I saw that he had changed course.
[4]     Q: Yes. But I think we have been down
[5] this one already. I want to make sure you are
[6] still giving the same testimony you gave before.
[7]     You actually watched the radar blips
[8] starting to alter.
[9]     MR. HEALEY: Objection.
[10] Asked and answered.
[11]    MR. SINGLETON: It was until
[12] he just made the statement he did.
[13]    A: I made a statement.
[14]    Q: There are two ways — let's go back
[15] to what you said. This is important. It's
[16] obviously been asked and I thought it was
[17] answered, know the answer may have been changed, I
[18] don't know. I want to find out.
[19]    Here is the question.
[20] Did you actually see the target        —
[21] vessel go on the radar screen from a straight
[22] bearing and you see that bearing start to change
[23] or did you watch it or did you look up at the
[24] radar screen, see that it had already changed, it
[25] was now heading for you?

Page 234

Stepski

[1]
[2]     A: No. I was watching it so steady
[3] that I could tell right away that it was headed
[4] for us.
[5]     Q: You said started to change; is that
[6] right?
[7]     A: Yes.
[8]     Q: When you saw it start to change, is
[9] that when you immediately said, okay, release the
[10] nets?
[11]    A: I said untie the nets and ran back
[12] into the wheelhouse, still watching and I saw it's
[13] changed. I yelled down, I said cut the nets.
[14] Yelled out.
[15]    Q: I suppose when you saw it just start
[16] to change, why didn't you do something with your
[17] vessels then, some maneuver to try and get out of
[18] the way or to go the other way or to turn the
[19] opposite direction?
[20]    A: I didn't want to get the vessel
[21] involved in the net, get the net down so we can
[22] move.
[23]    Q: If I understood you before, there
[24] was a possibility you could get the net in the
[25] wheel, but it was not a certainty; is that true?

Page 235

*Stepski*

[1]
[2] A: Yes.
[3] Q: It seems to me that you may have had
[4] choices, you either do what you can to get out of
[5] the way of a target bearing down on you or run the
[6] risk of fouling the propeller with the net?
[7] MR. HEALEY: That's not a
[8] question. He is telling you what he
[9] thinks.
[10] He might be interested, I'm
[11] not.
[12] MR. SINGLETON: Are you making
[13] a comment?
[14] MR. HEALEY: I don't make
[15] them, except I want them recorded.
[16] Q: Anyway, what you are telling me is
[17] you still made the choice to try to release the
[18] nets even though you knew the vessel was bearing
[19] down on you?
[20] A: Yes.
[21] Q: Rather than try to take steps to get
[22] out of the way immediately and run a risk of
[23] fouling the propellar; is that true?
[24] MR. HEALEY: Objection to the
[25] form.

Page 236

*Stepski*

[1]
[2] A: Yes. If I got the net caught in the
[3] wheel, we would have really been screwed.
[4] Q: You would really be screwed being
[5] cut in half by the boat.
[6] A: Not being able to move. I didn't
[7] know what it was.
[8] MR. HEALEY: Just answer the
[9] question.
[10] Q: Where were you actually physically
[11] standing when the collision occurred?
[12] A: Just outside the wheelhouse door.
[13] Q: And where was your crew standing,
[14] Geal and Ben?
[15] A: Geal was at the hauler and Ben was,
[16] he was either right at the table or in the back
[17] pen.
[18] Q: Did you watch as this other ship
[19] actually struck your vessel?
[20] A: Yes.
[21] Q: Where did the impact occur?
[22] A: Just ahead of the hauler on the
[23] starboard side.
[24] Q: Just ahead of the hauler on the
[25] starboard side.

Page 237

*Stepski*

[1]
[2] Step back for a second. The entire
[3] time that you were watching this target when you
[4] were taking in string No. 2, when you were hauling
[5] string No. 2, you were watching the target, you
[6] were making forward progress, weren't you, you
[7] were proceeding along the string?
[8] A: Yes. Very slowly.
[9] Q: More or less in the direction that
[10] you have indicated on the chart at position C?
[11] A: Yes, almost —
[12] MR. HEALEY: That's it.
[13] Q: And when the impact occurred, what
[14] happened?
[15] A: We were split in two.
[16] I thought we were going to be rolled
[17] right off and finished off like that. But it was
[18] a clean cut, it just pushed the boat aside. And
[19] we started sinking as the ship was going by, we
[20] were yelling up to them for help.
[21] The other side of the front, forward
[22] part of my boat was on the other side of the ship.
[23] Come right through.
[24] And as we were sinking, we were
[25] yelling up to them for help.

Page 238

*Stepski*

[1]
[2] By the time the ship had just passed
[3] us, our boat went under. We jumped off into the
[4] water and then a little bit later the life raft
[5] popped up. And we all started to climb in the
[6] life raft and we were watching the boat as it was
[7] going below the surface of the water, air bubbles
[8] were coming up, all the ropes that were pulling in
[9] the water away from the life raft so we wouldn't
[10] get snagged and sunk, be sucked down with the
[11] boat.
[12] As she started to go down me and
[13] Geal was in the raft at the time, Ben was still
[14] hanging on the side. It started to pull the raft
[15] down a little bit, we were still attached to the
[16] boat. Me and Geal walked to the other side of the
[17] craft, thought we were going to get pulled down
[18] with it, it snapped, let go, the raft popped back
[19] up.
[20] And then I noticed my dog was
[21] struggling swimming in the water behind us. I
[22] wanted to get Ben in the raft and go for him. By
[23] the time I got Ben, the dog was floating dead.
[24] And then —
[25] MR. HEALEY: You have answered

Page 239

Stepski

[1]
[2] the question. Let him ask you another
[3] question.
[4] Q: So after you got Ben in the raft,
[5] what did you guys do then?
[6] A: We kind of sat there stunned for a
[7] little bit and assured each other we were all
[8] right.
[9] We noticed the bow still floating
[10] upside down a little ways off in the distance. We
[11] propelled over to it, sat there for a while
[12] noticing it was sinking upside down and I knew my
[13] survival suits were in the forward section.
[14] I wasn't sure how long we were going
[15] to be out there and was really concerned about
[16] hypothermia and concerned about being in a rubber
[17] raft that just a pinhole could pop out in the
[18] middle of the ocean.
[19] I decided to swim down underneath
[20] the boat, through the escape hatch, it was open,
[21] reached up there and grabbed the survival suits
[22] one at a time, brought them up to the raft, put
[23] those on. We were all shivering by then. It was
[24] freezing.
[25] We started paddling around looking

Page 240

Stepski

[1]
[2] for anything that we could use to help survive if
[3] we were going to be stuck out there a long time.
[4] The EPIRB had gone off. We paddled around, we
[5] were picking up anything we could find, a bottle
[6] of ketchup, mustard, anything floating that might
[7] be useful.
[8] And then we came across my dog and I
[9] pulled him into the raft and I broke down for a
[10] while.
[11] Then we continued to look for
[12] anything we could find, anything, debris. It was
[13] a pretty big debris field. We found a flare.
[14] One of the guys threw it over
[15] thinking it was no good, it's all crushed, but I
[16] grabbed it again, wanted to hang onto that just in
[17] case.
[18] I found the EPIRB. It was, the
[19] antenna broke off, but it was still flashing. We
[20] were hanging on to that hoping it would give us a
[21] signal, holding it overhead hoping that might
[22] help. We kept looking around for stuff, kind of
[23] wanted to break at times.
[24] I wanted to find anything we could
[25] while we were still there and while the debris was

Page 241

Stepski

[1]
[2] still there.
[3] Q: What was the condition of the EPIRB
[4] when you found it?
[5] A: The antenna was broken off it, but
[6] it was flashing. I gauged it manually.
[7] Q: You say flashing, was there a strobe
[8] on it?
[9] A: Yes.
[10] Q: Were there any other lights lit on
[11] the EPIRB besides the strobe?
[12] A: I didn't see any lights.
[13] Q: But was it floating free or was it
[14] still connected to its bracket?
[15] A: It was floating free.
[16] Q: Was there any wind at that time?
[17] A: No. Very lightly.
[18] Q: Was there any current?
[19] A: I think I remember there being
[20] current. I don't remember how much though.
[21] Q: Is there a reason why you put your
[22] nets from east to west and not north to south and
[23] just happened to be the way you did?
[24] A: In this particular area they catch
[25] better that way.

Page 242

Stepski

[1]
[2] Q: You don't know what the speed of the
[3] current was at the time, do you?
[4] A: No.
[5] Q: Did you and did the life raft and
[6] what was left, the bow and the debris field, move
[7] at about the same speed?
[8] In other words, did you stay
[9] together?
[10] A: No. We ended up losing the bow
[11] after a while.
[12] Q: Losing sight of it?
[13] A: Yes. The debris field was so large
[14] we were paddling around and the fog was so thick,
[15] we could lose sight of things.
[16] I don't remember ever seeing the bow
[17] section again after we got the survival suits out.
[18] Q: You kept saying, at the time, 11:00
[19] o'clock, that you had written in your statement.
[20] Do you remember seeing that in your
[21] handwritten statement? I will show it to you if
[22] you need to see it.
[23] That was, you said that was the
[24] approximate time.
[25] But can you give me plus or minus of

Page 243

**Stepski**

[1]
[2] the approximation of the time?
[3]    A: We went over the times earlier.
[4] If we left at 4:38 a.m., usually it
[5] took me about six hours to get in this spot. If
[6] we were bucking the tide, it could have slowed us
[7] down. If we were going with it, it could have
[8] sped us up.
[9]    That's how I am guessing about that
[10] time. You are talking hours. All I know is the
[11] time we left the dock. I don't know any time
[12] after that. I'm just guessing.
[13]    Q: You say 11:00 o'clock, but is that,
[14] do you think that's a good figure, plus or minus
[15] 30 minutes?
[16]    MR. HEALEY: Objection.
[17]    A: I don't know, because didn't we come
[18] up with a later time when we just went over it?
[19]    Q: You wrote the time. All I know is
[20] you wrote 11:00 o'clock down the same day of the
[21] event.
[22]    And I'm just asking you with
[23] reference to that, do you believe that's a good
[24] time, plus or minus some other facts?
[25]    A: I want to go over this again with

Page 244

**Stepski**

[1]
[2] you before I come up with those figures.
[3]    Q: If you are just going to calculate
[4] it, we already did that. I don't want to do that
[5] again.
[6]    Since you wrote that right after it
[7] occurred, as you have already said —
[8]    A: That was a guess after it occurred,
[9] that was just a guess. Probably about the right
[10] time.
[11]    Just figuring, six hours out, 4:30.
[12] Probably later than 11, I would think, if it's six
[13] hours. Seven, eight, nine, ten, that's 10:30, if
[14] it took us six just to get there. So 10:30. Haul
[15] one, haul one, set it back, started hauling the
[16] next one.
[17]    MR. HEALEY: You have answered
[18] it.
[19]    Q: Was Schober drinking any beer before
[20] the collision?
[21]    A: No.
[22]    Q: You are sure?
[23]    A: Yes.
[24]    Q: How can you be sure?
[25]    A: All I can say is I never saw him

Page 245

**Stepski**

[1]
[2] drinking any.
[3]    Q: Who brought the beer on board?
[4]    A: He did.
[5]    Q: And he brought it on board for what?
[6]    A: After the trip, I assume.
[7]    Q: To drink it after the trip?
[8]    A: Yes.
[9]    Q: How much beer did you bring board?
[10]    MR. HEALEY: I object to the
[11] form, "did you bring."
[12]    A: He said Schober brought it.
[13]    Q: I said did Schober bring.
[14]    MR. HEALEY: I misheard you.
[15] Excuse me.
[16]    Q: Sorry if I misspoke. Let me ask the
[17] question again in case I did.
[18]    How much beer did Schober bring on
[19] board?
[20]    A: I don't remember.
[21] Some kind of a, I don't remember if
[22] it was a 12-pack or something like that, but it
[23] was a pack.
[24]    Q: More than a six-pack?
[25]    A: Yes.

Page 246

**Stepski**

[1]
[2]    Q: This was your second trip with him?
[3]    A: Yes.
[4]    Q: Did he bring some beer the first
[5] time to drink afterwards?
[6]    A: I don't remember.
[7]    Q: Is there any sort of a — near where
[8] you keep your boat, is there a local bar?
[9]    You always see that in the movies, a
[10] bar where all the fishermen hang out.
[11]    Is there a bar there?
[12]    A: Yes, there is.
[13]    Q: Did the crews go in to socialize in
[14] that bar after coming back from fishing?
[15]    A: Sometimes, sure.
[16]    Q: Have you ever seen Schober there?
[17]    A: No.
[18]    Q: What is the name of that particular
[19] bar?
[20]    A: Well, I wouldn't say there's any
[21] particular ones. There's many bars in the town.
[22]    Q: Did you know that Schober had
[23] completed an alcohol rehab program?
[24]    A: No, I don't think I knew at the
[25] time. Since then I have known.

Page 247

**Stepski**

[1]
[2] Q: Did Roderick bring any beer?
[3] A: No.
[4] Q: Did you bring any beer?
[5] A: No.
[6] Q: It was only Schober?
[7] A: Yes.
[8] Q: Then was there any beer consumed in
[9] the life raft?
[10] A: Yes. He had at least one. I saw
[11] him drinking a beer in the life raft. I think
[12] he — I know he had at least one in the life raft.
[13] Q: Did any pretzels pop up, bag of
[14] pretzels?
[15] A: I don't know.
[16] Q: How was Roderick compensated, how
[17] did you pay him?
[18] A: I gave him a percentage of the value
[19] of the catch.
[20] Q: What percentage was that?
[21] A: I don't know what we obtained at the
[22] time. I probably guess around 15 percent.
[23] Q: How was Schober compensated?
[24] A: Same thing as Roderick.
[25] Q: He got a percentage of the catch?

Page 248

**Stepski**

[1]
[2] A: A percentage of the value, yes.
[3] Q: What was his percentage?
[4] A: I don't know what it was for him. I
[5] don't even think we got the first check by then,
[6] so we hadn't paid him yet I don't think.
[7] Q: But your agreement with him was he
[8] would get some percentage of the catch, you just
[9] can't remember what it was.
[10] Is that written down anywhere?
[11] A: No.
[12] Q: Now, I understand at some point
[13] you —
[14] MR. SINGLETON: Do you have to
[15] go?
[16] MR. UNGER: Unfortunately, I
[17] have to go.
[18] As I understand it, we will
[19] set a date for the completion.
[20] MR. HEALEY: Right, for
[21] Michael to come back.
[22] MR. SINGLETON: For the fish
[23] catch evidence, unless you want to go
[24] through that now.
[25] MR. HEALEY: No.

Page 249

**Stepski**

[1]
[2] MR. WEIGEL: We don't have the
[3] documents anyway.
[4] MR. HEALEY: It's up to you.
[5] MR. SINGLETON: I will explain
[6] what I am going to do.
[7] Off the record.
[8] (Discussion off the record.)
[9] MR. SINGLETON: Back on the
[10] record.
[11]                BY MR. SINGLETON:
[12] Q: We learned that apparently sometime
[13] after this incident you went back out to the area
[14] where this occurred and did some dragging to try
[15] to find things.
[16] Will you tell me, just generally
[17] describe what it is you did.
[18] A: We went back to the area that I
[19] thought the wreck would be. I wanted to get the
[20] net that I was hauling at the time because we
[21] weren't finished hauling.
[22] I know it stretched east of the
[23] wreck, so we had a pretty good chance of catching
[24] it if we towed north and south, grappled in the
[25] area where I figured it was.

Page 250

**Stepski**

[1]
[2] And I went right there and grappled
[3] it in and by the third try we had the net and
[4] started pulling it in. And a few pieces of the
[5] boat came up with it, fishing pole, pieces of the
[6] rail, side of the boat, cabin, other pieces, stuff
[7] like that. I think you saw the pictures.
[8] Q: When the collision occurred, you
[9] still had the net, the No. 2 string and the hauler
[10] and part of it on board on the boat, right on your
[11] boat?
[12] A: Yes.
[13] Q: And so when your boat was sunk, then
[14] what you lost was the buoy that was attached to
[15] that one end of that string, the highflier, the
[16] other buoy wasn't there either though.
[17] How many other strings had you had
[18] out that you had not brought in on May 22nd?
[19] A: There was, I think I said seven in
[20] the beginning, but I think it was probably at that
[21] time six. I'm guessing.
[22] Q: Were they still there?
[23] A: Yes. This is a year later we did
[24] grappling.
[25] Q: But the buoys were still there?

Page 251

**Stepski**

[1]
[2] --A: No, the buoys weren't there.
[3]   Q: Let's go back.
[4] When did you go out to drag for the
[5] net?
[6]   A: A year later.
[7]   Q: What happened to the fishing nets
[8] that had been deployed when the collision
[9] occurred?
[10]   A: Oh, I went with my friend a couple
[11] of weeks later and got those.
[12]   Q: Were they still there intact?
[13]   A: Yes.
[14]   Q: And it was one year later that you
[15] went. And you went out and, of course, there were
[16] no visible signs there, there were no buoy floats,
[17] you went with a what, GPS or Loran?
[18]   A: All the high fliers were there. We
[19] went to retrieve the nets.
[20]   Q: No. One year later to get the net
[21] that you lost, right?
[22]   A: Yes. Just went about where I
[23] remember being.
[24]   Q: Did you use a Loran position or GPS
[25] position to get to that spot?

Page 252

**Stepski**

[1]
[2]   A: With his boat I think we used Loran.
[3]   Q: Do you remember what the coordinates
[4] were?
[5]   A: No. I don't remember.
[6]   Q: Who was this fellow you went with?
[7]   A: Peter Eshenfelder.
[8]   Q: Where does Mr. Eshenfelder live?
[9]   A: Waterford.
[10]   Q: Do you know the street?
[11]   A: It's Great Neck Road.
[12]   Q: Is he a friend of yours?
[13]   A: Yes.
[14]   Q: What is the name of his boat?
[15]   A: SHARON E.
[16]   Q: S-H-A-R-O-N E?
[17]   A: Yes.
[18]   Q: Did you have these coordinates in
[19] your head or did you have them on a piece of paper
[20] to give to him?
[21]   A: No. I just remembered about where
[22] we were. His boat, we just went looking on a nice
[23] hot day.
[24]   Q: When you were in the life raft,
[25] waiting to be rescued, did any other boats pass

Page 253

**Stepski**

[1]
[2] by?
[3]   A: We heard something, a boat at one
[4] point, but that was it.
[5]   Q: So you heard something, a boat, at
[6] one point.
[7]   · Did it sound like it was a ship or
[8] small boat?
[9]   A: I was terrified that it was another
[10] ship. I was expecting to see another ship come
[11] out of the fog and run us over again. I don't
[12] know what it was.
[13]   Q: But you couldn't tell from the sound
[14] of it?
[15]   A: No. It just sounded like a diesel
[16] engine. It was kind of faint, too.
[17]   Q: Did you feel a wave or anything like
[18] that, a bow wave or a wake, anything like that?
[19]   A: No.
[20]   Q: About how long after the collision
[21] occurred did you hear this boat go by?
[22]   A: I think I had already gotten the
[23] survival suits by then. I don't know how long.
[24]   Q: Sorry to belabor the point. Was it
[25] closer to 15 minutes or closer to two hours?

Page 254

**Stepski**

[1]
[2]   A: I would say two hours. I don't know
[3] if it was two hours. I don't know how long it
[4] was.
[5]   Q: Could it have been a half an hour
[6] after you were in the life raft that you heard
[7] this noise?
[8]   A: I think it was more that. I think
[9] it was closer to the two hours.
[10]   Q: Now, you know as a captain of your
[11] vessel you are responsible for the drug and
[12] alcohol testing of your crew, make sure that gets
[13] done; is that right?
[14]   A: No.
[15]   Q: Do you have copies of the drug and
[16] alcohol tests of your crew?
[17]   A: Yes.
[18] After we got rescued, sure, we went
[19] right to the hospital.
[20]   Q: You have copies of all these test
[21] results?
[22]   A: Yes.
[23]   MR. SINGLETON: And those
[24] haven't been produced in an unredacted
[25] form?

Page 255

[1]                    **Stepski**
[2]    MR. HEALEY: Then I haven't
[3]  got them either. The first time you
[4]  mention it, on the list.
[5]    MR. SINGLETON: Okay, good.
[6]  Thank you.
[7]    Off the record for a minute.
[8]    (Discussion off the record.)
[9]    MR. SINGLETON: Just a couple
[10]  more.
[11]            BY MR. SINGLETON:
[12]    Q: When you were interviewed by the
[13]  Coast Guard in New London, who was the
[14]  interviewing officer?
[15]    A: Bloom.
[16]    Q: That was Bloom?
[17]    A: Yes.
[18]    Q: Now that we have talked about this a
[19]  little, can you remember whether it was Bloom at
[20]  Cape Cod?
[21]    A: I think it might have been because I
[22]  remember we had to wait a while for him to get
[23]  there.
[24]    Q: After the interview at New London,
[25]  were you interviewed again by the Coast Guard?

Page 256

[1]                    **Stepski**
[2]    A: I don't believe so. I think that
[3]  was it.
[4]    Q: Do you remember when the interview
[5]  at New London was, how many days after the
[6]  incident?
[7]    A: I think it was more than a week, but
[8]  I don't remember.
[9]    Q: That's two interviews, and one
[10]  written statement you made?
[11]    A: I think that was it.
[12]    MR. SINGLETON: We need to
[13]  mark the chart as an exhibit.
[14]    (Chart entitled Approaches to
[15]  New York was marked as Exhibit No. 12
[16]  for identification, as of this date.)
[17]    MR. SINGLETON: I think we are
[18]  finished for today.
[19]    MR. HEALEY: Excellent.
[20]    (Whereupon, at 5:25 o'clock
[21]  p.m., the deposition was adjourned.)
[22]
[23]
[24]
[25]

Page 257

[1]
[2]                    CAPTION
[3]
[4]  The Deposition of MICHAEL A. STEPSKI, taken in the
[5]  matter, on the date, and at the time and place set
[6]  out on the title page hereof.
[7]
[8]
[9]  It was requested that the deposition be taken by
[10]  the reporter and that same be reduced to
[11]  typewritten form.
[12]
[13]
[14]  The Deponent will read and sign the transcript
[15]  of said deposition.
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 258

[1]
[2]        CERTIFICATE
[3]
[4]  STATE OF_____:
[5]  COUNTY/CITY OF_____ :
[6]
[7]  Before me, this day, personally appeared
[8]  MICHAEL A. STEPSKI, who, being duly sworn, states
[9]  that the foregoing transcript of his/her
[10]  Deposition, taken in the matter, on the date, and
[11]  at the time and place set out on the title page
[12]  hereof, constitutes a true and accurate transcript
[13]  of said deposition.
[14]
[15]
[16]        MICHAEL A. STEPSKI
[17]
[18]
[19]    SUBSCRIBED and SWORN to before me this_____
[20]  day of _____, 2006, in the
[21]  jurisdiction aforesaid.
[22]
[23]
[24]  My Commission Expires          Notary Public
[25]

Page 259

[1]
[2]     DEPOSITION ERRATA SHEET
RE:
[3] FILE NO.
[4] CASE CAPTION:  Stepski vs.  NORASIA ALYA
[5] DEPONENT: MICHAEL A. STEPSKI
DEPOSITION DATE: November 9, 2006
[6]
To the Reporter:
[7] I have read the entire transcript of my Deposition
taken in the captioned matter or the same has been
[8] read to me.  I request for the following changes
be entered upon the record for the reasons
[9] indicated.
I have signed my name to the Errata Sheet and the
[10] appropriate Certificate and authorize you to
attach both to the original transcript.
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24] SIGNATURE:_____ DATE:_____
[25]     MICHAEL A. STEPSKI

Page 260

[1]
[2]         INDEX   PAGE
[3] Witness       Direct
[4]
MICHAEL A. STEPSKI   4
[5]
[6]
[7]
[8]       EXHIBITS
[9]
Exhibits      Description        Page
[10] For Ident.
[11] 1   Photographs            60
[12] 2   Johnson Marine Service 3/2/03 survey  82
[13] 3   Athearn Marine Agency survey       89
[14] 4   Johnson Marine Services 8/4/04 survey  92
[15] 5   Certificate of documentation      101
[16] 6   Insurance binder        109
[17] 7   Diagram of repair        121
[18] 8   Diagram of ship's layout     128
[19] 9   Conversation record       196
[20] 10  Handwritten document dated 5/22/04   207
[21] 11  Summary               215
[22] 12  Chart entitled Approaches to New York 256
[23]
[24]
[25]

Page 261

[1]
[2]         REQUESTS FOR PRODUCTION
[3]
[4]      Page 11 - Line 9: Date of last physical
[5] Page 30 - Line 13: Copy of boater's license
[6] Page 63 - Line 23: Operations manual for radar
[7] Page 88 - Line 23: Johnson's survey bill
[8] Page 96 - Line 20: Eugene's last name and address
[9] Page 105 - Line 23: Evidence of purchase from Mr. Frye
[10] Page 112 - Line 5: Copy of insurance policy
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 262

[1]
[2]         CERTIFICATE
[3] STATE OF NEW YORK       )
[4]                 ) ss.
[5] COUNTY OF NEW YORK )
[6]      I, ANNETTE FORBES, a Certified
[7] Shorthand (Stenotype) Reporter and
[8] Notary Public of the State of New
[9] York, do hereby certify that the
[10] foregoing Deposition, of the witness,
[11] MICHAEL A. STEPSKI, taken at the time
[12] and place aforesaid, is a true and
[13] correct transcription of my shorthand
[14] notes.
[15]      I further certify that I am
[16] neither counsel for nor related to any
[17] party to said action, nor in any wise
[18] interested in the result or outcome
[19] thereof.
[20]      IN WITNESS WHEREOF, I have
[21] hereunto set my hand this 21st day of
[22] November, 2006.
[23]
[24]      ANNETTE FORBES, CSR, RPR
[25]

**Lawyer's Notes**

## $

$2,500 114:2

$35,000 109:16; 112:9; 114:23

$50 98:15

$60 94:13, 15

## 0

041119P 208:5

05 13:17

06371 3:15

## 1

1 43:22; 60:17, 19; 61:2; 75:23; 124:22; 139:9; 152:6

1.5 222:6; 223:4, 6, 11

1.6 223:2

10 34:23; 35:20; 207:12, 20; 218:20; 220:2

105 261:9

10:30 244:13, 14

11 215:3, 7; 216:11; 244:12; 261:4

1100 199:20; 200:6, 15

112 261:10

11:00 201:2; 209:11, 22; 210:6, 10, 11; 242:18; 243:13, 20

12 30:11; 32:7; 40:16; 57:25; 256:15

12's 57:22, 23; 59:12

12-pack 245:22

120 93:25; 94:5; 95:2, 2, 3

12300 13:16; 14:16

12:20 89:6

12:30 89:8

13 229:4; 261:5

14 33:4, 8, 13

14-foot 35:22; 36:19

140 3:14

14650 219:13

14700 218:22

147000 209:6

14760 198:15, 21; 217:15; 218:5, 9

15 138:22; 141:14, 17, 18; 156:11; 229:12; 247:22; 253:25

16 33:10, 24; 43:17; 62:19; 229:4

18 102:5

19 34:3

1900 207:18

1:10 115:8

1J 3:19

## 2

2 43:22; 59:12; 82:7, 9, 13; 87:2, 8, 12; 97:9; 103:10; 139:9; 152:15, 18, 25; 153:2; 237:4, 5; 250:9

2's 152:7

2,000 148:11

2,300 136:13

20 58:22; 117:4, 15; 136:14, 16; 138:22; 139:3, 25; 141:14, 14, 17, 25; 142:3; 154:22; 155:4; 229:12; 261:8

20/20 10:20

20/40 10:20

200 39:6

2000 6:5; 12:3

2001 40:12

2002 44:18; 47:4

2003 38:17; 83:16; 102:5; 103:11, 15, 17; 111:21; 225:22, 24

2004 38:5, 9, 17; 44:18; 111:22; 175:4; 176:5; 207:18

2005 38:9

2006 38:8; 116:3

22 175:4; 176:5; 207:18; 208:5

22nd 53:25; 133:19; 138:25; 143:20; 174:20; 228:14; 250:18

22lh 54:2

23 118:24; 261:6, 7, 9

24 10:8; 42:22

250 52:25

25lh 83:9

26 34:15, 18; 35:14, 20

2:05 116:4

## 3

3 84:7; 89:14, 16, 20; 90:10; 103:10

3/2/03 82:8

3/31/2003 83:9

30 100:21; 141:18, 20, 22; 243:15; 261:5

300-foot 136:10, 15; 213:11

300-nets 136:14

31st 38:22

35,000 113:23

350 52:25

38-foot 36:19

3:40 189:10

3:45 189:12

## 4

4 84:8; 92:2, 5, 9; 97:9; 111:21, 22; 116:22

405 85:15

42 40:16

42605 224:2

43600 209:6; 218:22

43605 217:14; 218:6, 10

43608 223:25

43610 223:25; 224:20

43615 219:12

460 94:13

4:30 133:20; 244:11

4:38 133:20; 134:19; 140:24; 243:4

## 5

5 101:3, 25; 103:10; 261:10

5/22/04 207:12

50 42:6; 56:13; 193:4, 12

5:25 256:20

## 6

6 86:17; 109:4, 8; 116:23

6,000 136:17, 18; 194:24

600 148:17; 223:15

615 219:12

63 261:6

## 7

7 121:16

700 39:7; 148:17

760 221:12, 13, 13

7:00 191:11

## 8

8 39:3; 84:7, 8; 128:17; 131:15; 142:12, 18; 143:11

8/4/04 92:4

80 161:5

88 261:7

8:00 191:11

## 9

9 116:3; 196:10, 14; 197:7; 207:16; 217:12; 220:4, 19; 221:3; 261:4

96 261:8

## A

a.m 134:19; 140:24; 209:11; 243:4

ability 10:10, 15

able 37:8; 107:10; 108:13; 145:19, 21; 156:7; 157:21; 182:15; 183:14; 194:19; 218:12; 223:19; 236:6

above 29:11; 87:19

absolutely 171:12; 215:23; 226:21; 230:21

accept 164:15; 172:18

accident 12:19; 18:19, 25; 19:7, 14; 36:3; 37:4, 13; 40:13; 44:16, 17; 53:7; 68:2; 71:11; 72:25; 73:8; 74:6; 84:17; 93:4, 12; 111:23; 139:18, 24; 148:14

accommodate 6:23

According 111:20; 214:15; 229:9

account 114:12

accurate 122:4; 125:9, 14; 225:3

acquire 32:10; 33:3; 36:25; 40:11

acquired 36:5, 6, 8; 37:5, 12; 38:16; 40:24; 44:15, 17, 19; 45:2; 59:22; 67:22, 25; 71:18; 83:11, 15; 84:21; 88:4

acquiring 74:7

acquisition 44:20

across 53:18; 59:2, 3; 122:6; 124:23; 125:7; 222:11, 17; 240:8

action 162:6; 187:7

activated 72:24; 73:8; 85:18, 19, 23; 86:2, 7

activates 85:21

actual 105:25; 186:13

actually 5:23; 11:16, 17; 13:21; 21:3; 26:25; 28:8; 30:3, 10, 13; 33:20; 42:7; 51:2; 57:20; 58:13; 81:7; 84:8, 14; 109:9; 114:13; 118:2; 123:11; 133:7; 145:12; 147:12; 149:25; 152:23; 156:2; 167:15; 188:14; 193:21; 195:9; 204:2; 219:4; 224:16; 229:6; 233:7, 20; 236:10, 19

added 57:4; 70:7

address 3:12; 4:2; 96:17, 18, 22, 23; 261:8

adjourned 256:21

administered 11:5

Administration 12:5

advance 49:10, 12; 160:3

advanced 30:4

advice 7:13

advised 5:20

affect 10:9, 15; 12:20

affected 86:22

affix 119:2

afford 46:6

aft 58:16; 61:24; 78:7, 11

AFTERNOON 116:2

afterwards 49:23, 24; 50:11; 51:6; 246:5

again 14:2; 24:17; 27:20; 104:3; 137:21; 138:2; 143:23; 152:20; 163:21; 174:3; 182:17; 185:16; 202:11; 204:6, 18; 212:19; 231:21; 240:16; 242:17; 243:25; 244:5; 245:17; 253:11; 255:25

against 6:3

age 32:2

Agency 89:15, 24; 101:9

AGGIE 33:19, 20, 25; 34:13, 24; 35:6, 7; 36:5; 39:18; 42:12; 45:12, 13

ago 8:9, 10; 9:9; 11:4; 12:11; 21:4; 29:14; 35:16; 38:4; 72:17; 162:23

agree 103:19, 22; 117:7; 232:14

agreed 67:4; 123:25; 124:5

agreement 7:5; 248:7

ahead 21:17; 74:2; 132:4; 151:15; 158:24; 173:20; 178:6; 194:13; 195:6; 203:9, 21; 222:12; 236:22, 24

air 238:7

Alan 5:24

alarm 69:22, 23, 25; 70:16; 72:7, 8, 9, 12, 13, 22

alcohol 8:13; 246:23; 254:12, 16

Alexander 3:11

alleging 6:4

almost 100:8; 130:21; 139:2; 140:2; 175:19; 237:11

along 5:24; 25:23; 26:16; 93:6; 134:17; 145:20; 169:8; 170:7; 223:25; 224:19; 237:7

alphabetical 60:23

alter 233:8

altered 176:23

although 229:23

aluminum 57:11, 14, 15

always 31:10; 42:25; 76:9; 79:10; 97:4; 226:16; 227:24; 229:24; 246:9

ALYA 5:25; 6:4; 20:23; 21:3, 9, 21; 22:2; 195:20, 23

Amongst 229:18

amount 109:20; 112:10;

164:19; 178:3; 200:10
amplify 182:16
anchor 72:9; 137:18
anchoring 73:5
Ann 5:4; 34:6, 9, 11, 17, 20, 22; 35:3, 9, 10, 25; 36:5; 39:14; 40:2, 9; 43:5, 13; 45:16; 68:16, 18, 21; 69:9, 19; 70:16, 20, 23; 71:3; 72:8
ANN's 69:23
Annapolis 223:18
Annette 3:4
answered 169:5; 176:20; 193:23; 232:9; 233:10, 17; 238:25; 244:17
antenna 68:23; 71:9; 73:15, 18, 20; 186:25; 240:19; 241:5
antennas 69:4; 72:3
Apart 16:24; 17:3; 49:4; 61:23; 116:11; 121:5, 10, 11
apparently 214:15; 249:12
appear 9:19, 22; 169:17
appearance 20:22; 21:8
appeared 201:9, 12
appears 106:14, 24; 107:5; 220:18
application 32:18; 106:23; 107:21
appreciable 139:8
appreciate 125:19; 182:23; 211:24
apprenticeship 31:8
approach 172:10, 20, 24
Approaches 13:15; 226:24; 256:14
approaching 67:17
approval 49:16
approve 49:10, 11
approximate 126:5; 197:17; 201:4; 242:24
approximately 39:2; 58:5; 198:22; 199:20; 200:5; 201:10, 13, 17; 217:14
approximation 155:25; 243:2
April 100:12; 102:5; 103:11, 15, 17; 111:21, 22
architect 49:9, 9, 15
area 13:13, 23, 24, 25; 14:5, 15, 19; 15:7, 12; 37:22; 39:5; 41:20; 122:24; 123:22; 124:10, 11, 13; 198:18; 219:12, 18; 220:13; 222:11; 225:8, 8, 17; 226:2, 3, 12, 22; 228:14; 241:24; 249:13, 18, 25
arguing 178:25
around 12:3; 41:15, 22; 56:13; 66:22; 80:17;

137:13, 19; 142:19; 145:2; 152:11; 187:2; 190:24; 192:4; 209:11, 22; 210:10, 11; 218:25; 219:11, 12; 221:12; 225:8; 239:25; 240:4, 22; 242:14; 247:22
arranged 106:10
array 68:23
Arrested 9:13, 15
arrive 94:15; 141:4
arrived 149:3; 152:7
arrow 62:13; 66:25; 67:3; 123:4; 126:13
artwork 121:19
aside 237:18
assault 8:17, 20
assess 191:10; 231:25
assessment 88:13; 151:24
assels 108:9, 10
assign 231:22
assigned 230:5, 6
assist 48:25
assisted 144:7
assume 43:9; 88:16, 19; 133:9; 223:23; 224:11, 13, 18; 245:6
assuming 11:20; 19:8; 150:9; 184:25; 211:5
assured 239:7
astern 132:7
Athearn 89:15, 23; 101:8; 105:17; 106:10
attached 84:4; 180:25; 192:21, 23, 24; 193:11; 194:2; 238:15; 250:14
attachments 195:19
attempt 109:20
Attempted 8:17, 19; 203:9, 20
attend 28:22; 50:4, 15; 52:12, 15, 19
attending 54:11; 185:24
attention 150:11, 19; 171:3, 11
auto 66:15; 91:12; 92:24
aux 133:3
auxiliary 132:13
auxilliary 132:16, 18; 133:3; 149:4, 22; 150:2, 12; 181:12, 16; 202:22
AVA 36:8, 9; 37:9; 40:10, 14; 42:8; 44:15, 17, 20; 45:2, 24, 25; 46:4, 23; 47:4; 61:7; 62:6; 64:14; 65:2, 11, 24; 67:6, 21; 69:7, 20; 70:19, 20, 22; 71:4, 18; 72:3; 73:11; 77:7, 9; 81:25; 83:15, 19, 23; 85:9, 12; 90:15, 24; 91:11; 101:6, 10, 13, 20; 102:4, 9, 12, 14; 104:12; 107:24; 108:8, 12, 21; 109:10; 117:2, 18; 121:21; 130:9; 174:20; 192:17; 193:14;

194:3; 209:4
available 198:2
average 88:12; 100:5
aware 21:19; 116:12; 117:11; 154:14; 227:23; 228:2; 232:11
away 47:16; 116:14; 158:20; 161:3; 162:13, 14, 24; 163:11; 165:22; 187:22; 188:16, 23; 201:20; 227:20; 228:7; 234:3; 238:9

## B

B 93:22; 95:6; 97:8; 219:21
Back 3:23; 4:20; 20:6; 30:24; 38:20; 41:23; 44:25; 49:23, 24; 50:11, 13; 54:10; 56:9, 10; 58:18, 19, 21; 66:19, 20; 80:8; 100:7; 102:18, 23; 104:22; 105:9; 137:20, 22; 138:6, 8, 10, 12, 19, 21; 139:3, 4, 9; 141:11, 20; 148:2, 2; 149:21; 151:20; 159:9, 23; 163:18, 20, 25; 164:17, 20; 165:4, 17; 166:10, 11, 25; 167:21, 24; 168:11, 16; 171:6; 189:17; 199:17; 201:7; 204:6; 214:6, 23; 217:10; 226:18; 233:14; 234:11; 236:16; 237:2; 238:18; 244:15; 246:14; 248:21; 249:9, 13, 18; 251:3
backed 147:4
backside 79:16
backwards 84:18
bad 179:2
bag 247:13
bank 114:12; 223:5
bar 124:15, 16; 125:4; 246:8, 10, 11, 14, 19
barely 184:14
bars 246:21
base 207:2, 4
based 176:8; 178:10; 215:14
basic 220:13
basically 12:18; 13:5, 13; 14:5; 17:18, 24; 18:6; 29:8; 51:25; 57:13; 74:23; 75:19; 79:6; 83:2; 97:10; 117:3; 122:21; 132:23; 147:14; 161:16; 195:19; 197:22; 200:9; 213:18
basis 18:24; 19:2, 10; 97:23
bat 25:15; 193:2
Bay 37:21
beam 161:5
bearing 160:25; 161:3; 169:19, 25; 170:13; 171:24; 172:2; 175:5, 6, 8,

9; 179:25; 180:3, 10; 186:16; 203:2; 213:22; 233:22, 22; 235:5, 18
became 194:19
beer 140:17; 244:19; 245:3, 9, 18; 246:4; 247:2, 4, 8, 11
began 71:15
beginning 51:7; 76:3; 139:19; 153:12; 185:8; 199:22; 200:17; 250:20
begins 113:8
behind 238:21
belabor 253:24
belief 19:15
believes 65:18; 81:24
believing 221:4
below 88:12; 110:10; 204:22; 238:7
belt 146:18
Ben 215:15; 236:14, 15; 238:13, 22, 23; 239:4
Bernie's 53:13, 17; 54:8
beside 35:13
besides 241:11
best 18:20; 125:16; 149:12; 153:5; 155:7
better 66:9, 11; 68:12, 16; 69:22; 70:16; 71:17; 79:23; 91:16; 120:24; 164:9, 13; 179:4; 225:13; 226:10; 241:25
beyond 223:3
big 5:11; 16:15; 22:4, 8; 81:11; 232:25; 240:13
bigger 34:12; 58:9; 218:15
biggest 39:7; 194:10
bill 88:17, 19, 21, 24; 89:3; 91:5; 261:7
binder 109:3, 8; 112:3
bird's 121:23
birthday 26:9
bit 5:17; 24:15; 34:20; 40:9; 46:14; 47:20; 55:22; 118:4; 125:23; 158:21; 194:7, 16; 199:2; 201:7; 213:4; 224:23; 238:4, 15; 239:7
blank 103:11, 12, 13, 15, 16
blip 186:24, 24, 25
blips 188:9; 233:7
Block 226:3
Bloom 196:21; 217:2; 255:15, 16, 19
blue 123:16
board 42:13; 57:4, 9; 61:17; 62:6; 64:11, 12; 66:2; 74:12; 245:3, 5, 9, 19; 250:10
boards 47:20; 57:5, 12; 122:6, 7, 11
boat 6:9; 13:21; 14:6, 8, 20; 17:19; 20:11, 14, 18;

26:5, 18; 32:14; 33:2, 3, 4, 8, 12, 14; 34:4, 5, 10; 35:15; 36:2, 11, 12; 41:6, 13, 23; 44:4; 49:25; 50:23; 51:2, 23; 52:3, 23; 53:4, 15; 55:21; 58:14, 17; 59:18; 61:21, 24; 63:9, 11, 13; 64:2, 24; 68:9, 11, 11; 71:16; 74:14; 76:10; 78:8; 81:22; 82:18, 25; 83:3, 11; 84:12, 25; 85:7; 90:2, 4, 7, 10, 11, 17, 22; 92:15, 21; 97:14; 98:14, 25; 99:5, 14, 18, 24; 102:11, 22, 23; 105:19; 110:6; 114:16; 118:23; 134:5; 145:12, 16, 19, 23, 25; 146:7, 8; 147:19, 25; 161:7, 8; 180:23; 181:2; 184:14; 188:7, 13; 191:13, 13; 192:17; 193:14, 18; 194:5, 12, 14; 204:2; 221:16; 225:15; 228:16; 229:3, 20, 21; 230:13; 231:9; 236:5; 237:18, 22; 238:3, 6, 11, 16; 239:20; 246:8; 250:5, 6, 10, 11, 13; 252:2, 14, - 22; 253:3, 5, 8, 21
boater's 30:2, 6; 261:5
boating 29:18; 31:2; 32:5
boats 29:7; 31:5; 35:12, 21; 39:22, 25; 41:21; 50:18; 86:11; 103:5; 252:25
boilermaking 31:9
bolt 119:6, 20; 120:7, 9; 121:5
bolted 41:19; 55:7; 119:8, 22; 120:2
bolts 119:15, 16, 18; 120:11; 121:6, 9; 124:25
border 28:14, 19
both 44:12; 68:25; 69:2, 4; 74:16, 17, 21; 103:9; 146:21
bottle 240:5
bottom 57:17; 62:7; 66:22, 25; 67:3; 75:5; 80:10; 86:19; 94:12; 106:25; 117:3, 24; 118:18, 23; 120:16; 138:19; 161:20
bought 33:4, 12; 34:4; 36:2; 37:16, 18; 38:3; 42:10; 47:4; 51:23; 52:8; 69:6; 91:8; 99:4, 13, 19; 100:18; 101:12; 102:18
bow 20:15; 175:17; 239:9; 242:6, 10, 16; 253:18
box 47:22; 59:14, 15, 20, 21; 61:10; 75:5; 80:22; 106:15; 127:22; 132:23; 133:2
braces 55:11
bracket 241:14
brand 204:25
breadth 34:19; 61:20

break 6:21; 54:13, 20; 108:24; 115:7; 189:9; 194:6, 16, 17; 195:10; 217:8; 240:23
bridge 184:20, 22, 23
bridle 212:16
bridles 212:21; 213:2
bring 53:14; 91:17; 245:9, 11, 13, 18; 246:4; 247:2, 4
bringing 145:6
broadside 204:15
broke 240:9, 19
broken 172:16; 241:5
broker 106:10; 116:18
brother 26:13; 40:8; 48:10, 12; 77:8, 13; 96:3
brother's 27:25; 48:13
brought 4:25; 6:3; 38:20; 239:22; 245:3, 5, 12; 250:18
Bruno 40:18
bubbles 238:7
bucking 243:6
build 110:11
building 76:4; 198:5
built 132:23
bulkhead 41:13; 128:3, 5, 6, 7
bundle 61:4
bunks 47:22
buoy 250:14, 16; 251:16
buoys 250:25; 251:2
business 6:8
busy 46:6; 192:15
butts 41:12
buy 70:23; 102:16, 22

**C**

C 3:2; 62:4; 77:18; 93:22; 95:6; 97:8; 112:19; 219:22; 220:4; 221:22; 223:12; 224:24; 225:3, 8; 237:10
C-i-a-n-c-i-u-l-l-i 107:11
C/F/V 112:18
cabin 47:21; 56:9; 58:19, 21; 79:7; 122:9; 250:6
cabinets 110:11
calculate 172:19; 188:15; 223:2; 244:3
calculated 39:22; 175:23
calculates 173:24, 25
calculation 160:8; 172:8; 173:9
calculations 172:15
calibrate 71:20
call 10:2; 42:15; 66:11; 80:15; 125:2; 129:17; 132:12; 134:22; 141:10, 14; 148:20, 23; 149:4; 163:6, 13; 164:10; 166:18;

175:21
called 3:2, 18:8; 92:9; 127:25; 129:17; 135:16; 184:20, 24
calls 185:3
calm 191:4
came 49:23, 24; 50:8, 10, 13, 17; 51:7, 12, 25; 52:6; 58:18; 67:12; 82:18, 25; 94:8; 142:19; 160:14; 184:15; 191:9; 194:15; 209:12; 214:7; 226:5; 230:9; 240:8; 250:5
can 7:12; 10:3, 4; 11:7, 13, 14; 21:11; 41:7, 8; 54:22; 67:13; 75:16; 78:5, 13, 17; 79:4; 89:21, 23; 95:8, 13, 17; 96:12, 17; 98:5, 6, 19; 99:3; 119:7; 122:4; 123:3, 9, 16; 127:2, 19; 129:15, 16; 131:20; 132:12, 15, 19; 145:4, 11, 17; 150:9; 164:18; 181:15; 183:12, 13; 185:16; 189:4; 190:3, 18; 213:16; 218:23; 222:25; 223:13; 224:21; 234:21; 235:4; 242:25; 244:24, 25; 255:19
canoes 35:23
capable 42:20
capacity 55:15
Cape 196:16; 206:23, 25; 208:13, 25; 220:15; 255:20
capital 209:9, 20
caplain 35:7, 10; 36:22; 92:14; 145:22; 209:4; 254:10
CAPTION 257:2
card 31:17
career 31:6
carefully 160:19; 229:13; 232:24
case 7:25; 28:6; 37:21; 138:11; 153:5, 6; 157:3; 212:16; 229:7; 240:17; 245:17
cash 97:23; 107:18
catch 27:16; 39:4; 99:17; 100:19; 241:24; 247:19, 25; 248:8, 23
catches 13:3
catching 249:23
category 24:18
caught 236:2
center 129:2; 161:18, 22
centermost 129:18
certain 32:2; 63:17, 19; 70:25; 73:7; 85:23; 215:23; 230:16
Certainly 226:22
certainty 234:25
certificate 31:3; 32:5; 101:2; 102:4
chance 195:12; 249:23
change 22:6; 43:2; 52:22;

55:3; 67:22; 68:6; 161:2, 6; 182:7; 183:16; 186:13, 19; 188:9; 190:16; 191:15; 194:5; 199:5, 6; 203:19; 205:17; 206:12, 17; 207:7; 226:8; 233:22; 234:5, 8, 16
changed 47:17; 55:17; 68:10; 105:11; 167:20; 169:20; 170:13; 171:25; 172:6; 181:6; 186:15, 17, 18; 204:25; 205:6, 8, 9; 233:3, 17, 24; 234:13
changes 68:2, 5
changing 199:6, 7
channel 57:11, 14, 15; 118:25; 119:4; 226:3; 229:4
characterize 70:13
charge 94:19, 22; 186:4
charged 8:7; 9:7, 10, 18
charges 7:24; 8:16
chart 13:8, 11, 13, 14, 15, 15, 18, 25; 14:8, 11, 12, 14, 15, 16; 15:3, 6, 6, 8, 10, 13, 14, 19, 22, 22; 16:3, 10, 10, 12, 15, 16, 24; 37:22; 43:7; 44:6, 8, 8, 11; 45:5, 6, 10; 48:5; 65:25; 66:9, 13, 16, 23; 67:4, 7, 15, 18; 73:12, 13, 16; 74:22, 25; 134:5; 155:19; 197:21, 25; 218:4; 220:13, 16; 225:9; 237:10; 256:13, 14
charter 29:7; 31:5
charts 13:22; 15:17; 17:2, 3, 12, 25; 74:21; 221:16
check 32:18; 52:2; 63:15; 114:6, 8, 11, 12, 19, 23, 25; 143:15; 150:6; 228:19; 248:5
checked 11:2; 72:4
checking 27:11
checks 105:21; 184:19
choice 235:17
choices 235:4
Cianciulli 107:11
circle 62:10, 12; 66:22; 67:2, 3; 218:11, 25; 219:19
circles 126:25
circular 41:18
circumstances 24:13; 178:9
claim 12:18, 24, 25; 63:5
CLAIRE 36:8, 9; 37:9; 40:10, 15; 42:8; 44:15, 17, 21; 45:2, 24, 25; 46:4, 24; 47:4; 61:7; 62:6; 64:14; 65:2, 24; 67:21; 69:7, 20; 70:19, 20; 71:19; 72:3; 73:11; 77:7, 9; 81:25; 83:15, 19, 23; 85:9, 12; 90:15, 25; 91:11; 101:6, 10, 14, 20; 102:4, 9, 12, 14; 104:12; 107:24; 108:8, 12, 21; 109:11; 117:2, 18;

121:22; 130:9; 174:20; 192:17; 193:14; 194:3; 209:5
CLAIRE's 65:11; 67:7; 70:22; 71:4
Clarify 225:10
class 29:14, 14; 30:5
clean 237:18
cleaning 147:12
clear 5:22; 64:6; 66:24; 151:5; 152:20, 21; 211:16
clearer 140:7
climb 80:24; 238:5
clock 155:19
close 55:23; 79:22; 118:14; 122:3; 130:16; 157:11; 163:21; 167:22; 172:25; 175:22; 176:7; 184:11; 187:25; 192:15; 202:10, 12; 203:24; 205:18, 20, 21; 227:13; 228:6, 24; 229:2
closed 38:11
closeness 187:18
closer 156:11; 160:3; 163:4; 165:6, 10, 11, 18, 21; 172:23; 174:2; 209:18; 210:16; 228:11; 253:25, 25; 254:9
closest 118:22, 23; 138:5; 172:9, 20
cluttered 6:20
Coast 17:10, 12, 24; 18:3, 5, 7, 24; 19:8, 11, 13, 18, 21; 20:2, 13, 17; 21:24; 22:3, 7; 31:12, 17; 86:14; 113:16; 135:3, 8; 140:4, 8, 12, 18; 143:4; 154:24; 195:13; 196:2, 16, 24; 197:2, 5, 10, 19; 200:14; 201:14, 16; 202:2, 14, 19; 203:5, 11, 15, 22; 205:4; 206:3, 7, 11, 15, 21; 207:15; 208:3, 10, 12, 22, 24; 215:7, 13, 24; 217:12, 17; 220:3, 11, 15, 19; 221:2; 223:23; 224:13, 18; 255:13, 25
coastal 30:4
coat 56:25; 57:3
coats 56:19
Cod 196:16; 206:23, 25; 208:13, 25; 220:15; 255:20
collected 215:17
collecting 28:5
collection 215:14
college 29:13
collision 72:8; 142:4, 17; 152:23; 154:17; 155:9; 156:22; 162:10; 165:8; 167:5, 12, 16; 168:3; 171:15, 23; 177:10, 13, 17, 20, 23; 178:4, 19; 182:8; 183:16; 184:8; 185:13, 18, 19; 187:15; 190:6; 191:16, 19; 192:5, 12; 193:22;

204:3, 8; 212:22; 215:22; 229:11; 230:2; 232:2, 5; 236:11; 244:20; 250:8; 251:8; 253:20
color 22:11; 123:15
column 84:9
combination 33:17; 44:8, 9; 87:22
comfortable 39:9; 166:25
coming 17:22; 20:19; 23:16, 17; 24:9; 59:18; 79:8; 80:8; 119:24; 122:6; 124:23; 170:6; 172:4; 175:9, 10; 180:14, 24; 187:19; 214:21; 238:8; 246:14
comma 209:10
Commander 196:21
comment 232:7; 235:13
Commerce 106:22
Commercial 5:16; 29:5, 6, 9; 33:8; 41:8; 112:20; 226:13; 227:13, 20; 228:5, 25
community 25:20
Company 53:13, 17; 104:21; 107:23; 113:11, 18, 22; 114:15; 115:4
compass 42:16
compensated 247:16, 23
complete 195:16
completed 111:7; 199:20; 200:16; 246:23
completely 6:13; 60:2; 76:7; 144:25; 145:2
completion 248:19
complies 123:6; 126:15; 127:3; 132:17; 218:13, 24
concentrate 157:23
conception 190:4
concern 226:11, 14
concerned 162:8, 12; 163:12; 171:15; 181:9; 183:22; 188:3; 214:16; 226:16; 227:12, 15, 17, 24; 239:15, 16
conclude 215:13
conclusion 87:15
condition 88:12; 241:3
conditions 10:13; 190:25
condominium 3:19
conducted 83:8
confident 61:25
confuse 6:16
confused 174:4
connected 44:10; 241:14
Connecticut 3:15; 4:4, 7; 8:2; 9:20; 28:13; 30:7, 19, 25; 31:19, 24; 34:20; 96:15; 101:17
connection 9:2
conscious 110:24; 111:5
consider 25:25; 46:15;