# In The Matter Of:

*STEPSKI   v.*

*THE M/V NORASIA*

---

*KIRSTEN STEPSKI*

*April 12, 2007*

---

*FINK & CARNEY REPORTING AND VIDEO SERVICES*

*39 WEST 37TH STREET*

*NEW YORK, NY   USA   10018*

*(212) 869-1500   or   (800) 692-3465*

*Original File 0412B.TXT, 119 Pages*
*Min-U-Script® File ID: 0204914283*

# Word Index included with this Min-U-Script®

Page 30

[1] UNITED STATES DISTRICT COURT
[2] SOUTHERN DISTRICT OF NEW YROK
[3]
[4] MICHAEL STEPSKI, KIRSTEN
    STEPSKI, Wife, GEAL
[5] RODERICK and BENJAMIN
    SCHOBER,
[6]                                    :
         Plaintiffs,                   :
[7]
      -versus-                 : No. 06 CV 01695
[8]              (CM)
    The M/V NORASIA ALYA, her
[9] owners, operators, etc.,    VOL. II
    and MS "ALENA"
[10] SCHIFFAHRTSGESELLSCHAFT
    mbH & CO. KG, PETER
[11] DOEHLE SCHIFFAHARTS-KG,        :
[12]      Defendants.               :
[13]
[14]
[15]         Continued deposition of KIRSTEN
[16] STEPSKI, taken by Defendants at the law office of
[17] Stevens, Harris, Guernsey & Quilliam, P.C., 351 Main
[18] Street, Niantic, Connecticut, before Jacqueline
[19] McCauley, RPR/CSR, a Notary Public in and for the
[20] State of Connecticut, on April 12, 2007, at 10:39 a.m.
[21]
[22]
[23]
[24]
[25]

Page 31

[1] APPEARANCES:
[2]      For the Plaintiffs:
[3]      THOMAS H. HEALEY, ESQUIRE
         17 Battery Place, Suite 605
[4]      New York, New York  10004
[5]      -and-
[6]      STEVENS, HARRIS, GUERNSEY &
         QUILLIAM, P.C.
[7]      351 Main Street
         Niantic, Connecticut  06357
[8]  By: RONALD F. STEVENS, Esq., of Counsel
[9]      For the Defendants:
[10]     BLANK ROME, LLP
         405 Lexington Avenue
[11]     New York, New York  10174-0208
         By: ALAN M. WEIGEL, Esq., of Counsel
[12]
[13]     -and-
[14]     FREEHILL, HOGAN & MAHAR, LLP
         80 Pine Street
         New York, New York  10005
[15]  By: MICHAEL E. UNGER, Esq., of Counsel
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 32

[1]              WITNESS INDEX
[2]                   PAGE
[3] Direct Examination by Mr. Weigel        33
[4] Cross-Examination by Mr. Unger          78
[5] Re-Direct Examination by Mr. Weigel    142
[6] Re-Cross-Examination by Mr. Unger      145
[7]
[8]
[9]
[10]
[11]              EXHIBIT INDEX
[12]    DEFENDANT'S    DESCRIPTION    PAGE
[13]      32   Document            33
[14]      33 Copy of Check          33
[15]      34    License & Permits  33
[16]      35   Data Sheets          33
[17]      36   Landing Data         33
[18]      37    Document            71
[19]   38    Medical Expenses Sheet   71
[20]
[21] NOTE: Exhibits retained by counsel.
[22]
[23]
[24]
[25]

Page 33

[1] KIRSTEN STEPSKI,
[2] 140 Four Mile River Road, Old Lyme, Connecticut,
[3] called as a witness, having been first duly
[4] sworn by Jacquelyn M. McCauley, a Notary
[5] Public in and for the State of Connecticut,
[6] was examined and testified as follows:
[7]     (Defendant's Exhibits 32 through 36,
[8] marked for identification.)
[9]     MR. HEALEY: Read and sign.
[10]     MR. WEIGEL: This is a continuation
[11] under oath.
[12]     MR. HEALEY: Yes. You're under
[13] oath. Do you understand?
[14]     A: Yes.
[15]         DIRECT EXAMINATION CONTINUED
[16]             BY MR. WEIGEL:
[17]     Q: While we were waiting we pre-marked some
[18] exhibits and I'll just have her identify those and
[19] then we'll start. I'll put before you an exhibit,
[20] which we've marked as 32, and it's a single page
[21] document. If you tell me if you've ever seen that
[22] document before?
[23]     A: No, I haven't.
[24]     Q: Okay.
[25]     A: I never saw that document before.

Page 34

[1]     Q: I'm going to put another document in front
[2] of you, which we've marked as 33, and see if you've
[3] ever seen that document before.
[4]     A: Yes.
[5]     Q: Can you identify that document for us,
[6] please?
[7]     A: It's a copy of a check that we wrote to
[8] the marine surveyor, I believe.
[9]     Q: And the date of that check is March 31,
[10] 2003?
[11]     A: Yes.
[12]     Q: When you say marine surveyor, is that the
[13] marine surveyor who did the surveyor of the Ava Claire
[14] when Michael Stepski was preparing to purchase it?
[15]     A: Yes.
[16]     Q: Another document which we've marked as
[17] Exhibit 34, and ask you have you ever seen that
[18] document before?
[19]     A: Yes.
[20]     Q: Would you identify that — for the record
[21] that's a document as a bundle and it is —
[22]     MR. HEALEY: Look at them all.
[23]     Q: It is 12 pages.
[24]     A: I'm not sure if anything is missing, but
[25] it looks like it's all of the licenses and permits

Page 35

[1] that Michael holds and the different boats hold.
[2]     Q: Okay.
[3]     A: Is it all the boats? It looks like it is,
[4] for 2004 and 2006.
[5]     Q: If you flip the document over, I'm sorry,
[6] 180 degrees, and you'll see there is a fax information
[7] line there. It says 860 area code, phone number, and
[8] Niantic Fish, LLC. Is that the —
[9]     A: That's our farm number for the house we
[10] lived in that we moved out of in '03, so that means my
[11] fax machine is still printing that out by error.
[12] Maybe I should fix my fax machine.
[13]     Q: This has a date of January 4. Is that
[14] January 4, 2007 or is it April 1, 2007?
[15]     A: I would assume it would be January 4. I
[16] know that you requested these documents in January.
[17]     Q: And you have a recollection of sending
[18] these documents to someone in January of —
[19]     A: It definitely wasn't April.
[20]     Q: It definitely was not April?
[21]     A: Definitely it was not April 1, and like I
[22] said, it must have our old phone number as the tag
[23] line, but it shouldn't have come from that phone
[24] number. It would not have originated from that phone
[25] number.

Page 36

[1]     Q: I'm going to show you a document which
[2] we've marked as Exhibit 35, and ask you have you seen
[3] that document before?
[4]     A: Yes.
[5]     Q: Could you identify that document for us?
[6]     A: These are the data —
[7]     MR. HEALEY: Look through them all.
[8]     A: These are the data sheets we received from
[9] National Marine Fisheries Service on vessel trip
[10] reports.
[11]     Q: And for the record I'll note that this
[12] document, which we have marked as Exhibit 35, is in
[13] fact a 4-page bundle of documents. Now, you said that
[14] this was information you had received from the
[15] National Marine Fisheries Service on the vessel trip
[16] reports?
[17]     A: Yes.
[18]     Q: It's dated January 11, 2007; is that
[19] correct? Is that your understanding of the date?
[20]     A: Yes.
[21]     Q: Can you tell us how did you come about
[22] that you received this document?
[23]     A: There's a trip report department at the
[24] National Marine Fisheries Service Department that I
[25] called, and requested in writing — we had to fax them

**Page 37**

[1] a written request, and then they mailed these to us.

[2] Q: You sent a written request to the National

[3] Marine Fisheries Service. Where did you send that?

[4] A: In Gloucester, Massachusetts.

[5] Q: And in response you got these four pages

[6] back?

[7] A: Yes.

[8] Q: Is this the entire bundle of documents,

[9] all four pages that you got back from the National

[10] Marine Fisheries Service?

[11] A: I believe so. It looks complete. I

[12] didn't bring my originals with me so this looks

[13] complete, because we just asked for the history from

[14] the year 2000 and up on the four different boats.

[15] Q: And how did you have to — do you have a

[16] copy of the fax that you sent to the National Marine

[17] Fisheries Service?

[18] A: I probably do. I'm not sure.

[19] Q: I am going to ask that you provide a copy

[20] of that to your attorney so he can produce it to us.

[21] MR. HEALEY: We got it? Yeah.

[22] A: It's actually a form that they asked us to

[23] fill out and fax back.

[24] MR. HEALEY: That's what we are

[25] talking about.

**Page 38**

[1] MR. WEIGEL: That's fine with me.

[2] MR. HEALEY: That's right. Now, off

[3] the record.

[4] (Whereupon, there was a discussion

[5] off the record.)

[6] Q: And when you got this bundle of four pages

[7] from the National Marine Fisheries Service, did it

[8] come with a cover letter?

[9] A: I'm not sure. I can't remember.

[10] Q: Well, if it did come with a cover letter,

[11] please provide that to your attorney as well so it can

[12] be produced to us. I'm going to show you one last

[13] document, which we marked as Exhibit 36, and I ask you

[14] do you recognize that document?

[15] A: Yes.

[16] Q: Could you just tell us what this document

[17] is?

[18] A: This is from the Connecticut Department of

[19] Environmental Protection data on Michael's landings

[20] for his vessels from 2000 and — I believe I requested

[21] 2003 through 2006.

[22] Q: The first couple of pages we have been

[23] provided with, the top is cutoff, and then I think you

[24] have to go about 3 pages in before the title of the

[25] document is apparent.

**Page 39**

[1] A: It was probably due to my fax machine.

[2] Q: I don't actually see any fax header on

[3] this particular document, so is it your understanding

[4] that this document was faxed to someone after you

[5] received it?

[6] A: I believe I faxed it to Attorney Healey.

[7] Q: Now —

[8] A: Probably with a cover letter.

[9] Q: If you go down the second page, and then

[10] again to the fourth page, there's a date and time

[11] printed on actually the third page, yes. The second

[12] and fourth page there is a date and time printed on

[13] here and it says 8:49, Thursday, January 18, 2007. Do

[14] you recall when you received this document from the

[15] Connecticut Department of Environmental Protection?

[16] A: No. There was quite a holdup on it. I

[17] ended up driving there and picking it up, and then

[18] they also sent it to me in the mail several days after

[19] that, so I ended up getting two copies of it.

[20] Q: Where did you drive to?

[21] A: It's in Old Lyme. They have a station.

[22] Q: How did you make the original request to

[23] them for —

[24] A: That was also by fax and with Michael's

[25] signature requesting.

**Page 40**

[1] Q: Did you have to fill out a form for them

[2] as well or it was just a cover letter?

[3] A: I believe that was just a cover letter,

[4] yeah.

[5] Q: You have a copy of the letter you sent to

[6] them requesting —

[7] A: I'm not sure.

[8] MR. HEALEY: Who is this now? Which

[9] government agent did I —

[10] A: DEP.

[11] Q: Connecticut Department of Environmental

[12] Protection. Is it your understanding that data on the

[13] catches is reported to one central location, and then

[14] collected by government agencies or does Michael have

[15] to make a report on both the National Marine Fisheries

[16] and DEP?

[17] A: He makes separate reports to the state and

[18] the federal.

[19] Q: If we were —

[20] A: I don't believe they share information.

[21] Q: If we were to compare Exhibit 35 and

[22] Exhibit 36, though, we should be able to — the

[23] numbers should match up?

[24] A: They should overlap, yeah.

[25] Q: He reports the same information to both

Page 41

[1] services; is that correct?

[2] A: Except for if he lands out-of-state. If

[3] he lands — it wouldn't apply to the Connecticut DEP

[4] if he lands out of state.

[5] Q: If he lands something in Massachusetts,

[6] for example, that doesn't get reported to Connecticut?

[7] A: That's right.

[8] Q: So there's a possibility that the — but

[9] that does get reported to the National Marine

[10] Fisheries Service?

[11] A: That's right.

[12] Q: So there would be a possibility that the

[13] information that the National Marine Fisheries

[14] Service, they might have higher totals than we could

[15] calculate using the DEP information. The Exhibit 35

[16] information includes those Connecticut and

[17] Massachusetts, correct?

[18] A: That's correct.

[19] Q: Does Michael land fish in Rhode Island?

[20] A: No, not Rhode Island.

[21] Q: Does he land fish in New York?

[22] A: Not in New York.

[23] Q: Are there any other states that you are

[24] aware of that he fishes in and lands fish?

[25] A: New Jersey.

Page 42

[1] Q: When has he landed in New Jersey?

[2] A: Every January and part of February for the

[3] last 3 or 4 years.

[4] Q: So then your understanding is that the

[5] National Marine Fisheries Service data includes New

[6] Jersey, Connecticut and Massachusetts. Those are the

[7] three states he lands fish in?

[8] A: Yes. It would include all. They keep

[9] track of all his days used on his permit.

[10] Q: Now, does Michael also have to report to

[11] the local, the state DEPs for environmental, whatever

[12] the environmental agencies are for those other states

[13] besides Connecticut?

[14] A: Yes.

[15] Q: Do you have records showing his reports to

[16] the Massachusetts Environmental Agency?

[17] A: I'm sorry, I misunderstood your question.

[18] He does not send reports to them. He does have to

[19] comply if they board him or if he sees any kind of an

[20] officer, that kind of a thing.

[21] Q: So he sends reports to the federal

[22] government?

[23] A: That's right.

[24] Q: And then the only state that he sends

[25] reports to is the State of Connecticut; is that

Page 43

[1] correct?

[2] A: That's right.

[3] Q: Mrs. Stepski, I'm going to give you a

[4] document which we've marked at prior depositions.

[5] Probably marked at Michael's deposition in January as

[6] Exhibit 27. Your prior testimony, I don't want to

[7] mischaracterize it, but as I recall it, it was that

[8] you prepared that document; is that correct?

[9] A: That's correct.

[10] Q: Now, I just want to go over a couple

[11] things. Some of this we covered previously. I may

[12] repeat a little bit, but I'm only trying to get it all

[13] concisely stated in the record so I understand it so

[14] I'm not trying to get — I'm not trying to get you to

[15] give me an inconsistent answer from last time. I want

[16] to know what the actual truth of the matter is with

[17] regard to this document. So if there is a little

[18] overlap, I'm trying to keep the overlap to a minimum.

[19] Now, I understood your prior testimony to be that

[20] projected lost income was calculated from the time of

[21] the accident to May 1, 2005, because if I understood

[22] correctly, the permit, the monkfishing permit runs

[23] from May 1 to May 1; is that correct?

[24] A: That's correct.

[25] Q: Now, does that time period for the

Page 44

[1] projected lost income, does that apply to all three

[2] categories of fishing that are on this projected lost

[3] income statement or just to the monkfishing?

[4] A: All three.

[5] Q: Is there a permit required to fish for

[6] bluefin tuna?

[7] A: Yes.

[8] Q: And does that permit also run from May 1

[9] to May 1?

[10] A: I'm not sure, because we don't apply for

[11] that until he's about ready to go, that season.

[12] Q: How about scalloping? Is there a permit

[13] required for scalloping?

[14] A: Scalloping, it would be exactly as the

[15] monk.

[16] Q: It runs the same period of time May 1 to

[17]

[18] A: Yes.

[19] Q: And I also think I recall your prior

[20] testimony where you said that you assumed, for the

[21] purposes of this projected lost income statement, that

[22] Michael made no further trips after the accident.

[23] A: That's right.

[24] Q: In other words, it says he had 33 trips

[25] left out of the 40 he was allotted for monkfishing,

Page 45

[1] and that you did not deduct from the projected lost
[2] income the actual income he did earn after he got the
[3] new boat; is that correct?
[4]     A: That's correct.
[5]     Q: Now, I think I don't want to
[6] mischaracterize your testimony. I just want to
[7] understand what you are thinking was in why you did it
[8] that way. I understood your testimony to be that you
[9] didn't deduct the income from the rest of the trips
[10] that were made after the accident until May 1, 2005,
[11] because that was — because you had this large expense
[12] in buying a new boat?
[13]     A: I would say the primary reason would be
[14] that's what I understood the lawyers requesting;
[15] and secondarily, would be that, yes, it's very hard to
[16] calculate when you had the additional expense of a new
[17] boat and new gear and everything else, which to
[18] subtract and which not to subtract, you know, which
[19] part of that is even with the loss of the Ava Claire
[20] as if it hadn't been lost. So this would be projected
[21] loss as if we had still kept the Ava Claire without
[22] the additional expenses, so that's as I understood as
[23] I should prepare it.
[24]     Q: Well, in your mind is the projected lost
[25] income meant to compensate you for your expenses you

Page 46

[1] had to incur to purchase a new boat?
[2]     A: Well, the expenses is a separate document
[3] I prepared.
[4]     Q: So you are not thinking that what
[5] compensation that you're due is that the lost income
[6] is supposed to compensate you for expenses for the new
[7] boat. You actually have a separate claim for expenses
[8] that you incurred to purchase a new boat; is that
[9] correct?
[10]     A: That's correct.
[11]     Q: Now, during the first part of your
[12] deposition we were looking at the monkfishing
[13] questions and your testimony, if I am not mistaken,
[14] was that you used invoices just from May, 2004 to
[15] calculate the average pounds per trip that you could
[16] hope to obtain to get to your lost income for
[17] monkfishing; is that correct?
[18]     A: I know I used about six invoices, but I'm
[19] not sure of the exact time frame. They were recent —
[20]     Q: That was one of the questions?
[21]     A: So it may differ from the actual average
[22] of that whole years now that we have them all.
[23]     Q: I have two sets of invoices that have been
[24] marked as Exhibit 22, and I believe those are the
[25] invoices for 2003, and then we have the invoices for

Page 47

[1] 2004, which we marked as Exhibit 23. Could you look
[2] at those, and identify for me which invoices you used
[3] to calculate the average pounds per trip for the lost
[4] income from monkfishing?
[5]     A: No, I can't do that. I have no idea which
[6] ones I used to calculate that. I just know that what
[7] he's allowed as a trip limit, the total allowable
[8] poundage he is allowed, and allowed for the fact that
[9] he may not reach that every time. I can't tell you
[10] which exact invoices I used to reach that.
[11]     Q: What is your understanding of the trip
[12] limit?
[13]     A: It has changed every year. It changes so
[14] much that there's no way for me to know. You would
[15] have to ask a fisherman or —
[16]     Q: You don't remember in other words?
[17]     A: Or National Marine Fisheries person. It
[18] changes so much.
[19]     Q: Your prior testimony was that you thought
[20] there was a 3,300 pound-a-day limit. Does that
[21] refresh your recollection that that was the figure you
[22] were going on?
[23]     A: I thought we had a 4,000-pound limit, but,
[24] again, it also varies whether he does a 24-hour trip
[25] or a 15-hour trip. If he goes over 24 hours, then if

Page 48

[1] he's using 2 days one trip —
[2]     Q: He has a bigger limit?
[3]     A: So it's really hard to say. I may have
[4] been wrong with 3,300 exactly.
[5]     Q: Is that your understanding if he goes over
[6] 24 hours — if he fishes for longer than 24 hours, he
[7] is entitled to 2 days' worth of limit rather that —
[8]     A: That's right.
[9]     Q: If one day limit is say 2,000 pounds, and
[10] he fishes for 28 hours, then he is actually entitled
[11] to land 4,000 pounds?
[12]     A: That's right.
[13]     Q: Well, here's what I would like to do. I
[14] would like to ask you to go back and — if you looked
[15] at the invoices here today, would you be able to
[16] refresh your recollection as to which invoices you
[17] used to calculate the projected lost income from
[18] monkfishing?
[19]     A: I don't think so, because I don't know —
[20] I don't remember when I prepared this document. It's
[21] not dated and I don't even know — I can't recall
[22] whether I did this this summer.
[23]     MR. HEALEY: Let me suggest
[24] because —
[25]     MR. WEIGEL: This is what I'll say.

Page 49

[1] If she can't do it today, then here's what I would
[2] like you to do. If you could go back through your
[3] invoices, and I'll advise your attorney as to which
[4] invoices you're using to calculate the lost income
[5] from monkfishing so we can look at your numbers and
[6] tell how you did it. I'm interested in finding out
[7] how you went about obtaining the numbers that you
[8] obtained here, so without knowing which invoices you
[9] used it's impossible for me to say, okay, she either
[10] did her math right or she didn't do her math right or
[11] she used the right invoices or —
[12] MR. HEALEY: That's fair. You
[13] follow —
[14] A: Yes.
[15] MR. HEALEY: When you get back, you
[16] and I will get an answer to that question and I'll —
[17] MR. WEIGEL: We'll post it here as
[18] if we were posting it as an interrogatory, and you'll
[19] deem it accepted as if it was an interrogatory.
[20] MR. HEALEY: Done.
[21] Q: Thank you.
[22] A: You have the cover sheet for this, the
[23] date I sent it.
[24] MR. HEALEY: As I say, we're going
[25] to do it. The best way to do it is let's get

Page 50

[1] together, do it right, and Alan has already said, and
[2] it's a fair concession, gracious concession that we'll
[3] do it as an interrogatory, so you and I will work
[4] together, and we'll get him a full answer.
[5] MR. WEIGEL: Go off the record.
[6] (Whereupon, there was a discussion
[7] off the record.)
[8] Q: Now, still on the monkfishing category.
[9] It says times 33 trips left, and if I remember your
[10] testimony, you called someone, whether it was the
[11] National Marine Fisheries Service or the Connecticut
[12] DEP, I don't recall the answer, but you called
[13] someone, and you were able to determine from that
[14] telephone call they had a record of how many trips you
[15] had made or Michael had made up to a certain point; is
[16] that correct?
[17] A: That's right.
[18] Q: Do you recall —
[19] A: And, actually, there was a decimal. It
[20] was point something with a few hours.
[21] Q: Do you recall who it was that the
[22] telephone call was made to?
[23] A: I believe it was Bethany. She always —
[24] she is still employed there. She has been extremely
[25] helpful with giving days left.

Page 51

[1] Q: Who is Bethany?
[2] A: She works at the National Marine Fisheries
[3] Service.
[4] Q: In Glouchester, Massachusetts?
[5] A: Uh-huh.
[6] Q: Do you happen to know her last name?
[7] A: No.
[8] Q: And was that done by a telephone call?
[9] A: Yes.
[10] Q: Do you recall when you made that telephone
[11] call?
[12] A: No, because I don't remember when I made
[13] this document, prepared this document.
[14] Q: Well, do you recall if you did it very
[15] soon after the accident or was it a year or two after
[16] the accident?
[17] A: No. This was at least a year or two after
[18] the accident.
[19] Q: So the 2004 to 2005 permit period had
[20] already expired by the time you called?
[21] A: Correct.
[22] Q: So you were asking her to go look in
[23] historical records, and see on a certain date how much
[24] time did he have left after this certain date?
[25] A: I believe I used that plus Michael had

Page 52

[1] told me from his logs how many trips he had used that
[2] year. It wasn't very many. It was five or six so we
[3] could kind of figure with 40 days, and then I just
[4] verified it with Bethany.
[5] Q: Now, if we look at Exhibit 36, if you turn
[6] in Exhibit 36 — unfortunately, the numbers didn't
[7] print on all of them, so we'll have to use the dates.
[8] If you go in 2004 till we get to November 11, 2004,
[9] and I think it's about the sixth or seventh page in,
[10] it's on page 6; 11/11/2004 is the entry I'm looking
[11] at.
[12] A: Yes.
[13] Q: Is it your understanding that that's the
[14] first time Michael fished for monkfish after the
[15] accident with the Ava Claire?
[16] A: Yes, that would be my understanding.
[17] Q: If I am not mistaken, there are 22 more
[18] trips that Michael made monkfishing in 2004 and 2005
[19] during the 2004/2005 permit season?
[20] MR. HEALEY: You said 20 more. Are
[21] you counting 20 more after —
[22] Q: After the November 11 — November 11 plus
[23] the rest of them are 22 more trips I think it is.
[24] A: Before May 1 of '05?
[25] Q: Yes.

Page 53

[1] A: That's what I'm counting also.

[2] Q: Now, do you have invoices for all the

[3] monkfishing that was done after from November 11,

[4] 2005, I'm sorry, November 11, 2004 to May 1, 2005?

[5] A: Other than — that's already included in

[6] the other exhibits; is it not?

[7] Q: I don't remember seeing any 2005 invoices.

[8] A: Okay. Well, I believe I gave you the

[9] years that were requested.

[10] MR. HEALEY: If they are not there

[11]

[12] A: Calendar years you requested. You didn't

[13] request them by permit year.

[14] MR. HEALEY: What do you want?

[15] MR. WEIGEL: I would like to have

[16] the — well, if I'm not mistaken — I don't have it

[17] with me. I have to go back and verify it, but if I am

[18] not mistaken, our original document request was for

[19] fishing records from I thought it was 2002 to the

[20] present, but —

[21] MR. HEALEY: Let's assume it was.

[22] Let's assume it wasn't. I'm going to give it to you.

[23] MR. WEIGEL: 2002 to the present.

[24] Here we go. Defendant's request for documents, let's

[25] verify it. Maybe I'm wrong. The documents —

Page 54

[1] actually, I was requesting May 22, 1999 to present,

[2] but I may have asked for just fishing records for —

[3] A: Because the boat didn't exist.

[4] Q: Right, right.

[5] MR. HEALEY: Ask me now.

[6] MR. WEIGEL: We've gotten 2003 and

[7] 2004. 2005 and 2006, I would like to see the invoices

[8] for those as well.

[9] MR. HEALEY: You understand

[10] invoices?

[11] A: Yes, but —

[12] MR. HEALEY: Go ahead. But what?

[13] A: Well, I just object to 2006 and the rest

[14] of 2005.

[15] MR. HEALEY: What we're doing now is

[16]

[17] A: They changed the lines and completely

[18] different limits and it's going to —

[19] MR. HEALEY: We're going to get

[20] them. The easiest thing is let him see them and talk

[21] to him. He is not an unreasonable man. We'll do it.

[22] So what we're doing is inquiring into the invoices,

[23] the '05 and '06; am I right?

[24] MR. WEIGEL: Right.

[25] MR. HEALEY: Kirsten, if there is no

Page 55

[1] problem involved, if something has to be explained —

[2] I'm not shmoozing these guys. I think the fact you've

[3] seen — we'll discuss these things. They'll be

[4] reasonable as when you get it — am I right, Al, we'll

[5] get it and see where we're going?

[6] MR. WEIGEL: Yes.

[7] MR. HEALEY: We'll take a look when

[8] you come back and see what it is. The first thing is

[9] you and I will look. You're not being asked to just

[10] — I would prefer to get everything out.

[11] A: It's confusing, because he's looking for

[12] an average, and 2005 is not going to help that

[13] average. It's going to be more confusing.

[14] Q: Let's explore that. Why is 2005 not

[15] relevant?

[16] A: I wish you guys could read a document from

[17] National Marine Fisheries, because it's extremely

[18] complicated, but the ratio of days at sea to total

[19] allowable catch change, and they are changing it again

[20] next week for this coming year, '07 season. It's

[21] extremely confusing, but sometimes when he fishes for

[22] other things, it takes away a day of his monkfish day.

[23] For example, if he fishes for cod, that uses one of

[24] his monkfish days. It's very confusing. The total

[25] allowable catch, which is the poundage per landing,

Page 56

[1] changes and the days allowed changes, but yet if

[2] you're in this area, it's this. It really depends on

[3] what area he's fishing when. Like I said, they go by

[4] decimals, so some of these trips we see is one trip.

[5] It may not be — when you are using days, it may not

[6] be one day. It may be 1.6 or 20, you know, 22 hours,

[7] and they actually go by hours and days, and I went by

[8] days on this. It's very confusing.

[9] Q: I understand that.

[10] A: I don't want to further confuse things for

[11] you.

[12] Q: Well, let me ask is your understanding of

[13] the fishing regulations, is that the same regulations

[14] that were in effect for the entire permit year May 1,

[15] 2004 to May 1, 2005?

[16] A: Yes.

[17] Q: So any of the invoices for monkfish that

[18] were landed in November of 2004 through April of 2005

[19] would have been landed under the same regulations that

[20] were in effect from May 1 to the date of the accident,

[21] 2004, correct?

[22] A: That's right. It's only after that I'm

[23] saying it would get complicated if I provided —

[24] Q: We would have to look at definitely the

[25] rest of the permit landings from the 2004/2005 permit

Page 57

[1] season, and we would also like to look at the 2006,
[2] and be able to compare, but certainly I think
[3] there's —
[4]   MR. HEALEY: I think there's more
[5] problem by not looking at them, because I'm getting
[6] more and more confused, and I think you should —
[7] seriously we all have to.
[8]   MR. WEIGEL: As you know,
[9] Mr. Healey, the standard is whether the production of
[10] documents could lead to the discovery of admissible
[11] information. I think there is probably —
[12]   MR. HEALEY: Alan I said yes.
[13]   Q: All right. I just want to put — now,
[14] let's stay on the same page we are looking at with 11
[15] November, 2004. The entry is on Exhibit 36. I see
[16] prior to that entry six entries for the landing of sea
[17] scallops; is that correct?
[18]   A: Yes.
[19]   Q: And do you have invoices for the sea
[20] scallops that were landed?
[21]   A: They should be included on the ones that I
[22] have provided.
[23]   Q: Could you look at the invoices for 2004,
[24] which is —
[25]   A: Although —

Page 58

[1]   Q: — Exhibit 23?
[2]   A: They are such small amounts. It may have
[3] been he didn't sell them. He landed them and reported
[4] them, but he didn't sell them. We probably had them
[5] for dinner or gave them to relatives.
[6]   Q: Okay.
[7]   MR. HEALEY: Put us on that list.
[8]   A: 14 pounds of scallops, when you include
[9] the shell, is not very many scallops, so that's
[10] probably why they're not on the invoices, on second
[11] thought.
[12]   Q: Is that the only — as far as you know, is
[13] that the only time Michael has been scallop fishing in
[14] 2004, 2005 or 2006?
[15]   A: Well, I can't really answer that question
[16] in that form, because I'm not sure if he was
[17] scalloping those days or if it was just scallop that
[18] he caught by-catch. If you're scalloping, you usually
[19] bring in around 400 or 500 pounds with a dredge.
[20]   Q: So you don't know if this particular, the
[21] six or seven entries for sea scallops, you don't know
[22] if that was a dedicated dredging or if it was just a
[23] by-catch of some other catch?
[24]   A: I would assume it was a by-catch and it
[25] was a seasonal — for some reason he — you know, for

Page 59

[1] some reason seasonally right in that time frame he
[2] caught sea scallops then, and not at other times of
[3] the year.
[4]   Q: If it was a by-catch product, would it be
[5] unusual if that were the only catch he had? In other
[6] words, there's only one entry for November 5 showing a
[7] landing of sea scallops. There's no other species
[8] landed on that day, so if it was a by-catch of another
[9] species, wouldn't there be an entry for November 5 for
[10] other species?
[11]   A: That's true. I don't recall why he landed
[12] sea scallops on those 6 days.
[13]   Q: As far as you know, you have no invoices
[14] for scale of sea scallops on those days?
[15]   A: That's right.
[16]   Q: If you look at Exhibit 35, first page in
[17] Exhibit 35 shows the Phyllis Anne, landed a thousand
[18] and 3 pounds of bluefin tuna in the year 2000,
[19] correct?
[20]   A: Yes.
[21]   Q: Is this the only record you have of
[22] Michael landing bluefin tuna?
[23]   A: No.
[24]   Q: Can you tell me what other times Michael
[25] landed bluefin tuna?

Page 60

[1]   A: Second page, the species code there is
[2] bluefin tuna.
[3]   Q: BFT is bluefin tuna?
[4]   A: Yes, and I believe there's some on the
[5] last page.
[6]   Q: If I understand this, 2000, it was 1,003
[7] pounds of bluefin tuna, in 2002 it was 897 pounds of
[8] bluefin tuna. There was no bluefin tuna landed from
[9] the Ava Claire, correct?
[10]   A: Correct.
[11]   Q: And then the Madelyn Ruth landed 1,792
[12] pounds of bluefin tuna in 2004?
[13]   A: Yes.
[14]   Q: And that's it?
[15]   A: Yes.
[16]   Q: So 2004 — when would Mike have fished for
[17] bluefin tuna in 2004?
[18]   A: That was immediately after he purchased
[19] the Madelyn Ruth, I believe within days, so September
[20] or October of 2004 is the first thing that he did with
[21] the new boat.
[22]   Q: Is it correct that Mike never fished —
[23] did he never fish for bluefin tuna off the Ava Claire
[24] or did he not catch any off the Ava Claire?
[25]   A: I believe he never caught any. This is

Page 61

[1] also 2005 and 2006.

[2] Q: Now, again, that's the same question on
[3] the Madelyn Ruth? He landed 1,792 pounds of bluefin
[4] tuna in 2004 but that's it. Did he not fish for
[5] bluefin in 2005 and 2006 or did he fish and not catch
[6] any?

[7] A: I remember that 2005 he did not fish for
[8] bluefin tuna. 2006 he did fish, spent a lot of money
[9] and caught nothing.

[10] Q: Now, during the period of time that you
[11] are projecting your lost income, which is May 1 — I'm
[12] sorry — the date of accident through May 1, 2005,
[13] during that time period Mike was also fishing inshore
[14] on a smaller boat that you owned; is that correct?

[15] A: Excuse me, yes, during that period of
[16] time, yes. There is a period of time he also fishes a
[17] smaller boat inshore.

[18] Q: And the records of those catch are
[19] reflected in Exhibit 36, correct?

[20] A: Correct.

[21] Q: Now, from the date of the accident it
[22] looks like the first time that Michael fished again
[23] was July 13, 2004. That was the next record of catch,
[24] and that's on the third page of Exhibit 36; is that
[25] correct?

Page 62

[1] A: That looks correct.

[2] Q: And then so he fished inshore from July
[3] 13, 2004 all the way through November 5, 2004, and
[4] then he fished offshore for monkfish with the Madelyn
[5] Ruth, correct?

[6] A: That's correct.

[7] Q: Now, I haven't counted them, but there's
[8] almost 2 and a half or 3 pages worth of records of
[9] catch inshore of summer flounder and fluke and that
[10] type of fish. In a typical monkfishing season would
[11] Michael have still made this many of inshore trips?

[12] A: Monkfishing can be either one or two days
[13] a week, and he often does the other, both, in-between
[14] if it's still in season, if the fish are still there,
[15] so it's possible. I didn't catch your number. How
[16] many did you say?

[17] Q: I don't know how many there are. I didn't
[18] count them, but if you go to — if you go further on
[19] in the document 2005, it shows usually about two
[20] monkfishing trips and maybe one or — actually, I'm
[21] actually — I can't really find separate trips on
[22] separate days. Maybe there are some trips on separate
[23] days where he landed monkfish one day, and then a day
[24] or two later landed —

[25] A: Should I point them out? Would that be

Page 63

[1] helpful.

[2] MR. HEALEY: Wait for a question.

[3] Q: What I'm asking is can you show me in
[4] Exhibit 36 where during the monkfishing season he
[5] would fish for monkfish one day, and then land a
[6] couple days later a catch working off the smaller boat
[7] inshore?

[8] A: Where do you want me to start?

[9] Q: Wherever you can point out that pattern of
[10] fishing to me, I would like to know where it is.

[11] A: 5/10/2005, winter flounder and summer
[12] flounder —

[13] Q: Hold on a second.

[14] A: — is in-between several monkfish trips.
[15] Generally anywhere from May to August, but I can't
[16] point them out.

[17] Q: Well, hold on. Let's just examine that
[18] entry. We have 5/10/2005. There where he lands
[19] winter flounder, black back summer flounder and fluke,
[20] is that the entry you are referring to?

[21] A: That's right.

[22] Q: You say that's between a monkfishing trip,
[23] but the next entry is for 5/10/2005 is also monkfish;
[24] is that correct?

[25] A: Oh, I'm mistaken then. Those were caught

Page 64

[1] while he was monking. He often does catch fluke while
[2] he's monking, and that probably will be reflected on
[3] the invoice to match that day. But if we go further
[4] down, there are trips that's just more in June of
[5] conch and welk and summer flounder and squid. That
[6] would just be the inshore boat.

[7] Q: So would you say on average he would make
[8] two monkfishing trips, and then two, maybe two inshore
[9] trips a week?

[10] A: On a bad weather week. On a good weather
[11] week he would probably make four or five inshore
[12] trips, and depending on how many fish were there, if
[13] it would be worth it. More like July and August we
[14] probably did a lot more of the inshore trips
[15] in-between and a lot less monking.

[16] Q: Now, did he also work for another
[17] fisherman after he used his 40 days up?

[18] A: In 2005 or 2004?

[19] Q: Well, in 2004 did he work for someone
[20] else. Before the start of the May 1, 2004 permit
[21] season, so prior to May 1, 2004, did he monkfish on
[22] someone else's boat, do you recall?

[23] A: I don't recall. I believe that he did
[24] many years leading up to the purchase of the Ava
[25] Claire, someone else's boat, but I don't recall if he

---

Page 65

[1] did that year. He may have done other trips on other
[2] people's boats not monkfishing.

[3]   Q: And how about in 2005 from the time of the
[4] accident until the time he purchased the Madelyn Ruth,
[5] and started monkfishing on the Madelyn Ruth, did he
[6] work on another boat?

[7]   A: That would be 2000 —

[8]   MR. HEALEY: What date?

[9]   Q: From May 22, 2004. I mis-spoke. From May
[10] 22, 2004 until November of 2004 when he purchased the
[11] Madelyn Ruth and began monkfishing off the Madelyn
[12] Ruth, did he work on anyone else's boat, and have any
[13] income from working on anyone else's boat?

[14]   A: Yes, I believe he did.

[15]   Q: Whose boat did he work on?

[16]   A: I believe he did the — what's the one out
[17] of New Bedford? I want to say Melinda Mae.

[18]   MR. HEALEY: Give him the best —

[19]   A: There is a boat out of New Bedford that
[20] goes dragging for several days. I believe he did a
[21] couple trips on that.

[22]   Q: Was he paid a share?

[23]   A: He was paid a share.

[24]   Q: Do you have any records showing what his
[25] share was for those trips?

Page 66

[1]   A: Yes.

[2]   Q: We have not seen those records. Would you
[3] please produce copies of those records to your
[4] attorney?

[5]   MR. HEALEY: Wait a minute. These
[6] are the boat out of New Bedford, his share.

[7]   A: Right. I believe we have copies of
[8] checks.

[9]   Q: Now, since the accident — we're still on
[10] Exhibit 27. Since the accident occurred in May, we
[11] really have 11 months of this projected lost income
[12] statement is based on 11 months of fishing. This is
[13] what you would have expected to earn in 11 months of
[14] fishing; is that correct?

[15]   A: That's correct.

[16]   Q: Besides — the boat you said he was
[17] working on in 2004 besides the Ava Claire, someone
[18] else's boat, what was it? You said it was out of
[19] where?

[20]   A: I can't recall the name.

[21]   Q: Is that out of New Bedford?

[22]   A: New Bedford.

[23]   Q: Did he also work on a boat out of
[24] Shinnecock?

[25]   A: In 2004? It's possible, but I don't think

Page 67

[1] so. He may have worked out of Scott's boat in New
[2] London.

[3]   Q: What we would like, Mr. Healey, is the
[4] records of any other income earned from fishing for
[5] boats not owned by Mr. Stepski. I think that covers
[6] the — I ask it that way. That covers —

[7]   MR. HEALEY: No, no, no, there's no
[8] problem. I have to sit-down with Kirsten. It's clear
[9] enough. We want to get all sources of income instead
[10] of going all over. We can do it, and do it from a
[11] different approach, and get it all tied up, all other
[12] boats, okay.

[13]   Q: On Exhibit 27, the income that you're
[14] projecting for monkfishing, bluefin tuna and
[15] scalloping is the gross income, correct?

[16]   A: Correct.

[17]   Q: It doesn't account for expenses and the
[18] other crewmen shares, correct?

[19]   A: Correct.

[20]   Q: I'll have to show you a document which we
[21] marked as Exhibit 24. Have you seen that document
[22] before?

[23]   A: Yes.

[24]   Q: Can you identify that document, please?

[25]   A: This is our tax return from 2003.

Page 68

[1]   Q: What was your gross income for 2003?

[2]   A: $1,787.

[3]   Q: Where did you find that figure?

[4]   A: On page — if you turn the other way, it's
[5] page 4.

[6]   Q: This is the Schedule C, gross income?

[7]   A: Yes.

[8]   Q: $1,787, correct?

[9]   A: Yes.

[10]   Q: Here's the income tax return for 2004,
[11] which we marked as Exhibit 25. What was your gross
[12] income from 2004?

[13]   A: $108,892.

[14]   Q: And let me show you the income tax return
[15] from 2005. Your gross income from 2005?

[16]   A: $180,507.

[17]   Q: Have you done your 2006 taxes yet?

[18]   A: Yes, we have.

[19]   Q: Do you have an estimate of what your gross
[20] income was from 2006?

[21]   A: It was $130,000 estimate.

[22]   Q: If you look at Exhibit 27 again, has
[23] Niantic Fish, LLC or Michael Stepski ever earned
[24] $362,337 in a year from fishing?

[25]   A: No.

Page 69

[1] Q: Let me just look over my notes for a
[2] minute.

[3] A: Can I explain?

[4] MR. HEALEY: No. I know —

[5] A: I had to clarify.

[6] Q: I do have a question. Look at 27. We do
[7] have some records now showing when you caught bluefin
[8] tuna, when Michael caught bluefin tuna, I'm sorry, not
[9] you personally, when Michael caught bluefin tuna, but
[10] I haven't seen any invoices which support your claim
[11] that you were paid $10 a pound for bluefin tuna. Do
[12] you have invoices for any of those catches?

[13] A: I should have invoices for them.

[14] Q: That support that number?

[15] A: Yes, I should have them. I don't know why
[16] I didn't include them.

[17] Q: So I would like to have —

[18] MR. HEALEY: You want the bluefin
[19] tuna invoices?

[20] MR. WEIGEL: Bluefin tuna invoices.

[21] MR. HEALEY: BFT. You see how
[22] quickly I am catching on?

[23] MR. WEIGEL: Off the record.

[24] (Whereupon, there was a discussion
[25] off the record.)

Page 70

[1] Q: Is that your — is your testimony that you
[2] obtained that figure, $10 a pound, from the invoices
[3] that you had in your words showing how much you were
[4] paid for prior tuna catches?

[5] A: Yes, that's an average, because it can
[6] vary on the quality of the meat.

[7] Q: Does the — when he lands tuna, do they
[8] butcher the tuna on the dock, and then weigh certain
[9] portions and say, okay, I'll buy this piece for this
[10] much, and this piece for another or do they just sell
[11] the fish whole, and the buyer makes some estimate of
[12] the quality of the fish?

[13] A: I don't know.

[14] Q: Because I haven't seen the invoices. I
[15] can't really tell. That's why I'm asking —

[16] A: I have never been there when he's landed a
[17] tuna and see how they process, the buyers process the
[18] tuna.

[19] Q: Are you familiar with the invoices,
[20] though?

[21] A: I'm familiar with the invoices.

[22] Q: And when he lands tuna, does he get an
[23] invoice for landing one amount of tuna at one price or
[24] is the invoice broken-down into several different
[25] price categories?

Page 71

[1] A: No. It's one price for the whole fish.

[2] Q: I would like to mark this document as the
[3] next exhibit. We may have marked this already.

[4] MR. HEALEY: This has been marked
[5] someplace.

[6] (Defendant's Exhibit 37, marked for
[7] identification.)

[8] Q: Did you prepare Exhibit 37?

[9] A: Yes.

[10] Q: You recognize Exhibit 37?

[11] A: Yes.

[12] Q: And you prepared Exhibit 37?

[13] A: Yes.

[14] Q: Did you prepare it the same time as you
[15] prepared projected lost income per Michael?

[16] A: Yes.

[17] Q: Could we take a quick break?

[18] (Whereupon, there was a brief
[19] recess.)

[20] (Defendant's Exhibit 38, marked for
[21] identification.)

[22] Q: Mrs. Stepski, I show you a document which
[23] we previously marked as Exhibit 29, and I believe that
[24] you were shown a copy of that document at your first
[25] part of your deposition; and if I understand this

Page 72

[1] document correctly, anywhere there is an asterisk for
[2] the first part, the value of year lost, you have a
[3] receipt or copy of a check for that figure?

[4] A: It may not be for that figure. I may have
[5] many, many receipts that total that figure.

[6] Q: For example, registrations total is
[7] $1,400. You might have seven checks for $200 that
[8] total $1,400?

[9] A: That's correct.

[10] Q: We would like to have copies of all of the
[11] receipts for checks that were used to arrive at the
[12] figures for value of boat and gear lost and expenses
[13] incurred and purchased for the vessel?

[14] A: Except the ones that are not asterisked I
[15] can't provide.

[16] Q: I understand for the first half value of
[17] boat and gear lost, if there is no asterisk you don't
[18] have a receipt, and that's your best estimate of what
[19] the cost was, correct?

[20] A: That's correct.

[21] Q: I do understand for the expenses incurred
[22] in purchase of new vessel that receipts can be provide
[23] for each of those listings; is that right?

[24] A: That's right.

[25] Q: I would like to have the astrisked ones

---

Page 73

[1] for the value of the gear lost, and all of the ones
[2] for expenses incurred in the purchase of a new vessel.
[3]   MR. HEALEY: Okay.
[4]   Q: Let's turn to what we've marked as Exhibit
[5] 37. If we look at what we've marked as Exhibit 37,
[6] you said you prepared this the same time you prepared
[7] Michael Stepski's lost income statement, correct?
[8]   A: Yes.
[9]   Q: How did you determine what to use for
[10] expenses?
[11]   A: They were pretty average every trip that
[12] we took off.
[13]   Q: Well, is there a document we could look at
[14] to determine how you decided that the average amount
[15] of fuel used was $200?
[16]   A: We have many fuel receipts, and they all
[17] average about that at that time of year, back in 2004,
[18] and most of his grocery receipts averaged around that.
[19] Sometimes Michael just took that out flat. He didn't
[20] go by the actual dollar amount. Michael just said to
[21] subtract so much for food. We're doing that this
[22] year.
[23]   Q: What I'm trying to understand is in 2004
[24] did Michael actually take the fuel receipt and the
[25] groceries receipt and the dockage receipt, total those

Page 74

[1] up for the trip, and then deduct them from the gross
[2] income before he calculated Geal's share?
[3]   A: The dockage is a percentage of the pounds
[4] landed.
[5]   Q: Do you know what that percentage is?
[6]   A: What percentage?
[7]   Q: Yes.
[8]   A: Actually, it can vary where he lands, but
[9] usually it's about 5 cents per pound.
[10]   Q: So dockage average is 5 cents per pound?
[11]   A: That's right. So I believe I went by the
[12] average gross trip poundage to get the dockage. We
[13] usually did not at that time use receipts for food and
[14] fuel. He took an average or rounded.
[15]   Q: So it was basically just an estimate of
[16] what the fuel and food was for the trip?
[17]   A: It was more of an average than an
[18] estimate.
[19]   Q: Well, I'm still trying to understand.
[20] I'm, for some reason, not getting how on each trip
[21] Michael did calculate expenses for food and fuel.
[22]   A: Well, he fueled the boat several days
[23] beforehand or the day beforehand, and he grabbed the
[24] groceries on the way to the boat; and, you know, if we
[25] didn't have them immediately available with each trip,

Page 75

[1] he would just tell me it was about $200 for fuel, and
[2] that's what we average for every time we fueled up
[3] because of the gallon size capacity of his both. It
[4] may have been $224. It might have been $189, but we
[5] averaged that for the crew, because it's not fair if
[6] sometimes like Geal comes, and he needed more fuel
[7] that trip, and the next guy comes, and he didn't need
[8] very much fuel, because he didn't burn very much,
[9] because he went a shorter distance, and he only needed
[10] to fill it half for that guy to make more, so we try
[11] to take an average.
[12]   Q: Does he use the same amount each time he
[13] calculated the share?
[14]   A: Of fuel?
[15]   Q: In other words, he calculate the share —
[16] did he use expenses, actual expenses on each trip to
[17] calculate the share or he just always said food and
[18] fuel is always $250?
[19]   A: I believe back in '04 pretty much he said
[20] food and fuel is right around that every time, but
[21] that's not what we do anymore.
[22]   Q: So in 2004 he just picked a figure that
[23] was appropriate?
[24]   A: That he felt was appropriate to subtract.
[25]   Q: And used that so you don't have any

Page 76

[1] documents that necessarily we could look at?
[2]   A: I have the documents, because I prepare
[3] them for the tax return.
[4]   Q: Would the tax return show us how much —
[5]   A: It would show.
[6]   Q: — food and fuel he used on a yearly
[7] basis?
[8]   A: Yes.
[9]   Q: If we know how many monkfishing trips he
[10] made that year, you could calculate it on a trip
[11] basis, correct?
[12]   A: That's correct.
[13]   Q: Now, since Michael didn't actually do any
[14] scalloping, how did you come up with expenses for the
[15] scallop fishing, projected lost income?
[16]   A: I asked him what he thought, and he knew
[17] that he had to go further out for scalloping and you
[18] also — it uses more fuel, because you're pulling a
[19] dredge, and you're kind of doing these paths, and then
[20] you turn around, and that uses a lot more fuel than
[21] when he idles and pulls in nets. So I basically, upon
[22] discussion with him, came about that, and the dockage
[23] I think is a set amount for 400 pounds per trip.
[24]   Q: It would a certain percentage?
[25]   A: Yes.

Page 77

[1] **Q:** It looks like 10 cents per pound,
[2] something like that, right?
[3] **A:** That's right.
[4] **Q:** But these are just estimates. They are
[5] based on Michael's estimate of what it might take to
[6] do that, correct?
[7] **A:** That's right. Both these documents were
[8] estimates that I tried to compile in a short amount of
[9] time and are not exacting or — they're the best that
[10] I came up with in a short amount of time.
[11] **Q:** Why is Geal's crew share different between
[12] monkfishing and scalloping?
[13] **A:** Because with monkfishing you need another
[14] guy, usually takes three guys, and when you take just
[15] one by themself, they earn more. With scalloping he
[16] would only need Geal.
[17] **Q:** And Geal's share for monkfishing was 15
[18] percent. What was the share for the third crewman?
[19] **A:** Probably 10 percent. It kind of depends
[20] on who he takes, and their level of experience, and
[21] that's the way it is on all charter boats and fishing
[22] boats. You could split 25 percent any amount, any way
[23] that you want amongst how many crew you have, and the
[24] more experienced crew member gets the higher
[25] percentage.

Page 78

[1] **Q:** So if there are two crew members for
[2] monkfishing trips, they split between them 25 percent
[3] share?
[4] **A:** That's right.
[5] **Q:** Was that, as far as you remember, the
[6] share that Benjamin Schober got for his few trips he
[7] made?
[8] **A:** As far as I remember. I know there's —
[9] there was a few trips that there was a lot of work or
[10] a huge amount that they hauled in, and he bumped it up
[11] to 30 percent, and gave them, you know, a division of
[12] that. There are times when he will increase the share
[13] for a certain trip.
[14] **Q:** Well, I'm done. Thank you.
[15] **MR. HEALEY:** All right, Mr. Unger.
[16] **CROSS-EXAMINATION BY MR. UNGER:**
[17] **Q:** Good afternoon, Mrs. Slepski. First of
[18] all, off the record.
[19] (Whereupon, there was a discussion
[20] off the record.)
[21] **Q:** This will be the third child, correct?
[22] **A:** This will be our third child together.
[23] It's my fifth.
[24] **Q:** Your fifth, okay.
[25] **MR. HEALEY:** We have to correct

Page 79

[1] this. It's not his fault. It's his responsibility.
[2] **Q:** Were you previously married?
[3] **A:** Yes.
[4] **Q:** The other two children are from that
[5] marriage?
[6] **A:** Yes.
[7] **Q:** How old are they?
[8] **A:** Right now?
[9] **Q:** Yes.
[10] **A:** They're 16 and 14.
[11] **Q:** Do they live with you?
[12] **A:** Part-time.
[13] **Q:** When you say part-time, is it —
[14] **A:** Joint custody and we share days.
[15] **Q:** When did that marriage end?
[16] **A:** November of '97.
[17] **Q:** And refresh my recollection. When were
[18] you and Michael married?
[19] **A:** I can't get this wrong now; October 4,
[20] 2003.
[21] **Q:** Your two children now with Michael are how
[22] old?
[23] **A:** 4 and 2 and a half.
[24] **Q:** And the names again, please?
[25] **A:** Ava and Madelyn. The two names of the

Page 80

[1] boats.
[2] **Q:** Are you on any medication today?
[3] **A:** No.
[4] **Q:** Do you take any medication on a regular
[5] basis?
[6] **A:** No.
[7] **Q:** Before the deposition did you have a
[8] meeting with Attorney Stevens and/or Attorney Healey?
[9] **A:** Not recently.
[10] **Q:** Is it correct to say that there have been
[11] a number of meetings that you have attended with the
[12] attorneys?
[13] **A:** Yes.
[14] **Q:** And is it correct that at those meetings
[15] Michael was also in attendance?
[16] **A:** Yes.
[17] **Q:** And was Geal Roderick also in attendance
[18] for those meetings?
[19] **A:** Yes.
[20] **Q:** What about Mr. Schober?
[21] **A:** Most of them. I think he missed a few.
[22] **Q:** About how many meetings have there been
[23] all told?
[24] **A:** Five or six maybe.
[25] **Q:** How long have they lasted in general?

**KIRSTEN STEPSKI**
**April 12, 2007**

**STEPSKI v.**
**THE M/V NORASIA**

---

Page 81

[1] A: 2 hours.

[2] Q: When was the last time you attended a

[3] meeting with the attorneys?

[4] A: Before the last time we met here; whenever

[5] the last deposition — the end of Michael's

[6] deposition. Was that in January?

[7] Q: In January, yeah. Was Mr. Gargan there

[8] for those meetings as well?

[9] A: Some of them; not all.

[10] Q: When was the first time that you met with

[11] an attorney in connection with this case?

[12] A: I'm not sure. Michael met once or twice

[13] without me.

[14] Q: And that was Attorney Stevens?

[15] A: Yes.

[16] Q: When was the first time that you met with

[17] Attorney Stevens?

[18] A: Probably would have been the spring of

[19] '05.

[20] Q: As the head of the household in terms of

[21] scheduling and keeping track of stuff —

[22] MR. HEALEY: And anything important.

[23] Q: — do you take care of the medical

[24] appointments for Michael and the children and

[25] yourself?

Page 82

[1] A: Yes.

[2] Q: What's the name of Michael's doctor?

[3] A: Dr. Rabinovich, R-A-B-I-N-O-V-I-C-H.

[4] Q: First name?

[5] A: I don't know.

[6] Q: And how long has Michael been a patient

[7] with Dr. Rabinovich?

[8] A: All his adult life; since 18.

[9] Q: Who is your primary care physician?

[10] A: I don't have one.

[11] Q: You do have an OB-GYN, I presume?

[12] A: Actually, I have a midwife, but I did have

[13] an OB-GYN.

[14] Q: What is that doctor's name?

[15] A: Maureen Davis is the OB-GYN and midwife I

[16] used for many years until just recently, and I

[17] switched to Birth and Beyond, Vickie — I'm not sure

[18] of her last name. I can get her last name, but her

[19] name is Vickie.

[20] MR. HEALEY: What is her name?

[21] A: You know, it's in my wallet.

[22] MR. HEALEY: I'm curious.

[23] A: I just recently switched. She's not on

[24] the card.

[25] Q: Where is Birth and Beyond?

Page 83

[1] A: Madison, Connecticut.

[2] Q: Your first two children you dealt with Dr.

[3] Davis?

[4] A: No. Dr. Levine who is in the same

[5] practice.

[6] Q: Where are Dr. Davis and Levine located?

[7] A: Shoreline OB-GYN in New London,

[8] Connecticut.

[9] Q: Do you presently have health insurance?

[10] A: No.

[11] Q: What about life insurance?

[12] A: Yes.

[13] Q: Both yourself and Michael?

[14] A: Yes.

[15] Q: Was there a change in the life insurance

[16] policy following May of 2004 for either yourself or

[17] Michael?

[18] A: Yes. I believe I increased Michael's and

[19] started one for myself.

[20] Q: How much did you increase Michael's to?

[21] A: From $100,000 to $200,000 and mine is

[22] $200,000.

[23] Q: And this took place after the Ava Claire

[24] accident?

[25] A: Yes.

Page 84

[1] Q: Was the accident a motivating factor in

[2] your doing the change to the life insurance policy?

[3] A: Absolutely.

[4] Q: Have you ever had any previous mental

[5] health therapy or visits with a doctor or

[6] psychologist, psychiatrist?

[7] A: Yes.

[8] MR. HEALEY: Before what? You

[9] didn't give a date. Before today?

[10] MR. UNGER: Ever.

[11] MR. HEALEY: I'm sorry, I

[12] misunderstood you.

[13] Q: When was the first time that you saw a

[14] psychiatrist, psychologist, mental health counselor?

[15] A: I saw a counselor back in 1994 after the

[16] birth of my son. I tend to suffer from postpartum

[17] depression. I started then.

[18] Q: And that was the reason you saw the

[19] counselor?

[20] A: Yes, and then I also saw a counselor while

[21] I was getting my divorce, I believe, from like '96 to

[22] '99 maybe sporadically; not too regularly.

[23] Q: Who was that?

[24] A: It was someone at — what's the name of

[25] that agency? It was so long ago I really —

---

STEPSKI  v.
THE M/V NORASIA

KIRSTEN STEPSKI
April 12, 2007

---

Page 85

[1]  Q: How about we do this. We'll leave a blank
[2] in the transcript, and if you remember it, you can
[3] fill it in when you get the transcript to read it and
[4] sign, okay?
[5]  MR. HEALEY: That's good.
[6]  A: Childhood Family Agency is the agency, but
[7] I can't tell you the name of the councilor.
[8]  Q: Where is Childhood Family Agency?
[9]  A: New London, Connecticut.
[10]  Q: Are you originally from New London?
[11]  A: Waterford, the next town.
[12]  Q: When was the next time that you saw a
[13] mental health professional?
[14]  A: After Ava's birth, which would be — I
[15] believe it was around April of '03 for postpartum
[16] depression also.
[17]  Q: Who was that?
[18]  A: That was Maureen Davis. Actually, I
[19] didn't receive counseling. I just received medication
[20] and appointments with the midwife, so I didn't see any
[21] mental health professional at that time.
[22]  Q: That was Zoloft you were taking back then?
[23]  A: Uh-huh, and then again when I was 6 months
[24] pregnant with Madelyn I started it again. Actually,
[25] the month of the accident, sometime recently or right

---

Page 86

[1] before the accident.
[2]  MR. HEALEY: You are talking about
[3] the May 22, '04 —
[4]  A: Yes.
[5]  Q: You had started the — you had started the
[6] treatment, again, not treatment, but you had started
[7] taking Zoloft again before the May 22, 2004 accident?
[8]  A: Yes.
[9]  Q: And that was Dr. Davis again?
[10]  A: Yes.
[11]  Q: Were you doing anything else besides
[12] taking Zoloft?
[13]  A: No. As far as with a professional?
[14]  Q: Right.
[15]  A: No.
[16]  Q: Well, were you doing anything with a
[17] nonprofessional such as a clergy or a family member or
[18] counselor of some sort?
[19]  A: To handle my postpartum depression or to
[20] handle —
[21]  Q: Well, to handle whatever issues you were
[22] having.
[23]  A: Yeah, I have a lot of family support. I
[24] have a couple of close friends. Hiking is something
[25] that really helps me, and, you know, being aware of

---

Page 87

[1] how the medication made me feel. The midwife was very
[2] supportive and involved so that was it.
[3]  Q: How long did you continue on the Zoloft
[4] from May of 2004?
[5]  A: Until April of 2006.
[6]  Q: So you took it for almost 2 years?
[7]  A: Yes.
[8]  Q: Did you continue to see Dr. Davis during
[9] this period?
[10]  A: Yes.
[11]  Q: And it was Dr. Davis who was the only one
[12] prescribing the Zoloft?
[13]  A: Yes. I believe we switched to Wellbutrin
[14] at one point, and went back to Zoloft. I don't know
[15] if that's important.
[16]  Q: Why did you stay on the antidepressant
[17] Zoloft?
[18]  A: I felt I needed it.
[19]  Q: Was it related to the postpartum
[20] depression?
[21]  A: Yes. It was a hormonal imbalance that I
[22] get that affects my moods and emotions, and it was a
[23] very low dose so we felt that it was safe to continue.
[24]  Q: Have you seen any other doctors in
[25] connection with any kind of mental health issues?

---

Page 88

[1]  A: No.
[2]  Q: Have you taken any kind of antidepressants
[3] since April of 2006?
[4]  A: No. We just started seeing a counselor
[5] recently.
[6]  Q: Who is that?
[7]  A: I'm sorry. Dr. Aron, Mark Aron, A-R-O-N,
[8] in Old Saybrook, Connecticut is a marriage counselor.
[9] I believe he's also a psychologist.
[10]  Q: When did you start seeing Dr. Aron?
[11]  A: In March. It may have been the end of
[12] February.
[13]  MR. HEALEY: This year, right?
[14]  A: Of this year, yes.
[15]  Q: How did you come to go to Dr. Aron?
[16]  A: Michael and I both felt it was something
[17] we wanted to do and needed.
[18]  Q: Did anyone recommend Dr. Aron to you?
[19]  A: No. I went to him, because he does
[20] Saturdays.
[21]  MR. HEALEY: He does what?
[22]  A: Does Saturdays.
[23]  Q: How long were you on the Zoloft after Ava
[24] was born?
[25]  A: I started it when she was about 6 months

---

**KIRSTEN STEPSKI**
April 12, 2007

**STEPSKI   v.**
**THE M/V NORASIA**

---

Page 89

[1] old, and I believe I was only on it — oh, I know. I
[2] stopped it in the middle of August, because it makes
[3] me gain weight, and we were getting married in
[4] October.
[5]   Q: How did you come to meet Michael?
[6]   A: We were setup on a blind date by our
[7] parents.
[8]   Q: Your parents knew one another?
[9]   A: Our parents worked together, his mother
[10] and my father.
[11]   Q: Okay.
[12]   A: And they coerced us into getting together.
[13]   MR. HEALEY: Coerced? Now strike
[14] that, please.
[15]   A: I was very, very reluctant. You have no
[16] idea. I said I am not going to get setup on a blind
[17] date by my dad.
[18]   Q: Okay.
[19]   A: It all worked out.
[20]   Q: When did you meet?
[21]   A: We met in November of 2001.
[22]   Q: Jumping back to Dr. Aron for a second.
[23] How many times have you seen Dr. Aron?
[24]   A: We have only gone three times.
[25]   Q: How often do you see him?

Page 90

[1]   A: We tried for once a week, and then Mike
[2] had to leave to go fishing, so when we can.
[3]   Q: What were the issues that brought you to
[4] go see Dr. Aron?
[5]   A: I felt that Michael had an explosive
[6] temper recently, and he was not fighting appropriately
[7] or arguing appropriately; that it was escalating to
[8] get out of hand; and we have a lot of stress in our
[9] life that we think we both need help handling, new
[10] suggestions for how to, you know, work through things
[11] and communicate.
[12]   Q: Has Michael ever been physically abusive
[13] toward you?
[14]   A: Just recently.
[15]   Q: Tell me about that.
[16]   A: He was arrested the end of February, no,
[17] it was the beginning of February, February 10, because
[18] he turned violent in an argument and I called 911.
[19]   Q: This was at your home?
[20]   A: Yes.
[21]   Q: A domestic dispute?
[22]   A: Yes.
[23]   Q: What was the argument about?
[24]   A: I didn't want him sleeping in the bed. I
[25] wanted him to sleep on the couch and he refused, and

Page 91

[1] he had had too much to drink.
[2]   Q: Were there charges brought?
[3]   A: Yes.
[4]   Q: And do you know what those charges are?
[5]   A: I'm not sure. I believe they were —
[6]   MR. HEALEY: Do you know? I mean,
[7] if you know, I would like you to tell us, but if
[8] you're guessing, it doesn't help us.
[9]   Q: I don't want you to guess.
[10]   A: I think it was assault in some degree.
[11] I'm not sure which degree, and there were more toward
[12] the police. He was very resistant with arrest and
[13] breach of peace and ...
[14]   Q: Is that court — is that court case still
[15] pending?
[16]   A: Yes.
[17]   Q: Is Michael still living in the house with
[18] you?
[19]   A: Yes, now he is, but we were separated.
[20]   Q: How long were you separated?
[21]   A: About a month.
[22]   Q: Where did he live during that time?
[23]   A: In Old Saybrook with his friend Dave.
[24]   Q: When did he return to the house?
[25]   A: I believe March 20.

Page 92

[1]   Q: When you mentioned before that Michael had
[2] demonstrated an explosive temper recently, is that a
[3] change from when you first started knowing him?
[4]   A: Yes, and by recently it's been within the
[5] last 3 years or so. It's been progressing to be
[6] different from when I first met him.
[7]   Q: How so?
[8]   A: Things that normally wouldn't even bother
[9] him he snaps at, and just has a lot less patience, I
[10] more irritable, tends to yell a lot more easily. I
[11] think he holds things in more, and that is different
[12] than the way it used to be.
[13]   Q: How was he when you first got to know him?
[14]   A: How is it when you first get to know
[15] anyone? Do I really need —
[16]   Q: That's why you married him, huh?
[17]   A: He cooked, he cleaned. Well, he cleaned
[18] his own place. He didn't clean my place. He was a
[19] clean person. He was very patient and quiet and easy
[20] going, and he still can be most of the time. But when
[21] he got angry, he never has gotten angry to that degree
[22] before or reacted to things quite so easily even if
[23] there was upsetting things, and there was stress in
[24] our life early on, in our combined lives early on, but
[25] not to that degree.

---

STEPSKI  v.
THE M/V NORASIA

KIRSTEN STEPSKI
April 12, 2007

---

Page 93

[1]   Q: The stress wasn't to the degree now?

[2]   A: No; his reactions to stress.

[3]   Q: You had some hard times early on as well?

[4]   A: We did, yeah. Well, I have two children
[5] from another marriage.

[6]   Q: Did that create —

[7]   A: We had Ava before we were married so there
[8] was stress and just family stuff and changing jobs and
[9] that kind of thing, too.

[10]   Q: You're employed now?

[11]   A: No.

[12]   Q: But you were employed before you were
[13] married?

[14]   A: Yes.

[15]   Q: What was your job?

[16]   A: I worked at Lawrence & Memorial Hospital
[17] as a medical secretary.

[18]   Q: When did you stop working?

[19]   A: April of '03.

[20]   Q: Did the loss of your income also create
[21] stress on the relationship?

[22]   A: I didn't make much income, but I had all
[23] the medical benefits so that caused some stress.

[24]   Q: When Ava was born, did that create some
[25] additional stress?

Page 94

[1]   A: Loss of sleep, I think, created a lot of
[2] stress, but Michael was making good money then, and it
[3] was actually a pretty happy, stress-free time for a
[4] year or so where I didn't need to work. We didn't
[5] need the income.

[6]   Q: What are the factors that you say are now
[7] the stressful things in your life?

[8]   A: Oh boy. As related to the accident? As
[9] related to my personal life? I mean, that's pretty
[10] personal.

[11]   MR. HEALEY: If you don't
[12] understand, tell him. Off the record.

[13]   (Whereupon, there was a discussion
[14] off the record.)

[15]   A: Financially we have difficulty just in
[16] general with arguments, working out arguments, having
[17] children that's very defiant is one of the major
[18] stressors in my life and teenagers, on the other hand,
[19] and they relies on us a lot, not working for us
[20] is a stress, and not being able to work and not having
[21] insurance.

[22]   Q: When you say your family relies on you,
[23] for what kind of things?

[24]   A: His father lives downstairs in an in-law
[25] apartment. His mother and brother he's very close to,

---

Page 95

[1] and they often need his support or help financially or
[2] otherwise. That can be stressful.

[3]   Q: Is his mother deceased?

[4]   A: No, no. I said his mother and brother
[5] often call. Just to be in support of them it can be
[6] stressful, just to be there for everyone that needs
[7] us.

[8]   Q: Okay. The father and the mother are
[9] split?

[10]   A: Separated, yeah, or divorced, I'm sorry.

[11]   Q: Has Michael adopted your teenagers?

[12]   A: No.

[13]   Q: What are the arguments generally about
[14] when you have them?

[15]   A: It's usually that I'm complaining about
[16] something that — if I bring up something I'm not
[17] happy with, and Michael doesn't like to hear, any kind
[18] of complaining — he doesn't handle criticism well or
[19] that kind of thing, so he considers me to be bitching
[20] or something like that, nagging, and he doesn't like
[21] it and maybe he's overwhelmed, I don't know, but just
[22] basically things that are not working or things that
[23] have come up, that's what we argue about, things that
[24] we are butting heads about. It's really hard. It's
[25] kind of a vague answer.

Page 96

[1]   Q: How often do you two argue?

[2]   A: Maybe once a week.

[3]   Q: Before May of 2004 how often did you
[4] argue?

[5]   A: Our first argument was after Ava was born,
[6] November of 2002, and I believe the next year or so we
[7] maybe had four or five arguments. It wasn't very
[8] much.

[9]   Q: What were the arguments typically about if
[10] there was a typical argument?

[11]   A: I think it kind of varied. Sometimes it
[12] was like, you know, if he stayed out late with friends
[13] or I couldn't go with my friends or something like
[14] that, I don't know, household things, you know.

[15]   Q: Did the postpartum depression have
[16] anything to do with the arguments?

[17]   A: Not so much the postpartum depression, but
[18] when my children wanted to live with their father, and
[19] we changed the custody arrangements, it was very
[20] stressful, and I think we didn't argue about it, but
[21] he would argue on my behalf to my ex-husband, and then
[22] that would make me argue with him so it wasn't a
[23] direct argument. It was some kind of indirect
[24] argument. Just in general just the stress of the
[25] custody and changing living arrangements.

---

**KIRSTEN STEPSKI**
**April 12, 2007**

**STEPSKI v.**
**THE M/V NORASIA**

Page 97

[1] **Q:** After the accident in 2004 did you begin
[2] to have further or more frequent arguments?
[3] **A:** Yes, they definitely got more frequent.
[4] **Q:** When did they start to become more
[5] frequent?
[6] **A:** When he had to start buying another boat,
[7] and shopping for another boat with a 4-day-old baby,
[8] and when we had the stress of not knowing where we are
[9] going to get any money from. Even getting our dog was
[10] kind of an argument. You know, it varied, but
[11] definitely with more responsibilities, bigger bills,
[12] we hadn't made our first mortgage payment on the house
[13] when the accident happened. We bought the house 3
[14] weeks before we moved in, and we hadn't made our first
[15] payment, so I think anxiety about that, and, you know,
[16] raising kids and that kind of thing, which we usually
[17] agree about, it got a little bit more stressful.
[18] **Q:** Had the number of arguments that you have,
[19] have they increased over time —
[20] **A:** Yes.
[21] **Q:** — since the accident?
[22] **A:** Uh-huh.
[23] **Q:** And the frequency between arguments, has
[24] that also changed?
[25] **A:** Yes, and the intensity.

Page 98

[1] **Q:** So that you argue more now than you did
[2] shortly after the accident?
[3] **MR. HEALEY:** And enjoy it less.
[4] **A:** Yes.
[5] **Q:** And these are the issues that you've been
[6] trying to address with Dr. Aron?
[7] **A:** Yes.
[8] **Q:** And has he given you any kind of
[9] assistance?
[10] **A:** Yes. He's very helpful. He sees patterns
[11] in the way that we speak rather than just focusing on
[12] what we actually said. He'll say to Michael, "Do you
[13] see how she said that with a smile and a laugh?" or
[14] something like that, you know, and points out and
[15] brings out our strengths together with and with
[16] communication definitely, but he can't help with the
[17] financial stressor, the no medical insurance stressor,
[18] any of that kind of thing so — I mean, he helps — he
[19] does help with feeling close, and having worked
[20] through a few things.
[21] **Q:** Does he give you any kind of things to
[22] work on at home as well?
[23] **A:** Not really, no, not really.
[24] **Q:** Is it a fair statement since you started
[25] to see Dr. Aron things are getting better?

Page 99

[1] **A:** Yeah, except we have just gone a long
[2] period of time without seeing him, and things
[3] definitely got worse, because we hadn't seen him in a
[4] while so we haven't been able to see him in a while.
[5] **Q:** You have an appointment with him coming
[6] up?
[7] **A:** No, but we'll probably have one for next
[8] week.
[9] **Q:** Have you seen any other kind of mental
[10] health professional or therapist, psychiatrist, any
[11] paraprofessionals?
[12] **A:** No.
[13] **Q:** Does Michael have a court date for the
[14] assault and resisting arrest charges?
[15] **A:** I believe April 30 is his next date. He
[16] had one already.
[17] **Q:** That was an arraignment?
[18] **A:** Yes.
[19] **Q:** What court is that, do you know?
[20] **A:** New London.
[21] **Q:** You mentioned before that Michael was not
[22] arguing appropriately. What did you mean by that?
[23] **A:** Well, he tends to like to be too
[24] physically close to me, and maybe sometimes even block
[25] me or have me in a corner, that kind of thing, just

Page 100

[1] physically dominant, and he swears, which I try not to
[2] do when we argue, and, you know, like name calling,
[3] just stuff that, you know, you want to try to fight
[4] without that.
[5] **Q:** You mentioned that the night of the arrest
[6] he had had too much to drink. Has Michael increased
[7] his alcohol consumption since the accident?
[8] **A:** For periods he did. That was not one of
[9] the periods. That was Super Bowl Sunday, but he has
[10] periods where he has increased his alcohol
[11] consumption, and then seems to be pretty cooperative
[12] when I say I think it's getting to be too much or
[13] other people say that. He is pretty good at, you
[14] know, either not drinking at all or just drinking
[15] socially or just cutting back. When he feels he needs
[16] to, he seems to recognize it. He definitely did for a
[17] time after the accident.
[18] **Q:** How long?
[19] **A:** Every day, you know, which was not like
[20] him before.
[21] **Q:** How long did that go on?
[22] **A:** I think 6 months or so where he was
[23] drinking really a lot more than usual, a lot
[24] regularly.
[25] **Q:** What was usual before the accident?

Page 101

[1] **A:** Maybe one or two beers one day and none
[2] for five and, you know, three or four on the weekend
[3] or something. It would kind of depend on the
[4] situation where we were, if we were out. But then he
[5] kind of increased his drinking every day, you know,
[6] three or four.
[7] **Q:** To the point where —
[8] **A:** Not drunk, no, but just drinking after
[9] lunch in the afternoon and evening, you know,
[10] regularly.
[11] **Q:** How many drinks would he have in a typical
[12] day?
[13] **MR. HEALEY:** Now or after the
[14] accident?
[15] **Q:** For that 6-month period.
[16] **A:** For that 6-month period I was
[17] uncomfortable with? We'll say if he had five or six
[18] at the most spread out, you know, not usually — I
[19] mean, I have not even really seen him drunk unless it
[20] was New Year's, so, yeah, it would be five or six or
[21] he and a buddy would go through a 12-pack so, you
[22] know, something like that.
[23] **MR. HEALEY:** I don't call that
[24] drinking.
[25] **Q:** You're Irish.

Page 102

[1] **A:** Super Bowl Sunday he did shots, and that's
[2] just a killer for him. He can't do shots; probably
[3] three times since I've known him he's ever done shots,
[4] and done shots like that so it's not a regular thing
[5] for him.
[6] **Q:** The antidepressants that you were taking
[7] between the period 6 months after Madelyn was born up
[8] until April of 2006, that period of about 2 years, do
[9] you attribute taking those antidepressants to the
[10] accident involving the Ava Claire?
[11] **A:** Yeah, yeah.
[12] **Q:** How so?
[13] **MR. HEALEY:** I don't understand the
[14] form, how so.
[15] **Q:** To what do you attribute the need for the
[16] antidepressants in connection with the Ava Claire?
[17] **A:** I was worried a lot more and anxious a lot
[18] more. You know, I was depressed when we couldn't pay
[19] our bills or we had things that were late and just not
[20] knowing. You know, something that we put all our
[21] money into was at the bottom of the ocean, and the
[22] fact that he still had to go back and fish. Actually,
[23] he mentioned that was one of the things we argued
[24] about. I kind of was hoping he might not go back to
[25] it, but depression definitely from, you know, worry

Page 103

[1] and anxiety, and not feeling like I could talk to
[2] Michael very much about it. He wasn't very receptive
[3] to talking about the accident or talking about how
[4] it's affecting us, and talking about our problems, and
[5] not being able to, you know, to have that sounding
[6] board or whatever.
[7] **Q:** Did you discuss these issues with Dr.
[8] Davis?
[9] **A:** Yes.
[10] **Q:** How often?
[11] **A:** About once a month.
[12] **Q:** When Dr. Davis prescribed the
[13] antidepressants, did she give you a prescription for a
[14] one-month dosage or was it one month renewable or tell
[15] me how it went?
[16] **A:** It was one month for three pills, but I
[17] could cut it in half, because it was cheaper with no
[18] insurance. I would get the higher dose, and cut them
[19] in half, but it was actually 2 months, but it was with
[20] refills, I believe, for maybe 6 months refills, so I
[21] didn't have to call her very often for refills.
[22] **Q:** But you would see Dr. Davis on a monthly
[23] basis even though you didn't need to get a refill?
[24] **A:** I didn't see her. I spoke with her.
[25] **Q:** On the telephone?

Page 104

[1] **A:** Yes.
[2] **Q:** Did you contact her or did she contact
[3] you?
[4] **A:** Usually I contacted her.
[5] **Q:** Was there a set period of time that you
[6] would contact her?
[7] **A:** No; just if I felt like I needed — if
[8] something had changed in the medication or in my life
[9] that I felt was relevant to her helping me, and then I
[10] got pregnant with Madelyn not long after that, so I
[11] was seeing her anyway for OB stuff and all that.
[12] **Q:** Did you and Michael have to borrow money
[13] following the accident?
[14] **A:** Yes.
[15] **Q:** How much did you borrow?
[16] **A:** We borrowed $8,000 from his father, and I
[17] believe we owe my father about $1,800, and then we
[18] took out another loan for the boat and expenses.
[19] **Q:** Have you repaid those loans?
[20] **A:** No.
[21] **Q:** None of them?
[22] **A:** No.
[23] **Q:** You were hoping Michael wouldn't return to
[24] fishing. What did you anticipate that he would do for
[25] a job as opposed to fishing?

**KIRSTEN STEPSKI**
April 12, 2007

STEPSKI  v.
THE M/V NORASIA

Page 105

[1] **A:** Well, I asked him that once when we were
[2] dating, and he could not imagine anything but fishing,
[3] and I asked him, "Well, what if you lost an arm or
[4] something?" He said he would fish with one arm, so I
[5] pretty much should have known that there wasn't
[6] anything else, you know. I tried to talk to him
[7] about, you know, he's a great builder. Maybe building
[8] decks or try to talk to him about something and, you
[9] know, he's just not comfortable starting into
[10] something that is not really his passion.
[11] **Q:** Did you or he take any steps to actually
[12] explore alternative sources of employment?
[13] **A:** I think he talked to some people, you
[14] know, a few friends that are self-employed, offered
[15] him, you know, this or that, but not in-depth, because
[16] he was — he knew the permit was valuable. He knew
[17] the monkfishing was profitable, and he wanted to go
[18] right back to it. I mean, he was hoping that he could
[19] get a good mate to kind of run it for him, so he would
[20] not have to go as often or even at all. You know, he
[21] was kind of hoping to be one of those boat owners,
[22] those nice, wealthy boat owners that we know that have
[23] someone captain it for them. He thought it would be
[24] temporary, and he knew he had to to support us.
[25] **MR. HEALEY:** If you keep adding

Page 106

[1] those little drips and drabs —
[2] **A:** They are emotional questions and I —
[3] **MR. HEALEY:** I know.
[4] **Q:** Did you or Michael ever talk to any
[5] members of the clergy concerning the accident?
[6] **A:** No. I had a very bad religious experience
[7] in the past.
[8] **MR. HEALEY:** Nobody asked you that.
[9] **A:** I'm sorry.
[10] **MR. HEALEY:** Off the record.
[11] (Whereupon, there was a discussion
[12] off the record.)
[13] **Q:** You ever meet with Dr. Small?
[14] **A:** No, I have never met him.
[15] **Q:** Michael ever talk about his sessions with
[16] Dr. Small?
[17] **A:** Briefly; not in great detail.
[18] **Q:** What has he told you about his sessions
[19] with Dr. Small?
[20] **A:** He said that he liked her, and he felt
[21] comfortable talking to her, and upon my questioning I
[22] didn't want him to feel like he had to tell me, so
[23] that was pretty much all I asked; did he feel it was
[24] helping; did he feel comfortable. Because you can
[25] keep looking for someone else if you want. I didn't

Page 107

[1] want to pry. I actually found out more at his
[2] deposition about what he talked about. That was news
[3] to me.
[4] **Q:** If I remember correctly, Attorney Stevens
[5] gave Michael Dr. Small's name. Is that your
[6] understanding?
[7] **A:** Yes.
[8] **Q:** How many times did Michael visit with Dr.
[9] Small?
[10] **A:** I'm not sure.
[11] **Q:** He started meeting with her about a month
[12] after the accident; is that right?
[13] **A:** Yes, that's right.
[14] **Q:** And he was supposed to or the plan was he
[15] was going to see her regularly; is that right?
[16] **A:** Yes. He started out once a week.
[17] **Q:** But then he went back to fishing, and that
[18] sort of put the kabosh on things just like Dr. Aron?
[19] **A:** Yes.
[20] **Q:** Hard to schedule these doctors when he's
[21] out on the boat, right?
[22] **A:** Right.
[23] **Q:** Let me refer you to what we've marked as
[24] Exhibit 38 for identification. This is the medical
[25] expenses sheet that you prepared.

Page 108

[1] **A:** Okay.
[2] **Q:** And it indicates that there were a total
[3] of 14 visits with Dr. Small; is that correct?
[4] **A:** Yes.
[5] **Q:** And when was the last visit, do you know?
[6] **A:** Well, it says 12/27/04 so I would assume
[7] that must be his last visit.
[8] **Q:** Did Michael pay Dr. Small when he went to
[9] see her?
[10] **A:** Yes, originally at full price and then at
[11] half price.
[12] **Q:** And you have copies of those checks?
[13] **A:** Yes.
[14] **Q:** I assume you paid by check?
[15] **A:** Yes.
[16] **Q:** And would you provide Mr. Healey with
[17] copies of those?
[18] **MR. HEALEY:** This is payments to Dr.
[19] Small?
[20] **Q:** Yes. And you would pay her on the days of
[21] the visits?
[22] **A:** Yes.
[23] **Q:** May I have that back, please?
[24] **A:** Sometimes he would pay the two visits in
[25] one.

**Min-U-Script®**

FINK  &  CARNEY (800) NYC-FINK