### Page 1

GLORIA SMALL
UNITED STATES DISTRICT COURT
DISTRICT OF NEW YORK

------------------------x
MICHAEL STEPSKI,            :
KIRSTEN STEPSKI             :
GEAL RODERICK               :
AND BENJAMIN SCHOBER        :
    Plaintiffs, :
                  :
    vs.         :No. 06 Civil 1694 (KMK)
              :JULY 18, 2008
The M/V NORASIA ALYA,   :
her owners, operators,  :
etc., and MS. "ALENA" :
SCHIFFAHRTSGESSELLSCHAFT:
mbh & CO. KG, PETER     :
DOHLE SCHIFFAHRTS-KG    :
    Defendants. :
------------------------x

    Deposition of Gloria Small, taken pursuant to Notice and in accordance with Section 13-27 of the Connecticut Practice Book, at the offices of Gloria Small, 26 Long Hill Road, Guilford, Connecticut, on July 18, 2008 at 11:00 a.m., before Natasha Christie Stewart, L.S.R, (Lic. #SHR.205), a Licensed Shorthand Reporter and Notary Public within and for the State of Connecticut.

### Page 2

1             GLORIA SMALL
2  APPEARANCES:
3  ON BEHALF OF THE PLAINTIFF:
   THOMAS H. HEALEY, ESQ.
4  17 BATTERY Place, Suite 605
   New York, NY 10004
5
6  ON BEHALF OF THE DEFENDANTS:
   MICHAEL E. UNGER, ESQ
7  FREEHILL, HOGAN & MAHAR, LLP
   80 Pine Street, 24 fl
8  New York, NY 10005

### Page 3

1           GLORIA SMALL
2          STIPULATIONS
3
4      It is stipulated by counsel for the
5  parties that all objections are reserved until the
6  time of trial, except those objections as are
7  directed to the form of the question.
8      It is stipulated and agreed between
9  counsel for the parties that the proof of the
10 authority of the Notary Public before whom this
11 deposition is taken is waived.
12     It is further stipulated that any defects
13 in the Notice are waived.
14     It is further stipulated that the
15 deposition may be signed before any Notary Public.

### Page 4

1           Gloria Small
2          GLORIA SMALL,
3  of Connecticut being first duly sworn by Natasha
4  Christie Stewart, Professional Reporter, a Notary
5  Public within and for the State of Connecticut, was
6  examined and testified on his oath as follows:
7          DIRECT EXAMINATION
8  BY MR. UNGER:
9     Q  Good morning, Dr. Small, for the record my
10 name is Michael Unger, I'm an attorney with Freehill
11 Hogan & Mahar, lawyers in New York.  We represent
12 the defendants in a lawsuit that has been brought by
13 Michael Stepski, his wife, Kirsten, Geal Roderick
14 and Benjamin Schober.
15       MR. HEALEY:  Schober, and you have all
16     of the names in the caption.
17    Q  We are here today to ask you some
18 questions concerning your involvement with these two
19 individuals and, in particular, your treatment of
20 them arising out of a incident which took place back
21 in May of 2004.
22     Okay.  If at any time you don't understand
23 one of my questions, let me know I'll be happy to
24 rephrase it; okay, and please just so it's easier

CHAIT DIGITAL                 888.978.4336                 chaitdigital.com

Page 5

Gloria Small

1 for the court reporter if you would wait for me to
2 finish my question before you answer that will help
3 her out.
4    Okay?
5 A   Okay.
6 Q   And please keep your voice up so she can
7 hear you, as well.
8    Okay?
9 A   Okay.
10 Q   Have you ever been deposed?
11 A   Yes.
12 Q   How many times?
13 A   Two.
14 Q   Were those in connection with lawsuits
15 involving your patients?
16 A   Yes.
17 Q   So you, pretty much, know the drill in
18 terms of how we go about this.
19    Let me ask you: Those two times you were
20 deposed, when were they?
21 A   One was approximately two years ago, and
22 one was -- am I speaking loudly enough?
23    COURT REPORTER: Yes.

Page 6

Gloria Small

1 A   -- and one was several months ago.
2 Q   And that was -- did you testify at trial?
3 A   Neither are case came to trial.
4 Q   All right.
5    Both depositions involved your treatment
6 of patients?
7 A   I treated both patients.
8 Q   And both patients had lawsuits against
9 some other party?
10 A   Yes.
11 Q   You weren't the defendant?
12 A   No.
13 Q   Okay.
14    Did either case involve a patient that had
15 PTSD?
16 A   Yes.
17 Q   Which one was that?
18 A   Both.
19 Q   What was the name what were the name of
20 the patients?
21 A   Um, I need to ask a question.
22 Q   Sure. Okay.
23    THE WITNESS: I'm not sure if I'm

Page 7

Gloria Small

1 allowed to give these names because of
2 patient confidentiality.
3 Q   That's fine.
4    Can you at least tell me who the attorneys
5 were in those cases?
6 A   I don't have the memory at the top of my
7 head, but I can get you the information from my
8 files.
9 Q   Okay.
10    We are going to get a copy of this
11 transcript sent to you, and we will leave some
12 blanks and ask you to fill in those blanks to fill
13 in the names of the attorneys who were involved in
14 both of those cases?
15 (See Line 17 Page 3:_____.)
16 A   That would be fine.
17    I could tell you the name of the
18 corporation that was involved in the first case.
19 Q   That would be helpful?
20 A   It was the Pfizer Corporation. I could
21 tell you the details, but I couldn't tell you the
22 names of the person.
23 Q   Well, if you could give me a brief of what

Page 8

Gloria Small

1 the case was about?
2 A   Yes, it was a case of complex
3 posttraumatic stress disorder. A woman had been 23
4 years old when her father had murdered her mother in
5 front of her. When she worked for this corporation
6 many, many, many years later, a fellow employee
7 showed her harassing e-mails during which a
8 frightening image appeared on the screen and it
9 caused this woman to suffer flashbacks and enormous
10 physical distress which involved her hospitalization
11 and great difficulty afterward.
12 Q   What about the other case, can you give me
13 a thumbnail about what that case was about?
14 A   The second case involved an elderly woman
15 who was involved in an automobile accident and
16 traumatized after the accident that caused her
17 enormous physical and mental injuries.
18 Q   Were those cases filed with the state or
19 federal court, if you know?
20 A   I believe there was -- I'm not sure.
21    There was some question about both state
22 and federal in the first case. I'm not sure.
23    The second one I think was the state.

CHAIT DIGITAL
chaitdigital.com                                           888.978.4336
b8cd7760-160e-4dc7-ba39-497b34a717a1

### Page 9

Gloria Small

Q  Okay.
MR. HEALEY: What state?
Q  Connecticut?
A  Connecticut.
Q  And those two cases are the only two cases in which you've testified in concerning treatment of your patients?
A  In a court of law.
I was called to, um, appear before a committee. I'm not sure if it was a committee of the Bar. A patient of mine wanted to be an attorney and there were questions that the examining committee had about this individual, and I appeared in that case. I don't know what the committee was. It was a committee.
Q  Character and fitness committee?
A  I think that was it.
Q  Let me ask you a couple of questions concerning your background and training, can you tell me where you went to school?
A  Um --
Q  College and --
A  The whole thing, yes, okay.

### Page 10

Gloria Small

Q  I don't know need to know elementary school?
A  It's a long story. I went to Long Island School of Design earned bachelors in fine arts, then I went to Case Western University, and I earned a masters' degree in I think it's early childhood education, and then a doctorate in it was educational psychology, um, then -- am I going to fast?
Q  No.
A  Then I earned an executive MBA at the University of New Haven, um, and, um, I did, um, a number of training programs in clinical work. One of those was at the Center for Family Learning. I think it's New Rochelle, actually, New York. I did analytic training at the Connecticut Center for Psychoanalytic Psychology. I was trained in a particular therapy that's used for trauma called EMDR in two different two training places.
I also did some training in substance abuse disorders, and for a while had a certificate of proficiency from the Psychological Association in substance abuse disorders. That covers a lot.

### Page 11

Gloria Small

Q  Are you certified in substance abuse?
A  No, I let that lapse.
Q  When did you do your training for EMDR?
A  Probably, five years ago, something like that.
Q  Where was that?
A  In New York City and in Ellington, Philadelphia.
Q  Where in New York City?
A  At a hotel of some sort.
Q  What organization?
A  There's an organization called -- I think it's called EMDRIA. It's an international association where they do EMDR.
Q  Can you tell me what EMDR stands for?
A  It stands for eye movement desensitisation and reprocessing.
Q  And you said that is a particular type of therapy that's used in actual trauma?
A  Yes.
Q  Briefly, can you describe what that therapy consists of?
A  Well, basically the patient is brought

### Page 12

Gloria Small

into a relaxed state, and in a relaxed state which is induced by the therapist moving his or her hands the patient, um, following a certain protocol experiences both memories of a, um, cognitive and emotional level which tend to reduce the, um, distress of trauma.
Q  Okay.
Can you tell me the circumstances of under which, um, Michael Stepski came to be a patient?
A  Yes.
Um, I believe I received a telephone call from Ron Stevens, an attorney who I think had heard of me, and asked if I would be available to see Michael Stepski. I think he asked me if I could see Geal Roderick, as well.
Q  When was that?
A  It was in 2004.
Q  Do you remember the date?
A  Of the telephone call?
Q  Yes.
A  Well, not exactly, but I would -- it was after the accident on May 22nd, so presumably sometime shortly after that.

Page 13

1         Gloria Small
2    Q   And had you ever met with Attorney Stevens
3  before?
4    A   I never met with him.
5    Q   Did you know who he was?
6    A   No, it was a telephone call. I've never I
7  met him.
8    Q   And you know Mr. Healey.
9       Correct?
10   A   I met Mr. Healey for the first time face
11 too face about a half hour a go.
12      MR. HEALEY: That's right.
13   Q   Had you ever -- prior to today, had you
14 spoken with Mr. Healey over a telephone?
15   A   Just in reference to this deposition.
16   Q   When you say "just in reference," can you
17 tell me what you mean by that?
18   A   Well, when I received it, it was a little
19 strange when I received the request for deposition
20 from your office. Actually, with a certain date
21 that I had no knowledge about it, and I didn't quite
22 know what to do. So I called Ron Stevens again, and
23 he said I should call Tom Healey and I guess we
24 spoke at that time. I think he may have told me

Page 14

1         Gloria Small
2  that I should somehow contact your office and find
3  out what it was all about.
4    Q   All right.
5       Did you discuss the case at all with Mr. I
6  Healey at any time?
7    A   No.
8    Q   Have you discussed the case at all at any
9  time with Attorney Stevens?
10   A   Well, he -- yes in the sense that --
11   Q   Other than the first conversation?
12   A   No.
13      The only thing we have spoken about has
14 been that I have not been paid for some services
15 rendered, and was to send, um, my statements to Ron
16 Stevens and so I've been doing that periodically
17 over the years.
18   Q   So the first time you spoke with
19 Mr. Stevens he asked if you would be free to see
20 Michael Stepski and Roderick.
21      Did he tell you anything about what had
22 happen?
23   A   Yes.
24   Q   What did he tell you?

Page 15

1         Gloria Small
2    A   He told me there had been an accident at
3  sea that these were fishermen. I don't know if he
4  asked me had I ever worked with fishermen, but how
5  did I feel about it and would I be able to do this,
6  and I felt I would be able to and I had the time.
7    Q   Was there anything else discussed in that
8  first phone call?
9    A   No.
10   Q   Okay.
11      Previously, had you ever worked with
12 fishermen before?
13   A   No, but I have worked with many firemen
14 and police officers but no fishermen.
15   Q   Just to be clear, mike step ski around I
16 gale I Roderick are you your I patients is that
17 right?
18   A   I don't consider them my patients at the
19 present time. They were my patients, neither of
20 them is in treatment at this point.
21   Q   Was Kirsten Stepski ever a patient?
22   A   No.
23   Q   And how about Ben Schober, was he ever a
24 patient?

Page 16

1         Gloria Small
2    A   No.
3    Q   When was the first time that you saw --
4    A   I need to refer to my notes.
5    Q   -- saw Mr. Stepski?
6    A   July 8th, 2004.
7    Q   And is it correct that Mr. Stepski was
8  seen before you ever saw Mr. Roderick?
9    A   Yes, I believe so.
10   Q   The conversation that you had with
11 Attorney Stevens before you saw Mr. Stepski, was
12 there one conversation or multiple conversations?
13   A   I don't remember, probably one.
14   Q   Did you have any notes concerning your
15 conversation with Mr. Stevens?
16   A   No. It was nothing substantiative. If I
17 could see those people but we did not -- after that
18 conversation, we never spoke about -- it would have
19 been a breech of confidentiality at that point for
20 me to speak to an attorney except if they gave me
21 permission. I didn't have permission from them,
22 there was no reason for me to speak to him about the
23 treatment.
24   Q   Did you ever receive permission from

4 (Pages 13 to 16)

### Page 17

1  Gloria Small
2  either Mr. Stepski or Mr. Roderick to speak to their
3  attorneys concerning their case?
4      A   Not that I can recall.
5      Q   I see you have a file in your lap.
6      A   Yes.
7      Q   May I just have a moment to briefly look
8  through that, if I could, if that is all right with
9  you?
10     A   Well, there are some things that I put
11 together before as part of my preparation so I'll
12 pull those out. Well, this is what I had pulled
13 out.
14         MR. HEALEY: Just he asked for your
15         file.
16     A   Oh, for my file.
17         MR. HEALEY: If you have other things,
18         you can explain that, but what is your
19         file is the first thing.
20         MR. UNGER: Right.
21     A   Okay.
22     In the manila folder, are things I put
23 together, the rest of it maybe a little messy, and
24 then things related to subpenas and billing.

### Page 18

1  Gloria Small
2      MR. UNGER: Off the record.
3      (Off the record.)
4      Q   Now, you have some other files with you,
5  as well?
6      A   They are not files. They are just
7  material I was looking at in reference to preparing
8  and thinking about today.
9      Q   Would you mind if I look at what these
10 are, please?
11     A   Sure.
12     Q   For the record, the witness has provided
13 me with a one sheet piece of paper that has some
14 citations to various -- I guess these are clinical
15 journals.
16     Is that correct?
17     A   No, it's a book.
18     Q   Are these portions of a book that you have
19 authored or...
20     A   I felt they were relevant.
21        MR. HEALEY: Your file, your file.
22        Let me see your file.
23        THE WITNESS: You want to see what I
24        gave him. That wasn't the file. It

### Page 19

1  Gloria Small
2  was something else.
3      MR. HEALEY: I'll give you this back.
4      I'd like to be able to stay abreast of
5      Mr. Unger --
6      THE WITNESS: Here are the two things
7      I've given him.
8      MR. UNGER: Off the record.
9      THE WITNESS: I'll give you the list.
10     (Witness complying.)
11 BY MR. UNGER:
12     Q   Is there anything else besides these four
13 pages that you looked at in connection with
14 preparing?
15     A   No, I think I gave you a piece of paper
16 called "materials I referred to."
17     Q   Right.
18     A   And all the things that were not stared
19 were the things that were in the folder as part of
20 the record that you looked at before. Um, the
21 things I stared were things that I looked at as I
22 was thinking about the material that I'd reviewed.
23     Q   Okay.
24     Would you mind if we marked these

### Page 20

1  Gloria Small
2  documents as exhibits and then we can make copies?
3      A   I don't have a copy machine. Those are
4  for you, I made a copy for each one.
5  (Defense Small Exhibits 1 through 4 marked
6  consecutively for identification.)
7      Q   Back on the record.
8      We've marked as Small Exhibit 1 through 4,
9  four pages which have been provided to us, and these
10 are all materials that you reviewed in connection
11 with the deposition today.
12     Is that correct?
13     A   Um, I have three pages.
14     Q   Well, let's go over them. The first one
15 we marked as Small Exhibit 1 is the list of --
16     A   Oh, okay.
17     Q   -- the list of chapters from a book that
18 you consulted?
19     A   Um hum.
20     Q   Assessing Psychological Trauma and
21 Posttraumatic Stress Disorder by WilsonandKeane,
22 specifically you looked at a Chapter 7?
23        MR. HEALEY: You don't have to read it
24        you --

Page 21

Gloria Small

1
2  Q  Chapter 7 and 15 of that book; is that
3  correct, right?
4  A  Yes.
5  Q  Exhibit 2 is a list of -- it's a page
6  taken from a book.
7     Can you tell us what book?
8  A  It's the same book. It says, "from above
9  text Page 170." It's called Impact of the.
10 Q  Okay.
11 A  -- revised from above text. It is the
12 second star.
13    Do you see it on there?
14 Q  Okay.
15    The third exhibit is listed materials
16 referred to in relation to today's deposition, and
17 it lists documents which you reviewed prior to
18 today.
19    Is that correct?
20 A  It's called "materials referred to?"
21 Q  Yes.
22 A  You are calling it NO. 3.
23    Okay.
24 Q  And references an article from the London

Page 22

Gloria Small

1
2  Day dated June 13, 2004 concerning the incident and
3  we have --
4  A  Are you calling that a number?
5  Q  No, I haven't called it anything yet. We
6  do have the -- we do have the article from the paper
7  and during an off the record conversation I believe
8  you identified this is a newspaper clipping as
9  having been provided to you by Michael Stepski at
10 your first visit?
11 A  Correct.
12 Q  We are going to make a copy of this and
13 Mr. Healey will return the original to you.
14    Okay?
15 A  Yes.
16    MR. HEALEY: It's two pieces?
17    MR. UNGER: The article is actually
18    two pieces of paper from the New
19    London Day.
20 Q  And then, referring back to Exhibit 3,
21 your list of materials. The next item is your notes
22 concerning Mr. Roderick, your notes concerning Mr.
23 Stepski, Dr. Mariam's report on both Roderick and
24 Stepski, and you refer again to an excerpt from the

Page 23

Gloria Small

1
2  WilsonandKeane text, you also reference a article
3  from the New York times from July 15, 2008 which we
4  have marked as Exhibit 4 called Losing Private
5  Dwyer, d-w-y-e-r.
6     Are those all the materials that you have
7  reviewed in connection with today's deposition?
8  A  Yes.
9  Q  And can you tell me why you included the
10 New York times article as being relevant to today's
11 deposition?
12 A  Yes. I happened to read it on Tuesday,
13 and I was struck by that particular article, um,
14 there were many, many others as well as movies and
15 films which have been presented to the American
16 public in relation to men who were returning from
17 Iraq. These men had been suffering from
18 posttraumatic stress disorder, and very often we see
19 them in trouble far more than these gentlemen but
20 the story seems so illustrative.
21 Q  "Illustrative" of what?
22 A  Of what can happen when one is suffering
23 from trauma which by in large has gone untreated.
24 Q  Okay.

Page 24

Gloria Small

1
2     Are you suggesting that what occurred to
3  Mr. Dwyer described in the article is something that
4  has or will occur to Mr. Stepski or Mr. Roderick?
5  A  No, I couldn't know that.
6  Q  Oh.
7     Now, we have covered everything else that
8  you have before you?
9  A  Correct.
10 Q  Okay.
11    You also produced a hanging folder that
12 has been labeled "Stepski" and it's got a manila
13 folder inside of it which has --
14 A  It's has what we --
15 Q  Okay.
16    Its has a number of documents in it. I'd
17 just like to have the record reflect what's
18 contained in this. If you just give me a moment,
19 there's an article from The Day dated June 13 of
20 2004, captioned A Trip to the Brink which discusses
21 Mr. Stepski's incident. There's a July 7th, 2008
22 fax from Mr. Healey to you forwarding Dr. Mariam's
23 report on Mr. Stepski looks like, fax consisting of
24 six pages in total, the cover and five pages or Dr.

Page 25

Gloria Small

1  Mariam's report, and the fax also says, "I'll speak
2  to you during the week of July 14th."
3      Did you have a conversation with
4  Mr. Healey on the week of July 14th?
5  A   Yes.
6  Q   Can you relay the content of that
7  discussion?
8  A   Yes.
9      I said I had reviewed this report, but I
10 had not received the report from Mr. Roderick. I
11 was wondering whether I would have a copy of that
12 report. I think I also, um, asked whether I would
13 be receiving a copy of the coast guard report which
14 I had known Michael Stepski had been waiting for
15 when I was working with him, and I was told that
16 that would not be forwarded to me.
17 Q   Did you discuss the contents of Dr.
18 Mariam's report?
19 A   No.
20 Q   Did you share your views in any way
21 concerning the case with Mr. Healey during your
22 July 14th conversation?
23 A   No.

Page 26

Gloria Small

1  Q   Okay.
2      There are -- also in here is a copy of
3  another fax from Mr. Healey dated July 15 and that
4  provides a copy of Dr. Mariam's report on
5  Mr. Roderick. It's four-page report. I'm sorry, a
6  three-page report and one cover page being the
7  contents of that fax.
8      Is that the complete fax that you
9  received?
10 A   Yes.
11 Q   Did you have a conversation with Mr.
12 Healey after you received the --
13 A   No.
14 Q   -- July 15th?
15 A   No.
16 Q   Also included in this manila folder, is a
17 letter, a memo dated December 26, 2006 to Attorney
18 Wiegel, w-i-e-g-e-l, forwarding your notes for
19 Mr. Roderick and that includes four-pages of notes
20 for Mr. Roderick.
21     Is that correct?
22 A   Yes, I assume so.
23 Q   Also in here is a summary of clinical

Page 27

Gloria Small

1  contact with Michael Stepski dated December 26, 2006
2  and two pages of notes concerning your visits with
3  Mr. Stepski on July 8th and July 12, 2004 plus
4  another copy of I Appendix 7.1 from the Wilson and
5  Keane text. Further included in the hanging file is
6  the February 28th, 2005 letter which was sent to
7  Attorney Stevens concerning unpaid charges for
8  Michael Stepski, various copies of subpenas and
9  correspondence with respect to your records,
10 releases for the records, handwritten notes with
11 attorney Stevens' fax and telephone number on it.
12 Then there is a purple folder that has copies
13 additional copies of subpenas and correspondence
14 from defense counsel with authorizations. There is
15 a December 10th, 2004 letter from you to Attorney
16 Stevens and a August 5, 2004 letter from you to
17 Attorney Stevens.
18 A   Excuse me.
19     May I ask a question?
20 Q   Of course.
21 A   These letters are in reference to payment.
22     Is that correct?
23 Q   Yes.

Page 28

Gloria Small

1  A   Right.
2  Q   September 10, 2004 letter to Attorney
3  Stevens also in respect to payment and a draft of a
4  letter to Attorney Stevens dated August 5, 2004 just
5  hold onto the correspondence for a moment.
6      We have multiple copies except for one or
7  two of those drafts of Attorney Stevens. I believe
8  the September 10 there is another copy?
9  A   I did not quote clean up the file for you.
10 I just brought the manila envelope.
11 Q   I do appreciate it.
12     Okay?
13 A   You wanted me to look at this?
14 Q   That is an extra.
15     If I may ask you about your correspondence
16 with Attorney Stevens.
17     Okay?
18 A   Yes.
19 Q   There's a -- first there is -- it's dated
20 August 5, 2004, and it's in reference to
21 Mr. Roderick who you indicated was under your care
22 for PTSD he sustained -- he is suffering as a result
23 of a May 22, 2004 incident which occurred aboard the

Page 29

Gloria Small

1
2  boat Avaclare, a-v-a-c-l-a-r-e, and you indicated in
3  the letter that it was your understanding that
4  Mr. Roderick was to pay whatever he is able to
5  toward your fee of $110.00 per session and that
6  Mr. Stevens would guarantee that the total payment
7  due you for services rendered would be paid through
8  his office.
9       Was that your understanding with Attorney
10 Stevens?
11    A   No, my understanding was that, um, medical
12 fees would be paid once the case was settled.
13    Q   And how did you arrive at that
14 understanding?
15    A   Mr. Stevens asked if that would be
16 acceptable to me, if I would see both Geal Roderick
17 and Mike Stepski based upon their ability to pay,
18 and if they couldn't pay, whether I would quote out
19 of the goodness of my heart or pro bono or wait to
20 be paid and I said that would be acceptable.
21    Q   When did you have that conversation with
22 Mr. Stevens?
23    A   I'm not sure.
24    Q   Was it before you wrote your August 5 --

Page 30

Gloria Small

1
2    A   What did I say in that August 5 letter.
3    Q   Why don't we take a break and mark all of
4  those as exhibits?
5    A   Actually there is a sentence I say
6  directly in here. It's my understanding that the
7  patient was -- we must have had that discussion
8  before that and in agreement. Although, this letter
9  says I will be paid through his office, but I have
10 not been paid through his office. I understood,
11 perhaps, later that would happen once the case was
12 settled.
13   Q   So just so I'm correct the understanding
14 you.
15      You have not been paid for treatment by
16 Attorney Stevens at all?
17   A   No.
18   Q   Okay.
19      And in this August 5 letter, you also
20 indicate that you were seeing Mr. Stepski and you
21 assumed that payment for service to him would be
22 treated the same as Mr. Roderick?
23   A   Correct.
24   Q   Okay.

Page 31

Gloria Small

1
2    Q   Did this particular version -- and we are
3  going to mark this as Exhibit 5 for identification
4  in a moment -- go out?
5    A   You mean did I send this to Mr. Stevens?
6    Q   Yes.
7    A   I assume so.
8    Q   I just note that there's no salutation or
9  signature at the bottom as there are on the other
10 letters?
11   A   There's a little note here on the top of
12 it. It says something corrected something on
13 letterhead. So this is probably -- you see that
14 little note. So it's probably not on letterhead
15 and, perhaps, as I initialed what went out. This is
16 a copy for my on files.
17   Q   I'm going to ask the reporter if she
18 would -- what I'd I like to do, with your
19 permission, is to mark these as exhibits. We will
20 send you copies.
21   A   I was going to ask will I have a copy of
22 the transcript including the exhibits so we are all
23 on the same page?
24   Q   Absolutely?

Page 32

Gloria Small

1
2    A   Sounds good.
3  (Defense Small Exhibits 5 through 10 marked for
4  identification.)
5    Q   Back on the record.
6       In addition to the August 5, 2004 letter
7  to Attorney Stepski that we were just discussing,
8  there's another letter also dated August 5, 2004 to
9  Attorney Stevens. I think you have a copy in your
10 file if you want to follow along. This one is not
11 the salutation and your signature at the bottom.
12 We've marked this as Exhibit 6. I think it was with
13 this purple --
14   A   It's dated what?
15   Q   August 5, 2004?
16   A   Yes.
17   Q   Okay.
18      And that is in reference to both Roderick
19 and Stepski and a statement for services in
20 reference to their -- a reference to a previous bill
21 for Gael Roderick?
22   A   Um hum.
23   Q   At $330?
24   A   Yup.

Page 33

Gloria Small

Q  Your treatment sessions were at $110 a session.
    Is that right?
A  Correct.
Q  And you charged half that rate if there was a no show?
A  Correct.
Q  And you had seen Mr. Roderick looks like three times and there were two no shows?
A  Correct.
Q  And Stepski, in July there was one visit, you saw him three times since; correct?
    Says August 26th, September 2, and September 9th?
A  Let me just check some place else. This is so confusing. Some place there is a summary of the times I have seen both of them. I'm just looking for it. Sorry.
Q  Take your time.
A  What is missing from this is my notes and you probably have them.
Q  I'll hand you the original notes.
A  Since I didn't keep a copy, no. No, all

Page 34

Gloria Small

of the clinical notes. Okay.
    What was your question again?
Q  I'm just confirming that you had seen --
A  The number of times saw --
Q  Well, let's do it a little differently. You have your clinical notes in front of you?
A  Yes, and I can tell you the number of times I saw each of them.
Q  We will go over each visit, if that is all right with you?
A  Sounds okay.
Q  Now, you started by first seeing Mr. Stepski?
A  Yes.
Q  And you first saw him on July 8th, 2004.
    Is that right?
A  Correct.
Q  Okay. And you prepared something which we have marked as part of Exhibit 10 for identification which is called a summary of clinical contact with Mike Stepski.
    Do you have that document in front of you?
A  Yes.

Page 35

Gloria Small

Q  When did you prepare that document?
A  December 26th, 2006.
Q  And what was the reason for preparing this document?
A  I believe I prepared that in reference to a request from an Attorney Wiegel, I think that's his name.
    MR. HEALEY: Wiegel is his name.
A  Wiegel.
    What happened was --
    MR. HEALEY: He didn't ask a question. what I'm suggesting is let Mike control his own --
    THE WITNESS: You ask the questions.
Q  In your practice as clinical psychologist, is it your habit to take notes when you meet with a patient?
A  Yes.
Q  Okay.
    Do you have the notes that you took during any of your meetings with either Mr. Stepski or Mr. Roderick?
A  I have some of the notes.

Page 36

Gloria Small

Q  Actual handwritten notes?
A  I don't take handwritten notes during the meeting.
Q  Is it fair to say then that after you meet with the patient you write down some notes?
A  Correct.
Q  And is it your habit to type those notes up?
A  Correct.
Q  And those are the notes that are typed up and we have marked them as Exhibit 10.
    Is that right, other than your clinical summary?
A  Correct, yes.
Q  Are those all the notes that you have concerning all of your visits with Mr. Stepski and Mr. Roderick?
A  Yes.
Q  There is nothing else?
A  No.
Q  Okay.
    Turning to this summary of clinical contact. This was prepared in response to a request

**Page 37**

```
 1            Gloria Small
 2   from Mr. Wiegel?
 3      A    Yes.
 4      Q    That request came in late 2006.
 5            Is that fair to say?
 6      A    In the material we have his request so...
 7      Q    Okay.
 8            And it indicates you saw Mr. Stepski nine
 9   times as a patient.
10            Is that correct?
11      A    Correct.
12      Q    But in your file there's only two pages of
13   typewritten notes concerning Mr. Stepski.
14            Is that fair to say?
15      A    Correct. And I note that in the summary.
16      Q    And those two pages concerning your visits
17   with Mr. Stepski, are dated July 8, 2004 and
18   July 12, 2004.
19            Correct?
20      A    Correct.
21      Q    Did you take notes concerning your visits
22   of July 19, August 26, September 2, September 9,
23   December 20 all in 2004 and in January 3, February
24   10 of 2005?
```

**Page 38**

```
 1            Gloria Small
 2      A    I did.
 3      Q    So what happened to those notes?
 4      A    When I attempted to retrieve them from my
 5   computer, I did not find them.
 6      Q    They just weren't saved somewhere?
 7      A    Somewhere.
 8      Q    They were typed up but they had been lost?
 9      A    Correct.
10      Q    Okay.
11            To your recollection, did you have a
12   separate file for each or a separate document for
13   each session on those dates?
14      A    I'm forgetting your question.
15      Q    When you take your notes, you type them up
16   on a computer?
17      A    Um hum.
18      Q    You save them some how.
19            Right?
20      A    No, not exactly. Um, I type them up on a
21   little keyboard and then they are entered from the
22   keyboard to the computer.
23      Q    Does the computer save them as a file?
24      A    Yes.
```

**Page 39**

```
 1            Gloria Small
 2      Q    Microsoft Word or some other type of file?
 3      A    I guess.
 4      Q    Am I getting beyond you?
 5      A    Yes.
 6            I have people who do that for me. Yes, I
 7   type them in and somebody puts them into the
 8   computer.
 9      Q    The first session that you had with
10   Mr. Stepski your note is about a full page long.
11            Correct?
12      A    Yes.
13      Q    The second session on July 12, 2004 your
14   note is only five or six, seven lines long?
15      A    Correct.
16      Q    Were the notes for the other seven
17   sessions approximately the same length?
18      A    The first note is an a intake note which
19   is a longer note. The other notes at sessions are
20   progress notes, and they would typically be the same
21   length as the, you know, the July --
22      Q    July 12th?
23      A    Yes.
24      Q    Let me refer you back to the intake note,
```

**Page 40**

```
 1            Gloria Small
 2   July 8th, 2004?
 3      A    Yes.
 4      Q    You indicate Mr. Stepski's address, phone
 5   number, date of birth and then referred by
 6   Attorney Ron Stevens. Then you indicate insurance,
 7   none self pay.
 8            What arrangements did you have at the time
 9   of first seeing Mr. Stepski concerning payment of
10   your fees?
11      A    I stated to do him what the fee was, and
12   he stated he would pay as he could, and I said that
13   would be fine.
14      Q    Is there anything in writing concerning
15   the fee agreement?
16      A    No.
17      Q    Did you ever issue any bill to
18   Mr. Stepski?
19      A    No, I don't believe so.
20      Q    Did he ever pay you at all?
21      A    Yes, he did.
22      Q    When he paid you, did he pay you by check
23   or in cash?
24      A    I don't remember.
```

Page 41

1           Gloria Small
2     Q   When Mr. Stepski paid you, did you furnish
3  him with a receipt?
4     A   I don't remember.
5     Q   How long was that first visit?
6     A   Presumably, it was 50 minutes.
7     Q   Who was there, if anyone, besides yourself
8  and Mr. Stepski?
9     A   Just myself and Mr. Stepski.
10    Q   And that was conducted here at your office
11 in Guilford or somewhere else?
12    A   It was conducted at my office in Old Lyme.
13    Q   Do you know what time of day it was?
14    A   I don't remember offhand, but if I
15 consulted, I do have my calendar pages from that
16 year. If I looked at my calendar pages, I could
17 tell you.
18    Q   Why don't we leave a blank in the
19 transcript, when you have a opportunity, if you
20 could fill in the time I'd appreciate that.
21 (See line 9 page 35:_____.)
22        Now, you go on to say, presenting problem
23 you say a fishing boat captained by Mike with two
24 members was crashed into by a freighter on a foggy

Page 42

1           Gloria Small
2  day, May 22, 2004.
3        Is that what he had told you or is that
4  what --
5     A   It was what I remembered from what he had
6  told me.
7     Q   Freighter ripped into boat, boat sank, man
8  held onto life raft, Mike's dog died, rescued by a
9  coast guard about four hours later.
10       That's all from your memory of what Mr.
11 Stepski told you happened in the accident?
12    A   This is my summary as I put the presenting
13 problem from my own edification for clinical
14 purposes.
15    Q   Did Mr. Stepski go into any further
16 details beyond what was reported by you on your
17 intake note --
18    A   Yes, I'm sure he did. We spoke for 50
19 minutes, and this is my summary for my own purposes
20 of what he said.
21    Q   Do you recall what else he said in respect
22 to how the accident had happened?
23    A   Well, let me say, it was a long time ago.
24 It's now 2008, and I saw him in 2004, but I do have

Page 43

1           Gloria Small
2  some additional memories of what he said.
3     Q   If you would tell me what you recall that
4  he told you that's not on here?
5     A   I remember him talking a great deal about
6  the fog and about the lines that there were lines or
7  lanes that boats were supposed to be in lanes, and
8  that this boat that approached him was not in the
9  lane. Um, I remember his disbelief that the boat
10 didn't stop, um, there were details about -- he went
11 into many details about the pieces of things that
12 were on the the water and things that weren't on the
13 the water and how it was kind of a miracle that they
14 managed to get on the boat on this rubber thing. He
15 talked a great deal about the dog. These are the
16 things that stand out that I just mentioned as I
17 think back on it.
18    Q   Did he tell you that he had observed a
19 target on his radar that he believes to ultimately
20 have been the boat that hit him?
21    A   I don't remember that.
22    Q   Do you recall him saying that he was
23 watching this radar and target coming closer and
24 closer as he continued to with his fishing?

Page 44

1           Gloria Small
2     A   You know, I think so. I think something
3  like that is referred to. There's something about a
4  radar. I don't know, I don't see it in my notes
5  here, but there was something.
6        MR. HEALEY: May I just suggest that
7        you -- Mr. Unger simply asked you what
8        you remembered. If you don't --
9        THE WITNESS: I don't. It was a long
10       time ago. I don't remember.
11       MR. HEALEY: It saves you time, him
12       time and me time.
13       THE WITNESS: I'm trying to remember.
14    Q   And I appreciate that. It's not a memory
15 test, I'm just trying to figure out what he told
16 you. If you remember, great. If you don't
17 remember, that's okay.
18    A   Either I remember or I don't remember, but
19 he may have told me or may not have told me.
20    Q   That's all we ask. So I appreciate that.
21       Do you recall if he related to you that he
22 had managed to get cold weather suits for his crew
23 members and get everything into the life boat?
24    A   Yes, I remember that.

Page 45

           Gloria Small
1
2    Q  And that he had managed to go around the
3 area and they picked up certain supplies like a
4 compass and picked up something called a epirb,
5 e-p-i-r-b, which is a device to signal a coast
6 guard?
7    A  I remember that, and it's referred to in
8 the notes but I wasn't sure about the name of that
9 device.
10   Q  And that they managed to come up with some
11 supplies?
12   A  Yes.
13   Q  Do you remember among those supplies was
14 some beer that had floated to the surface?
15   A  Yes. I'm not sure if I'm remembering or I
16 just read it. It was beer and mustard and something
17 else like honey or maple syrup or something.
18   Q  Okay.
19      Other than what you've told us, is there
20 anything else that you remember that Mr. Stepski
21 said too you concerning how the accident happened?
22   A  No. My memory is the boat came toward him
23 and struck the boat, struck his boat.
24   Q  Now, under the heading trauma, "the

Page 46

           Gloria Small
1
2 trauma" you say, "Mike repeated details of the
3 story."
4      Is that what we just discussed, those are
5 the details of the story that Mr. Stepski repeated
6 to you or related to you?
7   A  Yes, but he may have repeated more about
8 why didn't they stop, how could they -- you know, he
9 may have repeated that but I didn't put that in
10 there.
11   Q  You noted in your report he bought the
12 boat about a year prior to the incident, he
13 purchased it for $25,000 and put $100,000 or more
14 into it.
15     Do you recall him telling you that?
16   A  I wouldn't have remembered it because I
17 don't tend to remember details like that but seeing
18 it --
19   Q  But if it's in your notes, presumably it
20 was told to you by Mr. Stepski?
21   A  Yes.
22   Q  Okay. Fair enough.
23     You note the boat was only insured for
24 $35,000, is that something that Mr. Stepski

Page 47

           Gloria Small
1
2 volunteered or something you asked?
3   A  He volunteered.
4   Q  Would it make a difference to you about
5 what the insured value of the the boat was?
6   A  No.
7     Well, as a general listener, what I would
8 have abstracted not the details but the financial
9 hardship or loss the enormity of the loss to him.
10   Q  And you noted that they were 30 miles
11 south of --
12   A  Um hum.
13   Q  -- in your report. It had been foggy, the
14 freight that collided with them and Mr. Stepski
15 apparently told you that the ship that collided with
16 him should have known they were there because a
17 modern radar would show them -- should have shown to
18 the ships crew that there was a fishing boat there.
19     Is that something he related to you?
20   A  I guess.
21   Q  Is there --
22   A  My memory was more something about a
23 lanes, that they -- something about the lanes that
24 the boat shouldn't have been where it was. I don't

Page 48

           Gloria Small
1
2 remember about a radar.
3   Q  There's nothing in your intake notes about
4 lanes?
5   A  No.
6   Q  Correct?
7   A  About the lanes, no.
8   Q  Mr. Stepski apparently told you that he
9 thought he would be lost for a long time and,
10 perhaps, not ever found?
11   A  Yes.
12   Q  You knew that they were 30 miles from
13 shore because he told you that.
14     Right?
15   A  Yes.
16   Q  And you knew they were near the shipping
17 lanes because he told you that.
18     Right?
19   A  Yes.
20   Q  Did you believe it to be a reasonable fear
21 on Mr. Stepski's part that they would be floating
22 around in their life raft for a long period of time,
23 maybe weeks?
24   A  You know, I never questioned that.

### Page 49

     Gloria Small
 Q   And you never questioned that his
statement that he feared, perhaps, they would never
be found when they were only 30 miles away, they had
a compass, they were floating in a raft. They had
emergent cold weather suits?
     MR. HEALEY:  Survival suits it's
     called.
 Q   They had some provisions?
 A   I never questioned it because he --
     MR. HEALEY:  You didn't. I don't mean
     to snap it, but if you give an answer
     you really don't have to give another
     one.
 A   Okay.
 Q   So you said that they were floating in the
life raft for about three hours and the coast guard
picked them up by helicopter and brought them to the
coast guard station in Cape Cod.
     Correct?
 A   Correct.
     I would like to amplify the other question
because it is relevant to a psychological
perspective, perhaps, not a law school perspective.

### Page 50

     Gloria Small
The reason I didn't question is my sense of the
experience that Michael Stepski was presenting and
as he experienced what happened to him was as though
he might die.
 Q   Well, can we agree, doctor, that one can
have a belief that they might die under a particular
set of circumstances, but that belief may or may not
be rational?
 A   Well, a belief would not be rational, a
necessity belief or emotional reaction is not a
rational or experience but it is an experience
nevertheless.
 Q   Can one have an experience that has no
rational basis and --
 A   Let me give you -- I would like to say
something.
     MR. HEALEY:  I'm not stopping you but
     I'm saying he wasn't through with his
     question when you started.
 Q   I'm fine with the doctor, go ahead?
 A   There are cases that, perhaps, we all know
about of individuals who feel they are having heart
attacks and they present to the hospital. Low and

### Page 51

     Gloria Small
behold, they are not having a heart attack. They
are suffering panic or anxiety attacks that cannot
be verified until they get to the hospital.
 Q   Okay.
 A   So what I'm saying the experience of
something is sometimes different from the organic
reality of the case.
 Q   Either the organic reality or factual
reality as the case maybe?
 A   The factual reality but experience, if you
ask an emergency room doctor how many people they
see presenting that they think they are having heart
attacks but really are having panic attacks would be
a very high number.
 Q   You note again in your intake note that
Mr. Stepski was not allowed to bring his dog into
the helicopter with them?
 A   Yes.
 Q   Wasn't the dog already dead at this point?
 A   Yes.
 Q   And the loss of the dog was a sad event
for Mr. Stepski?
 A   Yes.

### Page 52

     Gloria Small
 Q   As it would be for most people that have a
pet?
 A   Sorry.
 Q   As it would be for most people when they
lose a pet?
 A   Yes.
 Q   Was the loss of the dog otherwise
significant in terms of your view of Mr. Stepski and
his, um, problems which flow out of this collision
at sea?
 A   Would you rephrase the question.
 Q   Sure was.
     The loss of Mr. Stepski's dog in your
clinical view is a significant factor in whatever
clinical psychological problems you believe Mr.
Stepski has which are related to this accident?
 A   Perhaps.
 Q   No way to say definitively?
 A   No, but many people who have survived
trauma have, um, what's sometimes called survival
guilt. I don't think he would exactly feel why
didn't I die rather than my dog, but I think the
death was significant.

Page 53

1    Gloria Small
2    Q   Did he ever explain to you in what way the
3    death of the dog was significant?
4        MR. HEALEY: I didn't -- just a
5        minute. Did you see -- did he ever.
6        MR. UNGER: Yes.
7        MR. HEALEY: You mean did Stepski ever
8        tell you.
9        MR. UNGER: Yes.
10   A   We talked extensively about the the dog.
11   Q   He had the dog for quite a number of
12   years?
13   A   And how upsetting to have the dog die in
14   front of him at sea.
15   Q   Anything else about the dog's death that
16   you consider significant?
17   A   Other than that he was attached to it and
18   he saw the animal die in the accident, no.
19   Q   You note that while they were in the life
20   raft --
21   A   Sorry.
22   Q   You note in your report that while they
23   were in the life raft before they were rescued by
24   the helicopter sounds were heard coming from another

Page 54

1    Gloria Small
2    boat, did Mr. Stepski tell you anything more about
3    those sounds?
4    A   I don't remember.
5    Q   And you note that panic set in and he
6    thought they would be hit again.
7        Is that what he told you?
8    A   I guess so.
9    Q   Why did he think they would be hit again?
10       MR. HEALEY: Object to the form.
11   Q   If you know?
12   A   I would assume if they were just hit once
13   here they could be hit again.
14   Q   Did he tell you that or is that just
15   surmise on your part?
16       MR. HEALEY: The answer was I assume.
17   A   I assume.
18   Q   Okay.
19       Did he tell you that in addition to the
20   compass and epirb the other supplies, they had a at
21   least one flare with them?
22   A   No, I don't remember that at all. I don't
23   think he said that.
24   Q   Did he indicate that he or the other men

Page 55

1    Gloria Small
2    in the life raft attempted to signal the other boat
3    through a noise they heard while they were waiting
4    in the life raft?
5    A   I don't remember that.
6    Q   Is that something that you would 1 someone
7    in Mr. Stepski's situation to try to do to signal
8    any passing boat in order to gain their attention?
9        MR. HEALEY: I object. You can
10       answer. I'm just making an objection
11       saying I think it's improper question.
12       I don't decide that, I don't think it
13       is a proper question, but if you can
14       answer this question as to guess what
15       somebody else is going to be doing,
16       are you an expert in coast guard and
17       all, no. I don't see any basis. I've
18       I said more than what I should --
19       MR. UNGER: If you would not explain
20       the basis for your question I'd
21       appreciate that. Just for the doctors
22       benefit this is lawyer's stuff. If I
23       ask a question that Mr. Healey thinks
24       is improper he has an obligation on

Page 56

1    Gloria Small
2        the part of his client to preserve an
3        objection on the record and the judge
4        at some later time can make a ruling
5        whether or not your answer to the
6        question can be used in the case so.
7    A   Am I required to answer?
8        MR. HEALEY: If you can.
9    A   What was the question?
10   Q   The question was, essentially, would you
11   expect that in a situation; such as, Mr. Stepski
12   found himself in where he was in a life raft and he
13   had a flare and he heard a noise from another ship
14   that he would try to signal a ship as it passed by?
15   A   Again, it could go both ways. You could
16   be so paralyzed from fear that you don't respond or
17   you think one boat did it this one might or respond
18   the other way they might help me.
19   Q   Did Mr. Stepski ever indicate that he was
20   paralyzed by fear?
21   A   Mr. Stepski doesn't talk like that.
22   Q   He doesn't what?
23   A   Talk like that.
24   Q   Not having, perhaps, used those specific

Page 57

Gloria Small

2 words, did you get the impression that Mr. Stepski
3 was so paralyzed by fear that he was not capable of
4 taking action?
5     A    He might have used the words he was in a
6 state of shock. On the other hand, we have scene
7 the action that he did take which was very
8 effective, but again we aren't inside of his mind
9 and he would have been in control of getting the
10 things from the boat where as if you have just been
11 struck by a boat that was a whole different
12 situation. If I had just been hit by a boat is this
13 next boat going to hit me is different from let me
14 swim around and get my stuff.
15    Q    So anything you and I or anybody else were
16 to say about it would be speculation?
17    A    I would think so.
18    Q    Okay.
19         Continue with your --
20    A    Well, except that all right it's quite
21 obvious that this man wanted to save his life and
22 the life of his, you know, we can conclude that he
23 would have done what he thought was necessary if he
24 was thinking clearly to do what would save them, and

Page 58

Gloria Small

2 if he didn't we would wonder what was going on in
3 his mind, you know.
4     Q    Okay continuing with the June 5th note,
5 you indicate that they were flown into the coast
6 guard station in Cape Cod, his wife was you called,
7 did he tell you his wife drove up to Cape Cod and
8 picked them up?
9     A    I don't know if he told me but I did read
10 the newspaper article which indicated that.
11    Q    Then you say that the coast guard
12 determined from the records which boat it must have
13 been.
14         Did Mr. Stepski tell you that?
15    A    Yes.
16    Q    And did he indicate where he obtained that
17 information?
18    A    He just told me the coast guard determined
19 some records. I don't know which records.
20    Q    You don't know where he got that
21 information from?
22    A    No.
23         Other than what he said.
24    Q    You didn't inquire?

Page 59

Gloria Small

2     A    No.
3     Q    Okay.
4          Then you say, "Mike did not know what to
5 do."
6          About what?
7     A    With his life.
8     Q    Okay.
9          In terms of his whether to continue being
10 a commercial fisherman?
11    A    Correct.
12    Q    As opposed to seeking some other form of
13 employment?
14    A    Yes.
15    Q    You note he did go out fishing three times
16 since the accident with other fishermen?
17    A    Um hum.
18    Q    Those were his words?
19    A    Yes, assume so.
20    Q    Did he also tell you that he had two other
21 boats besides the boat that sank?
22    A    I think he talked about some other boats.
23    Q    Did he tell you that within about a week
24 of this collision he was taking one of his other

Page 60

Gloria Small

2 boats out fishing?
3     A    I don't remember about a week, but he did
4 talk about some fishing that he did where he stayed
5 very, very close to shore.
6     Q    On the Long Island Sound?
7     A    I don't remember which shore.
8     Q    Did you get a sense of how often or how
9 soon he was back out fishing?
10    A    I don't know.
11    Q    Did you get a since of how long he stayed
12 out on those trips?
13         MR. HEALEY: Object to the form. "Did
14         you get a sense," I don't know what
15         that means.
16    A    All I remember is that he did some
17 fishing. I think there were some other boats he was
18 wondering how to manage his finances and he talked
19 about staying close to the shore.
20    Q    Was one of his concerns that he didn't
21 have any insurance for his boat beyond the $35,000
22 value that he told you about?
23    A    He, I guess mentioned that once, yes.
24    Q    He told you -- did he tell you that he

15 (Pages 57 to 60)

**Page 61**

```
 1        Gloria Small
 2   didn't have any kind of insurance that would pay for
 3   the rest of the value of the boat or to replace the
 4   income he would lose until he was able to replace
 5   that boat?
 6       A   I don't remember the details, but he did
 7   talk about how he was going to manage this and
 8   manage that and just worried that it was not going
 9   to work out.  I do remember him talking about, um,
10   some new rules about how much he could catch and how
11   much he couldn't catch and how those new rules were
12   going to be a problem for him in terms of how he was
13   going to go fishing and how he was going to make a
14   living even if he did decide to fish.
15       Q   Did he say anything else with regard to
16   any type to financial problems?
17       A   Yes, he went on and on about financial
18   problems.  I don't remember the details how he was
19   going to support his wife, what he was going to do
20   should he do this should he do that should he do the
21   other thing.
22       Q   Did he discuss an alternative career?
23       A   One of the things he talked about was
24   maybe a operating a fish store.  There were other
```

**Page 62**

```
 1        Gloria Small
 2   things he liked that he started to talk about.  I
 3   don't remember what they were.  He would come back
 4   to fishing.  He liked the independence, he liked the
 5   aloneness of the -- there was something special
 6   about being a fisherman but he was thinking of what
 7   else he could do and what else he would do given his
 8   level of education.
 9       Q   When he went out on other people's boats
10   you note that he found it difficult to be just a
11   crew?
12       A   Yes.
13       Q   What did he find difficult about being a
14   crew as opposed to being a captain?
15       A   Just that he is used to being in charge
16   and being a leader.
17       Q   And you also said that he was
18   hypervigilant, very hypervigilant as you put in your
19   report.
20           Was that his word or your word
21   "hypervigilant"?
22       A   I don't know, probably my word.
23       Q   Why did you indicate he was hypervigilant?
24       A   I was using the word to describe the
```

**Page 63**

```
 1        Gloria Small
 2   behavior that he was reporting.
 3       Q   What behavior was that?
 4       A   Feeling jumpy looking around not being
 5   able to relax, constantly on the alert for danger.
 6       Q   Not being a fisherman yourself, but just
 7   from your own general sense is that a normal type of
 8   reaction after you have been in an accident to
 9   become more aware of possible sources of danger and
10   to pay more attention?
11       A   There's a difference between paying
12   attention and hypervigilance.
13       Q   What expressly did he say that took him
14   over the line from paying better attention to being
15   hypervigilant in your view?
16           MR. HEALEY:  Objection to what did she
17       said.  She already told you what she
18       observed, is this a different
19       question?
20           MR. UNGER:  It's a different question
21       she can answer?
22           MR. HEALEY:  He said, what did he say
23       it's limited to that because you
24       already described --
```

**Page 64**

```
 1        Gloria Small
 2       A   I don't remember what he said.  I
 3   summarized in my own words.
 4       Q   What did he do in your words --
 5       A   I think I just told you that.
 6       Q   Let me just finish my question.
 7           What was it about Mr. Stepski's statements
 8   or actions in your view that took him over the line
 9   from paying more attention following an accident to
10   being as you described him hypervigilant?
11           MR. HEALEY:  Object, you've asked it
12       she answered it.  She already told you
13       what are you asking.
14           MR. UNGER:  If the doctor will
15       acknowledge me we will get pass this?
16           MR. HEALEY:  To be fair now she
17       doesn't have to add anything, if she
18       has given you the full answer already;
19       right?
20           MR. UNGER:  You've got your objection.
21           MR. HEALEY:  I thought -- I'm just
22       saying I think in fairness she should
23       know -- she's.
24           MR. UNGER:  You have already coached
```

CHAIT DIGITAL            888.978.4336            chaitdigital.com

Page 65

Gloria Small

her enough, Tom.
MR. HEALEY: I am not trying to coach her because you are --
MR. UNGER: You are trying to coach her and I'd appreciate it if you stopped so she can answer the question and we can move on.
MR. HEALEY: Michael this statement you left this statement I don't appreciate you coaching her. I think you are over the line and unfair. We leave it like that and continue but...
Q   Can you answer the question, doctor?
A   Well, I don't feel coached.
     Could you state the question again?
Q   Sure.
A   At this point, I've lost the question.
Q   Okay.
     All I'm trying to find out is what based upon your session with Mr. Stepski caused you to believe that he had crossed the line from simply paying closer attention to what was going on after he had an accident to being as you described him

Page 66

Gloria Small

hypervigilant?
A   As I recall, I was sitting and listening to him and I was listening to him talk about the variety of his reactions. I don't remember what his reactions were, but in listening to him describe his reactions, I used today word hypervigilant to describe his reaction as he reported them.
Q   Okay.
     You indicate that he did not feel he could protect himself, in what way?
A   In writing this I think I was capturing my sense of a state of vulnerability about that was being expressed in him, and that vulnerability may have related to his sense of safety against forces larger than himself. It may have been related to his sense of being able to support himself and his wife.
Q   Sitting here today, you don't recall exactly what it was that you were thinking about when you wrote, "he is not be able to be there for his family?"
A   He was worried about his family, yes.
     I'm not sure what you are asking.

Page 67

Gloria Small

Q   His ability to be there for -- you wrote "him" but I assume you meant them?
A   Yes.
     Well he was also worried about a brother, he seemed, as I recall, very concerned about his brother and his family in general, and that he seemed to take care of his brother in some ways, and his wife. He seemed to be a leader taking care of many people, children and I'm not sure if he provided some opportunities for his brother to do fishing. And that opportunity may not have been there something like that.
Q   Went fishing with his brother out on his boat, do you know how many times that would have been went fishing with his brother out on his boat?
A   No.
Q   You recommended as a treatment plan individual therapy to work through the trauma?
A   Yes.
Q   You considered EMDR. That's the EMDR we were talking about before?
A   Correct.
Q   In terms of having individual therapy, can

Page 68

Gloria Small

you describe what you had in mind?
A   That he would attend sessions and on a regular basis that he would, um, attempt to work through, talk through the problems, his reactions, the whole situation until he was able to function in a way that he felt normal himself.
Q   How often did you envision these sessions?
     MR. HEALEY: Each session or...
Q   How frequent?
A   I like to work with people on a weekly basis. We probably spoke about that, I also make myself available to people who are feeling in crisis to come in more often or talk on the phone.
Q   Do you believe that, um, had Mr. Stepski seen you on a regular basis early on he would have had a very good chance of having a favorable outcome?
A   Can you...
Q   Had --
A   Can you repeat the question.
Q   Had Mr. Stepski seen you regularly from July 8th for whatever period you think would have been appropriate, do you anticipate that he would

17 (Pages 65 to 68)