Page 69

Gloria Small

```
 2  have had a favorable outcome in terms of his
 3  treatment?
 4      A   Probably.  I've worked with many people
 5  who suffer from trauma and they have been
 6  successfully treated.
 7      Q   Did Mr. Stepski tell you why he waited a
 8  month and a half after the accident before he first
 9  saw you?
10      A   Not that I recall.
11      Q   Did you discuss that with him?
12      A   (Inaudible.)
13      Q   Did you answer, I didn't hear you if so?
14      A   I don't think we ever spoke about that.
15      Q   Okay.
16          You next saw Mr. Stepski on July 12th,
17  2004?
18      A   Correct.
19      Q   So this was four days later?
20      A   Correct.
21      Q   He said he had had several dreams since
22  you last saw him one of which his dog was still
23  alive and the other he was snugged in a small space
24  under water and died.
```

Page 70

Gloria Small

```
 2          Were those dreams significant in your
 3  view?
 4      A   I don't know what you mean by
 5  "significant," there is a difference between a dream
 6  and a nightmare and that theoretically the purpose
 7  of the dream is to protect sleep, and so we can have
 8  a bad dream by our sleep is protected.  Where a
 9  nightmare is such that we wake up in the middle of
10  the night and our sleep is disturbed.  So to that
11  extent a nightmare is more significant event
12  particularly to an adult.  Many adults do not have
13  nightmares, more typical in children.  So in terms f
14  the content, dream materials that comes out at night
15  that's reflective of our thoughts.
16      Q   Which word did he use dream or nightmare?
17      A   He probably used both.
18      Q   Do you know exactly?
19      A   I'm sure he used both because that is
20  significant that one is a ream and the other is a
21  nightmare.  He may not have known that.  In other
22  words, to a lay person a frightening dream maybe the
23  same as a nightmare but technically a nightmare and
24  dream are different.
```

Page 71

Gloria Small

```
 2      Q   What I'm trying to find out did he tell
 3  you, doctor, I had -- let me tell you about the
 4  dreams one the dog was alive the other was a bad
 5  dream or did he say the other was a nightmare?
 6      A   As I'm saying, I don't know this is a
 7  different --
 8      Q   Okay.
 9      A   Whether he used I had two bad dreams, I
10  don't know but the difference in his story was in
11  one he slept the night through and the other he woke
12  up.  He might have said I woke up and I was unable
13  to sleep and then I may have used the term
14  nightmare.
15      Q   You spoke again of this hypervigilance.
16          Why did you talk about that?
17      A   The sentence following that, "he looks
18  around all the time for danger."
19      Q   "Often related to automobiles," it goes
20  on.
21          Right?
22      A   Yes.
23      Q   And is that associative of the collision?
24      A   He is reporting his reaction of looking
```

Page 72

Gloria Small

```
 2  around all of the time for danger.  One of the
 3  things about emotions and fears is that they
 4  sometimes generalize.  He was probably more relating
 5  to an automobile than a boat.  So a began to looking
 6  around for danger and generalized.
 7      Q   Your thought and thought now --
 8      A   Well, that's what he said.
 9      Q   He was looking around?
10      A   Often related to automobiles.
11      Q   Okay.
12          Well, I'm trying to find out is what does
13  that mean in terms of his disorder?
14      A   Well, hypervigilance looking around for
15  danger, feeling unsafe, feeling vulnerable are
16  experiences that many people experience after they
17  have been through a traumatic experience.
18      Q   The first time you saw him on July 8th you
19  noted that he was suffering from posttraumatic
20  stress disorder.
21          Was that your diagnosis that you arrived
22  at the end of your first session?
23      A   Correct.
24      Q   Did he ever use the words posttraumatic
```

18 (Pages 69 to 72)

Page 73

Gloria Small

```
 2  stress disorder --
 3     A   Not that I recall.
 4     Q   -- or PTSD?
 5     A   Not that I recall.
 6     Q   In your first visit with him, he also
 7  talked about his background and his history.
 8        Correct?
 9     A   Yes.
10     Q   And you noted there was no trauma in his
11  background.
12        Did he tell you during that first visit
13  that he had been involved in a significant
14  automobile accident a couple of years beforehand?
15        MR. HEALEY: Object "significant."
16     A   No, I don't think so.
17     Q   Did he tell you about any automobile
18  accident he had been involved in?
19     A   He may have but I don't remember. It says
20  here, it says he was involved in an accident.
21     Q   Right.
22        On the second visit, he told you that he
23  had remembered he had been in an accident where the
24  car slid on black ice and hit a tree?
```

Page 74

Gloria Small

```
 2     A   Um hum.
 3     Q   My question is: Did he tell you about
 4  such an accident from on the first I visit?
 5     A   I don't think so.
 6     Q   Okay.
 7        The initial intake note says his wife says
 8  that he had had six close calls.
 9        What were those close calls?
10     A   I don't know.
11        In looking at the notes it was either he
12  or Roderick, one of them. Maybe it was that he was
13  invited to go out to fish when he was in high school
14  and didn't and the people who did go died at sea.
15     Q   That was him?
16     A   That was him.
17     Q   Was that a significant event?
18     A   Of course.
19     Q   Would that be traumatic?
20     A   Of course.
21     Q   Did he talk about how he felt after that
22  incident in your first session or any session?
23     A   Probably. Probably.
24     Q   You don't remember?
```

Page 75

Gloria Small

```
 2     A   You know, it's too bad I lost all of those
 3  notes.
 4        I would think he probably did.
 5     Q   Okay.
 6        Do you remember any specifics about what
 7  you discussed concerning that incident beyond the
 8  what we've discussed?
 9     A   I can only imagine. I can't really
10  remember. I can imagine but I don't think that's
11  useful.
12     Q   No. I just want to stick to what you do
13  recall; okay.
14        When you say his wife says that he had
15  been in these six close calls, when did you speak to
16  the wife?
17     A   Well, I had spoken to his wife on numerous
18  occasions on the telephone. I never met with her in
19  person. Often they were around scheduling issues,
20  he would ask me to speak to her around scheduling.
21  I don't know if he was reporting that she said or
22  she said. I don't think we had that kind of
23  dialogue, she never came into the session, I never
24  saw her in person. Whether she volunteered this on
```

Page 76

Gloria Small

```
 2  the phone, it's probably him saying that his wife
 3  told him.
 4     Q   Did you inquire further as to what the
 5  other five close calls were?
 6     A   Not that I remember. It was along time
 7  ago.
 8     Q   Would it be significant or important to
 9  find out what those other close calls were in trying
10  to establish his background?
11     A   Well, I probably did.
12     Q   You might have, but you just don't -- if
13  you did, you don't remember what he said?
14     A   We don't have the records. It was a long
15  time ago. I don't remember.
16     Q   You have the record of the first visit
17  with him; right, and that's where the six close
18  calls is mentioned?
19     A   Right.
20     Q   In a first session that you had with him,
21  he related about he fishing trip that he didn't go
22  on where the people drowned or died.
23        What I'm asking now specifically is in
24  that first session did you ask about what the other
```

19 (Pages 73 to 76)

Page 77

Gloria Small

1  five close calls were?
2  A  Probably not. Wait a minute. Did he
3  mention that in the first session?
4  Q  Yes. It's in the background and history?
5  A  Where?
6  Q  "There's no trauma in his background,
7  although, his wife says he had six close calls."
8  A  Oh, I see.
9  Q  He does remember one when he was in high
10 school, et cetera?
11 A  It would be my custom or habit or my way
12 of working with people would be to work with them on
13 the problem that they were presenting at the moment.
14 If This was a overwhelming problem, later on we
15 might explore those other problems. This is the one
16 he was coming similarly with the woman I was telling
17 you about where there was a place of complex trauma
18 she had been traumatized as a child, but then just
19 triggered a whole series of reactions. We dealt
20 with the present situation and worked backwards.
21 Q  Sitting here today without your notes,
22 there's no way of knowing whether you ever got back
23 to asking Mr. Stepski about what those other five

Page 78

Gloria Small

1  close calls were?
2  A  Well, that's not the way I would have
3  conducted therapy because it's not a question answer
4  thing. It really has to go with the material a
5  person is working through and bringing. If he had
6  brought it up, we would have responded to it. If he
7  hadn't, presumably it would have come up or with the
8  EMDR if it was traumatic it wold have come up. We
9  would have dealt with the material he presented
10 rather than my bringing material up for him.
11 Q  So just so I'm clear, you don't remember
12 if you discussed or not those other five close
13 calls?
14 A  No, we would have to ask him.
15 Q  Okay. You saw him on that first visit.
16 He told you that his wife was pregnant?
17 A  Um hum, yes.
18 Q  "Expects a baby in the next week or so."
19 A  Yes.
20 Q  They also had a one-year-old daughter at
21 that point.
22    Did he seem happy about his wife being
23 pregnant?

Page 79

Gloria Small

1  A  Um, may I ask a question?
2     THE WITNESS: Do I have to answer that
3     question?
4     MR. HEALEY: If you know, yes, you do
5     have to answer it. You cannot guess
6     not make it up. If you can't answer
7     it, you can't answer it.
8     THE WITNESS: I can answer it but it
9     seems irrelevant to this situation you
10    are concerned with, but I suppose he
11    said you can talk to me but so you can
12    talk to me.
13 Q  A lot of my questions seem irrelevant.
14    If you can answer the question, I'd
15 appreciate it if you would?
16 A  Did he seem happy?
17 Q  Yes.
18 A  No.
19 Q  Did he discuss beyond the mere fact that
20 his wife was pregnant anything else about her
21 pregnancy?
22 A  Aside from the fact she was pregnant, did
23 he talk about anything else?

Page 80

Gloria Small

1  Q  Yes.
2  A  No, not that I recall.
3  Q  I mean why are you saying he didn't seem
4  happy about his wife being pregnant?
5  A  My sense is that there were tenses in the
6  relationship.
7  Q  Would -- in the visits that you had with
8  Mr. Stepski, did you get into tensions he was having
9  with his relationship to his wife?
10    MR. HEALEY: Object to the form. She
11    said she made a conclusion it's not a
12    fact.
13 Q  I'm asking if you inquired or discussed
14 with Mr. Stepski any tension he had in his
15 relationship with his wife?
16    MR. HEALEY: Object to the form.
17 A  Maybe you can ask the question again or...
18 Q  You saw the man nine times.
19    Right?
20 A  (Inaudible.)
21 Q  Over a period of time during any of those
22 nine visits, did you have discussions with him
23 concerning problems he was having with his wife in

## Page 81

1  Gloria Small
2  their intrapersonal relationship?
3   A   He spoke about his relationship with his
4  wife.
5   Q   And what did he relate to you about this
6  relationship with his wife?
7   A   He was in some conflict.
8   Q   Was there a conflict that excised prior to
9  the collision in May of 2004?
10  A   Yes.
11  Q   What was the source or the cause of that
12 conflict?
13  A   Probably, um, dealing with being married.
14 Being married is not the easiest thing for anybody.
15  Q   Did he get into any specifics about what
16 it was the conflict in his relationship?
17  A   I don't remember.
18  Q   Going back to your note from July 12,
19 2004, you wrote that "he feels safe at home."
20  A   Yes.
21  Q   His words?
22  A   Um, perhaps he was responding to a
23 question of mine.
24  Q   You don't recall?

## Page 82

1  Gloria Small
2   A   Well, I think I asked the same question to
3  Gael Roderick. It's a question one asks in relation
4  to EMDR which is there a place in the world you feel
5  safe.
6   Q   Okay.
7   A   Because often trauma destroys one's
8  feeling of safety and having a place where one feels
9  safe is useful.
10  Q   Did he indicate that he feels safe
11 anywhere else?
12  A   That probably wasn't the question, I was
13 trying to help him find a place to feel safe.
14  Q   Okay.
15      You wrote he was having a hard time
16 thinking of work including deep seas again?
17  A   Yes.
18  Q   Can you tell me about your discussion or
19 that topic?
20  A   Yes.
21      As I said earlier, he talked about
22 swimming -- fishing near the shore but having fears
23 about going out into the deep.
24  Q   Was there anything you might have said to

## Page 83

1  Gloria Small
2  elaborate a little bit on that statement?
3   A   I have to say that's not what I would have
4  done because I'm not an attorney. I'm a therapist
5  so as a therapist my response would have been to try
6  to help him work through his feelings rather than to
7  grill him about them.
8   Q   I understand, doctor, we have a different
9  role in connection with Mr. Stepski.
10  A   So the questions in therapy are very, very
11 different from questions legally. A therapist uses
12 questions as one of a variety of techniques to help
13 a patient. Um, usually questioning is kept at a
14 minimum which is why you would see more questioning
15 at an intake than you would...
16  Q   The sense I get then from you is that you
17 let Mr. Stepski talk and basically you excepted him
18 at his word for whatever he said, and you tried to
19 help him in terms of working through whatever
20 problems he was discussing?
21  A   That doesn't work. Your way of
22 formulating it doesn't exactly work because there is
23 a difference between therapy and law. In law, you
24 deal with the rational, the reasonable, the

## Page 84

1  Gloria Small
2  intellectual. In therapy, we deal with the
3  emotional not very often that a person speaks at the
4  rational.
5      What we are interested in is the feelings
6  so that people can get to integrate their emotional
7  and there rational being because mental health is
8  one's thinking and feeling and behaving are all
9  meshed. It's a very different conception.
10  Q   Is it important to you as a therapist that
11 the patient tell you honestly factually what
12 happened to them?
13  A   Is it important for them?
14  Q   Is it important to you as a therapist if a
15 person tell you honestly, factually the
16 circumstances of whatever their trauma was or
17 whatever caused their trauma?
18  A   I would assume that unless the people are
19 lying when they come to me they present their
20 version of reality. Their reality as they
21 experience it, I except understand and listen to
22 their version of reality as they give it, and then
23 we work with it over time.
24  Q   Okay.

Page 85

Gloria Small

A  For understanding not for them to tell me the truth or not the truth. Sorry.
Q  That's fine.
    The second session, did you have any discussions about other alternative careers again with Mr. Stepski?
A  I don't remember, but in much of the work that I spent with him he did talk about other things he could do. How serious he was, I don't really know but he was talking about other things.
Q  Now, again in that second session he told you about the accident where he hit the tree, what was significant, if anything, about that?
A  Well, I would imagine it felt like a near death experience.
Q  Anything else that you recall commented upon in terms of that incident?
A  I don't remember anything.
Q  Now, you also saw Mr. Stepski a week later July 19th.
    Do you remember anything about that therapy session?
A  You know, I don't remember the other

Page 86

Gloria Small

sessions other than we explored personal relationships, family relationships, work, money, the trauma, possibly his concern about, um, Gael Roderick and the other man whose name I don't remember.
Q  Did you discuss anything in those other sessions that you can recall?
A  He may have talked a little bit about his growing up and his father.
Q  In terms of the personal relationships, what did you discuss, any specifics?
A  As I said, there were issues that he talked about in relation to his marriage, issues in relation to his brother.
Q  What the issues were with respect to his marriage did he talk about that?
A  We talked about that earlier, I can't think of any other.
Q  Other than he was not happy that his wife was pregnant?
A  He didn't say he wasn't happy that his wife was pregnant.
Q  But it seemed that way?

Page 87

Gloria Small

A  I don't think he was unhappy about the pregnancy.
    There were tensions. I had the sense that perhaps they didn't have the necessary skills, you know, to get a smooth flowing marriage. Many people don't but I think he was happy about the baby.
Q  What about his personal relationship with his brother, do you recall?
A  Yes.
    MR. HEALEY: Let me -- she told you about that. You are going over and over of that note. Are you now asking her to try to remember. This is something she told you about what is in the notes, what she recollects in these visits that you don't have any notes on. Is that what where are directing her to?
Q  That is fine or if in the first two sessions that you do have notes for that you we haven't discussed so far. I will include that, as well?
A  What were you asking about his brother?

Page 88

Gloria Small

Q  Yes, during those nine sessions you had --
A  Yes, his brother, his parents were concerned about his brother and wanted him to help take car of his brother, watch out for his brother. His brother had a serious addiction. Mike, as I got to experience him, was a caring person. Even though he may have had difficulties with his wife, he seemed be a very caring person and he would have done, um, all he could to help his brother. And I think we probably spoke about what I thought he might be able to do to help his brother.
Q  What other discussions did you have with him concerning his intrapersonal relationships?
A  As I said earlier, my experience of Mike was he was a caretaker, leader. I think he was not only concerned about his own, you know, um difficulties, financial difficulties but also concerned about what this might mean to Roderick and Schober.
Q  During your sessions, did Mr. Stepski ever indicate to you that he didn't care whether he continued to live?
A  I don't remember that.

## Page 89

Gloria Small

Q During any of your sessions, did you hear from Mr. Stepski or get a sense that he had sort of given up in terms of his outlook on life?
A Not at that time.
Q What else about work-related matters and money related matters did you and Mr. Stepski discuss in those other sessions?
A Could you ask the question again?
Q In the other sessions that you had, what else was said in terms of his work and, um, let me limit it we will limit it to work?
A Um, I think he was kind of inquisitive and very upset, I think he kept coming back to how could the boat not stop. He just kept coming back to that, how could the boat not stop.
And I think that affected his outlook, how could people do this in the world, how could they do this?
Q His sense of morality was harmed by this incident, is that what you are suggesting?
MR. HEALEY: Object to the form.
A I don't understand what you are saying.
Q I'm sorry.

## Page 90

Gloria Small

Did he indicate in anyway that he thought it was immoral that the boat that hit him didn't stop.
A I don't think he would have used the word immoral but he kept going back to it, how could they have done this.
Q Anything else about his --
A How could people do this I wouldn't do this, that kind of sense. He may have used the word irresponsible.
Q Anything else about his work that you remember discussing with him?
A I think he spent time, perhaps, in several sessions thinking about could he get more schooling, should he get more schooling, what would he do if he got more schooling, what other options would be open to him, could he afford to do anything different with an additional baby coming, with his wife, how should they look at there lives.
He seemed to be mulling doing some problem solving which is not uncommon for people to do in therapy.
Q Did he indicate he was making any progress

## Page 91

Gloria Small

in terms of solving his problems in the sessions?
A You know, no. I did not actually see him very many times, the times were very spread out and, um, as reported as he reported elsewhere it was not as useful as it may have been to him.
(Short break taken.)
Q What other significant items did Mr. Stepski bring up during the course of your therapy sessions with him?
A Other than the things we have discussed?
Q Yes.
A Nothing that I can recall.
Q Did you see Mr. Stepski at any time after February 2005?
A Let me just look at the -- no.
Q Had there been any contact with him at all since then?
A No.
Q Any contact with his wife since then?
A No.
Q Were you aware that Mr. Stepski and Ms. Stepski were in marital counseling?
A At the time I was seeing him?

## Page 92

Gloria Small

Q Subsequent to the time you were seeing him?
A Don't remember.
Q Do you believe that marital counseling would have been indicated for Mr. Stepski based upon your sessions with him and in which he talked about problems in his personal relationship with his wife?
A Um, maybe, yes, maybe no. Hard to tell.
MR. HEALEY: Off the record.
Q So your answer is as such because you don't have enough information to go on?
A No, that's not the reason.
Q What is the reason?
A Well, I think marriage therapy is indicated when it's clear that two people are fully committed to the relationship.
Q Was it your sense, then, that Mr. Stepski was not fully committed to the relationship?
A I wasn't sure.
Q You put down a diagnosis of PTSD in your initial intake report.
Is it your practice typically to include a diagnosis when you first see the patient?

Page 93

Gloria Small

A  Sometimes put down diagnostic impressions.
Q  Okay.
So when you wrote "Mike is suffering from posttraumatic stress disorder" that was a diagnostic impression?
A  No. It was more of a diagnosis than a diagnostic impression.
Q  Why do you believe you were able to make a diagnosis of PTSD of Mr. Stepski on that first visit?
A  Because a diagnosis in this case would hinge on two facts. One, the fact that a trauma had occurred, two and second, that the reactions to it were indicative of that disorder. So that both pieces were there, the trauma and the reactions.
Q  What reactions on Mr. Stepski's part were there that were indicative of PTSD on that first visit?
A  These other ones reported nightmares, difficulty sleeping, distressing recollections, memories, intrusive thoughts, shift in his feeling of safety, just about everything would be. Oh, and you can see my conclusion in Paragraph 3. I'm sorry

Page 94

Gloria Small

I'm talking about a summary. I was looking at the summary note.
Q  Just referring to your intake note?
A  Sorry. I was looking at the summary. Going back into the intake.
Q  What's your intake a notes of reactions that are indicative of PTSD?
A  Well, in the notes for one thing is that recorded is the lack of feeling of safety what I call hypervigilance, kind of, loss of sense of self, what to do with himself.
Q  Is that it?
A  Well, that seems to be as I wrote it down.
Q  Did you --
A  But, again, the intake note is for me not for...
Q  What else do you remember, then, from that first visit which was also an indicative reaction that would support the finding of PTSD?
A  He probably said he was having trouble sleeping this feeling of unreality.
Q  Anything else?
A  Nothing that I recall.

Page 95

Gloria Small

Q  Coming up with the diagnosis of PTSD, did you take into account that he had returned to fishing?
A  I'm sorry.
That wouldn't have had anything to do with it.
Q  Would?
A  No, that wouldn't have anything to do with it.
Q  Avoidance of the type of situation which gave rise to trauma in the first place, is that a symptom of PTSD?
A  It is, but not necessarily. I have worked with firefighters who are traumatized all the time, but they have do go back to work and they do, they are traumatized so are soldiers.
Q  In your summary of Clinical Contract third paragraph I think this is what you were referring to before initially with the question as to what reactions were indicative of PTSD?
A  Yes.
Q  You wrote in the third paragraph "Initially Mr. Stepski was suffering from acute

Page 96

Gloria Small

posttraumatic stress disorder."
Does he still suffer from or did he still suffer from posttraumatic stress disorder as of the last time you saw him in February 2005?
A  If you read you further, yes. If you read further into that chapter paragraph, and I was writing this for Weigel, Attorney Weigel at his request.
I was making a distinction between the initial diagnosis and the post and the longer term one. When I said his reactions have --
Q  So --
A  -- lessened for more than a three-month period. Therefore can be categorized as chronic rather than acute. The DSM makes a distinction between acute posttraumatic stress and chronic posttraumatic stress.
Q  In your view, he had PTSD in an acute form and subsequently it became a chronic form?
A  As far as I could tell, yes.
Q  Is there anything about, um, Mr. Stepski's sessions that you believe to be significant in terms of his symptomatology that we have not yet

Page 97

Gloria Small

discussed?
    MR. HEALEY: Object to the form. You don't want me to say anything, I won't I'm objecting to the form. If you can't figure that one out.
    MR. UNGER: We have your objection.
 A  I'm not sure what the question was.
 Q  Other than what we have discussed already, was there anything else from your therapy sessions with Mr. Stepski that you believe to be reactions on his part that are indicative of PTSD?
    MR. HEALEY: Same objection.
 A  Well, one thought comes to mind is that when we talk, again, about marriage sometimes when you add things when you additional stress and additional turmoil, troubles get magnified. So the accident, um, perhaps was an additional factor even if it wasn't presented that way in the marital distress.
 Q  Anything else?
 A  No.
    Just the thought, I think that subjectively I liked Michael Stepski, and I wished

Page 98

Gloria Small

that he would have stayed in treatment, but I think I kind of understood why it was difficult for him to do so.
 Q  Why do you believe that it was difficult for him?
 A  Well, I don't think it was that kind of help particularly of his culture. I think he didn't like the fact that he wasn't able to pay and that he didn't want to be indebted because he did try to pay me when he could, and given, you know, who I think he is, the person, that would be hard for him to sort of talk about weakness and as a vulnerability. That's my sense of it.
 Q  Do you have a sense of machismo that didn't allow him to go behind the hard exterior?
    MR. HEALEY: I object to a machismo. I think know but --
    MR. UNGER: She knows what it is.
    MR. HEALEY: Would a jury know? My objection is not that you can't handle it, not that I don't know, not that Michael isn't asking in good faith. I think the term machismo, I wish you

Page 99

Gloria Small

could narrow it to a lot of other people, it has a lot of meaning.
 Q  I'll change the question.
    Was your sense that there was a macho factor to him that didn't permit his feelings to get beyond the hard exterior shell?
 A  I would not use the word macho, I would use the word independence. I think there -- I think there was a lot of independence. I think in his culture men might use drugs or some other way of dealing with emotions rather than expressing them.
 Q  Did you get a sense that there was a stigma in his view toward being -- against being in therapy?
 A  I never got that sense, but I did get the sense of his wanting to be independent and solve his problems on his own.
 Q  Did he ever indicate to you that he was having flashbacks?
 A  Not that I recall, no.
 Q  Did you read the report prepared by Dr. Mariam?
 A  I did.

Page 100

Gloria Small

 Q  Do you have any comments on his report?
 A  I read the report, yes, I read the report with interest; and I wound up using that diagnostic tool the impact of event scale revised. I wound up -- seeing how many times in Dr. Mariam's report factors on that scale came up and there were many so that I found that of interest. The other thing I thought was interesting was the substance abuse or use and the relationship between posttraumatic stress disorder and substance use disorders. I found those things of interest.
 Q  Michael Stepski had substance abuse problems?
 A  In Dr. Mariam's report there are a number of times that flags were raised in my mind, alcohol, depression, the incidents with his wife.
 Q  Did you have any discussions during any of your sessions with Mr. Stepski concerning drinking?
 A  I don't think he was drinking at that time.
 Q  Did you ever discuss his alcohol use?
 A  We probably did because it was a problem for his father as I recall, and he was concerned

Page 101

1        Gloria Small
2  about his brother, and as I recall it wasn't an
3  issue at the time.
4     Q   Did you specifically ask him about his
5  alcohol or drug consumption?
6     A   I don't remember, but I probably did,
7  perhaps, not in that way. I probably said, you
8  know, given your family history is this an issue for
9  you, something like that; and he probably said no
10 because I don't remember talking about it but he was
11 concerned about his father and his brother but not
12 about himself.
13    Q   So maybe he did but you don't remember?
14    A   I don't think it was a problem for him at
15 that time.
16    Q   You don't remember specifically discussing
17 it with him?
18        MR. HEALEY: Objection, she has
19        answered that specifically just before
20        that.
21    Q   You use the word "probably" a lot, doctor.
22 I probably asked him, he probably said.
23    A   Let me go back, again, then, if I can.
24 I'm sure we spoke about his father's

Page 102

1        Gloria Small
2  problem and his brother's problem and my memory is
3  that we spoke about his relation to substances in
4  that context and it did not become a focus of
5  treatment.
6     Q   Is there anything else that you found
7  significant about Dr. Mariam's report concerning
8  Mr. Stepski?
9     A   No, just those two things.
10    Q   You saw Mr. Roderick how many times?
11        MR. HEALEY: Off the record.
12        (Off record.)
13    Q   Why don't you grab Mr. Roderick's records?
14    A   Okay.
15    Q   How many times did you see Mr. Roderick?
16    A   Five.
17    Q   It ranged from July 19, 2004 to your last
18 visit was November 16 of 2006.
19        Right?
20    A   Correct -- no, November 21st.
21    Q   Sorry. November 21?
22    A   Yup.
23    Q   So you saw him three times in 2004?
24    A   Yup.

Page 103

1        Gloria Small
2     Q   And waited -- he waited a little more than
3  two years before he saw you again for two visits in
4  November of 2006.
5        Right?
6     A   Yes.
7     Q   Well, referring to your intake note on
8  Mr. Roderick, you first saw him after you had seen
9  Mr. Stepski twice.
10        Correct?
11    A   Yes. I think that's correct.
12    Q   You saw Stepski July 8th and 12th and
13 19th?
14    A   Correct.
15    Q   Under "presenting problems," we just have
16 "Trauma was in boat with Mike. It was crashed into
17 by freighter on May 22, 2004."
18        Was there anything that Mr. Roderick told
19 you about the happening of the accident that had not
20 been told to you by Mr. Stepski?
21    A   I don't remember. See I do this for
22 myself so I was just presenting the problem but I
23 did not go into detail.
24    Q   Oh. Do the facts of the traumatic events,

Page 104

1        Gloria Small
2  are they significant in terms of the therapy at all?
3     A   We had this discussion before. I can't
4  quite answer that question the way you are putting
5  it.
6     Q   If you have a rape victim, do you treat
7  that patient any differently than you treat somebody
8  who is involved in a automobile accident or someone
9  who had been involved in a boating accident?
10        MR. HEALEY: Object to the form.
11    A   Well, you take the person coming with what
12 they come with. I can't --
13        MR. HEALEY: I'm not suggesting that's
14        an answer --
15        MR. UNGER: Don't cut her off.
16        MR. HEALEY: What would -- I didn't
17        cut her off. I suggested that was an
18        answer because your question is
19        idiotic, it's apples and oranges.
20        There's no way to ask what happened to
21        a rape victim. I am not coaching.
22        Sometimes Mike take it in the spirit
23        it's given. Sometimes your question
24        is not a good question. I'm not

26 (Pages 101 to 104)

Page 105

Gloria Small

```
 1   attacking you as a lawyer, I have
 2   lousy questions.  I listen when
 3   somebody tells me I'm in error and get
 4   it off.  I'm just trying to tell you
 5   that question is so far up in the air.
 6   If she can't answer it, it cannot be
 7   taken into court.  I'm not attacking
 8   you, not talking about your competence
 9   everybody trips sometimes, I think you
10   have on that one.
11        MR. UNGER:  You are entitled to your
12        opinion, Tom.
13   Q    What I'm trying to find out is do you
14   approach your therapy differently from patient to
15   patient based upon what the experience is the
16   patient had in terms of a traumatic event?
17   A    Could you ask it again.
18   Q    Sure.
19        Do the facts of the specific trauma that
20   each patient underwent affect how you go about
21   treating them in therapy?
22   A    It is the experience that they are
23   bringing not the facts that we deal with.  The facts
```

Page 106

Gloria Small

```
 1   maybe embedded in the experience, but it is the
 2   experience that they are bringing.
 3   Q    Did you have the same agreement with Mr.
 4   Roderick in terms of payments in you had with
 5   Mr. Stepski?
 6   A    Not exactly.
 7   Q    Tell me how they differed?
 8   A    I understand somehow either from
 9   Mr. Stepski or Gael, himself, that he could not
10   afford to pay and it would be paid by somebody else
11   someday, where as Mike Stepski did attempt to pay
12   what he could.  So that basically I've seen them
13   pro-bono at this point with the expectation that I
14   would be paid someday when the case got settled.
15   Q    Okay.
16        Is it fair to say that Mr. Roderick's
17   personal relationship with the mother of his child
18   was in not so great shape prior to this accident?
19   A    Yes.
20   Q    And did Mr. Roderick ever indicate to you
21   that the accident had caused any further negative
22   impact upon his relationship with the mother of his
23   child?
```

Page 107

Gloria Small

```
 1   A    No, not that I can read here.
 2   Q    As I see in your notes, Mr. Roderick spent
 3   a good deal of his time in his discussions with you
 4   talking about the problems he was having with the
 5   mother of his child?
 6   A    Yes.
 7   Q    And they had some kind of whacky
 8   relationship, if you will excuse the use of that
 9   word, unusual living arrangement.  Mr. Roderick was
10   friendly with the former husband?
11   A    Yes.
12   Q    Now, in terms of his experiences
13   concerning his post accident -- strike that.
14        In terms of Mr. Roderick's post accident
15   experiences gone, he had gone out fishing a number
16   of times sometimes with his father.
17        Do you know how often when he started
18   going back fishing?
19   A    No.
20   Q    Was that discussed?
21   A    I don't remember.
22   Q    You note that he had felt extremely
23   nervous you wrote, was that his words?
```

Page 108

Gloria Small

```
 1   A    I think it's his words.
 2   Q    Did he explain what was making him
 3   nervous?
 4   A    That's what I wrote down there scared that
 5   the boat would crash.
 6   Q    Do you know if he remembered the sound of
 7   the collision?
 8   A    Yes.
 9   Q    What about that was significant?
10   A    I thought that was very interesting
11   because when we think about a traumatic reactions,
12   we often think about recurring images.  So I found
13   this fascinating that he had had reoccurring
14   auditory because he couldn't see.  I thought that
15   was a very interesting reaction.  Then he talks
16   about a visualizing because as humans in our society
17   we are more visually oriented so as an auditory it
18   was interesting but he used a number of perceptions.
19   He uses hearing and sight and perceptions where you
20   are standing I think that's proprioception.
21   Q    Right.  Okay.
22   A    So he seem to process things.
23   Q    He indicated that he believes if had been
```

CHAIT DIGITAL        888.978.4336        chaitdigital.com

Page 109

```
 1            Gloria Small
 2   situated elsewhere on the boat he may have been
 3   struck and perhaps killed.
 4      A   Um hum.
 5          I'm sorry, yes, that is what I wrote.
 6      Q   Was that significant to you at all?
 7      A   Yes.
 8      Q   Why is that?
 9      A   When we think about trauma and
10   posttraumatic reactions, then the visualizing of
11   this and then I would have been dead is pretty
12   traumatic.
13      Q   He told you for the first three or four
14   weeks he had a difficulty sleeping but was able to
15   sleep as of the time you saw him July 19?
16      A   Um hum.
17      Q   Is that significant in anyway?
18      A   Well, yes, his body seemed to be adapting
19   and he seemed to be doing okay at that point.
20      Q   In terms of his body, also his mind was
21   adapting, as well, and that he was able to go to
22   sleep and stay asleep?
23      A   He was able to sleep.  Our emotions are
24   physical events in our bodies.  So we very often
```

Page 110

```
 1            Gloria Small
 2   react differently.  So thinking is different from
 3   our body reacting.
 4      Q   So his body was adapting?
 5      A   His body was calming down.  When a body is
 6   in stress it's in a state of emergency, the
 7   adrenaline.
 8      Q   Just so I understand where you are coming
 9   from, the body and mind are two separate things or
10   are they connected.
11          Can you explain it to me somehow?
12      A   I'm laughing because the mind body dilemma
13   is a dilemma for philosophers if you ask me.
14      Q   I'm looking for your opinion and not the
15   100's of books that have been written on it.
16      A   I have a very concise way of looking at
17   these things.  As humans, we respond three ways,
18   with our behavior, with our thoughts and with our
19   feelings.  They are like burners on the stove,
20   thinking burner, feeling burner and behaving burner.
21   They each have their own knob and they each operate
22   differently and together they form the way we
23   function.
24          It's an interesting way to think about it,
```

Page 111

```
 1            Gloria Small
 2   and emotions and feelings operate in coordination
 3   with our thoughts, and a truly integrated person has
 4   access to their thoughts, their feelings and their
 5   behavior.  That's the truly integrated person, if
 6   you find one let me know.  They are all going one
 7   way.
 8      Q   Like in law we call it the ordinary
 9   reasonable man.  If I ever met that guy on the
10   street, I'd be shot.
11          Going back to Mr. Roderick and his
12   sleeping, in layman's terms it was a good sign that
13   he is getting better because he is not having
14   problems sleeping some weeks after the accident when
15   he said he had been having problems right after the
16   accident?
17      A   Right.
18      Q   I have to break these things down to a
19   very simple level for me.
20          You also noted in your intake that he
21   wasn't thinking about the accident very often at
22   that point?
23      A   No.
24      Q   Again, in layman's terms, that's another
```

Page 112

```
 1            Gloria Small
 2   good sign?
 3      A   Yes.
 4      Q   That he is getting better?
 5      A   Yes.
 6      Q   So most often he would be thinking about
 7   the accident when he was questioned by others?
 8      A   Yes.
 9      Q   Logical.  Right?
10      A   Yes.
11      Q   And as for the place in the world where he
12   felt safe.
13          He indicated it was his father's boat.
14   right?
15      A   Yes.
16      Q   And he still goes there sometimes by
17   himself?
18      A   Yes.
19      Q   You wrote?
20      A   Um hum.
21      Q   Did he indicate why he goes there?
22      A   Well, I assume to feel safe.  Again this
23   question is the same type of question that was meant
24   for me as in trying to help these people determine
```

CHAIT DIGITAL
chaitdigital.com                              888.978.4336
b8cd7760-160e-4dc7-ba39-497b34a717a1

Page 113

1    Gloria Small
2    how they can feel safe and where.
3        Q    Sure. I understand.
4            On your treatment plan, you indicated
5    individual therapy was necessary to process trauma
6    and posttraumatic actions?
7        A    Um hum.
8        Q    Did you at that time have a diagnose of
9    PTSD for Mr. Roderick?
10       A    I didn't put it down here.
11       Q    So does that mean you hadn't settled on a
12   diagnosis or PTSD?
13       A    Not necessarily.
14       Q    Had you settled -- had you considered
15   there might be some other type of disorder; such as,
16   anxiety disorder or something else or were you
17   considering anything else?
18       A    Again, I was just presenting what he
19   presented in terms of his reactions that would have
20   been conducive to posttraumatic stress reaction, but
21   they seemed to have been fading at least in this
22   intake.
23           So I might have, perhaps, I wasn't
24   consistent maybe I needed someone to review it and

Page 114

1    Gloria Small
2    say you are not consistent. I don't know, I wasn't
3    consistent as the Stepski intake.
4        Q    You didn't have a diagnosis; in other
5    words, for Mr. Roderick.
6            Is that fair to say?
7        A    Well, none is put here.
8        Q    Were there sufficient indicia of
9    posttraumatic stress disorder on the part of Mr.
10   Roderick on that first visit that you could have
11   concluded that he had PTSD?
12       A    Yes, I could have probably used the same
13   traumatic reactions and they would have fit into
14   that DSM category. I could have used that but I
15   didn't.
16       Q    Is there anything else about that --
17       A    In part, you know, it seemed like he was
18   kind of minimizing it. I'm okay, you know it was
19   like this, but I'm okay.
20       Q    Did you get the sense that he came to see
21   you more because it had been suggested to him by
22   Mr. Stepski or Mr. Stevens that he should go rather
23   than he felt he needed to come see you for therapy?
24       A    Yes.

Page 115

1    Gloria Small
2        Q    Was there anything else about that first
3    visit with Mr. Roderick that you found to be
4    significant?
5        A    Nothing I can recall.
6        Q    You then saw him a week later on
7    July 26th?
8        A    Yes.
9        Q    Again, I take it all of the visits with
10   Mr. Roderick were just a one-on-one?
11       A    Yes.
12       Q    He was speaking of money difficulties?
13       A    Yes.
14       Q    And financial hardship, since the
15   accident, what specifically did he relay about money
16   difficulties to you?
17       A    I think he wasn't fishing so much.
18       Q    Did he inquire with Mr. Roderick other
19   sources of income that he might have besides
20   fishing?
21       A    I don't remember.
22       Q    Did he ever relay to you that he was a
23   diesel mechanic?
24       A    I don't think so.

Page 116

1    Gloria Small
2        Q    Or that he drove a snow plow in the
3    wintertime, that kind of thing?
4        A    He may have said something about a snow
5    plow. I don't remember anything about a diesel.
6        Q    Did he say anything else about a money
7    problem that you recall?
8        A    No.
9        Q    Did his money problems impact on his
10   continuing treatment?
11       A    No, because he was wasn't paying.
12       Q    Would you have continued to treat him on a
13   weekly basis without him paying?
14       A    Yes.
15       Q    It seems that most of the second session,
16   please correct me if I'm wrong, dealt with his
17   personal problems with the girlfriend?
18       A    Yes.
19       Q    Did you discuss with him the accident
20   involving the boat in that second session?
21       A    I don't remember other than the financial
22   hardship.
23       Q    Then, mainly it was the girlfriend problem
24   that was the source of discussion on that second

Page 117

Gloria Small

1  visit, fair to say?
2  A   Yes.
3  Q   All right.
4      Then the following week on August 2, he
5  told you he had been to the blessing of the fleet in
6  Stonington and that that was something he regularly
7  done every year with his family most of his family
8  were fishermen.
9      Correct?
10 A   Yes.
11 Q   This was a family tradition?
12 A   Yes.
13 Q   Did he relate any problems he experienced
14 as a result of going to the blessing of the fleet?
15 A   Well, here it said that his mother threw
16 the bone in honor of the dog and that he began to
17 ruminate again about the incident.
18 Q   Did he say anything else about it?
19 A   About the fleet, about the blessing of the
20 fleet?
21 Q   Yes. Anything else come out of that
22 discussion other than he thought about the incident
23 because his mom threw a bone for the dog?

Page 118

Gloria Small

1  A   Well, what comes to -- of course, I'm
2  reading this note again after all this time, but
3  Gael is not apparently a complicated man, seems to
4  be a fairly healthy person. There's something about
5  a community and there's something about grieving and
6  mourning with community, that's helpful. The ritual
7  with community mourning the dog would have been
8  useful so then the trauma came back. So it seemed
9  like a mixed kind of situation in that the community
10 was helpful. The ritual was important in dealing
11 with the dog but it also triggered other things.
12 Q   Sort of tied into -- I don't think about
13 the accident unless somebody asks me about the
14 accident?
15 A   I want to be okay, I'm really more
16 distressed about this woman but this stuff comes up.
17 He is more of the sort of person to push it down.
18 Q   Did he indicate that Mike Stepski went to
19 the blessing of the fleet?
20 A   I don't recall.
21 Q   He also told you that he had been out
22 fishing and lobstering, fishing was in his blood,
23 but he had a disturbing thought on Friday night.

Page 119

Gloria Small

1  He -- the incident kept replaying in his mind and he
2  kept thinking about what he should have done and
3  should have been able to do.
4  A   Yes.
5  Q   Is that related to having been to the
6  blessing of the fleet the day before?
7  A   It's coming up the ruminating what should
8  I have done, what could I have done is an event in a
9  way of replaying the accident which is not uncommon.
10 Q   Is it also sometimes healthy to have those
11 thoughts of what I could have done, is that part of
12 working through the process?
13 A   It's very common in people who have been
14 through trauma.
15 Q   So is that a healthy sign that trying to
16 figure out was there something I could have done if
17 not then it was just one of those things that happen
18 in life, it was a bad break?
19 A   I think it just is what should I have
20 done, what could I have done, what could I have
21 done, often people who are completely helpless or
22 powerless will say what would I have done, what
23 could I have done because guilt is easier to deal

Page 120

Gloria Small

1  with than powerlessness in my experience.
2  Q   But in terms of --
3  A   Healing --
4  Q   Healing?
5  A   Well, if you work through the guilt, for
6  example, like woman who have been sexually abused as
7  children if they continue to feel guilty and feel
8  guilty and guilty and never work it through, it's a
9  sign of the trauma, but it doesn't help them until
10 they get some help working through that they were
11 not responsible.
12 Q   In terms of ruminating about what could I
13 have done, if one eventually says well there really
14 wasn't anything I could have done therefore --
15 A   That's a way of working it through, if he
16 did get to that point.
17 Q   Do you know if Mr. Roderick ever reached
18 that point?
19 A   I don't know. I haven't seen him in year.
20 Q   Well, what else did he tell you on that
21 third visit that you found to be significant, if
22 anything?
23 A   Nothing that I can recall.

Page 121

Gloria Small

Q  Did he indicate that he was going to stop therapy at that point, August 2?
A  August 2, no he made appointments but then didn't show after that.
Q  Any idea why he didn't show?
A  No.
Q  Did you ever find out subsequently when he came back to you in November of 2006 why he didn't -- had stopped attending therapy in 2004?
A  No.
Q  When he came back in 2006, at that time he had insurance.
   Is that right?
A  I don't know. I see this but that may not I don't think he paid me then it may have been a insurance that covered his -- I'm not sure because it says there was insurance, but I'm not sure that they covered him for treatment because I don't think he ever paid me.
Q  You submitted a health insurance claim form to?
A  I'd have to look at that. I don't remember. I did submit a claim form.

Page 122

Gloria Small

Q  To what's called Healthy Options in 2006?
A  I don't know if they paid or not. They may not have. I believe I can look into that. I believe Healthy Options is the insurance plan which is a private version of medicaid which is Title 19 for the medical indigent. They don't cover adults nowadays, I'm not sure if that was covered. Obviously, I submitted it but whether they paid I don't remember. We could look at our records.
Q  We can leave a space in the record you can indicate whether or not you were paid by Healthy Options or not?
A  Yes.
(See Page 119 Line 20_____.)
Q  So when Mr. Roderick showed up again after two years and a couple of months in November of 2006?
A  Um hum.
Q  He was saying he was overwhelmed, anxious and depressed as a result of having given a deposition in this case.
   Do you recall that?
A  Yes.

Page 123

Gloria Small

Q  What did you discuss with Mr. Roderick on that November 16, 2006 visit?
A  I don't remember other than what's in here.
Q  So other than your note?
A  I don't remember.
Q  Well, the note indicates that he is distressed because of the deposition, but also distraught over the state of the relationship of his significant other the mother of his two-year-old son. Those two situations are causing him distress, he wants to go back to weekly individual therapy but perhaps as a longer time than his first therapy. You indicate to him in response you would be happy to continue therapy at that time?
A  I assume so.
Q  And did you inquire at that time why he had stopped coming back in 2004?
A  I don't remember.
Q  Did you ask him how he had been doing between when he stopped coming in 2004 up to the point where he gave a deposition?
A  I can't specifically remember, but I can

Page 124

Gloria Small

just conclude that he was doing all right, felt overwhelmed and remembered that this was a place that he could come to talk and did, but I don't recall.
Q  Anything else about that November 16th visit that you recall?
A  No, but, um, something, you know, interesting is we can assume since he was having difficulty in his relationship two years earlier and was still having difficulties with the relationship now but hasn't sought out help that it was the, um, trauma of the deposition that added -- brought him to treatment because presumably there wasn't anything different going on in the last two years; but I don't really know.
Q  You then saw him on November 21 of 2006?
A  Um hum.
Q  He was somewhat calmer?
A  Um hum.
Q  In what way?
A  He was overwhelmed and aggravated the first time. Again, it seemed similar to the way he was when he first appeared to treatment. He seems

31 (Pages 121 to 124)

Page 125

Gloria Small

1 to be able to calm himself down.
2   Q   But he was anxious and worried mainly
3 about the relationship with this significant other?
4   A   Yes.
5   Q   Does that indicate that whatever spiked it
6 in terms of anxiety and problems that was caused by
7 the deposition that he had given had sort of
8 tampered down and it was back to the problem with
9 the girlfriend slash mother?
10  A   Sound likes it.
11  Q   Seems like from your note, correct me if
12 I'm wrong, in most of your session the second
13 session in November of 2006 was dealing with
14 interpersonal problems again?
15  A   Yes.
16  Q   Do you remember discussing anything
17 further concerning the incident --
18  A   I don't remember but then he just stopped
19 coming again so...
20  Q   Okay.
21       Did he indicate that he was going to stop
22 coming after that second visit?
23  A   I don't remember.

Page 126

Gloria Small

1   Q   He just went off the radar screen?
2   A   I don't remember. I could check in my
3 calendar back then to see if he made another
4 appointment that he didn't keep, but I would have
5 indicated that as a no-show. It may have been more
6 he was going to call when he wanted an appointment
7 and didn't.
8   Q   We will leave a blank in the transcript if
9 he did?
10  A   If he did make an appointment, I'll let
11 you know.
12 (See Page 122 Line 20_____.)
13  Q   Did he indicate back in November of 2006
14 that he was involved in legal proceedings with his
15 girlfriend?
16  A   I don't remember.
17  Q   Did he indicate that there had been, for
18 give me if I have my time wrong on this Tom, but did
19 he indicate that he and the girlfriend had been
20 instructed to have some kind of joint counseling
21 together not sure if that was '06 or '07?
22       MR. HEALEY: What you are asking is
23       all right.

Page 127

Gloria Small

1   A   Are you talking about Roderick.
2   Q   Yes?
3   A   No, I don't remember.
4   Q   Okay.
5       Did Mr. Roderick ever indicate to you that
6 he was having flashbacks?
7   A   Not that I can recall.
8   Q   Did he ever indicate to you that he was
9 hypervigilant in terms of his demeanor out on boats
10 or elsewhere?
11  A   Yes, he did.
12  Q   Did that hypervigilance diminish over
13 time?
14  A   Um, if I may I think what might be more
15 relevant in the way of answering that question would
16 be to look at Dr. Mariam's report which is much
17 recent and then apply that level of incident to the
18 traumatic incident scale point by point notes and to
19 Dr. Mariam's notes because that's much later, and,
20 um, this was a long time ago. And you are asking me
21 if I know now whether he is still experiencing these
22 things and I couldn't know that.
23  Q   I'm sorry if my question was confusing.

Page 128

Gloria Small

1       I was talking about when you --
2   A   At that time?
3   Q   When you last saw him back in November of
4 2006, the hypervigilance which you initially noted
5 in 2004 had that decreased?
6   A   I don't know that he stayed in treatment
7 long enough for me to know, really. He talked about
8 being overwhelmed, being upset, about experiencing
9 certain reactions to the deposition. Whether that
10 stayed, left or came back after the two times he was
11 in therapy, I don't know.
12  Q   Well, during the course of November of
13 2006 in either session, did you discuss his demeanor
14 in terms of being hypervigilant in any way?
15  A   I don't remember if hypervigilance was
16 discussed, you know, unless I mentioned it on the
17 first one. We talked about having memories, that is
18 all I remember.
19  Q   In fact, correct me if I'm wrong, but
20 hypervigilance is not noted in connection with Mr.
21 Roderick in any of your notes.
22      Correct?
23  A   I'm not sure. Let me go back and look. I

Page 129

Gloria Small

1  don't see anything specifically about
2  hypervigilance.
3      Q   So we agree that hypervigilance is
4  excessive and continual checking of things for
5  danger?
6      A   Correct.
7      Q   And that to your recollection it's not
8  something that was an issue for him?
9      A   I don't think we can conclude that it
10 wasn't an issue for him.
11     Q   Did he -- what did he say or do which
12 would indicate to you that it may have been an issue
13 for him?
14     A   This is man who responded to questions if
15 you asked him he will tell you, but when he is again
16 processing his own experience, each person processes
17 their own experience in different ways.
18     Michael Stepski seems to be processing
19 talking about hypervigilance. This man is different
20 he talks about memory, about seeing about standing
21 he is just processing things very differently.
22 Humans are different.
23     Q   I understand?

Page 130

Gloria Small

1      A   Yup.
2      Q   Help me understand.
3      A   They were in the same boat, experienced
4  the same trauma, but one has this one has that, who
5  knows.
6      Q   So we can't say there was a hypervigilance
7  on the part of Mr. Roderick or not.
8      Correct?
9      A   Correct. Maybe Mr. Mariam mentions it. I
10 don't know.
11     Q   In terms of Dr. Mariam's report as to both
12 Stepski and Roderick --
13     A   Um hum.
14     Q   -- you read them?
15     A   Um hum.
16     Q   But is it a fair statement that these are
17 reports concerning an interview that took place at
18 least a year and change after you had last seen both
19 of those fellows; correct?
20     A   Correct.
21     Q   So what Dr. Mariam may or may not have
22 been told or what he may have concluded as a result
23 of his interviews you wouldn't know if his

Page 131

Gloria Small

1  conclusions are correct or incorrect.
2      Is that a fair statement?
3      A   Well, some of his conclusions I would know
4  if they are correct because so me of them could be
5  easily verified, for example, seemed to get
6  interested in substances and when he talks about
7  Gael smoking more than two packs a day, that easily
8  could be verified. Either he does or doesn't.
9      Q   That is a fact, but what I'm talking about
10 is subjective stuff in those reports. There's no
11 way to verify any of that, is there?
12         MR. HEALEY: Object to the form. I
13         don't know "subjective stuff," what
14         are we talking about.
15     A   Well, are you asking me to say whether I
16 think this is truthful or not truthful.
17     Q   No.
18     Let me ask you a different question.
19     Is there any way to empirically prove or
20 disprove whether a patient actually has experienced
21 a feeling or an emotion that they relay to you?
22     A   Is there any way empirically to tell -- I
23 suppose a lie detector test could tell.

Page 132

Gloria Small

1      Q   Other than a lie detector test, there's no
2  such psychological test battery or anything else
3  that anybody can give you to determine whether if I
4  say I'm upset because I lost my skate key whether
5  that's true or not?
6      A   No.
7      Q   I'm old enough to have a skate ski.
8      Sorry.
9      A   Well, there are possibly two separate
10 questions, and I'm not sure you are asking me those
11 two separate questions. One is giving what I say or
12 my records two years before are they consistent with
13 what Dr. Mariam found or didn't find.
14     Q   I'm not asking you that?
15     A   Did Gael Roderick tell Dr. Mariam the
16 truth, I don't know or are some of those things
17 related to the trauma that are recorded in this
18 report, I mean the impact events scale could be
19 applied to this and you will see how many events
20 typically relate to the trauma related in that
21 interview. I'm not sure if that is where you are
22 going.
23     Q   No. I wasn't going there.

Page 133

1  Gloria Small
2  All I'm trying to just confirm is
3  basically when a patient comes in and they tell you
4  I feel, there's no way for you as a therapist to
5  know if they actually are feeling that emotion.
6      Is that correct?
7  A   Not exactly, I suppose because --
8  Q   Other than the lie detector?
9  A   Some emotions are very powerful, tears
10 will come as a sign of emotion when people are
11 afraid.  Those are physical events, sometimes we can
12 sense them, sometimes we can't, but you know I'm
13 flipping it and I don't know if you want me to flip
14 it around.  There's a whole lot of questions here.
15      If any ten, 30 or 40 people were involved
16 in a similar kind of situation, would they be
17 expected to have some sort of reaction, and are the
18 reactions that these men are having consistent with
19 the reactions other people are expected to have.  To
20 that purpose we would have to get ten volunteers or
21 I don't know how many people who have been involved
22 in ship wrecks and similar things.  I mean there are
23 probably several.
24 Q   Is there anything else about Michael

Page 134

1  Gloria Small
2  Stepski and his therapy sessions that you find to be
3  significant that you haven't already told me about?
4      MR. HEALEY:  Objection.  I think you
5      asked that, Mike.
6      MR. UNGER:  I don't know.
7      MR. HEALEY:  I think you did.
8  A   Ask the question again.
9  Q   Other than what you've already told me, is
10 there anything else about Michael Stepski's therapy
11 you find to be significant?
12 A   No, nothing I can think of.
13 Q   Same question with respect to Mr.
14 Roderick?
15 A   No.
16 Q   If one is not exposed to the risk of
17 losing ones life in a traumatic event is PTSD a
18 proper diagnosis?
19 A   Yes, it could be.  Because, for example,
20 the case I told you about before.
21 Q   The rape as a child?
22 A   The woman that was three years old, her
23 father killed her mother you can be a witness to a
24 traumatic event and suffer posttraumatic stress

Page 135

1  Gloria Small
2  disorder, you could inherit it vicariously.  In
3  other words, it could have happen to me but it
4  didn't.
5  Q   That is enough to trigger PTSD?
6  A   Could be.  Actually, I worked with a young
7  woman whose bedroom was -- lightening hit her
8  bedroom she wasn't killed but...
9  Q   Fair enough.  One last question?
10     MR. HEALEY:  That is the biggest --
11     all lawyers say that and one no lawyer
12     has ever held up to it.  I have one
13     last question I then we have 14.
14     (Off record.)
15 Q   Have you provided any opinions as to this
16 case formally or informally orally or any writing or
17 otherwise spoken or written about this case of Mr.
18 Stepski and Mr. Roderick other than what we have
19 discussed today and documents that we have looked at
20 today?
21 A   I have not discussed it other than today.
22 Q   All right.  Thank you.
23
24

Page 136

1  Gloria Small
2  CROSS EXAMINATION
3  BY MR. HEALEY:
4  Q   I'm going to ask you just one question, it
5  might be one?
6      MR. UNGER:  Might be one.
7      MR. HEALEY:  I had to stop I'm falling
8      into my own trap.  It will be very
9      few.
10 Q   Just now, on Gael Roderick, is it your
11 opinion is it your testimony that he during the time
12 when you saw him was suffering from posttraumatic
13 stress disorder?
14     MR. UNGER:  Object to the form.
15 A   Is this on the record or off the record?
16 Q   We are on the record?
17 A   Certainly acute posttraumatic stress
18 disorder.
19 Q   Because it was a limited period of time
20 that you saw him?
21 A   It's very interesting I question.
22 Q   Don't go into theory?
23 A   No, it isn't.  Because, again, with trauma
24 sometime people stare in your face all the time and

Page 137

Gloria Small

1  they can't get it and others repress it. There's a
2  very interesting movie, did you ever see the
3  Analysis with Dinero he was he was the gangster, he
4  was doing this gangster thing and doing it and doing
5  it and doing it and then keeping all of this stuff
6  down all of a sudden he couldn't. It was repressed
7  and it came up.
8         We see that with people who have been
9  raped sometimes, they will not remember and then
10 talk about it 15 years later of it takes a lot of
11 energy to keep that material down.
12        One other thing about traumatic memory
13 which is interesting if you think about normal
14 memory it's like food, you digest it. Traumatic
15 memory is indigestible what do you do with it, it's
16 in there or you stuff it whether Roderick was
17 stuffing it because that is who he is who knows all
18 they --
19 Q   You made a diagnosis of acute?
20 A   He takes cigarettes, there's a difference
21 between people who take cigarettes and alcohol.
22 Nicotine is a stimulant and alcohol helps you relax.
23        (Adjourned: 3:00 p.m.)

Page 138

Gloria Small

INDEX OF EXAMINATIONS
Direct                 4
Cross                136

Page 139

Gloria Small
INDEX OF DEFENSE EXHIBITS
1-4                    20
5-10                   32
(All exhibits retained by counsel.)

Gloria Small
CERTIFICATE

I hereby certify that I am a Notary Public in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing was by me duly sworn, and the thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither counsel nor attorney to either of the parties to said suit, nor am I an employee of either party to said suit, nor of either counsel in said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this 18th day of July, 2008.

Natasha Christie Stewart
Notary Public

My commission Expires: 9/30/2011