# In The Matter Of:

*STEPSKI   v.*
*THE M/V NORASIA*

---

*ARNOLD MERRIAM*
*July 11, 2008*

---

*FINK & CARNEY REPORTING AND VIDEO SERVICES*
*39 WEST 37TH STREET*
*NEW YORK, NY  USA  10018*
*(212) 869-1500   or   (800) 692-3465*

*Original File LA071108.TXT, 160 Pages*
*Min-U-Script® File ID: 2178046661*

# Word Index included with this Min-U-Script®

Page 1

[1]
[2] UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
[3]
MICHAEL STEPSKI, KIRSTEN STEPSKI, Wife,   :
[4] GEAL RODERICK AND BENJAMIN SCHOBER,
[5]         Plaintiffs,
[6]
-against-                  :06 Civ. 1694
[7]                    (KMK)
The M/V NORASIA ALYA, her owners,        :
[8] operators, etc., and MS "ALENA"
SCHIFFAHRTSGESELLSCHAFT mbH & CO, KG,   :
[9] PETER DOHLE SCHIFFAHRTS-KG,
[10]        Defendants.
[11]
[12]
[13]        DEPOSITION of ARNOLD EDWARD MERRIAM, M.D.,
[14] taken by Defendants at the offices of Blank Rome, 405
[15] Lexington Avenue, New York, New York, on Friday,
[16] July 11, 2008, commencing at 1:10 p.m., before Leah
[17] Allbee, a Registered Professional Reporter and Notary
[18] Public within and for the State of New York.
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 2

[1]
[2] APPEARANCES:
[3]
        THOMAS H. HEALEY
[4]        Attorney for Plaintiffs
        17 Battery Place -Suite 605
[5]        New York, New York  10004
[6]   BY: TERRENCE GARGAN, Esq., of Counsel
[7]
[8] BLANK ROME
        Attorneys for Defendants
[9]        405 Lexington Avenue
        New York, New York  10174
[10]
        BY: ALAN WEIGEL, Esq., of Counsel
[11]
[12]
        FREEHILL HOGAN & MAHAR
[13]        Attorneys for Defendants
        80 Pine Street
[14]        New York, New York  10005
[15]   BY: MICHAEL UNGER, Esq., of Counsel
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 3

[1]
[2]        IT IS HEREBY STIPULATED AND AGREED
[3] by and between the attorneys for the respective
[4] parties hereto that filing and sealing be and the
[5] same are hereby waived.
[6]        IT IS FURTHER STIPULATED AND AGREED
[7] that all objections except as to the form of the
[8] question, shall be reserved to the time of the
[9] trial.
[10]        IT IS FURTHER STIPULATED AND AGREED
[11] that the within examination may be signed and
[12] sworn to before any notary public with the same
[13] force and effect as though signed and sworn to before
[14] this Court.
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 4

[1]
[2]        A R N O L D E D W A R D M E R R I A M, M.D.,
[3] called as a witness, having been first duly
[4] sworn by Leah Allbee, a Notary Public
[5] within and for the State of New York, was
[6] examined and testified as follows:
[7]        **DIRECT EXAMINATION BY MR. UNGER:**
[8]    **Q:** Good afternoon, Doctor. My name
[9] is Mike Unger. I am one of the attorneys who
[10] represents the defendants in this case. With me
[11] is Alan Weigel, who is co-counsel for the
[12] defendants. I am here this afternoon to take
[13] your deposition concerning your examinations and
[14] opinions concerning the plaintiffs, Michael
[15] Stepski, Geal Roderick and Benjamin Schrober.
[16]    Have you ever been deposed before?
[17]    **A:** Yes, sir.
[18]    **Q:** Okay. Now, before we started I
[19] asked if you had a list of cases in which you
[20] have previously testified within the last four
[21] years. And you indicated that you don't have
[22] such a list?
[23]    **A:** The last time I testified was
[24] maybe a year ago and I can tell you the name.
[25] It was a plaintiff's case. The plaintiff's name

ARNOLD MERRIAM                                                    STEPSKI   v.
July 11, 2008                                            THE M/V NORASIA

Page 5

**Merriam**

[1]
[2] was Patricia Traina, T-R-A-I-N-A. And I would
[3] have to try to find a list of other cases in
[4] which I have testified.
[5]     **Q:** Were you —
[6]     **A:** I will do my best.
[7]     **Q:** Okay. Were you asked —
[8]     **A:** I may have been asked in the
[9] context of that trial.
[10]    **Q:** Okay. What were you asked by
[11] either Mr. Healey or Mr. Gargan to provide a
[12] list of the cases?
[13]    **A:** He told me that you would be
[14] asking for one. But I just learned that last
[15] night. I didn't have a chance to put it
[16] together.
[17]    **MR. UNGER:** Well, I just
[18] want to preserve an objection on the
[19] record of failure of no list of
[20] cases required by the federal rules
[21] and to reserve the right to recall
[22] the doctor as necessary once the
[23] list has been provided.
[24]    **Q:** But I will try to figure out what
[25] cases you have testified for now. If you can,

Page 6

**Merriam**

[1]
[2] the Patricia Traina case?
[3]     **A:** Uh-huh.
[4]     **Q:** You said that was a plaintiffs'
[5] case?
[6]     **A:** Correct.
[7]     **Q:** Meaning that you were acting on
[8] behalf of Ms. Traina?
[9]     **A:** Correct.
[10]    **Q:** And did you testify in deposition,
[11] trial or both?
[12]    **A:** Trial.
[13]    **Q:** What court was that?
[14]    **A:** I don't recall which court it was.
[15]    **Q:** Here in New York?
[16]    **A:** Come to think of it, it was one of
[17] the — I believe it was one of the courts in
[18] Foley Square.
[19]    **Q:** And who was the plaintiff's
[20] attorney who retained you?
[21]    **A:** I don't recall the name of the
[22] firm.
[23]    **Q:** Did you give a deposition in this
[24] case as well?
[25]    **A:** No, sir.

Page 7

**Merriam**

[1]
[2]     **Q:** Did that case have anything to do
[3] with posttraumatic stress disorder?
[4]     **A:** No.
[5]     **Q:** What other cases have you been
[6] involved in?
[7]     **A:** I am trying to recall the
[8] specifics of any other case that I have provided
[9] testimony in. I can't right now.
[10]    **MR. UNGER:** Would you mark
[11] that for me, please?
[12]    (Whereupon, Dr. Merriam's
[13] C.V., was received and marked
[14] Merriam Exhibit 1 for
[15] identification, as of this date.)
[16]    **Q:** Are there other cases in which you
[17] have testified that you just can't remember?
[18]    **A:** Yes.
[19]    **Q:** Approximately how many?
[20]    **A:** I would say a dozen or less.
[21]    **Q:** Did any of those cases involve
[22] posttraumatic stress disorder?
[23]    **A:** Not to my recollection.
[24]    **Q:** Let me show you what we have
[25] marked Merriam Exhibit 1 for identification.

Page 8

**Merriam**

[1]
[2] Can you tell us what that is, please?
[3]     **A:** Yes. That's my C.V. which I
[4] handed to you.
[5]     **Q:** Okay. And your C.V. sets forth
[6] all of your training and qualifications?
[7]     **A:** I don't know all my training and
[8] qualifications. The essentials thereof.
[9]     **Q:** By whom are you presently
[10] employed?
[11]    **A:** New York Medical Alliance.
[12]    **Q:** And what is that?
[13]    **A:** I am the chairman of psychiatry at
[14] the North Bronx Healthcare Network, which is
[15] comprised of two hospitals, Jacobi Medical
[16] Center and North Central Bronx Hospital. And
[17] New York Medical Alliance is the medical group
[18] that provides physician services to those
[19] hospitals.
[20]    **Q:** How long have you been involved
[21] with New York Medical Alliance?
[22]    **A:** Since its inception in 1997.
[23]    **Q:** And before that, by whom were you
[24] employed?
[25]    **A:** I have been at Jacobi Medical

Page 9

**Merriam**

[1]
[2] Center since I completed my training and the
[3] organization that provided medical services to
[4] the hospital at that time was Albert Einstein
[5] College of Medicine, Yeshiva University. That
[6] was up through 1996 when Montefiore Medical
[7] Center took over the contract for a year. And
[8] then in 1997, New York medical Alliance took
[9] over the contract.
[10]   **Q:** You are a professor of psychiatry
[11] in neurology at Albert Einstein —
[12]   **A:** That's correct.
[13]   **Q:** — College of Medicine?
[14]   **A:** Yes, sir.
[15]   **Q:** Okay. Do you actively teach?
[16]   **A:** Yes.
[17]   **Q:** Does any of your teaching involve
[18] posttraumatic stress disorder?
[19]   **A:** It has. Right now I am not giving
[20] any lectures on P.T.S.D. But I have.
[21]   **Q:** When was the last time that you
[22] were involved in giving lectures on P.T.S.D.?
[23]   **A:** Probably ten years ago or so.
[24]   **Q:** And in addition to being a
[25] professor, what courses do you currently teach,

Page 10

**Merriam**

[1]
[2] what subject matters?
[3]   **A:** I regularly teach classes in
[4] various neuropsychiatric topics to the Einstein
[5] medical students.
[6]   **Q:** Can you just give me an example?
[7]   **A:** Yes. I am talking about various
[8] neurotoxicological syndromes, such as serotonin
[9] syndrome, neuroleptic malignant syndrome. I
[10] talk about psychiatric disorders related to
[11] neurological problems such as stroke or
[12] epilepsy.
[13]   **Q:** I see you have — just briefly
[14] looking over your resume — that you have also
[15] had some experience with multiple sclerosis?
[16]   **A:** Yes, sir.
[17]   **Q:** Is that one of the areas that you
[18] focus on?
[19]   **A:** My area of primary academic
[20] interest has been topics that involve neurology
[21] and psychiatry, either psychiatric
[22] manifestations of neurologic disease or
[23] neurological aspects of psychiatric treatment.
[24]   **Q:** Do you currently in your practice
[25] treat patients?

Page 11

**Merriam**

[1]
[2]   **A:** Yes, I do.
[3]   **Q:** Does any of your treatment involve
[4] posttraumatic stress disorder?
[5]   **A:** I have a few patients I am
[6] treating who have P.T.S.D. now.
[7]   **Q:** About how many?
[8]   **A:** Probably two or three.
[9]   **Q:** Has that been the case over the
[10] last ten years or so that you have dealt with
[11] patients with P.T.S.D. or sometimes you have
[12] some patients who have been diagnosed with
[13]   **A:** Yes. I should explain the nature
[14] of my practice.
[15]   **Q:** I would appreciate that.
[16]   **A:** Okay. I am a psychiatric
[17] consultant to several area long-term care
[18] facilities and my private practice chiefly
[19] entails those consultations at this point. I
[20] formerly had more of a private practice, but my
[21] wife contracted cancer in 1999 and I curtailed
[22] my hours to consultations in long-term care
[23] facilities, which I found more flexible for
[24] my purposes.
[25]   **Q:** Okay. So going back to treating

Page 12

**Merriam**

[1]
[2] patients who have been diagnosed with P.T.S.D.,
[3] over the last say ten years, approximately how
[4] many patients have you treated?
[5]   **A:** Perhaps half a dozen, on a regular
[6] basis. There are patients who are admitted to
[7] long-term care facilities briefly and for
[8] short-term rehab and then return home. So I may
[9] have consulted on them during a portion of their
[10] stay.
[11]   **Q:** So when you say "consulted," are
[12] you talking about just jumping in and jumping
[13] out of a case, not actively being involved in
[14] their —
[15]   **A:** No. I would be managing the
[16] medications and verifying the diagnosis,
[17] establishing the diagnosis, managing
[18] medications. And then working in collaboration
[19] with the psychologist who would be doing the
[20] psychotherapy.
[21]   **Q:** Okay. The collaboration with the
[22] psychiatrists —
[23]   **A:** Psychologists.
[24]   **Q:** Psychologists, thank you.
[25] Doing this psychotherapy, what

Page 13

[1]                    **Merriam**
[2] does that involve?
[3]    **A:** The psychologist would be the
[4] individual who would be meeting with the patient
[5] regularly in therapy. And I would have
[6] conversations with the psychologist regarding
[7] the patient's progress. If the patient were
[8] doing poorly according to the psychologist, the
[9] psychologist would alert me, which I would
[10] consider making a medication change.
[11]    **Q:** Does your practice as a private
[12] consultant also include diagnosis of patients?
[13]    **A:** Yes.
[14]    **Q:** And does it include diagnosis of
[15] patients as having P.T.S.D.?
[16]    **A:** Sure.
[17]    **Q:** And over the last ten years, about
[18] how many patients have you diagnosed with
[19] P.T.S.D.?
[20]    **A:** Again, I would say a dozen or so.
[21]    **Q:** Have there been patients which
[22] others have suspected of having P.T.S.D. that
[23] you have examined and concluded that P.T.S.D.
[24] was not a proper diagnosis?
[25]    **A:** I can't recall any such case now,

Page 14

[1]                    **Merriam**
[2] but I would think that very likely.
[3]    **Q:** P.T.S.D. is a term that is thrown
[4] around quite a lot these days, would you agree?
[5]    **A:** It's very much in the news because
[6] of the Iraq War.
[7]    **Q:** Okay. In your opinion, is a
[8] clinical psychologist properly able to diagnose
[9] P.T.S.D.?
[10]    **A:** Yes.
[11]    **Q:** Let me just switch topics a little
[12] bit and ask you generally about this case. When
[13] were you first contacted?
[14]    **A:** I think you have a copy of the
[15] letter that I received. Can I have my file
[16] back?
[17]    (Handing.)
[18]    **A:** So this letter is dated March 6,
[19] 2007. And that follows a telephone call, I
[20] believe, from Mr. Gargan asking me if I would be
[21] willing to evaluate three gentlemen who had been
[22] involved in a fishing boat accident.
[23]    **MR. UNGER:** Okay. Let me
[24] take a second and ask the reporter
[25] to mark the letter as Exhibit 2.

Page 15

[1]                    **Merriam**
[2]    (Whereupon, March 6, 2007
[3] letter, was received and marked
[4] Merriam Exhibit 2 for
[5] identification, as of this date.)
[6]    **Q:** We marked Exhibit 2. And that's
[7] the March 6, 2007 letter that you were just
[8] referring to?
[9]    **A:** Yes.
[10]    **Q:** And that was from Mr. Healey?
[11]    **A:** Yes.
[12]    **Q:** You said this followed —
[13]    **A:** A telephone call from Mr. Gargan.
[14] I don't remember if I spoke to Mr. Healey or
[15] just Mr. Gargan.
[16]    **Q:** You don't remember if you spoke to
[17] Mr. Healey before you received the March 6, 2007
[18] letter?
[19]    **A:** That's correct.
[20]    **Q:** When was the call from Mr. Gargan?
[21]    **A:** Sometime before this. I don't
[22] recall exactly when.
[23]    **Q:** Do you have any notes concerning
[24] that call?
[25]    **A:** No, sir.

Page 16

[1]                    **Merriam**
[2]    **Q:** What did Mr. Gargan say during
[3] that call?
[4]    **A:** He told me that he is serving as
[5] counsel on a case of three fishermen who had
[6] been involved in an accident at sea and would I
[7] be willing to evaluate them psychiatrically.
[8]    **Q:** Okay. You agreed to do so?
[9]    **A:** Yes, sir.
[10]    **Q:** Okay. Did you request any
[11] particular records be provided to you?
[12]    **A:** No. I know Mr. Gargan from
[13] previous interaction and I am confident that he
[14] would send me what is pertinent.
[15]    **Q:** What previous interactions had you
[16] had with Mr. Gargan?
[17]    **A:** Mr. Gargan is an attorney for
[18] Hill, Betts & Nash. And Hill, Betts & Nash has
[19] retained me in previous cases.
[20]    **Q:** When you were retained previously
[21] by Hill, Betts & Nash, was that on the defense
[22] side?
[23]    **A:** Yes.
[24]    **Q:** How many times had you been
[25] retained by Hill, Betts & Nash?

STEPSKI   v.
THE M/V NORASIA

ARNOLD MERRIAM
July 11, 2008

---

Page 17

**Merriam**

[1]
[2]   **A:** I am going to guess two or three.
[3]   **Q:** Do you recall the names of those
[4]   plaintiffs involved in those cases?
[5]   **A:** No, sir.
[6]   **Q:** Did you testify in any of those
[7]   cases?
[8]   **A:** No. I don't recall testifying in
[9]   a case. It's possible, but I have no
[10]   recollection of having testified in any of those
[11]   cases.
[12]   **Q:** Do you maintain files on those
[13]   cases?
[14]   **A:** What I maintain is a list of
[15]   reports that I have given. And, unfortunately,
[16]   the hard drive of the computer where I maintain
[17]   them crashed. So I had to replace the computer.
[18]   And so — maybe two or three years ago. So all
[19]   I have on my current computer are reports from
[20]   the last two or three years. But I can look for
[21]   you.
[22]   **Q:** Okay. Do you maintain a physical
[23]   file under any of those cases that you have been
[24]   involved in previously?
[25]   **A:** No. Once a case is completed, I

---

Page 18

**Merriam**

[1]
[2]   don't retain a physical file.
[3]   **Q:** Okay. Had you ever worked
[4]   previously with Mr. Healey?
[5]   **A:** No, sir.
[6]   **Q:** Now, in this letter of March 6,
[7]   2007, which is signed by Mr. Healey, he sets
[8]   forth a sketch of the circumstances concerning
[9]   this incident?
[10]   **A:** Yes.
[11]   **Q:** Okay. In addition to the
[12]   rendition that is set forth in the letter, what
[13]   else were you provided in terms of the
[14]   information concerning this incident?
[15]   **A:** I was provided with a report by
[16]   Gloria Small, Ph.D. I was provided with
[17]   portions of deposition transcripts related to
[18]   Mr. Roderick and Mr. Stepski. And notes by
[19]   Gloria Small. Did I say regarding Mr. Roderick?
[20]   **Q:** Anything else?
[21]   **A:** No.
[22]   **MR. UNGER:** If you could
[23]   just mark these as the next four in
[24]   order, please.
[25]   (Whereupon, handwritten

---

Page 19

**Merriam**

[1]
[2]   notes, typed notes and two portions
[3]   of transcripts, were received and
[4]   marked Merriam Exhibits 3, 4, 5 and
[5]   6 for identification, as of this
[6]   date.)
[7]   **MR. UNGER:** For the record,
[8]   we have marked as Exhibit 3 five
[9]   pages of notes, one of which is
[10]   handwritten. The other four typed,
[11]   which appear to be from Gloria
[12]   Small, Ph.D. and they reference
[13]   Mr. Roderick.
[14]   **A:** Uh-huh.
[15]   **Q:** Those are the notes that you were
[16]   provided concerning Mr. Roderick by Mr. Healey
[17]   and Mr. Gargan?
[18]   **A:** I believe that's on this.
[19]   **Q:** And for the record, we have marked
[20]   as Exhibit Number 4 three pages, also
[21]   typewritten, on the letterhead of Dr. Gloria
[22]   Small. And these reference Michael Stepski.
[23]   Are those the notes that were
[24]   provided to you concerning Mr. Stepski by
[25]   Mr. Healey and Mr. Gargan?

---

Page 20

**Merriam**

[1]
[2]   **A:** Yes, sir.
[3]   **Q:** Also marked as Exhibit 5 a portion
[4]   of a deposition transcript of Mr. Roderick,
[5]   specifically pages 198 through 206.
[6]   Is that the deposition transcript
[7]   that you are referring to for Mr. Roderick?
[8]   **A:** Yes, sir; yes, sir.
[9]   **Q:** And Exhibit 6 is marked and is the
[10]   portion of the deposition transcript of Michael
[11]   Stepski, specifically pages 373 through 378, 381
[12]   through 314, 416 through 418 —
[13]   **A:** Wait. You said 381 through what?
[14]   **Q:** 381 to 413.
[15]   **A:** Yes.
[16]   **Q:** 416 through 418?
[17]   **A:** Yes.
[18]   **Q:** Page 437?
[19]   **A:** Yes.
[20]   **Q:** 445?
[21]   **A:** Yes.
[22]   **Q:** And 446?
[23]   **A:** Correct.
[24]   **Q:** Is that the extent of the
[25]   documentation that was provided to you by the

---

Page 21

**Merriam**

[1]
[2] plaintiffs' counsel?
[3]    **A:** Yes, sir.
[4]    **Q:** Throughout the entire time that
[5] you have been involved with these three
[6] plaintiffs?
[7]    **A:** That's right.
[8]    **Q:** I just want to make sure that you
[9] haven't seen anything else in terms of
[10] documentation.
[11]    **A:** No, sir.
[12]    **Q:** Okay. And it's fair to say that
[13] you met with Mr. Stepski, Mr. Roderick and
[14] Mr. Schrober?
[15]    **A:** I did.
[16] Schober, isn't it?
[17]    **Q:** Okay.
[18]    **A:** Schober.
[19]    **Q:** I think we have been calling him
[20] Schrober throughout the case.
[21]    **A:** I think there is no R. Or only
[22] one R, terminal R.
[23]    **Q:** Okay. I will try and go with your
[24] pronunciation.
[25]    You saw them all on the same day,

Page 22

**Merriam**

[1]
[2] May 19, 2007, correct?
[3]    **A:** That's correct.
[4]    **Q:** Before you saw the three
[5] plaintiffs, did you have any discussions with
[6] either Mr. Healey or Mr. Gargan concerning the
[7] case, other than the initial telephone
[8] conversation that you had with Mr. Gargan asking
[9] if you would be involved?
[10]    **A:** Not to my recollection.
[11]    **Q:** Okay. When you are involved in a
[12] litigation, do you keep a file?
[13]    **A:** Yes.
[14]    **Q:** Do you keep notes of telephone
[15] conversations and put them in that file?
[16]    **A:** Generally not.
[17]    **Q:** So you do not believe that you
[18] either had a telephone conversation or met in
[19] person with either Mr. Healey or Mr. Gargan or
[20] anybody else from the plaintiffs' side of the
[21] case before you met with these gentlemen on May
[22] 19, 2007; is that right?
[23]    **A:** That's correct.
[24]    **Q:** Have you ever had any discussions
[25] with an attorney in Connecticut concerning this

Page 23

**Merriam**

[1]
[2] matter?
[3]    **A:** Not to my recollection, no.
[4]    **Q:** Who set up the appointments on May
[5] 19th?
[6]    **A:** I did.
[7]    **Q:** Who did you set them up with?
[8]    **A:** I don't recall if I spoke to the
[9] men themselves. What I usually do is ask that
[10] the party contact me to arrange the appointment.
[11] But I don't have a specific recollection of how
[12] I made this particular appointment.
[13]    **Q:** And what time of day was it
[14] that — I take it you saw Mr. Stepski first; is
[15] that right?
[16]    **A:** Yes.
[17]    **Q:** Did they all come together at the
[18] same time?
[19]    **A:** Yes.
[20]    **Q:** Where was the interview with them?
[21]    **A:** I have an office in my home.
[22]    **Q:** In New Rochelle?
[23]    **A:** Correct.
[24]    **Q:** What time did they arrive?
[25]    **A:** Sometime in the morning.

Page 24

**Merriam**

[1]
[2]    **Q:** Can you be any more specific than
[3] that?
[4]    **A:** No, sir.
[5]    **Q:** Did you note their time of arrival
[6] anywhere?
[7]    **A:** No.
[8]    **Q:** And how long did you spend in
[9] total meeting with the three men?
[10]    **A:** I think the total duration was
[11] between four and five hours, if I remember.
[12]    **Q:** Did you see them separately or in
[13] a group?
[14]    **A:** Separately.
[15]    **Q:** Did you ever talk to them together
[16] in a group?
[17]    **A:** No.
[18]    **Q:** You first saw Mr. Stepski?
[19]    **A:** That's right.
[20]    **Q:** Who was next?
[21]    **A:** I don't recall.
[22]    **Q:** Now, you saw them on May 19, 2007.
[23] You prepared reports concerning your interviews,
[24] correct?
[25]    **A:** Correct.

STEPSKI   v.
THE M/V NORASIA

ARNOLD MERRIAM
July 11, 2008

---

Page 25

**Merriam**

[1]
[2]    **Q:** When did you prepare those
[3] reports?
[4]    **A:** I don't recall the date that I
[5] prepared the report.
[6]    **MR. UNGER:** Let me just have
[7] these marked as the next three, if
[8] we could.
[9]    (Whereupon, three separate
[10] reports and handwritten notes, were
[11] received and marked Merriam Exhibits
[12] 7, 8, 9 and 10 for identification,
[13] as of this date.)
[14]    **Q:** Let me show you what we have
[15] marked as Exhibits 7, 8 and 9. Could you just
[16] tell us what those are, please?
[17]    **A:** Yes. Those are the reports that I
[18] wrote regarding the three gentlemen.
[19]    **Q:** Could I have those back?
[20]    (Handing.)
[21]    **Q:** Thank you.
[22] Now, you took notes during the
[23] course of your interviews?
[24]    **A:** That's right.
[25]    **Q:** Let me show what we have marked as

---

Page 26

**Merriam**

[1]
[2] Exhibit 10.
[3]    Can you tell me what that is,
[4] please?
[5]    **A:** Yes. These are handwritten notes.
[6]    **Q:** We have marked them as one
[7] exhibit, but they are the handwritten notes
[8] concerning your interviews of all three men,
[9] correct?
[10]    **A:** Let me make sure they are all
[11] there.
[12]    Yes.
[13]    **Q:** Okay. Is it your regular practice
[14] to take notes during an interview?
[15]    **A:** Yes.
[16]    **Q:** Were you ever asked to conduct an
[17] examination of Mrs. Stepski?
[18]    **A:** No.
[19]    **Q:** Now, you say you don't remember
[20] the exact date that you prepared the reports.
[21] But can you give me an estimate in terms of how
[22] long it was from May 19, 2007 until when you
[23] prepared the reports?
[24]    **A:** I am really not sure when I
[25] prepared them.

---

Page 27

**Merriam**

[1]
[2]    **A:** A couple of days, a week, a month,
[3] shorter, longer?
[4]    **A:** Months, a few months.
[5]    **Q:** Several months?
[6]    **A:** Yes.
[7]    **Q:** And did you have any discussions
[8] with either Mr. Healey or Mr. Gargan subsequent
[9] to your interviews with the three men and before
[10] you prepared your reports?
[11]    **A:** No.
[12]    **Q:** Did you send — prior to preparing
[13] your reports — any correspondence to either
[14] Mr. Healey or Mr. Gargan?
[15]    **A:** No.
[16]    **Q:** When you conducted your
[17] interviews, did each interview last about the
[18] same period of time? Or did you spend more time
[19] with one of the plaintiffs rather than the
[20] others?
[21]    **A:** As I recall, I spent more time
[22] with Mr. Stepski.
[23]    **Q:** Why was that?
[24]    **A:** There was more material.
[25]    **Q:** Had you reviewed the transcripts

---

Page 28

**Merriam**

[1]
[2] of — the portions of the transcript of the
[3] depositions and the notes of Gloria Small prior
[4] to your interviews with the three men?
[5]    **A:** Yes.
[6]    **Q:** And when did you review those
[7] materials?
[8]    **A:** I don't recall.
[9]    **Q:** Shortly before, within a day or
[10] two, was it some period of time longer than
[11] that?
[12]    **A:** I don't recall.
[13]    **Q:** As you went through your
[14] interview, you were taking notes. Did you write
[15] down everything that was discussed or only what
[16] you believed to be salient facts and
[17] observations?
[18]    **A:** I am not a stenographer. So...
[19]    **Q:** So only what you believed to be
[20] significant you wrote down?
[21]    **A:** There was no intentional omission
[22] of material, if that's what you are asking.
[23]    **Q:** Okay.
[24]    **A:** I took the best notes I could of
[25] the questions that I asked and the responses.

---

Page 29

**Merriam**

[1]
[2]   Q: In addition to the interviews, did
[3] you administer any kind of tests to any of the
[4] three men?
[5]   A: No.
[6]   Q: Is this a reason why you didn't
[7] administer any kind of tests?
[8]   A: There are schedules that can be
[9] administered for P.T.S.D. They are generally
[10] used in research settings and did not seem to be
[11] indicated for the purposes for which I was
[12] seeing the men.
[13]   Q: Now, you were seeing the men not
[14] as a clinician to provide any kind of treatment,
[15] but solely in order to render an expert report
[16] in connection with the litigation; is that
[17] correct?
[18]   A: I was seeing them in order to
[19] establish a diagnosis and treatment
[20] recommendations. I was not myself intending to
[21] treat them.
[22]   Q: So there was no physician-patient
[23] privilege or — I am sorry — physician-patient
[24] relationship between yourself and any of the
[25] three men; is that right?

Page 30

**Merriam**

[1]
[2]   A: Well, I did not treat them, no.
[3]   Q: Okay. You don't consider that
[4] there was a physician-patient relationship; is
[5] that right?
[6]   A: I didn't — well, I issued
[7] recommendations to them that they should be
[8] treated. So to that extent there was a
[9] physician-patient relationship, but I wasn't
[10] seeing them in order to personally offer them
[11] treatment. I didn't write any prescriptions. I
[12] didn't arrange any follow-up visits.
[13]   Q: In your practice as a clinician in
[14] treating P.T.S.D. patients, do you typically
[15] administer a battery of tests?
[16]   A: No.
[17]   Q: Are you aware that there are tests
[18] which some clinicians do recommend be performed
[19] when dealing with P.T.S.D. patients or potential
[20] P.T.S.D. patients?
[21]   A: There are batteries of tests, yes.
[22]   Q: Why did you conclude that those
[23] tests did not appear to be indicated in this particular situation?
[24] administered in this particular situation?
[25]   A: Because I conducted clinical

Page 31

**Merriam**

[1]
[2] interviews that were designed to see whether or
[3] not the individuals had psychiatric signs and
[4] symptoms that were commensurate with any
[5] psychiatric disorder, recognized psychiatric
[6] disorder. So I elicited what I could of their
[7] psychiatric signs and symptoms, compared them
[8] with known psychiatric disorders, the criteria
[9] for known psychiatric disorders. I didn't need
[10] a test battery to do that.
[11]   Q: Okay. Now, going into these
[12] interviews, you were aware that Dr. Small had
[13] indicated that she believed at least with
[14] respect to Stepski and Roderick that they were
[15] suffering from P.T.S.D.?
[16]   A: Yes.
[17]   Q: Had you drawn any conclusions
[18] concerning Dr. Small's observations before
[19] seeing either man?
[20]   A: Did I draw any conclusions?
[21]   Q: Did you have any thoughts
[22] concerning Dr. Small's diagnosis of P.T.S.D.
[23] prior to seeing either man?
[24]   A: No.
[25]   Q: You just noted that fact, but it

Page 32

**Merriam**

[1]
[2] didn't affect the way you went about your
[3] interview?
[4]   A: No.
[5]   Q: No.
[6] What did Mr. Roderick and Schober
[7] do while you were having your interview with
[8] Mr. Stepski?
[9]   A: They were in the waiting room.
[10]   Q: Okay. And —
[11]   A: If I remember correctly, one of
[12] them went out for a cigarette.
[13]   Q: Was that the case when Mr. Stepski
[14] was finished with his interview and you saw
[15] whichever was the next man in order —
[16]   A: Yes.
[17]   Q: — the two who were not being
[18] interviewed hung around in the waiting room?
[19]   A: Yes.
[20]   Q: Okay. Do you know if the men in
[21] the waiting room had any discussions concerning
[22] your interview at any time?
[23]   A: I wouldn't know.
[24]   Q: You don't know if Stepski was
[25] comparing notes with man number three while you

STEPSKI   v.
THE M/V NORASIA

ARNOLD MERRIAM
July 11, 2008

---

Page 33

**Merriam**

[1]
[2] were interviewing man number two, in other
[3] words?
[4]    **A:** I don't know.
[5]    **Q:** Had you asked any of them at any
[6] time during your interview if they had
[7] previously gotten together to discuss either the
[8] case or the approach to your interviews?
[9]    **A:** I didn't ask.
[10]    **Q:** Do you know — subsequently, did
[11] you ever find out that they had had meetings
[12] together in order to discuss the case and to
[13] discuss in particular your interviews?
[14]    **A:** I don't understand your question.
[15] Subsequent to what?
[16]    **Q:** Subsequent to the interviews
[17] taking place, did you ever come to learn that in
[18] advance of the interviews, the three men had
[19] gotten together either separately or with
[20] counsel to discuss the interviews?
[21]    **A:** I have never been told that.
[22]    **Q:** Okay. And do you know if — have
[23] any information as to any meetings that took
[24] place either with the three men or with the
[25] three men and their counsel subsequent to the

Page 34

**Merriam**

[1]
[2] interviews, in which the interviews were
[3] discussed?
[4]    **A:** I have no information regarding
[5] that.
[6]    **Q:** Let me ask you to refer then,
[7] Doctor, to Exhibit 7, which is your report
[8] concerning Mr. Stepski?
[9]    **A:** Okay.
[10]    (Witness reviewing document.)
[11]    **Q:** He told you that prior to the
[12] incident which took place on May 22, 2004, he
[13] had been in, as you write, excellent state of
[14] physical and mental health?
[15]    **A:** That's what he said.
[16]    **Q:** When you take an interview of any
[17] patient, not just these three men, but any
[18] patient who you interview in your practice, do
[19] you accept everything everybody says as being
[20] 100 percent truthful? Or do you sometimes look
[21] at it and say, I got to look at this with a
[22] clinician's view and take what the patients say
[23] with somewhat of a grain of salt?
[24]    **A:** The latter.
[25]    **Q:** Okay. Now, Mr. Stepski gave you

Page 35

**Merriam**

[1]
[2] an account of the incident, correct?
[3]    **A:** That's correct.
[4]    **Q:** And is that the account that is
[5] set out in your report and in your notes? Is
[6] that the complete account of what he told you?
[7]    **A:** Yes.
[8]    **Q:** You were careful in taking notes
[9] concerning the facts of the occurrence?
[10]    **A:** I tried, yes.
[11]    **Q:** And that's because, especially in
[12] dealing with P.T.S.D., it's important to
[13] understand what circumstances the person was
[14] exposed to?
[15]    **A:** Yes.
[16]    **Q:** Is that fair to say?
[17]    **A:** Yes.
[18]    **Q:** You note that he told you as the
[19] other boat was approaching, that he felt a sense
[20] of emergency?
[21]    **A:** Yes.
[22]    **Q:** Did he elaborate on what meant by
[23] that?
[24]    **A:** I think it speaks for itself.
[25]    **Q:** Okay. I am just trying to put it

Page 36

**Merriam**

[1]
[2] in context. Did he —
[3]    **A:** He told me he felt this was an
[4] emergency, state of emergency.
[5]    **Q:** Now, he said he visualized the
[6] approaching ship in a state of fear as it
[7] approached had and you wrote "such a strong
[8] effect on him"?
[9]    **A:** That's what he said.
[10]    **Q:** What did you understand that to
[11] mean?
[12]    **A:** That the state of fear that he was
[13] in was intense.
[14]    **Q:** Now, he said he and his crew saw
[15] the other boat approaching theirs and you wrote
[16] that he told you that they felt they were going
[17] to die. Then he quickly amended — but
[18] Mr. Stepski quickly amended that to say that he
[19] knew they were going to die. Is there any
[20] significance that you attribute to Mr. Stepski's
[21] change of wording?
[22]    **A:** I think he was trying to explain
[23] how he felt and he was trying to find the right
[24] words and first said, I thought we were going to
[25] die and then he said, I knew we were going to

---

ARNOLD MERRIAM
July 11, 2008

STEPSKI  v.
THE M/V NORASIA

Page 37

**Merriam**

[1]
[2] die. He had a state of conviction that he was
[3] about to die.
[4]   **Q:** Okay.
[5]   **A:** Is my recollection.
[6]   **Q:** And he had thoughts of his
[7] daughter?
[8]   **A:** That's what he told me.
[9]   **Q:** Did he use the word daughter or
[10] daughters?
[11]   **A:** That I don't recall.
[12]   **Q:** Were you aware that at that time
[13] he had two daughters? You said it later in your
[14] report. But what I am asking you is —
[15]   **A:** He has two daughters, two and four
[16] years old.
[17]   **Q:** Right. But had he previously told
[18] you before he made the poor daughter remark,
[19] that he had two children?
[20]   **A:** I didn't elicit that he had two
[21] children until later.
[22]   **Q:** Okay.
[23]   **A:** And it's possible that he said
[24] daughters and I wrote down daughter. Or, again,
[25] I am not a stenographer. I am taking

Page 38

**Merriam**

[1]
[2] handwritten notes as quickly as I can while I am
[3] talking to someone.
[4]   **Q:** Okay.
[5]   **A:** So he certainly has two daughters.
[6] He may well have said daughters.
[7]   **Q:** Sitting here today, you don't know
[8] if he said daughter or daughters?
[9]   **A:** Correct.
[10]   **Q:** Would it be significant if he said
[11] daughter as opposed to daughters?
[12]   **A:** I don't know why he would say
[13] daughter instead of daughters. More likely than
[14] not he said daughters, but I don't recall.
[15]   **Q:** You don't remember?
[16]   **A:** No.
[17]   **Q:** He said that he estimated the time
[18] between having heard the other vessel and the
[19] actual collision was between 30 and 60 seconds;
[20] is that right?
[21]   **A:** That's what he said, yes.
[22]   **Q:** Did you ask him at all what he
[23] estimated the other vessel's speed to be?
[24]   **A:** I don't think I asked him. Nor
[25] would it mean anything to me.

Page 39

**Merriam**

[1]
[2]   **Q:** Okay. Well, would it be
[3] significant if a vessel — if the collision was
[4] between two objects that were coming together at
[5] a speed of say 20 miles an hour versus two
[6] objects coming together at a speed of say
[7] 10 miles an hour, five miles an hour or 40 miles
[8] an hour, 50 miles an hour?
[9]   **A:** What was the first part of the
[10] question?
[11]   **Q:** Does the speed of how quickly the
[12] two objects that collide are approaching one
[13] another impact upon the experience of someone
[14] who may have P.T.S.D.?
[15]   **A:** What affects the P.T.S.D.
[16] experience is the danger, the threat. And if
[17] the object that is approaching you is very, very
[18] large and capable of harming you, I don't think
[19] that the speed is critical, if it's — you
[20] realize it's coming toward you and that you are
[21] in danger. I don't think it matters how much —
[22] whether it's coming at five miles an hour or
[23] 50 miles an hour.
[24]   **Q:** Okay. Other than describing that
[25] the boat had a bulbous bow, did Mr. Stepski

Page 40

**Merriam**

[1]
[2] describe the other boat?
[3]   **A:** I had him draw a picture of the
[4] relative sizes of the two boats, and that's what
[5] that is (indicating).
[6]   **Q:** That's the second page of Exhibit
[7] 10?
[8]   **A:** Yes.
[9]   **Q:** Which are your notes?
[10]   **A:** Yes.
[11]   **Q:** So that's a picture drawn by
[12] Mr. Stepski?
[13]   **A:** Yes.
[14]   MR. UNGER: Off the record.
[15]
[16]   (Discussion off the record.)
[17]   **Q:** Other than drawing the picture,
[18] did he provide any other description concerning
[19] the vessel that hit his boat?
[20]   **A:** It was substantially larger than
[21] his and —
[22]   **Q:** Did he give you a color or
[23] anything like that?
[24]   **A:** No, sir.
[25]   **Q:** He was the big boat being —

STEPSKI  v.
THE M/V NORASIA

ARNOLD MERRIAM
July 11, 2008

---

Page 41

**Merriam**

[1]
[2] **A:** He was the little boat.
[3] **Q:** He was the little boat with the
[4] big boat bearing down on him and that was enough
[5] as far as your interview was concerned?
[6] **A:** Correct.
[7] **Q:** Okay.
[8] **A:** His fear was that the big boat was
[9] going to harm him.
[10] **Q:** Okay. Mr. Stepski and the other
[11] two were on the back end of his boat at the time
[12] of his collision, right, that's what he told
[13] you?
[14] **A:** You know, I don't recall that fact
[15] off the top of my head. He told me that his
[16] boat was cut in two and that he and the two crew
[17] were all on the same portion of the now cut in
[18] half boat.
[19] **Q:** Okay.
[20] **A:** But I don't recall which part of
[21] the boat they were standing.
[22] **Q:** Are you a boater, by the way?
[23] **A:** No. I think you could probably
[24] tell that from my answers.
[25] **MR. UNGER:** Can we just take

---

Page 42

**Merriam**

[1]
[2] a break for five minutes?
[3]      (Recess taken 2:08 p.m. to
[4] 2:11 p.m.)
[5] **Q:** Before the deposition today, did
[6] you review any materials in order to prepare?
[7] **A:** I reviewed the materials at hand.
[8] **Q:** Okay. The documents we have
[9] marked as exhibits?
[10] **A:** Correct.
[11] **Q:** Did you do anything else to
[12] prepare for the deposition?
[13] **A:** I looked at the DSM criteria.
[14] **Q:** Okay.
[15] **A:** Once again.
[16] **Q:** Anything else?
[17] **A:** No.
[18] **Q:** Did you meet with Mr. Gargan or
[19] Mr. Healey?
[20] **A:** I met with Mr. Gargan.
[21] **Q:** When was that?
[22] **A:** Earlier in the week.
[23] **Q:** Okay. For how long?
[24] **A:** About an hour.
[25] **Q:** And had you had other meetings

---

Page 43

**Merriam**

[1]
[2] with either Mr. Gargan or Mr. Healey prior to
[3] that?
[4] **A:** I have never met Mr. Healey.
[5] **Q:** Okay. About this case, I am
[6] talking about.
[7] **A:** Yes. I have never met Mr. Healey
[8] and I think I met with Mr. Gargan one other
[9] time. I don't recall.
[10] **Q:** Subsequent to preparing your
[11] reports?
[12] **A:** Correct.
[13] **Q:** How long was that other meeting
[14] with Mr. Gargan?
[15] **A:** Maybe a half hour.
[16] **Q:** What was the purpose of that
[17] meeting?
[18] **A:** I don't even recall.
[19] **Q:** Okay. Did you have any of the
[20] other men besides Mr. Stepski draw you any
[21] pictures or anything?
[22] **A:** No.
[23] **Q:** Did they bring anything with them
[24] to the interviews?
[25] **A:** No, sir.

---

Page 44

**Merriam**

[1]
[2] **Q:** Were they accompanied by anybody?
[3] **A:** No, sir.
[4] **Q:** Just the three men showed up?
[5] **A:** Correct.
[6] **Q:** All right. Now, going back to
[7] your report on Mr. Stepski?
[8] **A:** Yes.
[9] **Q:** He said that he was surprised he
[10] was alive?
[11] **A:** I am trying to recall.
[12] **Q:** About seven or eight lines up from
[13] the bottom.
[14] **A:** Yes.
[15] **Q:** Okay. Did he indicate why?
[16] **A:** He just described having been —
[17] his boat having been in a collision with a
[18] larger boat and his boat cut in half.
[19] **Q:** Okay.
[20] **A:** And anticipating that he was going
[21] to die and he didn't die. So it's consistent,
[22] feeling surprised that he was still alive.
[23] **Q:** Okay. Now, he indicated to you
[24] that at the time the three of them were bobbing
[25] around in the water 30 miles out at sea after

---

Page 45

[1]                         **Merriam**
[2] the portion of their boat sank, correct?
[3]     **A:** Yes, yes.
[4]     **Q:** But subsequently he was able to
[5] have the life raft inflate and then he got cold
[6] weather emergent suits for the crew members,
[7] correct?
[8]     **A:** Yes.
[9]     **Q:** And he was able to also find the
[10] EPIRB, the signaling device that tells the Coast
[11] Guard that there is an emergency and indicates
[12] the position of where that particular unit is?
[13]     **A:** Yes. Ultimately he located that.
[14]     **Q:** Okay. Within a couple of minutes,
[15] correct?
[16]     **A:** I don't recall the time frame.
[17] But at first he did not see the EPIRB, because
[18] it was located on a wall that was no longer
[19] there. And there was also no life raft
[20] initially. So his initial experience was that
[21] he told me that we were just three guys bobbing
[22] in the water, shocked to be alive.
[23]     **Q:** Well, as I said, ultimately they
[24] all got in the life raft, they all had cold
[25] weather emergent suits put on, they found the

Page 46

[1]                         **Merriam**
[2] EPIRB, turned it on, they found a compass, they
[3] found water and some other provisions — I am
[4] sorry — beer and some other provisions, right?
[5]     **A:** Yes.
[6]     **Q:** All within a few minutes, correct?
[7]     **A:** I don't recall the number of
[8] minutes.
[9]     **Q:** Was it significant the length of
[10] time that they were exposed in terms of just
[11] three guys bobbing around in the sea until they
[12] were safe and secure in their life raft with
[13] emergent suits on?
[14]     **A:** I think the most important thing
[15] about that event is that there was a period of
[16] time when they were bobbing around and that,
[17] first of all, they easily could have been killed
[18] by the collision itself. And then were bobbing
[19] around in the water with no promise of finding
[20] the EPIRB or getting on life suits or having
[21] even beer to drink. So that their experience
[22] was that they were facing death.
[23]     **Q:** Well, Mr. Stepski, according to
[24] your report, suggested initially the situation
[25] as, his word, hopeless? Very bottom of page

Page 47

[1]                         **Merriam**
[2] one.
[3]     **A:** Yes, that's what he said.
[4]     **Q:** And then further on, on that same
[5] line you note that a few minutes later:
[6]     **A:** Yes.
[7]     **Q:** The raft, you don't know how long
[8] it was, though?
[9]     **A:** I don't know.
[10]     **Q:** Is the length of time that they
[11] were just without the life raft and the other
[12] things that they eventually found, is that at
[13] all significant in terms of their experience?
[14]     **A:** It's potentially of significance.
[15] But the facts of the event and the duration of
[16] the event is more than sufficient to be
[17] classified as a life-threatening event that
[18] meets the DSM-IV criteria for P.T.S.D.
[19]     **Q:** Okay. So in your opinion, it
[20] wouldn't matter if they were only bobbing around
[21] in the water for a minute versus an hour, it
[22] makes no difference?
[23]     **A:** Well, I am not going to say that
[24] it makes no difference. The more distress that
[25] they are in and the longer that they are in the

Page 48

[1]                         **Merriam**
[2] worse. But this is much, much, much more than
[3] bad enough.
[4]     **Q:** Now, Mr. Stepski's actions in
[5] getting the life raft organized, getting the
[6] rope released, actually going in and getting the
[7] emergent suits, looking and finding the EPIRB,
[8] the provisions, the compass, things like that,
[9] shows a presence of mind on his part?
[10]     **A:** Yes.
[11]     **Q:** Shows that he was capable of
[12] rational, coherent thinking?
[13]     **A:** Yes.
[14]     **Q:** And, in fact, he was acting with
[15] prudence in terms of doing the best he could
[16] under the circumstances to make their situation
[17] as best as could be?
[18]     **A:** Yes. As I understood it, he
[19] really went into emergency mode and did
[20] everything he could to try to survive and try to
[21] help his crew survive. And he — I am trying to
[22] see where I wrote it. But I recall that he
[23] dove — yes. He made several dives into the
[24] water to get materials that would help them
[25] survive and it was actually dangerous for him to

STEPSKI   v.
THE M/V NORASIA

ARNOLD MERRIAM
July 11, 2008

---

Page 49

**Merriam**

[1]
[2] do that. But he was in emergency mode, doing
[3] everything he could to try to — he had no idea
[4] if they would be rescued or when they would be
[5] rescued. And he was doing everything he could
[6] to try to survive as long as they could.
[7]    **Q:** You noted that they found beer?
[8]    **A:** That's what they told me — that's
[9] what he told me, yes. Found ketchup, mustard.
[10]    **Q:** Did you ask if he or any of the
[11] other men consumed any of the beer while they
[12] were in the life raft?
[13]    **A:** If I had asked, I would have
[14] written it down. So I don't believe I asked.
[15]    **Q:** Did you ask if any of the men had
[16] been drinking beer before the collision?
[17]    **A:** I don't recall asking that.
[18]    **Q:** What significance, if any, is it
[19] that Mr. Stepski's dog drowned?
[20]    **A:** He was actually emotionally
[21] attached to the dog. That was all. Emotional
[22] loss for him.
[23]    **Q:** Okay. Does that impact one way or
[24] the other in terms of your finding that he
[25] suffers from P.T.S.D.?

Page 50

**Merriam**

[1]
[2]    **A:** No. Even if the dog had lived, it
[3] would not have altered my conclusion.
[4]    **Q:** It's just a factoid in the report?
[5]    **A:** That's correct.
[6]    **Q:** You noted that they spent about
[7] four hours in the life raft before they were
[8] rescued?
[9]    **A:** That's what Mr. Stepski told me.
[10]    **Q:** Okay. And you also noted that
[11] they heard some ships pass?
[12]    **A:** Yes.
[13]    **Q:** He told you that as well?
[14]    **A:** Yes, sir.
[15]    **Q:** Did they undertake to try to
[16] signal the passing ships, to your knowledge?
[17]    **A:** I don't recall.
[18]    **Q:** What else did Mr. Stepski tell you
[19] about the incident and the rescue —
[20]    **A:** That —
[21]    **Q:** — that's not included in the
[22] report?
[23]    **A:** I don't recall anything that I
[24] didn't include in the report. The helicopter
[25] was passing by, he assumed it was looking for

Page 51

**Merriam**

[1]
[2] them, but he didn't have any — he was
[3] frightened that the helicopter would not find
[4] them.
[5]    **Q:** He was concerned that they might
[6] be in the life raft for a considerable period of
[7] time?
[8]    **A:** Yes.
[9]    **Q:** To your knowledge, did it occur to
[10] Mr. Stepski to undertake to try to paddle the
[11] life raft either back to the shipping lane or
[12] toward the shore?
[13]    **A:** I don't recall talking about that
[14] with him.
[15]    **Q:** Did Mr. Stepski talk about after
[16] they were in the helicopter and his experience
[17] with meeting his wife in Cape Cod?
[18]    **A:** I don't recall talking about that.
[19]    **Q:** Have you ever talked to
[20] Mrs. Stepski?
[21]    **A:** No.
[22]    **Q:** Have you ever talked to any of the
[23] three plaintiffs at any time other than when you
[24] met with them back in May 2007?
[25]    **A:** No.

Page 52

**Merriam**

[1]
[2]    **Q:** Did Mr. Stepski tell you that he
[3] went — withdrawn.
[4]        You mentioned that at first he
[5] felt in a state of shock?
[6]    **A:** That's what he told me.
[7]    **Q:** Okay. Is that when he got back
[8] home? Because the next sentence in your report
[9] says he had trouble sleeping?
[10]    **A:** Yes.
[11]    **Q:** I am trying to figure out what
[12] context of time we are talking about.
[13]    **A:** Yes. This was acutely.
[14]    **Q:** That same day?
[15]    **A:** Yes. Well, yes. The initial day,
[16] days.
[17]    **Q:** Okay. He told the story of the
[18] event to the news and to family and friends,
[19] okay?
[20]    **A:** That's what he told me.
[21]    **Q:** Does that impact one way or the
[22] other in terms of your views as to whether he
[23] has P.T.S.D. or not?
[24]    **A:** No.
[25]    **Q:** Reliving the experience to friends

---

Page 53

[1]                    **Merriam**
[2] and media, is that significant?
[3]    A: Not necessarily, no. It's
[4] actually — there are some individuals that
[5] think that it's good to talk about the emotional
[6] trauma and there are other people that think
[7] it's not good. There is no —
[8]    Q: It can be cathartic to discuss it?
[9]    A: It might be for some people.
[10]    Q: There are different views among
[11] the mental health professionals —
[12]    A: Right.
[13]    Q: — as to whether that is helpful
[14] or not?
[15]    A: Correct.
[16]    Q: In Mr. Stepski's case, did you
[17] believe it could be helpful or unhelpful that he
[18] was discussing the events?
[19]    A: I didn't determine that.
[20]    Q: Is there a reason why you didn't
[21] determine that?
[22]    A: Well, it's long gone.
[23]    Q: What's that?
[24]    A: I wasn't — I didn't see him in
[25] the acute stage where I would counsel him.

Page 54

[1]                    **Merriam**
[2]    Q: Did you inquire, though, as to
[3] whether he felt that discussing it was helpful
[4] or not, unhelpful?
[5]    A: No, I didn't inquire.
[6]    Q: Okay. You said he then told you
[7] he stayed home and took a week off of work?
[8]    A: Yes.
[9]    Q: Did he tell you that, in fact, he
[10] went back out on other boats during that week
[11] off?
[12]    A: He did not tell me that.
[13]    Q: Okay. Would that be significant
[14] if he had been on other boats in the immediate
[15] days after the incident?
[16]    A: Not necessarily, no. He
[17] ultimately did go back to sea.
[18]    Q: About a week later?
[19]    A: About a week later.
[20]    Q: He went back looking to recover
[21] the gear that was still down on the bottom?
[22]    A: That's what he told me.
[23]    Q: Okay. Now, the state of shock,
[24] how long did that last?
[25]    A: I didn't make a notation about how

Page 55

[1]                    **Merriam**
[2] long it lasted. I just said at first.
[3]    Q: Is it significant one way or the
[4] other how long a patient is in a state of shock?
[5]    A: Not necessarily.
[6]    Q: Now, you say once back at sea he
[7] used binoculars and was on constant lookout for
[8] other ships. He kept seeing things on the water
[9] that he thought might have been ships headed for
[10] him. He was tense and kept his hands clenched.
[11]    What is the significance of those
[12] observations?
[13]    A: It shows hypervigilance for a
[14] threat and anxiety.
[15]    Q: Now, you then note that he
[16] repeatedly woke up the next man on watch
[17] prematurely?
[18]    A: Yes.
[19]    Q: How often did he do that?
[20]    A: I don't know. He just said that.
[21] I wrote repeatedly. It means he did it more
[22] than once. I don't know.
[23]    Q: Was this on the same first trip
[24] back or on subsequent trips?
[25]    A: I don't know the answer to that,

Page 56

[1]                    **Merriam**
[2] on how many trips.
[3]    Q: Well, you are aware that —
[4]    A: Hold on. Actually, he told me
[5] even — if you go down a few paragraphs to the
[6] second to last paragraph on the page, he told me
[7] the type of behavior continues, that he doesn't
[8] trust other people to keep watch, he gets up
[9] every hour to check on them, because he doesn't
[10] trust them to effectively keep on the lookout
[11] for other ships. So he is up for 30 hours at a
[12] clip except for brief naps.
[13]    So the behavior of not trusting
[14] others to keep effective lookout is continuous
[15] through the time that I saw him.
[16]    Q: Did he indicate that prior to this
[17] incident he had been completely trustworthy of
[18] his other crew members to stand their watch and
[19] he didn't have to wake up or would wake up?
[20]    A: He represented this is a change.
[21]    Q: Well, a change from what, though?
[22]    A: From his previous demeanor.
[23]    Q: Was his previous demeanor that he
[24] would wake up occasionally or he would never
[25] wake up at all?

STEPSKI   v.
THE M/V NORASIA

ARNOLD MERRIAM
July 11, 2008

---

Page 57

**Merriam**

[1]
[2]   **A:** I don't know the answer to that.
[3]   **Q:** So we don't know what the baseline
[4] is in terms of the change —
[5]   **A:** Correct.
[6]   **Q:** — now?
[7]   **A:** But he represented it as a change.
[8]   **Q:** Okay. He said that he considered
[9] giving up fishing because he couldn't cope
[10] emotionally?
[11]   **A:** That's what he said.
[12]   **Q:** Did he elaborate on this?
[13]   **A:** No.
[14]   **Q:** Did you inquire further?
[15]   **A:** Well, he had already told me what
[16] his symptoms were, that he was anxious and
[17] hypervigilant and found it very stressful and
[18] the statement that he was considering giving up
[19] fishing was in the context of those emotional
[20] complaints that I just enumerated earlier.
[21]   **Q:** Is it significant at all that he
[22] didn't give up fishing, that he continues to
[23] fish to this day?
[24]   **A:** Yes.
[25]   **Q:** In what way is it significant?

---

Page 58

**Merriam**

[1]
[2]   **A:** He is forced to deal with
[3] something that is stressful for him.
[4]   **Q:** Well, did you have any discussions
[5] with him about alternative sources of employment
[6] or career income?
[7]   **A:** My recollection is that this is
[8] the only type of work he knows.
[9]   **Q:** Well, we can agree that nobody is
[10] holding a gun to his head saying, you absolutely
[11] have to go fishing, you can't do anything else,
[12] right?
[13]   **A:** There was no statement that
[14] someone was holding a gun to his head, no.
[15]   **Q:** Figuratively?
[16]   **A:** No, there is no one holding a gun
[17] to his head.
[18]   **Q:** Okay. You next note that for four
[19] or five months after the incident he went
[20] fishing close to shore in a smaller boat.
[21] That's what he told you?
[22]   **A:** That's what he told me.
[23]   **Q:** He told you that it was one of two
[24] other boats that he owned at the time of the
[25] collision?

---

Page 59

**Merriam**

[1]
[2]   **A:** I didn't go into any further
[3] detail about that. What the told me was that it
[4] was frightening and anxiety provoking for him to
[5] go to sea. So he tried to fish using a smaller
[6] boat, less far away from the shoreline to try
[7] and get used to being on a boat. And like to
[8] try and do something less dangerous in an
[9] attempt to get back on the horse, so to speak.
[10]   **Q:** Did he share with you that the
[11] other smaller boat he was using during this
[12] period of time was actually not set up or
[13] capable of being used for the type of offshore
[14] fishing that he was doing at the time of the
[15] collision?
[16]   **A:** No. We didn't talk about that.
[17]   **Q:** What else did Mr. Stepski share
[18] with you concerning his activities in the
[19] several months after the collision?
[20]   **A:** Nothing that is not recorded in my
[21] notes.
[22]   **Q:** So he didn't tell you that he was
[23] soon after the collision in the market for
[24] purchasing a replacement boat for the one that
[25] sank?

---

Page 60

**Merriam**

[1]
[2]   **A:** I don't recall that we spoke about
[3] that.
[4]   **Q:** Then he purchased such a boat and
[5] used that boat then to go out fishing and he
[6] continues to use that boat to go fishing
[7] offshore?
[8]   **A:** I don't know about that.
[9]   **Q:** Any significance about the fact
[10] that he ultimately did as soon as he was able to
[11] replace the boat that sank and went back to
[12] doing the same kind of fishing that he was doing
[13] at the time?
[14]   **A:** In terms of P.T.S.D.?
[15]   **Q:** Yes.
[16]   **A:** The significant thing about
[17] P.T.S.D. is that he continues to experience
[18] symptoms, even though he has returned to his
[19] vocation, it's with symptoms.
[20]   **Q:** Well, we will get to the symptoms.
[21] But any other significance in respect to
[22] P.T.S.D. that he is back to doing the same
[23] activities?
[24]   **A:** There are some cases of P.T.S.D.
[25] where people are unable to surmount their

---

ARNOLD MERRIAM
July 11, 2008

STEPSKI   v.
THE M/V NORASIA

---

Page 61

[1]                    **Merriam**

[2] symptoms enough to return to work. Other people

[3] can.

[4]   **Q:** All right. You mentioned that

[5] Mr. Stepski considers himself permanently

[6] changed?

[7]   **A:** That's what he told me.

[8]   **Q:** In what way?

[9]   **A:** I will read what he told me.

[10]   **Q:** Right.

[11]   **A:** Which is that he is now much more

[12] aware of danger when he is at sea, he feels that

[13] he is a nervous wreck. He said that he checks

[14] and rechecks excessively, that he is preoccupied

[15] with thoughts of boats sinking, how boats can

[16] sink.

[17]   **Q:** Let me just stop you right there.

[18]   **A:** Okay.

[19]   **Q:** Do you agree that fishing,

[20] commercial fishing is a dangerous occupation?

[21]   **A:** Intrinsically dangerous

[22] occupation?

[23]   **Q:** Yes.

[24]   **A:** I don't know enough about it to

[25] know. I think it is more dangerous than being a

---

Page 62

[1]                    **Merriam**

[2] doctor or an attorney. But I don't know how

[3] much more dangerous it is than other

[4] occupations.

[5]   **Q:** You are not aware that

[6] statistically commercial fishermen suffer some

[7] of the highest rates of on-the-job accidents

[8] among any kind of employment?

[9]   **A:** I don't know what those statistics

[10] are.

[11]   **Q:** Now, in terms of a nervous wreck,

[12] did he describe what he meant by that?

[13]   **A:** I think it speaks for itself, he

[14] is nervous.

[15]   **Q:** Then he checks and rechecks, his

[16] word, excessively?

[17]   **A:** I don't know that his word was

[18] excessively or mine.

[19]   **Q:** Okay. What is excessive?

[20]   **A:** Excessive means that after

[21] checking for something, you immediately check

[22] again, because you don't trust your — what your

[23] senses told you the first time that you checked.

[24]   **Q:** Well, what was he checking and

[25] rechecking? What things?

---

Page 63

[1]                    **Merriam**

[2]   **A:** For oncoming ships.

[3]   **Q:** Okay. So he was talking about

[4] checking his radar and keeping a lookout?

[5]   **A:** Yes. Checking the radar and the

[6] horizon, yes.

[7]   **Q:** And you say later on down, "While

[8] at sea scans the horizon for other ships." Not

[9] a bad idea, huh?

[10]   **A:** Not a bad idea. But it's

[11] something that could be done calmly or it's

[12] something that could be done with anxiety or

[13] it's something that could be done excessively.

[14]   **Q:** And he says he does it excessively

[15] and it's —

[16]   **A:** Without confidence that he is

[17] safe.

[18]   **Q:** And he is anxious about it, true?

[19]   **A:** Yes.

[20]   **Q:** Subjective?

[21]   **A:** Yes.

[22]   **Q:** Okay. You indicate that he no

[23] longer looks forward to going out to sea —

[24]   **A:** That's what he told me.

[25]   **Q:** — anymore.

---

Page 64

[1]                    **Merriam**

[2] Again, there is no way to measure

[3] this desire to go out to sea or is there?

[4]   **A:** No, there is no way to measure

[5] that.

[6]   **Q:** Okay. For awhile he dread going

[7] out, but now he no longer dreads going out?

[8]   **A:** That's what he said.

[9]   **Q:** Okay. How long did he dread going

[10] out?

[11]   **A:** I don't know.

[12]   **Q:** Did you ask?

[13]   **A:** I don't recall I asked.

[14]   **Q:** Okay. He now experiences no

[15] enthusiasm and no drive?

[16]   **A:** That's what he said.

[17]   **Q:** Are there tests that can be given

[18] to someone to measure their job satisfaction?

[19]   **A:** There are not tests. There are

[20] scales.

[21]   **Q:** Scales?

[22]   **A:** Yes.

[23]   **Q:** Okay. Is there any way —

[24]   **A:** It's just a way of quantifying

[25] subjective responses. It's not an objective

---

STEPSKI   v.
THE M/V NORASIA

ARNOLD MERRIAM
July 11, 2008

---

Page 65

**Merriam**

[1]
[2] test.
[3] **Q:** He has reduced the quantity of his
[4] catch and, therefore, his income?
[5] **A:** That's what he told me.
[6] **Q:** You haven't seen any records?
[7] **A:** No, sir.
[8] **Q:** Do you know anything as to how
[9] Mr. Stepski's income relates vis-a-vis other
[10] commercial fishermen?
[11] **A:** No idea.
[12] **Q:** And he is less aggressive?
[13] **A:** That's what he told me.
[14] **Q:** What did you understand that to
[15] mean?
[16] **A:** He explained that the skipper of
[17] the boat has choices to make about where he is
[18] going to sail the boat in search of fish. And
[19] that he is less willing to take chances and more
[20] conservative and this has caused his catch to
[21] decline. And he just wants to finish his work
[22] and get back to shore.
[23] **Q:** He goes on to say that he finds
[24] his mind dwells on bad things that he hears on
[25] the news?

Page 66

**Merriam**

[1]
[2] **A:** That's what he said.
[3] **Q:** How often, did he indicate?
[4] **A:** No. He didn't tell me how often
[5] that happens.
[6] **Q:** Or how long he dwells?
[7] **A:** He didn't tell me.
[8] **Q:** Did you discuss with him any
[9] strategies as to how not to dwell on these bad
[10] things that he hears on the news?
[11] **A:** No.
[12] **Q:** There are strategies for doing
[13] that, correct?
[14] **A:** Yes.
[15] **Q:** Part of the therapy?
[16] **A:** Yes.
[17] **Q:** And he also told you that these
[18] bad things that he hears now affect him in a way
[19] that they didn't before?
[20] **A:** That's what he said.
[21] **Q:** In what way do they affect him?
[22] Did he say?
[23] **A:** He just said that they affect him
[24] emotionally. So he has a more disturbing
[25] quality to bad news.

Page 67

**Merriam**

[1]
[2] **Q:** He said he finds it difficult to
[3] be happy?
[4] **A:** That's what he said.
[5] **Q:** And he worries all of the time?
[6] **A:** That's what he said.
[7] **Q:** Okay. And you quoted both of
[8] those statements?
[9] **A:** Yes.
[10] **Q:** Any significance to that?
[11] **A:** It was approximating his words.
[12] **Q:** Okay. And he had a fear that his
[13] children might be kidnapped?
[14] **A:** That's what he told me.
[15] **Q:** Did you discuss that with him,
[16] this fear, in any detail?
[17] **A:** No. He just told me that he was
[18] now worried that his children might be kidnapped
[19] and that he has thoughts about terrible things
[20] that would happen to them if they were. But we
[21] didn't describe them.
[22] **Q:** Is there a relevance to these
[23] thoughts that he has concerning his children?
[24] **A:** I interpret this as another
[25] example of exaggeration of threats and the

Page 68

**Merriam**

[1]
[2] environment that is typical of P.T.S.D.
[3] **Q:** He told you about putting four
[4] fire extinguishers in his house?
[5] **A:** Yes. He told me that he put four
[6] fire extinguishers in his home and that he knew
[7] that this was many more than was needed. I
[8] think he told me that only one were called for.
[9] But that he was anxious and trying to soothe
[10] himself by trying to be as safe as he possibly
[11] could.
[12] **Q:** Do you find that four fire
[13] extinguishers in a house that has a fireplace, a
[14] downstairs apartment, a garage, and a kitchen is
[15] excessive?
[16] **A:** I haven't seen the home.
[17] **Q:** Okay. Well, would it be excessive
[18] if there was a rational need for having —
[19] **A:** Not if there was a rational need.
[20] **Q:** Okay. But he thought that this
[21] was a response to his anxiety?
[22] **A:** That's what he told me.
[23] **Q:** Did he comment further on that?
[24] **A:** No.
[25] **Q:** Did you go into it any further?

---

ARNOLD MERRIAM
July 11, 2008

STEPSKI   v.
THE M/V NORASIA

---

Page 69

**Merriam**

[1]
[2]  **A:** No.
[3]  **Q:** You said he feels cut off from
[4] other people?
[5]  **A:** That's what he said.
[6]  **Q:** Now, did you discuss the change in
[7] his relationships with others?
[8]  **A:** He told me that he was unable to
[9] relate to other people the way he used to.
[10]  **Q:** And they find him strange?
[11]  **A:** He said that he thought other
[12] people find him strange. But he also felt that
[13] he was unable to relate emotionally with other
[14] people.
[15]  **Q:** Do you contribute any significance
[16] to that?
[17]  **A:** Yes. That's compatible with the
[18] P.T.S.D. criteria of — I don't recall the
[19] criteria exactly. Feelings of detachment or
[20] estrangement from others.
[21]  **Q:** Did you go into any further detail
[22] concerning his claimed change in relationship
[23] with others?
[24]  **A:** No, no. That's something that
[25] would be appropriate to go into during therapy.

---

Page 70

**Merriam**

[1]
[2]  **Q:** He made the one remark, you noted
[3] it and you moved on?
[4]  **A:** Yes.
[5]  **Q:** You said that he has feelings of
[6] inner sadness and negative thoughts?
[7]  **A:** Yes.
[8]  **Q:** Did you discuss that with him any
[9] further?
[10]  **A:** Yes. He told me he didn't — he
[11] previously enjoyed his job as a fisherman and
[12] didn't anymore.
[13]  **Q:** So the sadness and negative
[14] thoughts are related to his work?
[15]  **A:** Well, he told me specifically that
[16] his work was affected by the feelings of
[17] sadness. But that there was no — the feelings
[18] of sadness were much more pervasive than just
[19] being about his work. He told me that it would
[20] be fine with him if he died. He didn't want to
[21] kill himself. But it would be fine if he
[22] passed, because he was generally so sad and
[23] unhappy now. And so this did affect his career,
[24] but it was not limited to his career.
[25]  **Q:** Okay. Anything else on that

---

Page 71

**Merriam**

[1]
[2] point?
[3]  **A:** He said that he never felt that
[4] way earlier in his life and that his children
[5] were very important to him and that was the
[6] reason why he didn't want to die.
[7]  **Q:** Any comments or observations that
[8] you have in respect to those statements by
[9] Mr. Stepski?
[10]  **A:** None come to mind right now.
[11]  **Q:** They impact upon your opinions
[12] professionally concerning Mr. Stepski's
[13] diagnosis?
[14]  **A:** Yes. I think it shows how
[15] profoundly his emotional life was changed by the
[16] accident. That something very important to him,
[17] namely his role as a commercial fisherman, was
[18] altered by the accident. And that he — while
[19] he wasn't suicidal, life had lost its
[20] satisfaction for him.
[21]  **Q:** Okay. Again, these are subjective
[22] statements?
[23]  **A:** Yes.
[24]  **Q:** There is no objective way of
[25] measuring one's sadness or joy?

---

Page 72

**Merriam**

[1]
[2]  **A:** No, no.
[3]  **Q:** Different things can make people
[4] sad and different things can make people happy?
[5]  **A:** That's correct.
[6]  **Q:** The fact that Mr. Stepski returned
[7] to smoking after the accident, does that have
[8] any impact upon your opinions?
[9]  **A:** Smoking is a notoriously difficult
[10] habit to quit. And the fact that he resumed
[11] smoking is pretty typical for someone who is
[12] experiencing a life stress. And he told me that
[13] he didn't even want to quit anymore. He
[14] previously wanted to quit and no longer cared.
[15] That's another example of how his life was
[16] changed by the events.
[17]  **Q:** Now, you discussed his sleeping
[18] patterns?
[19]  **A:** Yes.
[20]  **Q:** Okay. And he told you that he has
[21] difficulty falling asleep unless he has a few
[22] beers?
[23]  **A:** That's what he told me.
[24]  **Q:** How many beers?
[25]  **A:** He said a few.

---

**Min-U-Script®**    FINK & CARNEY (800) NYC-FINK

STEPSKI   v.
THE M/V NORASIA

ARNOLD MERRIAM
July 11, 2008

---

Page 73

**Merriam**

[1]
[2]    **Q:** What do you understand "a few" to
[3] be?
[4]    **A:** I don't have a number associated
[5] with a few.
[6]    **Q:** Two, three, four?
[7]    **A:** That's what most people mean by a
[8] few. It's very hard to quantify when people
[9] tell you frequently distorted numbers to those
[10] sorts of things.
[11]    **Q:** Did he tell you how often he has
[12] problems falling asleep?
[13]    **A:** He indicated regularly. I didn't
[14] inquire the exact frequency.
[15]    **Q:** Did you inquire as to whether
[16] there had been a change in his ability to fall
[17] asleep from shortly after the accident to the
[18] time of your interview?
[19]    **A:** He had trouble falling asleep
[20] immediately after the accident. And I saw him
[21] quite a while later and the trouble was
[22] persistent. Whether it's improved a little bit
[23] in comparison with the immediate wake of the
[24] accident, I don't know.
[25]    **Q:** Well, when he was discussing

Page 74

**Merriam**

[1]
[2] having trouble falling asleep, how many times a
[3] week did he tell you?
[4]    **A:** It appeared to be regular,
[5] frequent. But I don't have an exact frequency.
[6] It wasn't an occasional time.
[7]    **Q:** You don't know if it's once a
[8] week, twice a week, every night?
[9]    **A:** No. I don't know the frequency.
[10] But it appeared to be a problem for him that was
[11] a regular facet of his falling asleep. So that
[12] I do not think it was once or twice a week.
[13]    **Q:** You wrote that he experienced
[14] nightmares several times a week?
[15]    **A:** Yes.
[16]    **Q:** Do you know if that changed in any
[17] way over the course of time?
[18]    **A:** I do not know.
[19]    **Q:** Did he discuss the contents of his
[20] nightmares?
[21]    **A:** He told me he couldn't recall the
[22] content.
[23]    **Q:** And he awakens from sleep about
[24] once a week?
[25]    **A:** In a state of fear.

Page 75

**Merriam**

[1]
[2]    **Q:** In a state of fear?
[3]    **A:** Yes.
[4]    **Q:** Fear about what? Did he
[5] elaborate?
[6]    **A:** No, he didn't elaborate. Just a
[7] state of fear. But he awakens frequently and
[8] can't get back to sleep. And then wakes in a
[9] state of fear about once a week, he said.
[10]    **Q:** And had that awakening at night in
[11] a state of fear changed in frequency from the
[12] time of the incident?
[13]    **A:** I don't know. But it was
[14] continuous through the time when I saw him.
[15]    **Q:** Is it significant that problems in
[16] terms of sleeping, nightmares, waking up, these
[17] sort of behaviors change from the time of the
[18] incident or shortly after the incident as time
[19] passes?
[20]    **A:** Typically they are more intense
[21] early on. But the importance is that the
[22] problem is a persistent problem.
[23]    **Q:** So if —
[24]    **A:** In other words, it hasn't gone
[25] away.

Page 76

**Merriam**

[1]
[2]    **Q:** So unless it goes away totally,
[3] it's still a problem in your book?
[4]    **A:** Totally or near totally. Yes.
[5] When I saw him it was three years after the
[6] accident. It wasn't fresh in the wake of the
[7] accident. So these are now persistent problems.
[8] And he did say it was a change, because prior to
[9] the accident he said he slept soundly and had no
[10] nightmares at all.
[11]    **Q:** Okay. You also note that
[12] Mr. Stepski indicated he experienced frequent
[13] mental imagery of a ship coming out of a fog
[14] occasioned by an emotional sense of imminent
[15] death. Did you ask him how often he has these
[16] experiences?
[17]    **A:** Yes. He told me a few times a
[18] week.
[19]    **Q:** Was there any change in frequency
[20] in respect of those, the images?
[21]    **A:** The frequency appeared to be
[22] variable depending on his activity. So he said
[23] they were more often when he would be going back
[24] out to sea, before he went on another trip or if
[25] he is out to sea and in the fog.

---

ARNOLD MERRIAM
July 11, 2008

STEPSKI   v.
THE M/V NORASIA

Page 77

[1] **Merriam**

[2] **Q:** When you questioned him, did you
[3] ask him if he was experiencing those images
[4] presently as opposed to in the past?
[5] **A:** Yes. They were ongoing, they were
[6] in the present.
[7] **Q:** And you questioned him concerning
[8] his sleep and he said —
[9] **A:** That was in the present, yes.
[10] **Q:** A few times a week, meaning how
[11] many, approximately?
[12] **A:** A few typically means two to
[13] three.
[14] **Q:** But he didn't say?
[15] **A:** He didn't say.
[16] **Q:** Okay. You wrote that the images
[17] are powerful, but not accompanied by feeling
[18] that he is actually back at the scene of the
[19] accident?
[20] **A:** Yes.
[21] **Q:** Any significance to the fact that
[22] he doesn't feel that he is back at the scene of
[23] the accident?
[24] **A:** Yes. Some people in P.T.S.D. have
[25] actual reexperiencing, almost like a

Page 78

[1] **Merriam**

[2] hallucination.
[3] **Q:** Flashbacks is another word for
[4] that?
[5] **A:** Yes. But these are not actual
[6] hallucinations. He is aware of the current
[7] reality, even though he has a mental image that
[8] is associated with an emotional state.
[9] **Q:** Now, the fact that he has these
[10] images, what is the significance of that in
[11] terms of your diagnosis?
[12] **A:** It's compatible with the
[13] reexperiencing criteria of P.T.S.D. Namely that
[14] the afflicted person continues to have —
[15] experiences abnormal experiences based on the
[16] event.
[17] **Q:** Now, you also note that he said he
[18] was troubled by these images and he wished that
[19] they would stop?
[20] **A:** Yes.
[21] **Q:** What did you take that to mean?
[22] **A:** That they were emotionally
[23] distasteful to him. They weren't something that
[24] he was merely experiencing without emotion, but
[25] that they were troubling.

Page 79

[1] **Merriam**

[2] **Q:** Now, if one had had an accident
[3] say skidding on ice and snow and running into a
[4] tree, having images of that happening, would
[5] that be a compatible example of the same type of
[6] thing that Mr. Stepski was describing?
[7] **A:** I don't understand the question.
[8] **Q:** If years ago I had had an accident
[9] driving along where I skidded on ice or snow and
[10] I ended up into a tree and now when there is ice
[11] or snow as I am driving, I have these images of
[12] running into the tree, would that be a similar
[13] type of example as to what Mr. Stepski was
[14] describing to you?
[15] **A:** Same type of category. I can't —
[16] a mental event. In terms of the intensity of it
[17] and the intensity of danger in which you felt
[18] yourself when you skidded into the tree compared
[19] to his, there is no way to compare it.
[20] **Q:** Now, you said he had experienced
[21] panic attacks, but they weren't a major problem
[22] for him?
[23] **A:** Yes.
[24] **Q:** Did he describe what these panic
[25] attacks were all about?

Page 80

[1] **Merriam**

[2] **A:** Periods of time, less than a
[3] minute, in which he felt powerful sensations of
[4] fear.
[5] **Q:** Did he tell you what triggered
[6] them in his experience?
[7] **A:** He, actually, did not complain
[8] very much about these. He said they only
[9] happened a few times a year, lasted less than a
[10] minute each. So they were not major events for
[11] him.
[12] **Q:** Did he indicate that there had
[13] been a change in frequency of having panic
[14] attacks over the course of time?
[15] **A:** We did not discuss that.
[16] **Q:** Would the fact that he had related
[17] that he had panic attacks be significant in
[18] terms of your diagnosis?
[19] **A:** Yes. It's another example of an
[20] anxiety related symptom. P.T.S.D. is an anxiety
[21] disorder. The chief thing that I took from this
[22] actually is that I thought he was being quite
[23] honest with me, telling me that he had this
[24] symptom. But it wasn't particularly
[25] troublesome. He wasn't trying to come up with a

Page 81

**Merriam**

[1]
[2] laundry list of various symptoms. This was
[3] something he told me about only after I
[4] inquired. And there didn't seem to be any
[5] tendency to try to inflate its significance. So
[6] I thought it represented that he was being
[7] honest with me.
[8]    **Q:** You note that he said that he
[9] experienced chronic anxiety that he would lose
[10] his business, his family and his home. What did
[11] he tell you about that?
[12]    **A:** That he worries about those
[13] things.
[14]    **Q:** What does "chronic anxiety" mean
[15] to you?
[16]    **A:** That he is now worrying. Anxiety
[17] is worrying.
[18]    **Q:** Right. Did he indicate how often
[19] he worries and how significant these worries
[20] are?
[21]    **A:** Frequent basis. Again, these are
[22] things that would be gone into more in the
[23] context of psychotherapy. But he told me that
[24] he had persistent worries about his future,
[25] about the security of his business, economics of

Page 82

**Merriam**

[1]
[2] the family.
[3]    **Q:** Chronic?
[4]    **A:** Chronic means persistent, yes.
[5]    **Q:** And at the time, did you discuss
[6] the fact that his wife was pregnant?
[7]    **A:** I am trying to recall. I don't
[8] recall that.
[9]    **Q:** And would the fact that his wife
[10] was pregnant with an unplanned child tend to
[11] cause one to have anxiety concerning security
[12] about one's business and income future in
[13] general?
[14]    **A:** Well, he didn't say to me, listen,
[15] I just found out my wife is pregnant and now I
[16] am really uptight about it. That's not what he
[17] was saying. He is saying this is something that
[18] has been a problem for him chronically since his
[19] accident and that he feels worried about the
[20] future. He feels like, God knows what is going
[21] to happen next type of feeling.
[22]    **Q:** What I am inquiring about is
[23] whether other factors in this man's life could
[24] be a source of some of the anxiety which he was
[25] describing to you?

Page 83

**Merriam**

[1]
[2]    **A:** He didn't describe his wife's
[3] pregnancy to me, as far as I recollect.
[4]    **Q:** Well, could that cause one to be
[5] anxious?
[6]    **A:** Yes.
[7]    **Q:** Emotional?
[8]    **A:** Yes.
[9]    **Q:** Especially where the child is not
[10] planned and one might be concerned about
[11] finances and supporting another child?
[12]    **A:** Yes, it could.
[13]    **Q:** Okay.
[14]    **A:** But, again, he didn't tell me that
[15] this was situational. What he told me was that
[16] it was —
[17]    **Q:** Well, he said that he felt
[18] insecure about his future and he worried what's
[19] coming around the corner, right?
[20]    **A:** Yes.
[21]    **Q:** Could the fact that his wife was
[22] pregnant play into those statements?
[23]    **A:** He didn't indicate to me that,
[24] look, I am having a baby and I am really worried
[25] about it. What he told me was there was a

Page 84

**Merriam**

[1]
[2] general sense of being insecure about his future
[3] and this had been for sometime now, since he had
[4] been in the accident. And that's a very typical
[5] statement in P.T.S.D. that one has a
[6] foreshortened sense of future, can't think with
[7] any security about what is going to be.
[8]    **Q:** Did he describe for you that he
[9] started to become concerned and anxious about
[10] his future either immediately or shortly after
[11] the incident? Did he use those words?
[12]    **A:** Yes. The description of the
[13] symptoms was in the context of him telling me in
[14] what ways he is emotionally changed since his
[15] accident.
[16]    **Q:** Is that also noted in your
[17] handwritten notes?
[18]    **A:** I don't know the answer to that.
[19] But what I asked him was, tell me what emotional
[20] problems you have now that you attribute to the
[21] accident and he told me.
[22]    **Q:** He told you that he was anxious?
[23]    **A:** He told me all of these things.
[24]    **Q:** What I am asking you is, did the
[25] anxiousness about his future arise in his words

Page 85

**Merriam**

[1]
[2] soon after the incident, or did you get any time
[3] frame at all from him as to when the anxiousness
[4] about his future started to be a concern to him?
[5]   **A:** The account was that these
[6] symptoms began after the accident and persisted.
[7] There is no description by him that and then
[8] three years out, suddenly I have got this new
[9] symptom. These are all things that occurred in
[10] the wake of the accident and persisted.
[11]   **Q:** Can we agree that there is no date
[12] we can look to on a calendar after — on or
[13] after May 22, 2004, that anybody can say, that's
[14] the date I started to feel anxious, that's the
[15] date I started to feel concerned about my
[16] future?
[17]   **A:** That's correct.
[18]   **Q:** Now, you say when he is aboard a
[19] boat, he feels hypervigilant for signs of
[20] potential danger. Is that your word or his?
[21]   **A:** Hypervigilance, my word.
[22]   **Q:** What did he say to you concerning
[23] being on the lookout for signs of potential
[24] danger?
[25]   **A:** I would have to look in my

Page 86

**Merriam**

[1]
[2] handwritten notes and see what I wrote.
[3]   **Q:** Let ask you this question then —
[4]   **A:** He didn't use the word
[5] hypervigilant. I would be surprised if he knew
[6] what the word hypervigilant means.
[7]   **Q:** Okay.
[8]   **A:** But whatever he said it was the
[9] equivalent of that, that he's excessively
[10] looking for signs of danger.
[11]   **Q:** Well, is that a normal reaction
[12] for somebody who has been involved in an
[13] accident to be on the lookout for signs of
[14] danger?
[15]   **A:** Is it normal, no. Being
[16] hypervigilant is abnormal. It's an abnormal
[17] state. And the degree of hypervigilance, if
[18] it's in the context of a life-threatening event
[19] and it's associated with the other symptoms,
[20] then it's P.T.S.D.
[21]   Can an individual with a — who
[22] has been in an accident have isolated
[23] hypervigilance, sure.
[24]   **Q:** Let me ask you another question.
[25] If one has been involved in an accident that was

Page 87

**Merriam**

[1]
[2] partially their fault and then in the future
[3] becomes more vigilant in terms of making sure
[4] that they are following better safety practices,
[5] you agree with me that's a good thing?
[6]   **A:** Sure. Typically people who get
[7] caught speeding keep a closer eye on their
[8] speedometer. Some people.
[9]   **Q:** If you have a car accident because
[10] you are following somebody too close or you are
[11] trying to pass or do something reckless and you
[12] curtail that behavior, that is a good and normal
[13] reaction, hopefully, right?
[14]   **A:** Yes.
[15]   **Q:** Now, you next wrote in your report
[16] that these feelings persist?
[17]   **A:** Can we just take a break at some
[18] point?
[19]   **Q:** Oh, yes. Sure. Let me just
[20] finish this one question.
[21]   **A:** Sure.
[22]   **Q:** You write "these feelings persist,
[23] but are becoming less intense."
[24]   I am just trying to figure out
[25] which feelings you are talking about, the

Page 88

**Merriam**

[1]
[2] hypervigilance or the anxiety that you were
[3] talking about before?
[4]   **A:** The hypervigilance.
[5]   **Q:** And becoming less intense, did he
[6] describe it in any way that was quantifiable?
[7]   **A:** No.
[8]   **Q:** What does this impact upon your
[9] diagnosis and views?
[10]   **A:** It doesn't change the diagnosis at
[11] all.
[12]   **Q:** Does it support the diagnosis or
[13]
[14]   **A:** Neither supports nor unsupports.
[15] The fact that he has hypervigilance three years
[16] afterwards is significant. The fact that he's
[17] telling me it's becoming less intense, once
[18] again I actually took an indication that he was
[19] being honest with me and not trying to
[20] exaggerate his symptoms and say that everything
[21] is at the max and never getting better, as some
[22] people do. But he was being pretty factual.
[23]   **Q:** Okay. You want to take a minute
[24] or two break?
[25]   (Recess taken 3:19 p.m. to 3:26

STEPSKI    v.
THE M/V NORASIA

ARNOLD MERRIAM
July 11, 2008

---

Page 89

**Merriam**

[1]
[2] p.m.)

[3]   **Q:** Switching gears, Mr. Stepski's
[4] relationship with his wife. You indicated that
[5] he said he has feelings of blame toward his
[6] wife. In what respect?

[7]   **A:** We didn't go into it in any great
[8] detail. But that, obviously, the relationship
[9] is now strained.

[10]   **Q:** Does he blame his wife for his
[11] current condition?

[12]   **A:** No. He blamed the accident for
[13] his current condition.

[14]   **Q:** What does he blame his wife for?

[15]   **A:** I don't know. Again, this would
[16] be something in therapy that would come up to
[17] explore.

[18]   **Q:** What, if any, significance does
[19] the change in the relationship with his wife
[20] have with respect to your diagnosis?

[21]   **A:** It's not pivotal for the
[22] diagnosis. But many patients with P.T.S.D. have
[23] trouble with close relationships with loved
[24] ones.

[25]   **Q:** Is that one of the symptoms of

---

Page 90

**Merriam**

[1]
[2] P.T.S.D.?

[3]   **A:** It is.

[4]   **Q:** What about the anger management
[5] and substance abuse classes that he has been
[6] required to attend?

[7]   **A:** Yes.

[8]   **Q:** How does that relate?

[9]   **A:** Anger management, irritability and
[10] angry behavior is another typical symptom of
[11] P.T.S.D. But it's also common behavior.

[12]   **Q:** Do you know if he attended the
[13] classes?

[14]   **A:** I would assume so. But I don't
[15] know for sure.

[16]   **Q:** Are these incidents related to the
[17] collision?

[18]   **A:** Well, he told me that since the
[19] accident, they are arguing more and that he is
[20] more short tempered. She feels him to be more
[21] short tempered. In which case it's likely
[22] related to the P.T.S.D.

[23]   **Q:** Fair to say that most patients
[24] with P.T.S.D. have a loss of appetite?

[25]   **A:** No, not necessarily.

---

Page 91

**Merriam**

[1]
[2]   **Q:** Okay. What about decrease in
[3] sexual drive? Is that common among P.T.S.D.?

[4]   **A:** It's common, but it's not
[5] necessary.

[6]   **Q:** Could be caused by any number of
[7] factors?

[8]   **A:** Yes.

[9]   **Q:** Could be caused by —

[10]   **A:** Could be caused by depression.

[11]   **Q:** It could be caused by the fact
[12] that his wife is pregnant and they have had a
[13] baby, right?

[14]   **A:** Oh, he did tell me that his wife
[15] is pregnant, I am sorry, the last sentence on
[16] the page he did tell me that his wife was
[17] pregnant.

[18]   **Q:** He noted avoiding thinking about
[19] fishing?

[20]   **A:** I am sorry. While on sexual
[21] drive, he told me that since the accident his
[22] sexual drive is diminished and he attributed
[23] this to his feelings of being tense, in which
[24] case it would be related to the accident.

[25]   **Q:** He avoids thinking about fishing?

---

Page 92

**Merriam**

[1]
[2]   **A:** That's what he said.

[3]   **Q:** What significance is that in
[4] respect to your diagnosis?

[5]   **A:** Another symptom of P.T.S.D. is
[6] that people try to avoid things that remind them
[7] of the stimulus that caused the P.T.S.D. So
[8] something may have been pleasurable in the past
[9] to think about and now it's something that is
[10] distressing.

[11]   **Q:** You noted he considered changing
[12] careers. Did you discuss to what?

[13]   **A:** No, I didn't.

[14]   **Q:** Current alcohol use of two to six
[15] beers a day, is that normal, excessive?

[16]   **A:** I think it's excessive. Six beers
[17] a day is excessive.

[18]   **Q:** Well, did he tell you how often he
[19] has six beers versus two beers?

[20]   **A:** No. But this is excessive, he is
[21] drinking daily. If he had two beers a day, it
[22] would be at the limit of what is acceptable.
[23] But he is drinking significantly more than that.
[24] And he is drinking up to two six-packs. And
[25] this is a change in his consumption. Previously

---

Page 93

**Merriam**

[1]
[2] he drank two or three days a week and now he is
[3] drinking every day. It's excessive.
[4]   **Q:** What impact did that have on your
[5] diagnosis?
[6]   **A:** Well, he told me that he is trying
[7] to medicate himself. The substance abuse,
[8] alcoholism and substance abuse are frequently
[9] complications of P.T.S.D. He told me he was
[10] trying to use alcohol as a medication to relieve
[11] his anxiety.
[12]   **Q:** Do you think Mr. Stepski is an
[13] alcoholic?
[14]   **A:** Well, he fulfills some of the
[15] criteria. He has tried to cut back
[16] unsuccessfully. He hasn't had withdrawal
[17] symptoms. He is drinking excessively and he's
[18] unsuccessfully tried to reduce his consumption.
[19] So I think he is right on the edge of
[20] alcoholism.
[21]   **Q:** Okay. And do you attribute that
[22] to the accident?
[23]   **A:** It may well be. Prior to the
[24] accident he was only drinking two or three days
[25] a week. Now he is drinking daily.

Page 94

**Merriam**

[1]
[2]   **Q:** Well, there is a family history of
[3] alcoholism, right?
[4]   **A:** Yes, there is.
[5]   **Q:** So people —
[6]   **A:** If there is a family history,
[7] there is a family history of alcoholism.
[8] Alcoholism and drug abuse are probably the most
[9] common complications of P.T.S.D. And if there
[10] is a prior history of drinking, then the — I am
[11] sorry. Strike. I didn't remember what I was
[12] going to say.
[13]   **Q:** Okay. Well, is it your belief
[14] that his alcoholism, if he is an alcoholic, is
[15] caused by the collision as opposed to being
[16] caused by predisposition based on a family
[17] history, or is it a combination?
[18]   **A:** It's a combination.
[19]   **Q:** When you conducted your exam,
[20] right —
[21]   **A:** Yes.
[22]   **Q:** — you noted he expressed full
[23] range of mood?
[24]   **A:** Yes.
[25]   **Q:** His affect was appropriate?

Page 95

**Merriam**

[1]
[2]   **A:** Yes.
[3]   **Q:** No observable psychomotor signs of
[4] excessive anxiety?
[5]   **A:** Correct.
[6]   **Q:** He was coherent?
[7]   **A:** Correct.
[8]   **Q:** No signs of any thought disorders?
[9]   **A:** Correct.
[10]   **Q:** Grounded in reality?
[11]   **A:** Correct.
[12]   **Q:** Effectively sitting there having a
[13] conversation with you, but for him telling you
[14] that he subjectively had these symptoms of
[15] anxiety, he appears perfectly normal, correct?
[16]   **A:** Which is — yes, which is the case
[17] in P.T.S.D.
[18]   **Q:** Okay. Now, Mr. Stepski told you
[19] all of these symptoms that he attributes to the
[20] accident, correct?
[21]   **A:** Correct.
[22]   **Q:** As a doctor, which of his
[23] symptoms, if any, do you attribute to the
[24] accident?
[25]   **A:** I think I enumerated them in my

Page 96

**Merriam**

[1]
[2] conclusions. He has intrusive recollections of
[3] the event; he avoids things that remind him of
[4] the event; he did not want to return to fishing;
[5] he has difficulty thinking ahead of the
[6] remainder of his life; he has trouble staying
[7] asleep; he has had outbursts of anger; he is
[8] hypervigilant; looking for threats; and his
[9] situation distresses him. And I attributed
[10] those to the P.T.S.D.
[11]   **Q:** So all of these things that he
[12] related to you subjectively, if you take them at
[13] his word that he does, in fact, experience these
[14] symptoms —
[15]   **A:** Yes. There is no objective test
[16] for P.T.S.D.
[17]   **Q:** Right. Okay.
[18] Now, did you consider what other
[19] stressors in his life may be causing any of
[20] these symptoms that you note in your conclusion?
[21]   **A:** He did not describe any other
[22] stressors.
[23]   **Q:** He didn't describe any financial
[24] problems?
[25]   **A:** I don't recall discussing

STEPSKI   v.
THE M/V NORASIA

ARNOLD MERRIAM
July 11, 2008

Page 97

**Merriam**

[2] financial problems.

[3] **Q:** Did he describe any other events
[4] in his life which could impact upon stressors
[5] and/or serve as stressors? Such as, did he tell
[6] you that he had been involved in a significant
[7] auto accident several years back?

[8] **A:** No. We did not discuss an auto
[9] accident.

[10] **Q:** Okay. Is that the type of event
[11] which could impact upon his situation and —

[12] **A:** Well, an auto accident is not
[13] going to make you frightened to go fishing. An
[14] auto accident is not going to make you scan the
[15] horizon for threats when you are at sea. The
[16] specifics of what he is fearing and anxious
[17] about are specifically related to the event at
[18] sea.

[19] **Q:** Well, running over your children
[20] as you back out of the driveway, would that be
[21] more related to an auto accident as opposed to a
[22] collision at sea?

[23] **A:** Could be related to either.

[24] **Q:** Let me ask you to switch to
[25] Mr. Roderick.

Page 98

**Merriam**

[2] **MR. GARGAN:** That's Exhibit
[3] 8?

[4] **MR. UNGER:** Exhibit 8, yes.

[5] **Q:** Did you discuss with Mr. Roderick
[6] in detail his version of the accident?

[7] **A:** Yes.

[8] **Q:** And you took notes as to what he
[9] told you?

[10] **A:** Yes.

[11] **Q:** They are all in what we have
[12] marked as Exhibit 10?

[13] **A:** Yes.

[14] **Q:** And that includes pretty much
[15] everything he told you; is that right?

[16] **A:** Yes.

[17] **Q:** You note that when Mr. Roderick
[18] first got back to shore, he had frequent
[19] flashbacks. Did he discuss those with you?

[20] **A:** I am trying to —

[21] **Q:** Third paragraph down.

[22] **A:** That's what he told me, yes.

[23] **Q:** Did he discuss the flashbacks in
[24] any detail?

[25] **A:** No.

Page 99

**Merriam**

[2] **Q:** He didn't talk about what he was
[3] recalling or how frequent?

[4] **A:** No.

[5] **Q:** What triggered the flashbacks,
[6] none of that information?

[7] **A:** No, no. Mr. Roderick is a less
[8] articulate individual.

[9] **Q:** Well, did you ask him any of those
[10] questions?

[11] **A:** Yes.

[12] **Q:** Did he just not respond or what
[13] did he say when you asked him what were the
[14] flashbacks all about?

[15] **A:** I don't recall specifically asking
[16] him the content of the flashbacks. But...

[17] **Q:** Okay. He returned to going back
[18] on boats with his father within a couple of
[19] days, correct?

[20] **A:** Within six days.

[21] **Q:** Yes. Although he said he was
[22] distracted?

[23] **A:** He said he was nervous, yes.

[24] **Q:** He was back at it?

[25] **A:** Yes.

Page 100

**Merriam**

[2] **Q:** He got back in the saddle?

[3] **A:** Yes.

[4] **Q:** Right. And he said his father
[5] pushed him to do it?

[6] **A:** Yes.

[7] **Q:** He forced himself because —

[8] **A:** Yes.

[9] **Q:** Because of his father?

[10] **A:** Yes.

[11] **Q:** Is that a positive thing to get
[12] back in the saddle when you fall off the horse?

[13] **A:** It can be for some people.

[14] **Q:** Okay. Was it for Mr. Roderick in
[15] your view?

[16] **A:** I don't have a view about that.

[17] **Q:** He said that it continues to
[18] bother him to leave shore because of a
[19] persistent sense of fear?

[20] **A:** That's what he told me.

[21] **Q:** But this has gotten better over
[22] time, right?

[23] **A:** He said he still has to push
[24] himself, is what he told me.

[25] **Q:** But did you discuss with him

Page 101

**Merriam**

[1]
[2] whether it's any easier now for him to be back
[3] at it working on the boats than it was
[4] initially?
[5]    **A:** I don't think I inquired or if I
[6] did, I didn't write it down.
[7]    **Q:** What did he relate to you which
[8] caused you to note that he was hypervigilant
[9] while at sea?
[10]    **A:** He said that he looked for signs
[11] of threats. He said what when it's foggy, he is
[12] very apprehensive, even if he is driving his
[13] car.
[14]    **Q:** Anything else?
[15]    **A:** He said looking for threats and
[16] that he was very, very nervous and that's
[17] improved, now he is more comfortable, except
[18] when he is in the fog.
[19]    **Q:** Okay. Well, being in the fog when
[20] you are out on a boat, would you agree that even
[21] not having been involved in a collision with
[22] another vessel, it's an anxiety producing
[23] experience?
[24]    **A:** I would say it's probably
[25] something that makes many people anxious.

Page 102

**Merriam**

[1]
[2]    **Q:** Okay.
[3]    **A:** But he was describing a change
[4] that he is now more anxious when he is at sea
[5] and the fog.
[6]    **Q:** Again, hypervigilant was your
[7] word, not his?
[8]    **A:** Yes, that's correct.
[9]    **Q:** In terms of Mr. Roderick's sleep,
[10] you noted he is able to fall asleep, but he
[11] wakes up a couple of times a night, but doesn't
[12] have any nightmares?
[13]    **A:** Right. He awakens three to four
[14] times a night.
[15]    **Q:** Did you discuss whether there has
[16] been any change in frequency?
[17]    **A:** Oh, may I add something to a
[18] previous answer?
[19]    He did tell me about the content
[20] of the flashbacks. He said that the flashbacks,
[21] he has mental imagery of being on the raft and
[22] it happens over and over. And that for the
[23] first two years, these occurred daily and then
[24] became less frequent.
[25]    And then he had been required to

Page 103

**Merriam**

[1]
[2] give a deposition, I guess to you folks, and
[3] after the deposition and having to repeat the
[4] various details of his experiences, they got
[5] worse and then they got better again and were
[6] occurring intermittently. So he did describe
[7] them in more detail.
[8]    **Q:** What is intermittently?
[9]    **A:** Non-continuously. You know, once
[10] and —
[11]    **Q:** Once and again?
[12]    **A:** Once and again. I don't know the
[13] frequency. But, again, this is typical of
[14] P.T.S.D., that once one has the disorder, it
[15] will wax and wane, symptoms will wax and wane
[16] and symptoms will become accentuated if there
[17] are life stresses, especially life stresses that
[18] remind one of the accident.
[19]    **Q:** Okay.
[20]    **A:** And he told me that the flashbacks
[21] were mental images of the impact and of being on
[22] the raft.
[23]    **Q:** Is that, having flashbacks, is
[24] that a symptom of P.T.S.D.?
[25]    **A:** Yes.

Page 104

**Merriam**

[1]
[2]    **Q:** That's something that you — his
[3] flashbacks are something that you attribute to
[4] the accident?
[5]    **A:** Yes.
[6]    **Q:** Now, his relationship with his
[7] wife or girlfriend, as the case may be —
[8]    **A:** I think it's his girlfriend.
[9]    **Q:** — it wasn't healthy before the
[10] accident, right?
[11]    **A:** That's what he told me.
[12]    **Q:** To your belief, did the accident
[13] impact on that relationship?
[14]    **A:** He told me they had actually
[15] broken up six to seven months before the
[16] accident.
[17]    **Q:** Okay. So the accident then, in
[18] terms of his personal relationship with his
[19] ex-wife, former girlfriend, however you want to
[20] describe her, is annuity; is that correct?
[21]    **A:** He didn't describe any impact of
[22] the accident on that relationship.
[23]    **Q:** Okay. He saw Dr. Small?
[24]    **A:** Yes.
[25]    **Q:** Only a couple of times, right?

**Min-U-Script®**