UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------x

MICHAEL STEPSKI, KIRSTEN STEPSKI, Wife,
GEAL RODERICK AND BENJAMIN SCHOBER,

                  Plaintiffs,

       -against-

                              06 Civil 1694
The M/V NORASIA ALYA, her owners,         (KMK)
operators, etc., and MS "ALENA"
SCHIFFAHRTSGESELLSCHAFT mbH & CO. KG,
PETER DOHLE SCHIFFAHRTS-KG,

                  Defendants.

--------------------------------------x

## **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DATED DECEMBER 23, 2008, AND IN SUPPORT OF PLAINTIFFS' MOTION**

Respectfully submitted,

THOMAS H. HEALEY, ESQ.
Attorney for Plaintiffs

17 Battery Place - Suite 605
New York, New York 10004
(212) 943-3520

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES....................................iii, iv

POINT I.........................................................1

   THRESHOLD ISSUES

   INADEQUACY OF DEFENDANTS' PAPERS...........................3
   SANCTIONS..................................................4

POINT II........................................................5

   RESPONSE TO DEFENDANTS' CONTENTIONS

POINT III.......................................................8

   STEPSKI: PUNITIVE DAMAGES

   MARITIME LAW ON SHIPOWNER'S VICARIOUS LIABILITY..........12

   THE UNIQUE STATUS OF A VESSEL MASTER.....................18

POINT IV.......................................................19

   DEFENDANTS' BELATED COUNTER-CLAIM SEEKING
   "A RECOVERY ON THEIR COUNTER-CLAIM" BECAUSE
   OF STEPSKI'S FAILURE TO PROVIDE PROPER
   MEDICAL CARE

POINT V........................................................20

   KIRSTEN STEPSKI CLAIMS OF EMOTIONAL DAMAGE
   AND LOSS OF CONSORTIUM

POINT VI.......................................................22

   PLAINTIFFS' MOTION

   FED.R.CIV.P. RULE 56: GENERAL PROCEDURES
   RE: SUMMARY JUDGMENT.....................................22

   COLREGS RULE 5: LOOKOUT..................................23

   COLREGS RULE 6: SAFE SPEED...............................25

   COLREGS RULE 7(A) AND (B): PROPER USE OF RADAR...........27

i

POINT VII.....................................................29

    PLAINTIFFS MOVE TO AMEND THE CAPTION TO
    ADD NIANTIC FISH, LTD. AS AN ADDITIONAL
    PLAINTIFF

CONCLUSION...................................................30

ii

## TABLE OF AUTHORITIES

### FEDERAL CASES

The Adriadne, 80 U.S. (13 Wall.) 475, 20 L.Ed. 542 (1871).....23

American Export Lines v. Alvez, 446 U.S. 274 (1980)...........21

American Society of Mechanical Engineers, Inc. v.
      Hydrolevel Corp., 456 U.S. 556, 575 n.14 (1982)..........16

The Amiable Nancy, 16 U.S. (3 wheat) 546 (1818)...............15

In Re Atlas Concrete Pipe, 668 F.2d 905 (6th Cir. 1982).........4

Bloomfield Steamship Co. v. Brownsville Shrimp Exchange,
      243 F.2d 869...........................................6,7

CEH, Inc. v. F/V Seafarer, 70 F.3d 694
      (1st Cir. 1995) ........................12, 13, 14, 15, 17

Chandris v. Latsis, 515 U.S. 347.............................19

In Re Continental Airlines, 981 F.2d 1450(5th Cir. 1993).......23

Doralee Estates, Inc. v. Cities Service Oil Company,
      569 F.2d 716 (2d Cir. 1977)..........................16, 17

Elenson v. S/S FORTALEZA, 1992 AMC 1447,
      (SDNY, Sweet, J.)............................24, 25, 26, 27

Exxon Shipping Company, et al. v. Grant Baker, et al.,
      128 S.Ct. 2605...................................8, 9, 10

Foman v. Davis, 371 U.S. 178 (1962)..........................29

Friedman v. Cunard Line, Ltd, 996 F.Supp. 303 (SDNY 1998).....22

In Re Horizon, 101 F.Supp.2d 241.............................22

Lake Shore & M.S.R. Co. v. Prentice, 147 U.S. 101,
      13 S.Ct. 261, 37 L.Ed. 97 (1893).........................15

iii

## TABLE OF AUTHORITIES (Cont'd)

Local 33,Int. Hod. Carriers, et al. v. Mason Tenders,
   291 F.2d 496 (2 Cir. 1961)...............................23

Long v. Bureau of the Econ. Analy, 646 F.2d 1310 (9 Cir.)......3

Maritime & Merchantile v. U.S.A., 2007 AMC 814 (SDNY 2007).....6

The MEDFORD v. United States, 65 F.Supp. 622 (EDNY 1946).......5

Miles v. Apex Marine Corp., 498 U.S. 19 (1990)................22

Mullen v. Solem, 728 F.2d 1020 (8' Cir.) cert denied
   469 U.S. 841...............................................4

Otal Investments, Ltd. v. M/V CLARY, 494 F.3d 40
   (2d Cir. 2007)........................................6, 11

Southwest Marine, Inc. v. Gizoni, 112 S.Ct. 486 (1991)........4

Strom v. M/V Western Dawn, 698 F.Supp. 212...................19

Yamaha Motor Corp. v. Calhoun, 516 U.S. 119...............21, 22

### FEDERAL STATUTES

46 U.S.C. 6308................................................3

### MISCELLANEOUS

Schoenbaum, Admiralty & Maritime Law, 2ᴺᴳ Edition..............21

Craig, Farwell's Rules of Nautical Road,
   8ᵗʰ Edition.........................................18, 25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------x

MICHAEL STEPSKI, KIRSTEN STEPSKI, Wife,
GEAL RODERICK AND BENJAMIN SCHOBER,

               Plaintiffs,

      -against-

                           06 Civil 1694
The M/V NORASIA ALYA, her owners,        (KMK)
operators, etc., and MS "ALENA"
SCHIFFAHRTSGESELLSCHAFT mbH & CO. KG,
PETER DOHLE SCHIFFAHRTS-KG,

               Defendants.

-------------------------------------x

### **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DATED DECEMBER 23, 2008, AND IN SUPPORT OF PLAINTIFFS' MOTION**

### **POINT I**

### **THRESHOLD ISSUES**

1. <u>Defendants exceed the parameters of the permissible motion</u>.

The defendants sought permission by letter of September 3, 2008 to make a motion on three (3) issues:

      (a) COLREGS Rule 19;

      (b) punitive damages;

      (c) Kirsten Stepski's claims of emotional distress and loss of consortium.

At the October 21, 2008 pre-motion conference, defendants' counsel added a new issue: maintenance and cure. Such an issue was

-1-

never raised earlier.

In response to the court's inquiry if defendants "preserved the issue", defendants' counsel referred to its answer.  The answer does not contain any references to maintenance and cure, but pleads that Stepski, Roderick and Schober were engaged in "a common venture", which concept argues against maintenance and cure.

Having misled the court, defendants' voluminous motion papers do not address its error.

On the contrary, defendants, without leave, seek to raise more new issues, viz:

(a)  "Plaintiff failed to mitigate damage."

(b)  Stepski is liable to defendants for contribution referencing the defendants' counter-claim which does not plead contribution.

2. Defendants offer no evidence permissible under Fed.R.Civ.P. 56 to support their motion.

Affidavit of Richard V. Singleton ("Singleton") claims "personal knowledge of the matters stated herein."

To the contrary, Singleton only offers personal views of depositions and of hearsay exhibits.  This is not "personal knowledge."   See Fed.R.Civ.P. 56(e).

The references to various depositions out of context is misleading.  For example, there is no evidence to refute that at collision, the vessels were in sight.

-2-

Singleton affixes what he declares "true and correct copy of USCG message." The paper is hearsay and statutorily prohibited. 46 U.S.C. 6308.

Singleton reports on Kowalewski's declaration, the bulk of which is inadmissible and untrustworthy.[1]

Kowalewski's admissions about his multi-tasking, e.g. lookout, monitor of two radars, navigator, schedule maker, reader of AIS, back-talk listener (with time off for "meals and toilet"), prove not compliance, but violations of COLREGS (see plaintiffs' counter-motions).

## INADEQUACY OF DEFENDANTS' PAPERS

Fed.R.Civ.P. 56(e):

> FORM OF AFFIDAVITS...affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters...

Affidavits are the least trustworthy basis for the motion since affiant has not been subject to cross-examination and his demeanor is masked. Long v. Bureau of the Econ. Analy, 646 F.2d 1310 (9th Cir.) vacated and remanded on other grounds 454 U.S. 934. (An unsworn "declaration" is equally, if not more, untrustworthy.)

---

[1]      Defendants claimed they cannot locate Radio Logs which should document messages sent or received. Kowalewski has annexed selected messages after counsel for defendants stated that no messages were in their possession.

-3-

The exhibits attached must be independently admissible in evidence. <u>Mullen v. Solem</u>, 728 F.2d 1020 (8th Cir.) cert. denied 469 U.S. 841.

## **SANCTIONS**

Fed.R.Civ.P. 56(g):

> AFFIDAVITS MADE IN BAD FAITH.  Should it appear to the satisfaction of the court at any time that any of the affidavits...are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party to pay...to the other party...reasonable   expenses...including reasonable attorney's fees. ...

**\* \* \* \* \* \* \* \* \* \* \* \* \***

Trial court may not resolve any issues of fact. <u>Southwest Marine, Inc. v. Gizoni</u>, 112 S.Ct. 486 (1991) (Also pertinent to defendants' claim re: cure, the Supreme Court held that determination of Jones Act seaman status is necessarily fact specific so that summary judgment cannot be given.)

If issues of credibility are involved, summary judgment must be denied.  <u>In Re Atlas Concrete Pipe</u>, 668 F.2d 905 (6th Cir. 1982).

In deciding a motion for summary judgment, the court must resolve all ambiguities in non-movant's favor and draw all permissible inferences against moving party.

Therefore, plaintiffs move:

(a) to strike the Singleton and Unger Affidavits as both fail to meet Fed.R.Civ.P. 56 standards;

-4-

THOMAS H. HEALEY, ESQ.

(b) to strike the following exhibits:

    Singleton Affidavit: Exhibits C, D, E, F, G, H, I;

    Unger Affidavit: Exhibits: J, K, L.

(The depositions are not admissible in toto, but subject to objection on trial.)

(c) to strike Kowalewski's declaration (see annexed Rider);

(d) to strike Kowalewski's Exhibit 1 (incompetent as affirmative proof, admissible in part as admission against interest) and Exhibit 3.

(e) that defendants pay to plaintiffs their reasonable expenses including attorneys' fees incurred in opposing defendants' motion.

## **POINT II**

### **RESPONSE TO DEFENDANTS' CONTENTIONS**

Defendants' contention that the AVA CLAIRE'S navigation was governed by Rule 19, not Rule 18 of COLREGS is patently incorrect and an attempted diversion from obvious issues. The MEDFORD v. United States, 65 F.Supp. 622 (E.D.N.Y. 1946):

> ...The faults of the Barry were so numerous and glaring as to explain the adroitness of her proctor in seeking to direct attention solely to his criticisms of the Medford, and away from handling and navigation of the Barry, concerning which it is difficult to speak with restraint. ...

Obviously the conduct of a vessel can involve many COLREGS

-5-

violations so both Rules 18 and 19 can apply.  Otal Investments,

Ltd. v. M/V CLARY, 494 F.3d 40 (2d Cir. 2007); Maritime &

Merchantile v. U.S.A. 2007 AMC 814 (SDNY 2007).

COLREGS Rule 18 (in part) reads, "a power driven vessel

underway shall keep out of the way of...(iii) a vessel engaged in

fishing." Rule 18 falls within Section II "Conduct of Vessels in

Sight of One Another." The uncontradicted proof shows the vessels

were in sight.[2]

Since the AVA CLAIRE could be seen, NORASIA ALYA was "under

power" and the AVA CLAIRE was engaged in "fishing", Rule 18

compelled that NORASIA ALYA keep out of the way of AVA CLAIRE.

Since the AVA CLAIRE could be seen, the exact distance is

irrelevant, as the myriad faults of NORASIA ALYA, (speed,

proceeding blindly on auto pilot, without helmsman, alteration of

course), made the collision inevitable. See, Bloomfield Steamship

Co. v. Brownsville Shrimp Exchange, 243 F.2d 869:

> ...The Court was, therefore, amply justified
> in finding Genevieve Peterkin guilty of the
> most flagrant fault in proceeding through a
> fishing fleet on the baseless supposition that
> all were at anchor...this arc was a safe
> fairway for unabated speed. She failed to see
> or heed what was either seen or clearly
> visible. And when, by her sheer size and
> speed, she ran through vessels actually
> engaged in trawling, it was a plain violation

---

Kowalewski said he could identify a fishing boat by
radar. If he, therefore, knows he's running toward a fishing
boat whose maneuverability is compromised, Rule 18's stricture to
keep out of the way should be no less compelling.

-6-

of statutory duty. ...

> Seeking to divert attention (and legal consequences) from such palpable neglect, Genevieve Peterkin paradoxically insists that her fault was so great, the impending risk of collision so imminent, that the real blame lay on Linda Lee for not having a lookout better to see how reckless was the navigation of the oncoming ship...

Defendants' convoluted attempt to avoid responsibility rests entirely on counsel's proposition that NORASIA ALYA did not see the AVA CLAIRE.

Rule 18 is not subjective, but objective, i.e. should the NORASIA ALYA have seen the AVA CLAIRE?

A closer look at the evidence shows Kowalewski is charged with the duty to see the AVA CLAIRE.

(1) The AVA CLAIRE was engaged in fishing.

(2) She was displaying mast lights signaling fishing.

(3) The EPIRB fixed the time of collision at 12:37.

(4) At 12:37, the NORASIA ALYA was at Point X.[3] (Kowalewski p.76, lines 12-17.)

(5) At the time of the collision, AVA CLAIRE and NORASIA ALYA were in sight of each other.

(6) Visibility varied, 0.1 nautical miles to 90 meters to three nautical miles. (Kowalewski, p. 160, lines 20-22.)

---

[3] The actual coordinates were broadcast by EPIRB; for present purposes, Point X is convenient.

-7-

(7)   At the time of the collision, no one was
      specifically assigned to monitor radar,
      to   act   as   lookout   or   helmsman.
      (Kowalewski p. 196, lines 10-16).

(8)   Kowalewski was aware he was near fishing
      grounds, (Kowalewski, p. 203).

(9)   In lesser visibility, Captain Kowalewski
      could determine fishing boats by display
      of green and white lights (at night),
      (Kowalewski, p. 240-241) and "from the
      radar in some areas, I can know it is a
      fishing boat even if there is no
      visibility", (Kowalewski, p. 241, lines
      9-17).

(10)  When the NORASIA ALYA on automatic pilot
      veered into fishing grounds, the area
      dead ahead fell within its radar dead
      zone (see Exhibit C).

(11)  Kowalewski admitted he is bound by Rule
      18 testifying:

      "A.   If he knows [the ship master]
      but if it's a fishing vessel, he has
      to give way to her."
      (Deposition, p. 236)

NORASIA ALYA failed to see the AVA CLAIRE due to neglect, poor

seamanship and violation of COLREGS.[1]


## POINT III

### STEPSKI: PUNITIVE DAMAGES

The maritime law on punitive damages was reviewed by the

Supreme Court, Exxon Shipping Company, et al. v. Grant Baker, et

---

[1]    See below plaintiffs' motion for summary judgment for
further examination of COLREGS and legal analysis.

al., 128 S.Ct. 2605.  The Court affirmed that punitive damages are available under maritime law and described the required conduct and the ultimate purpose of punitive award:

> ...the consensus today is that punitives are aimed not at compensation but principally at retribution and deterring harmful conduct. ...("The purpose of punitive damages is not to compensate the plaintiff but to punish the defendant...and thereby to discourage the defendant...from acting in a similar way in the future").  The prevailing rule in American courts also limits punitive damages to cases of what the Court in *Day, supra*, at 371, spoke of as "enormity," where a defendant's conduct is "outrageous," 4 Restatement sec. 908(2), owing to "gross negligence," "willful, wanton, and reckless indifference for the rights of others," or behavior even more deplorable...

The court posed this question:

> ...whether a shipowner may be liable for punitive damages without acquiescence in the actions causing harm...

The court split evenly and made no ruling.

FACTS OF WILLFUL, WANTON, RECKLESS INDIFFERENCE:

a.  Prior to collision: in restricted visibility maintained 22.5 knots, no lookouts, improper monitoring of radar, failure to avoid recognizable fishing boat, inadequate manning of bridge, veering into known fishing grounds, no VHF call alerting other vessels, on automatic pilot without helmsman, without engines on maneuver mode, knowingly maintaining improperly mounted radar.

b.  After collision: unreasonable refusal to assist party in distress (possible hit and run), failure to make proper log

-9-

entries.

    c.   Continuing effort to conceal.

Such conduct shows complete failure of ordinary care, lack of good seamanship and multiple COLREGS violations, i.e. willful, wanton and reckless indifference.

Given this mandate to impose punitive damages as a deterrent, the only way to effect this end is to hold shipowner responsible.

In Exxon, the Supreme Court restated these established maritime principles:

    i.   If the shipowner participates or subsequently acquiesces or approves the acts, the shipowner is responsible for the punitive award.

    2.   Shipowner is responsibility for the acts of managing agents.

The question left for resolution is:

        (a) what is a managerial agent; and

        (b) is a master of a major ship a managerial agent.

Before addressing that question, exploration of acts of acquiescence, participation or approval are cited.

There is proof that the owners to foster relations with the charterer, tailored schedules which would impact on speed and navigation.

The captain testified that he maintained a constant speed, 22.5 knots as directed, for optimum performance of the engines

-10-

(i.e. less wear, fuel efficiency, cheaper fuel).

The owners, through sophisticated electronics, were always aware of ship's position, speed and ambient weather.  In ordinary marine practice, regular radio communication is maintained with owners.

The radio log has not been produced.

See, <u>Otal Investments, Ltd. v. M/V CLARY</u>, <u>supra</u>:

> "...was at best sloppy and at worst dishonest in its on-board log-keeping, but none of these violations appear causative of the collision."...
>
> Our admiralty jurisprudence is especially sensitive to the unexplained alteration of logbooks.  Where a logbook is altered, we "cannot avoid the conclusion that it had been dressed up to excuse the ship's faults." ...Such alterations should give rise to a presumption the logbook contained entries adverse to the vessel's contentions at trial. The inference "goes much further than merely to discredit the document itself; it is positive evidence upon the very issue" of liability. *Id*. "When a party is once found to be fabricating, or suppressing, documents, the natural, indeed the inevitable, conclusion is that he has something to conceal, and is conscious of guilt." ...

Such questions of fact mandate that defendants' motion be denied and the jury examine owners' direct participation.

-11-

## MARITIME LAW ON SHIPOWNER'S
## VICARIOUS LIABILITY

On the question of owner's vicarious liability, neither the Supreme Court nor the Second Circuit has ruled. There is persuasive law and logic that a shipowner is vicariously liable in punitive damages through the acts of the master.

The First Circuit, CEH, Inc. v. F/V Seafarer, 70 F.3d 694 (1st Cir. 1995), reviewed various approaches:

### C. Vicarious Liability

The district court found Doyle liable for punitive damages under the standard enunciated in Restatement (Second) of Torts, §909(c)(FN9) because Doyle delegated "nearly absolute managerial authority" to Niles. The adoption of the Restatement rule as a basis of liability is a question of first impression in this circuit, although we alluded to it in Muratore, 845 F.2d at 354-56. ...

> FN9...(c) the agent was employed in a managerial capacity and was acting in the scope of employment...

We discussed three approaches courts have taken when addressing the liability of a principal who neither authorizes nor ratifies her agent's misconduct. Under the majority approach, punitive damages are treated indistinguishably from compensatory ones, and traditional respondeat liability attaches. Id. at 354. Principals are held accountable for their agents' misdeeds that occur within the scope of employment. In contrast, a significant minority of courts follow the strict complicity rule of Lake Shore & M.S.R. Cc. v. Prentice, 147, U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97 (1893), which limits principal liability to those acts participated in, authorized or ratified. Finally, the Restatement rule incorporates the Lake Shore

-12-

limitation but extends liability, regardless of authorization or ratification, to acts committed by a managerial agent within the scope of employment. 845 F.2d at 355.

...Now, however, our determination of Doyle's liability hinges upon which standard we adopt, because although there is no evidence that Doyle authorized, ratified or participated in the wrongdoing, it is clear that Niles meets the "managerial capacity" criteria. ...

In contrast, the Ninth Circuit, in *Protectus Alpha Navigation Co. v. North Pacific Grain Growers, Inc.*, 767 F.2d 1379 (9th Cir. 1985), expressly adopted the *Restatement* rule. ...

Justifying its adoption of the *Restatement* rule, the court reasoned:

> We believe the standard of the Restatement better reflects the reality of modern corporate America. We agree that a corporation can act only through its agents and employees, and that no reasonable distinction can be made between the guilt of the employee in a managerial capacity acting within the scope of his employment and the guilt of the corporation. 22 Am. Jur.2d, Damages §261 (1965). It seems obvious that no corporate executive or director would approve the egregious acts to which punitive damages would attach, and, therefore, no recovery for more than compensatory damages could ever be had against a corporation if express authorization or ratification were always required.

> In sum, both approaches draw support from precedent. ...we do not believe the early nineteenth century decision in *The Amiable Nancy* and the late nineteenth, nonadmiralty decision in *Lake Shore* dictate the

-13-

result here. Neither considered the
more modern concerns reflected in
the contrary caselaw and, indeed,
the Court has indicated that *Lake
Shore* may have been unduly
restrictive even for its own time.
*American Society of Mechanical
Engineers, Inc.* v. *Hydrolevel Corp.*
456 U.S. 556, 575 n.14, 102 S.Ct.
1935, 1947 n.14, 72 L.Ed.2d 330
(1982) ("[T]he Court may have
departed from the trend of late 19th-
century decisions when it issued
*Lake Shore*..."). We note, moreover,
that most courts outside the
maritime context do not follow *Lake
Shore*. *Id.*; W. Page Keeton, et al.,
*Prosser and Keeton on the Law of
Torts* 13 (5th ed. 1984). This
growing body of precedent is of
significance because we discern no
reason, and defendants point to
none, why vicarious liability should
be treated differently on sea than
on land. *See* *Archer v.
Trans/American Services*, 834 F.2d
1570, 1573 (11th Cir. 1988) ("Federal
maritime law embraces the principles
of agency."). After all, *Lake Shore*
itself, though repeatedly cited by
admiralty courts, was not a maritime
case.

After giving both perspectives due
consideration, we conclude that
strict adherence to the complicity
approach would shield a principal,
who, though not guilty of direct
participation, authorization or
ratification in his agent's
egregious conduct, nevertheless
shares blame for the wrongdoing.
Therefore, we believe that some
features of the *Restatement* approach
are helpful here. In our view,
imposing vicarious liability on a
principal for the act of an agent
employed in a managerial capacity

-14-

> and acting in the scope of
> employment represents an appropriate
> evolution of the *Lake Shore* rule, at
> least when linked to requiring some
> level of culpability for the
> misconduct.
>
> Our approach today falls short of
> wholesale adoption of the
> *Restatement* because section 909(c),
> read literally, could impose
> liability in circumstances that do
> not demonstrate any fault on the
> part of the principal. Because this
> is not such a case, however, we need
> not resolve whether the
> *Restatement*'s vicarious liability
> principle would in fact reach so
> far. ...

The restrictive minority view holds owners vicariously liable, but requires some level of complicity. Aside from vagueness in defining complicity, the source cases are not persuasive.

The Amiable Nancy, 16 U.S. (3 wheat) 546 (1818), is prior to the development of punitive damage law, and it is factually unique. The SCOURGE was a private armed merchant ship licensed by the federal government to molest hostile vessels, a privateer, i.e. a licensed thug.

The SCOURGE did such licensed outrage on the AMIABLE NANCY. Justice Story noted the contradiction between punishing the SCOURGE's owner for such outrage and the government license to do that. An inference lies that Story would hold owners responsible but for protection of the privateer license.

Also always cited is Lake Shore & M.S.R. Co. v. Prentice, 147

-15-

U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97 (1893), a non-maritime case announcing a rule of general federal jurisprudence.

The Supreme Court has distanced itself from this restrictive view.  See, <u>American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.</u>, 456 U.S. 556, 575 n. 14 (1982):

> ...The Court may have departed from the trend of late 19'' century decisions when it issued *Lake Shore*..., requiring the principal's participation, approval, or ratification. ...

The Second Circuit in <u>Doralee Estates, Inc. v. Cities Service Oil Company</u>, 569 F.2d 716 (2d Cir. 1977), a non-maritime case, made observation apropos here:

> ...Appellant takes exception to Judge Owen's charge to the jury that "(y)ou may not impose punitive damages on a corporation, however, unless a reasonable management official or officials of the company, or the relevant division, either authorized, participated in, consented to, or after discovery ratified..." We assume that New York law governs the propriety of an award of punitive damages. ...

> ...we did note that "New York adheres to the 'complicity rule' holding the corporate master liable for punitive damages 'only when superior officers either order, participate in, or ratify outrageous conduct'" citing Morris, Punitive Damages in Personal Injury Cases, 21 Ohio St.L.J. 216, 221 (1960). ...

> The test of who is a "superior officer" or a "person in authority" to bind the corporate entity to participation or ratification cannot be rigid.  We have mentioned with approval an observation of Professor Morris that a crucial factor is whether "the case calls for institutional correction not likely to be forthcoming without a punitive damage award." ...To hold that punitive damages may not be

-16-

imposed unless there is participation in the
tortfeasing decision by the highest corporate
executives is unrealistic given the size of
giant corporations like appellant whose
operations are so far-flung. See <u>General
Motors Acceptance Corporation v. Froelich</u>, 106
U.S.App.D.C. 357, 359, 273 F.2d 92, 94 (1959).
[FN6]...

> FN6. In New York it has been held
> that a jury may assess punitive
> damages against a corporation even
> though the tortious act was not
> authorized or ratified by a director
> or an officer. See, e.g. <u>Gill v.
> Montgomery Ward & Co.</u>, 284 App.Div.
> 36, 40, 129 N.Y.S.2d 288 (3d Dept.
> 1954); <u>Corrigan v. Bobbs-Merrill
> Co.</u>, 228 N.Y.58, 71-72, 126 N.E. 260
> (1920); <u>Rose v. Imperial Engine Co.</u>,
> 127 App. Div. 885, 112 N.Y.S. 8 (4th
> Dept., 1908), aff'd 195 N.Y. 515, 88
> N.E. 1130 (1909). See generally,
> Prosser, Law of Torts, 11-12, 464
> (4th ed. 1971); Morris, Punitive
> Damages in Tort Cases, 44
> Harv.L.Rev. 1173, 1200-03, 1209
> (1931); ...

Since a corporation can act only through agents and no
reasonable distinction can be made between the guilt of a
managerial agent and the guilt of the corporation, the shipowner is
responsible for master's acts. <u>CEH Inc. v. F.V Seafarer</u>, <u>supra</u>.

If the master of the NORASIA ALYA is not a managing agent, who
is?

-17-

THOMAS H. HEALEY, ESQ.

## THE UNIQUE STATUS OF A VESSEL MASTER

Modern vessels are potential instruments of enormous destruction. The master has power of discretion at sea. His judgment is paramount. (If defendants deny their captain has such broad discretion, it necessarily follows that owners remain "hands-on" and are "participating.")

Upon proof of master's duty and standing, it is generally recognized that a ship master is in total command and, therefore, a managing agent.

> ...Recent changes to the SOLAS Convention clarified the captain's paramount role in vessel safety matters. The convention now directs that the "master shall not be constrained by the shipowner, charterer...from taking any decision which, in the professional judgement of the master, is necessary for safe navigation, in particular in severe weather..."

Farwell's Rules of the Nautical Road, 8ᵗʰ Edition, pgs. 181-82.

> Pressure to...maintain their schedule sometimes makes masters reluctant to come to a safe speed in poor visibility. The owners...have a responsibility to ensure they exert no such pressure on the master...

Farwell's Rules of the Nautical Road, 8ᵗʰ Edition, pg. 203.

The master, by definition, is a managing agent empowered with unfettered authority concerning handling and navigation of the owners' vessel.

Pressure from the owners to maintain schedules does not excuse non-compliance with COLREGS; quite the contrary, the owners are now directly responsible.

-18-

### POINT IV

### DEFENDANTS' BELATED COUNTER-CLAIM SEEKING "A RECOVERY ON THEIR COUNTER-CLAIM" BECAUSE OF STEPSKI'S FAILURE TO PROVIDE PROPER MEDICAL CARE.

There is no such counter-claim!  Counsel's misstatement does not create one.

There has been no discovery on the issue. Defendants' attempt now to inject the issue is highly prejudicial.

The timing and defendants' lack of legal research raises questions on good faith.  That all fishermen are Jones Act seamen is not "hornbook" law.

A person seeking maintenance and cure must meet three requirements: (a) vessel in navigation; (b) plaintiff's employment contributes to the mission; (c) the employment is substantial both in terms of duration and nature.  Chandris v. Latsis, 515 U.S. 347.

Roderick worked regularly for his father; Schober has been a shore side cook before this first voyage; employment on the AVA CLAIRE was not substantial.

Stepski is not the owner.  Niantic Fish, Ltd. owned the AVA CLAIRE.   Cure is an obligation imposed on the vessel owner.   The master or operator cannot be liable for cure.  Strom v. M/V Western Dawn, 698 F.Supp. 212.

Under Point III, defendants again exceeded the permissible limits.  Here, for the first time, they seek an order "that Stepski

-19-

is liable for contribution for judgment in excess of NORASIA ALYA's proportional fault." This is an improper and impossible argument.

Defendants' liability is joint and several. Conceding that Roderick and Schober are without fault, defendants are liable for the totality of their damages.

Any comparative fault of Stepski is a matter of proof. If, by this attempt, the court holds that they have placed the question of Stepski's fault up for decision, partial summary judgment should be entered for Stepski since defendants offer no proof of any fault on his part.

## POINT V

### KIRSTEN STEPSKI CLAIMS OF EMOTIONAL DAMAGE AND LOSS OF CONSORTIUM

Defendants concede that the emotional damage claim may go forward if there is proof of physical impact or injury.

Kirsten Stepski testified that at the time of the collision, she was pregnant, suffering from depression, was under care and medication.

That as an immediate result of the collision, her physical condition worsened.

What is hornbook law is that a defendant takes a plaintiff as she is. Kirsten was directly effected starting with call from U.S. Coast Guard, and hours of uncertainty. Then, a frantic drive to Cape Cod Coast Guard. Much could have been avoided had NORASIA

-20-

ALYA aided the AVA CLAIRE.

## **LOSS OF CONSORTIUM**

Under maritime law, the injured spouse was entitled to a separate claim for loss of consortium.

American Export Lines v. Alvez, 446 U.S. 274 (1980).

Then came Miles v. Apex Marine Corp., 498 U.S. 19 (1990), creating confusion whether any non-pecuniary damages are available in maritime law.

> ...The force of *Miles* in eliminating loss of society damages is weakened...[since] both *Gaudet* and *Alvez* were reserved ...

> Thus, loss of society or consortium damages are recoverable...under the general maritime law absent some statutory restriction. ...*Miles,* far from creating uniformity, throws the question...into a state of confusion. ...

Admiralty & Maritime Law, Second Edition, Schoenbaum, §5-16.

Confusion reigns.

In Yamaha Motor Corp. v. Calhoun, 516 U.S. 119, the Supreme court affirmed that general maritime law allows loss of consortium, but no general rule was formulated.   Determination is made on a case to case basis, (e.g. Jones Act seamen or harbor workers, suits against non-employers, physical situs, availability of state law, etc.).

Professor Schoenbaum suggests "there are persuasive reasons for adopting a bright line rule that consortium damages are not available under maritime law." He suggests there is "no principled

-21-

way to give non-pecuniary damages to some, not others." To the contrary, <u>Miles v. Apex</u>, supra, found such a principle of denial. Consortium remains viable unless directly clashing with Congressional intent.

Loss of consortium remains valid in maritime law.

<u>Miles</u> was limited to actions brought under statutorily created rights.

Uniformity does not dictate one remedy, rather parties of similar status have uniform remedies.

In this circuit, there are two contrasting views on non-pecuniary damages. <u>Friedman v. Cunard Line, Ltd.</u>, 996 F.Supp. 303 (S.D.N.Y. 1998), which denied non-pecuniary damages relying on "unformity." <u>In Re Horizon</u>, 101 F.Supp.2d 241, which allowed non-pecuniary damages noting that <u>Yamaha Motor Corp. v. Calhoun</u>, supra, found that "uniformity" does not sweep away traditional maritime doctrines.

In <u>Yamaha</u>, the court noted, with approval, its earlier comment that "it better becomes the humane and liberal character...of admiralty to give than withhold remedies..."

### POINT VI

### PLAINTIFFS' MOTION

### Fed.R.Civ.P. RULE 56: GENERAL PROCEDURES RE: SUMMARY JUDGMENT

(d)...the court at the hearing of the motion,

-22-

> by examining the pleadings and the evidence
> before it and by interrogating counsel, shall
> if practicable ascertain what material facts
> exist without substantial controversy and what
> material facts are actually and in good faith
> controverted.    It shall  thereupon  make  an
> order specifying the facts that appear without
> substantial  controversy...and  directing  such
> further proceedings in the action as are just.
> ...

The court may grant summary judgment for a non-moving party where facts and applicable law so warrant.   In Re Continental Airlines, 981 F.2d 1450 (5th Cir. 1993).

The court can grant summary judgment to the non-moving party, even sua sponte.

The Second Circuit held that in determining a summary judgment motion, the court should cut through outworn procedural niceties and render a decision, if proper, against the original movant. Local 33, Int. Hod. Carriers, et al. v. Mason Tenders, 291 F.2d 496 (2 Cir. 1961).


### COLREGS RULE 5: LOOKOUT

From  earliest  times,  maritime  courts  have  affirmed  the paramount importance of lookout.   The Supreme Court said in The Adriadne, 80 U.S. (13 Wall.) 475, 20 L.Ed. 542 (1871), that:

> ...The duty of the lookout is of the highest
> importance.
>
> Upon nothing else does the safety of those
> concerned   so   much   depend.    A   moment's
> negligence on his part may involve the loss of
> his vessel with all the property and the lives

-23-

of all on board.  The same consequence may
ensue to the vessel with which he shall
collide.  In the performance of this duty the
law requires indefatigable care and sleepless
vigilance. ...

See, <u>Elenson v. S/S FORTALEZA</u>, 1992 AMC 1447, (S.D.N.Y. Sweet,

J.):

...In <u>In re Complaint of Interstate Towing
Co.</u>, 1983 AMC 2971, 717 F.2d 752 (2 Cir.
1983), the Second Circuit held that the
failure of a nineteen-foot pleasure craft to
maintain a proper lookout contributed to her
collision with a barge under tow.  See <u>id.</u>
1983 AMC at 2975, 717 F.2d at 755.  In so
holding, the court stated:

"It is axiomatic that 'an
inefficient lookout is equivalent to
none'...A proper lookout is one that
is vigilantly maintained by a
competent person of suitable
experience...The need for competent
vigilance has prompted repeated
holdings that a lookout's sole duty
should be that with which he is
charged and that one who is assigned
the duties of helmsman is not a
proper person to act as a lookout."
<u>Id.</u> (citations omitted).

See also <u>Complaint of Flota Mercante
Grancolombiana, S.A.</u>, 1979 AMC 156, 171, 440
F.Supp. 704, 715 (SDNY 1977) (lookouts must
have no other duties to perform). ...<u>Farwell's
Rules of the Nautical Road</u> 360 (6th ed. 1982).

Courts have found that violation of the
lookout rule set forth in Rule 5 is serious
and results in the offending vessel being held
wholly or partially at fault.  See, e.g., <u>In
re Complaint of Pacific Bulk Carriers, Inc.</u>,
1980 AMC 2530, 2534-35, 639 F.2d 72, 75 (2
Cir. 1980) (vessel which failed, among other
things, to post a lookout held 100% at fault
in a collision);  <u>Flota Mercante</u>

-24-

Grancolombiana, supra, 1979 AMC at 171-72, 188, 440 F.Supp. at 715-16, 726...

Farwell's Rules of the Nautical Road offers a realistic view of the absolute necessity for an ever vigilant lookout:

### Enhanced Lookout in Fog

The required degree of lookout vigilance is vastly increased when under way in fog...The absence or insufficiency of a lookout...can never be justified by the plea that visibility was so restricted that a lookout would have been useless.  A circuit court of appeals said, "The denser the fog and the worse the weather [the] greater [the] cause for vigilance...

As another court put it, lookouts must be stationed "to see if they can see." ...

Farwell's Rules of the Nautical Road, 8[ta] Edition, pgs. 148-149, citing The Sagamore, 247 F.743 (1 Cir. 1917).

### COLREGS RULE 6: SAFE SPEED

Elenson v. Fortaleza, supra, discussing safe speed:

Rule 6, in its applicable parts, states:

"Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions. ...

In Amoco Transport Co. v. S/S Mason Lykes, 1983 AMC 1087, 650 F.Supp. 1264 (S.D. Tex. 1982), rev'd on other grounds, 1986 AMC 563, 768 F.2d 659 (5 Cir. 1985), the court held fourteen knots to be excessive speed under conditions almost identical to the prevailing

-25-

conditions on the fateful morning here.   The
court wrote that the

> "actions of the *Mason Lykes* crew
> were 'unbelievably stupid,' as
> plaintiffs' expert, Captain Richard
> Patterson, testified.   Due to lack
> of visibility, both the speed and
> direction of the *Mason Lykes* were
> the result of negligent navigation
> of *Mason Lykes* crewmen.   The court
> finds that the vessel was traveling
> too fast....

See also, *The Umbria*, 166 U.S. 404, 407-09
(1897) (speed of 16-18 knots excessive within
12 miles of heavily frequented harbor and in
variable fog); *The Martello,* 153 U.S. 64, 70
(1894) (speed of six miles per hour excessive
in "neighborhood where [ship] is likely to meet
vessels approaching the harbor from at least a
dozen points of the compass.   Under such
circumstances, and in such a fog that vessels
could not be seen more than a quarter of a
mile away, it is not unreasonable to require
that she reduce her speed to the lowest point
consistent with a good steerage way. ...")
*Skibs A/S Siljestad v. S/S Mathew Luckenbach,*
1963 AMC 2280, 2296-97, 215 F.Supp. 667, 679
(SDNY 1963), aff'd, 1964 AMC 1, 324 F.2d 563
(2 Cir. 1963).

By its failure to maintain an appropriate
speed, the *Fortaleza* also disregarded the
requirements of Rule 19.   Rule 19 applies to
"vessels not in sight of one another when
navigating in or near an area of restricted
visibility"...The rule provides in relevant
part that

> "(b) ...A power-driven vessel shall
> have her engines ready for immediate
> manoeuvre...

## COLREGS RULE 7(A) AND (B)
## PROPER USE OF RADAR

See, <u>Elenson v. S/S FORTALEZA</u>, <u>supra</u>.:

> ...Rule 7's provision that the vessel properly make "equivalent [to long-range scanning and radar plotting] systematic observation of detected objects." Rule 7(b), 33 U.S.C. foll. §1602.

> The Fourth Circuit has addressed the question of what constitutes the required "equivalent systematic observation" under Rule 7(b):

> > "Even continuous observation by a competent person is unlikely to be accepted as proper use of radar to obtain early warning of risk of collision if the bearings and distances of approaching vessels are not taken at regular intervals and carefully evaluated by *plotting* or by some *equivalent* method." *Hellenic Lines, Ltd. v. Prudential Lines, Inc.*, 1984 AMC 2713, 2718, 730 F.2d 159, 163 (4 Cir. 1984) (quoting A. Cockcroft & J. Lameijer, *A Guide to the Collision Avoidance Rules* 58 (2d ed. 1976) (emphasis added)). ...

(Also note that when the NORASIA ALYA altered course, she placed the AVA CLAIRE in the radar dead zone making any observation impossible.)

THEREFORE, by directive of Rule 56(d), the Court, by order, shall set forth those material facts upon which there is no substantial controversy:

-27-

COLREGS 5: LOOKOUT:

(a) There was no competent individual assigned the sole task of standing lookout. Given the multi-tasking of bridge officer and improper placement, as a matter of law, the officer on the bridge is not a lookout.

(b) COLREGS 5 was not complied with.

COLREGS 6: SAFE SPEED:

(a) Between 11:00 and 1400, the NORASIA ALYA was proceeding in restricted visibility. She was on auto pilot, her engines were not on maneuver mode, no helmsman was posted, there were no lookouts. Her speed was 22.5 knots.

(b) COLREGS 6 was not complied with.

COLREGS 7(A) AND (B) RISK OF COLLISION:

(a) The NORASIA ALYA's radar transmission was blocked by forward deck and deck containers creating a "dead zone" within which the radar was not effective.

(b) From 11:00 to 1400, no crew member of NORASIA ALYA was assigned exclusively to monitor the radar. Targets were not evaluated by plotting.

In addition, the court may consider whether the proof now establishes that the NORASIA ALYA was the colliding vessel.

Plaintiffs submit that these determinations do not warrant entry of liability judgment for plaintiffs. The question of causation remains open for jury determination.

-28-

## POINT VII

### PLAINTIFFS MOVE TO AMEND THE CAPTION TO ADD NIANTIC FISH, LTD. AS AN ADDITIONAL PLAINTIFF.

### FED.R.CIV.P. RULE 15

Niantic Fish, Ltd. is a corporation under which Michael Stepski operated his fishing business.

The complete records of Niantic/Stepski enterprise were produced and the operation explored by defendants' counsel during examination before trials of Michael and Kirsten Stepski.

The proposed amendment raises no new issue or surprise and involves no prejudice having full discovery.

### FED.R.CIV.P. RULE 19

### Rule 19.   Joinder of Persons Needed for Just Adjudication.

A person shall be joined if "(a)...(1)"in the person's absence complete relief cannot be accorded..."

Foman v. Davis, 371 U.S. 178 (1962), the Court said, "Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires', this mandate is to be heeded."

-29-

## **CONCLUSION**

Defendants' motion for summary judgment should be denied in its entirety.

Plaintiffs' motion to strike improper affidavits and exhibits should be granted and plaintiffs awarded costs and attorneys' fees.

Plaintiffs' motion for partial summary judgment for an order determining those material facts upon which there is no reasonable dispute be granted.

Plaintiffs' motion to amend the complaint to add Niantic Fish, Ltd. as party plaintiff be granted.

DATED: NEW YORK, NEW YORK
        February 17, 2009

                              Yours, etc.

                              THOMAS H. HEALEY, ESQ.
                              Attorney for Plaintiffs


                        BY:

                              Thomas H. Healey (THH-3093)
                              17 Battery Place   Suite 605
                              New York, New York 10004
                              (212)943-3520

TO:   BLANK ROME LLP
      Attorney for Defendants
      405 Lexington Avenue
      New York, New York 10174

      FREEHILL, HOGAN & MAHAR
      80 Pine Street
      New York, New York 10005

## RIDER

### UNTRUSTWORTHINIESS OF
### "KOWALEWSKI DECLARATION"

The Declaration is not sworn to or notarized evidently invoking U.S. Code, Title 28 Chapter 115, Sec. 1746.

The evidentiary requirements of Rule 56 of Fed.R.Civ.P and the Federal Rules of Evidence control content of declaration. Rule 56(3) requires, "affidavits shall be made on personal knowledge...set forth...facts...admissible in evidence and show affirmatively that...affiant is competent to testify..."

This declaration must be carefully examined since it is not tested by cross-examination.

Long v. Bureau of Econ. Anal, 646 F.2d 1310 (9th Cir. 1981) vacated on other grounds 454 U.S. 934.

Even if allowable, the contents of the affidavit and any attached exhibits must pass normal scrutiny of admissibility.

Miller v. Solem, 728 F.2d 1020 (8th Cir.) cert. den'd 469 U.S. 841.

### NON-PROBATIVE NATURE OF DECLARATION

The only area of relevance for Kowalewski on Rules 18-19 is to prove that the AVA CLAIRE could not be seen.

The point is avoided. Vague references to radar potential is irrelevant especially in view of proof it was not used properly.

On punitive damages, Kowalweski does not deny the multiple

COLREGS violations, but seeks to give himself absolution.

* * * * * * * * * *

The exhibits show a lack of candor.

The charterer's two radio messages, fairly read confirm:

(1) There was no firm date for Coast Guard inspection;

(2) The captain can proceed as he chooses;

(3) The weather conditions, assumedly fog, are known and U.S. Coast Guard, anticipating proper navigation, expects delay.

Whoever, later, penned in "speed request from N.Y. agent" does violence to the truth.

Producing these messages now after failing to produce NORASIA ALYA's radio logs further weakens credibility.

No reference to icebergs (off Long Island on 22 May) is in the log.

Exhibit 3 is dated May 21st; the collision was May 22nd.

Exhibit 6, Master's Standing Order, is dated "at sea 30 June '04." The only probative value is that no such order was in effect on May 22, 2004.

This declaration shows contrivance, fabrication and untrustworthiness.

THOMAS H. HEALEY, ESQ.